UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-20215-CIV-HUCK/O'SULLIVAN

| | |
|---|---|
| IN RE SANTANDER-OPTIMAL SECURITIES LITIGATION | **CONSOLIDATED AMENDED CLASS ACTION COMPLAINT** |
| | **JURY TRIAL DEMANDED** |
| _____/ | |

**ACKERMAN, LINK & SATORY, P.A.**
2525 Ponce de León Boulevard, Suite 700
Coral Gables, Florida  33134
Tel: (305) 529-9100
Fax: (305) 529-1612

**LABATON SUCHAROW LLP**
140 Broadway
New York, New York 10005
Tel: (212) 907-0700
Fax: (212) 818-0477

**COUGHLIN STOIA GELLER
RUDMAN & ROBBINS LLP**
120 E. Palmetto Park Road, Suite 500
Boca Raton, Florida 33432-4809
Tel: (561) 750-3000
Fax: (561) 750-3364

## TABLE OF CONTENTS

**Page**

I.     NATURE OF THE ACTION ........................................................... 1

II.    THE PARTIES.................................................................................. 12

      A.     PLAINTIFFS ......................................................................... 12

      B.     DEFENDANTS ...................................................................... 15

III.   RELEVANT NON-PARTIES ......................................................... 20

IV.    BACKGROUND FACTS ................................................................ 21

      A.     MADOFF'S PONZI SCHEME ............................................... 21

      B.     MADOFF'S ARREST AND GUILTY PLEA ....................... 22

V.     SUBSTANTIVE ALLEGATIONS CONCERNING THE SANTANDER DEFENDANTS ........................................................ 23

      A.     IN 2002, SANTANDER AND OIS IDENTIFIED MADOFF'S SUBSTANTIAL COUNTERPARTY AND CUSTODIAL RISK...................... 23

            1.     The First Courvoisier Memorandum ......................... 23

            2.     The Second Courvoisier Memorandum ...................... 26

      B.     OIS VIOLATED ITS OWN INTERNAL DUE DILIGENCE PROCEDURES, AMONG OTHER THINGS, BY FAILING TO CONTACT MADOFF'S COUNTERPARTIES ........................... 32

            1.     The OIS 2005 Due Diligence Questionnaire ............. 32

            2.     The OIS 2008 Due Diligence Questionnaire ............. 34

            3.     OIS's Quantitative Analytics Tools Raised Red Flags ............................. 40

            4.     A January 2008 Internal Presentation By OIS To Santander Asset Management Highlighted The Profitability Of Optimal SUS To Santander.................... 42

            5.     Santander Documents Show That In Other Contexts Santander And OIS Knew How To Take Adequate Precautions With Respect To Custodial And Counterparty Risk ....................... 44

                (a)     The 2002 Custodian And Administration Agreement .................. 44

(b)      The Currency Overlay Agreement ................................................. 45

C.      CONDUCT BY THE SANTANDER GROUP IN 2008 INDICATES GROWING CONCERNS ABOUT MADOFF ..................................................... 47

1.      Santander Miami And Santander Bahamas Asked Investors In Optimal SUS To Sign Waivers Purporting To Ratify Madoff As The Sole Manager ..................................................................................... 47

2.      Echeverria Left OIS In June 2008 And Santander Sent A Director To Meet With Madoff On Thanksgiving Day 2008 ................................. 49

D.      SANTANDER AND ITS AFFILIATES WERE DEEPLY INVOLVED IN OIS AND PROFITED IN THE FORM OF COMMISSIONS ........................... 51

1.      Santander And It Affiliates Oversaw Risk Management At OIS ............ 51

2.      Santander Miami Profited From The Sale Of The Optimal Funds .......... 52

E.      THE SANTANDER DEFENDANTS SETTLED THE CLAW BACK SUIT FILED BY THE SIPC TRUSTEE PREMATURELY TO PREVENT THE RELEASE OF INCRIMINATING INFORMATION ............. 52

F.      THE FAILURE OF INDER RIEDEN AND WILKINSON TO EVER COMMUNICATE WITH MADOFF OR BMIS WAS WRONGFUL ............... 56

G.      THE SANTANDER DEFENDANTS SOLD THE OPTIMAL FUNDS PURSUANT TO THE EXPLANATORY MEMORANDA ............................... 57

1.      The July 2001 Explanatory Memorandum ................................................. 57

2.      The May 2002 Explanatory Memorandum ................................................. 61

3.      The June 2004 Explanatory Memorandum ................................................. 61

4.      The October 2006 Explanatory Memorandum ......................................... 67

5.      The January 2008 Explanatory Memorandum ........................................... 68

6.      The October 2008 Explanatory Memorandum ......................................... 69

VI.      SUBSTANTIVE ALLEGATIONS CONCERNING THE PwC DEFENDANTS .......... 71

A.      PwC OPERATED AS A UNITARY INTERNATIONAL PROFESSIONAL ORGANIZATION .................................................................. 71

B.      PWC IRELAND ISSUED UNQUALIFIED (CLEAN) AUDIT OPINIONS .......................................................................................................... 74

C.     THE 2007 FINANCIAL STATEMENTS ........................................................ 75

    1.    The Schedule of Investments, Net Assets, Income Statement, and Statement of Cash Flows ........................................................ 75

    2.    The Notes To The 2007 Financial Statements ........................................ 77

D.     PwC IRELAND'S AUDIT FAILED TO CONFORM TO INTERNATIONAL STANDARDS ON AUDITING ........................................ 80

    1.    PwC Ireland's Audit Violated ISA ........................................ 80

        (a)    Overall Accounting Framework Under The ISAs ........................ 81

        (b)    PwC Ireland's Audit Not Only Failed To Apply ISA General Principles, But Also Failed To Apply Specific Procedures ........................................................ 83

    2.    The PwC U.S. Practice Guide Concerning Audits Of Hedge Funds, Such As The Feeder Funds, Highlighted The Importance Of Confirming That The Assets Listed On The Optimal SUS Financial Statements Existed, Which PwC Failed To Do ........................ 87

E.     INTERNAL PwC DOCUMENTS SHOW THAT PwC's AUDIT VIOLATED ISA ........................................................ 89

F.     PwC IRELAND, PwC U.S., AND PwC BERMUDA SHARED INFORMATION BETWEEN AND AMONG THEMSELVES REGARDING MADOFF THAT AFFECTED THE AUDITS OF THE OPTIMAL FUNDS ........................................................ 96

VII.    SUBSTANTIVE ALLEGATIONS CONCERNING THE HSBC DEFENDANTS ........ 98

A.     HSBC SERVICES VIOLATED ITS OBLIGATIONS AS ADMINISTRATOR TO PLAINTIFFS AND THE CLASS ................................ 98

    1.    HSBC Services' Obligations To Verify Pricing Information .................. 98

    2.    HSBC Services Received Trade Confirmations From Madoff That Were Outside The Trading Range For The Period Reported ................. 100

B.     HSBC TRUST VIOLATED ITS OBLIGATIONS AS CUSTODIAN TO PLAINTIFFS AND THE CLASS .................................................... 102

VIII.   SUBSTANTIVE ALLEGATIONS CONCERNING OBVIOUS RED FLAGS THAT ALL DEFENDANTS IGNORED .................................................... 103

A.     RED FLAGS ........................................................ 103

1. Madoff's Custody of Equity Securities...................................................103

2. Madoff's Non-Existent Counterparties.................................................104

3. Defendants Failed To Confirm The Existence Of Government Securities At The End Of Each Year ........................................104

4. Madoff's Unknown Auditing Firm........................................................104

5. Madoff's Secretive Operation...............................................................105

6. Madoff's Paper Trading Records...........................................................105

7. Madoff's Consistent Returns ................................................................105

8. Madoff's Fee Structure ........................................................................106

B. OTHER FINANCIAL INSTITUTIONS DID NOT IGNORE THE RED FLAGS AND REFUSED TO DEAL WITH MADOFF ...................................107

IX. JURISDICTION AND VENUE ........................................................................108

A. THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EDGE ACT........................................................................109

B. THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EXCHANGE ACT ................................................................110

1. Defendants Purposefully Availed Themselves Of The Benefits Of Having Plaintiffs And The Class Invest 100% Of Optimal SUS In The United States; It Was Foreseeable That Defendants Would Be Haled Into Court In The United States ...................................110

2. The Conduct And Effects Tests Are Both Met......................................112

(a) Defendants' Conduct In The United States Was "More Than Merely Preparatory," And The "Culpable Failures To Act Within The United States Directly Caused The Losses" .....112

(b) Effects Test: Defendants' Conduct Had A Substantial Effect In The United States.......................................................125

C. INDER RIEDEN HAS HAD CONTINUOUS AND SYSTEMATIC CONTACTS WITH FLORIDA SINCE 1979 ...................................128

1. Inder Rieden Owns Property In Florida Through Buttswell Corporation ...........................................................................129

2.     Inder Rieden Owned A Broker-Dealer In Florida Until The Broker-Dealer Was Caught Funneling Monies To A Company Controlled By Inder Rieden In The Bahamas .......................................... 130

D.     THE COURT HAS PERSONAL JURISDICTION OVER PwC IRELAND BECAUSE PwC U.S. AND PwC BERMUDA ACTED AS PwC IRELAND'S AGENTS FOR PURPOSES OF JURISDICTION PURSUANT TO NEW YORK'S LONG ARM STATUTE .............................. 132

E.     THE COURT HAS SUBJECT MATTER JURISDICTION AND PERSONAL JURISDICTION (UNDER NEW YORK LAW) OVER ECHEVERRIA, INDER RIEDEN, AND WILKINSON, BECAUSE BMIS ACTED AS AGENT AND ATTORNEY-IN-FACT OF OPTIMAL SUS IN NEW YORK .......................................................................................... 132

F.     THE COURT HAS PERSONAL JURISDICTION UNDER NEW YORK LAW OVER THE HSBC DEFENDANTS ........................................................ 133

CLASS ACTION ALLEGATIONS ................................................................................ 134

COUNT 1 BREACH OF FIDUCIARY DUTY PURSUANT TO FLORIDA COMMON LAW AGAINST THE SANTANDER DEFENDANTS ................................................ 137

COUNT 2 GROSS NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST THE SANTANDER DEFENDANTS .......................................................... 142

COUNT 3 NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST THE SANTANDER DEFENDANTS ............................................................ 145

COUNT 4 UNJUST ENRICHMENT PURSUANT TO FLORIDA COMMON LAW AGAINST THE SANTANDER DEFENDANTS .......................................................... 148

COUNT 5 IMPOSITION OF CONSTRUCTIVE TRUST PURSUANT TO FLORIDA COMMON LAW AGAINST THE SANTANDER DEFENDANTS ........................... 151

COUNT 6 BREACH OF CONTRACT PURSUANT TO FLORIDA COMMON LAW AGAINST OIS AND THE DIRECTOR DEFENDANTS ............................................ 152

COUNT 7 BREACH OF FIDUCIARY DUTY PURSUANT TO NEW YORK LAW AGAINST WILKINSON ............................................................................................. 153

COUNT 8 GROSS NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST WILKINSON ............................................................................................. 156

COUNT 9 NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST WILKINSON ............................................................................................................... 159

COUNT 10 UNJUST ENRICHMENT PURSUANT TO NEW YORK COMMON LAW AGAINST WILKINSON ............................................................................... 161

COUNT 11 IMPOSITION OF CONSTRUCTIVE TRUST PURSUANT TO NEW YORK COMMON LAW AGAINST WILKINSON ........................................................ 163

COUNT 12 BREACH OF CONTRACT PURSUANT TO NEW YORK COMMON LAW AGAINST WILKINSON .................................................................................... 164

COUNT 13 THIRD PARTY BENEFICIARY CLAIM PURSUANT TO FLORIDA COMMON LAW FOR BREACH OF CONTRACT AGAINST OIS ........................... 165

COUNT 14 CONVERSION  IN CONNECTION WITH THE SIPC TRUSTEE-OPTIMAL AGREEMENT PURSUANT TO FLORIDA COMMON LAW AGAINST SANTANDER, OIS, AND THE DIRECTOR DEFENDANTS................. 166

COUNT 15 BREACH OF FIDUCIARY DUTY IN CONNECTION WITH THE SIPC TRUSTEE-OPTIMAL AGREEMENT PURSUANT TO FLORIDA COMMON LAW AGAINST SANTANDER, OIS, AND THE DIRECTOR DEFENDANTS........ 168

COUNT 16 GROSS NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA ................................. 170

COUNT 17 NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA.................................................... 172

COUNT 18 GROSS NEGLIGENCE AND NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST PwC INTERNATIONAL ................................................. 174

COUNT 19 UNJUST ENRICHMENT PURSUANT TO FLORIDA COMMON LAW AGAINST PwC IRELAND.................................................................................... 176

COUNT 20 GROSS NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA ................................. 177

COUNT 21 NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA ................................. 179

COUNT 22 GROSS NEGLIGENCE AND NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST PwC INTERNATIONAL................................... 181

COUNT 23 UNJUST ENRICHMENT PURSUANT TO NEW YORK COMMON LAW AGAINST PwC IRELAND.................................................................................... 183

COUNT 24 BREACH OF FIDUCIARY DUTY PURSUANT TO NEW YORK COMMON LAW AGAINST HSBC SERVICES ......................................................... 184

COUNT 25 GROSS NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC SERVICES.......................................................................... 186

COUNT 26 NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC SERVICES.......................................................................... 187

COUNT 27 UNJUST ENRICHMENT PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC SERVICES.......................................................................... 188

COUNT 28 BREACH OF FIDUCIARY DUTY PURSUANT TO NEW YORK
    COMMON LAW AGAINST HSBC TRUST .................................................. 190

COUNT 29 GROSS NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC TRUST................................................................................ 191

COUNT 30 NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC TRUST................................................................................ 192

COUNT 31 UNJUST ENRICHMENT PURSUANT TO NEW YORK COMMON LAW
    AGAINST HSBC TRUST................................................................................ 194

COUNT 32 FOR VIOLATIONS OF RULE 10b-5(b)  AND SECTION 10(b) OF THE
    EXCHANGE ACT AGAINST OIS AND THE DIRECTOR DEFENDANTS............. 195

COUNT 33 FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
    AGAINST SANTANDER AND ECHEVERRIA.......................................... 202

COUNT 34 FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE
    EXCHANGE ACT AGAINST PwC IRELAND........................................... 203

COUNT 35 FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
    AGAINST PwC INTERNATIONAL.............................................................. 206

COUNT 36 FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE
    EXCHANGE ACT AGAINST HSBC SERVICES....................................... 207

COUNT 37 FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE
    EXCHANGE ACT AGAINST HSBC TRUST............................................. 209

PRAYER FOR RELIEF ...................................................................................... 211

CERTIFICATE OF SERVICE .............................................................................. 214

# GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
| --- | --- |
| 2005 DDQ | 2005 Due Diligence Questionnaire |
| 2007 Financial Statements | Financial Statements for the Year Ending, Optimal SUS, December 31, 2007 |
| 2007 FS | Financial Statements for the Year Ending, Optimal SUS, December 31, 2007 |
| 2008 DDQ | 2008 Due Diligence Questionnaire |
| Acorn | Acorn Partners |
| Administrator | Defendant HSBC Securities Services (Ireland) Limited |
| ADRs | American Depositary Receipts trading on the New York Stock Exchange |
| AICPA | American Institute of Certified Public Accountants |
| Aksia | Aksia LLC |
| Antiques | Antique Holdings, Inc. |
| Atkins | Hugh Burnaby Atkins |
| Bermuda Trust | Bermuda Trust (Dublin) Limited |
| BMIS | Bernard L. Madoff Investment Securities LLC |
| BONY | Bank of New York |
| Botín | Emilio Botín |
| Brown | Scott-Watson Brown |
| BSCH International | Santander Central Hispano International, the predecessor entity to Santander Miami |
| Buttswell | Buttswell Corporation |
| Buttswell N.V. | Buttswell Corporation N.V. |

CA .................................................. Custodian Agreement Dated November 28, 2002 between Bermuda Trust, Optimal SUS, Optimal Arbitrage and Certain Other Optimal Funds

CAFA .............................................. Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2)

CBOE .............................................. The Chicago Board Options Exchange

Charul .............................................. Marcelo Charul

Clark ................................................ Jonathan Clark

Class Period ...................................... January 27, 2004 to December 10, 2008

Claw Back Lawsuits ......................... Lawsuits the SIPC Trustee has Filed Against Feeder Funds for Refusing to Return Monies Withdrawn from BMIS

COA ................................................. Currency Overlay Agreement

Commercial ....................................... Commercial Property Investors (Palm Bay) Inc.

Courvoisier Memoranda ................... Internal memoranda written by OIS's in-house counsel, Karine Courvoisier

Currency Overlay Agreement ........... Currency Overlay Agreement between Optimal Multiadvisors and Overlay Asset Management

Custodian Agreement ...................... Custodian Agreement Dated November 28, 2002 between Bermuda Trust, Optimal SUS, Optimal Arbitrage and Certain Other Optimal Funds

Davies .............................................. Dawn E. Davies

Diez .................................................. Fernando Diez

DiPascali .......................................... Frank DiPascali, Jr.

Director Defendants .......................... Defendants Manuel Echeverría Falla, Anthony L.M. Inder Rieden and Brian Wilkinson

DTC ................................................. The Depository Trust & Clearing Corporation

Echeverría ........................................ Defendant Manuel Echeverría Falla

EM .................................................. Explanatory Memorandum

Euro Dutch .......................................... Euro-Dutch Management Ltd.

Exchange Act ..................................... The Securities Exchange Act of 1934

F&H ................................................. Friehling & Horowitz

Fairfield Greenwich ........................... Fairfield Greenwich Advisors, LLC

FCM ................................................. First Courvoisier Memorandum, Prepared by Karine Courvoisier to Echeverría re Legal Risks for the Group

First Courvoisier Memorandum ......... Memorandum Prepared by Karine Courvoisier to Echeverría re Legal Risks for the Group

FOFIX-Madoff Results ...................... Riskdata Analysis of Madoff's Supposed Split Strike Conversion Strategy Using FOFIX Published February 9, 2009

Fortis Bahamas .................................. Fortis Fund Services (Bahamas) Limited

Gauvain ............................................. Toby Gauvain

GSCC ................................................ Government Securities Clearing Corporation

HSBC ................................................ Defendant HSBC Securities Services (Ireland) Limited

HSBC Trust ....................................... HSBC Institutional Trust Services (Ireland)

IAASB .............................................. International Auditing and Assurances Standards Board

IAPS ................................................. International Auditing Practice Statements

Inder Rieden ..................................... Defendant Anthony L.M. Inder Rieden

Intercoastal ....................................... Intercoastal Financial Services Corp.

Intercontinental ................................. Intercontinental Estates, Inc.

International Harvester ...................... International Harvester Limited

Investment Advisory .......................... The Investment Advisory Business Unit of Bernard L. Madoff Investment Securities

ISA ................................................... International Standards on Auditing

January 2008 Presentation ................ Detailed presentation about Optimal SUS made by OIS in January 2008

Jones................................................... Terrence Owen Jones

July 2001 EM..................................... Explanatory Memorandum Dated July 2001

Lileng ................................................. Tom Lileng

López ................................................. Alfredo López

Madoff ............................................... Bernard L. Madoff

Mar Octava ....................................... Inversiones Mar Octava Limitada

May 2002 EM ................................... Explanatory Memorandum Dated May 2002

McGowan........................................... Linda McGowan

Mikdashi ........................................... Louay Mikdashi

Mr. Picard ......................................... Irving H. Picard

NASD................................................. National Association of Securities Dealers, Inc.

Notz Stucki ....................................... Notz Stucki & Cie

OIM................................................... Optimal Investment Management Ltd.

OIS ................................................... Optimal Investment Services, S.A.

Optimal Arbitrage ............................. Optimal Arbitrage Ltd.

Optimal Arbitrage (Ireland) ............... Optimal Arbitrage Ireland US Dollar Fund and Optimal Arbitrage Ireland Euro Fund

Optimal Funds................................... Optimal Strategic U.S. Equity Ltd. and Optimal Arbitrage Ltd.

Optimal Multiadvisors ...................... Optimal Multiadvisors Ltd.

Optimal Multiadvisors Ireland.......... Optimal Multiadvisors Ireland Public Limited Company

Optimal SUS ..................................... Optimal Strategic U.S. Equity Ltd.

Optimal SUS 3Q'08 Report................ OIS Report for Optimal SUS for the quarter ending September 30, 2008

Optimal SUS Ireland......................... Optimal Strategic US Equity Ireland US Dollar Fund and Optimal Strategic US Equity Ireland Euro Fund

Optimal SUS October
2008 Presentation............................... October 2008 Optimal SUS presentation entitled, "Optimal Investment Services: Optimal Strategic US Equity"

Overlay Management......................... Overlay Asset Management S.A.

Participating Shares ........................... Non-voting participating shares offered by Optimal Multiadvisors in Optimal Strategic US Equity Ltd. and Optimal Arbitrage Ltd.

Plaintiff Puado ................................... Plaintiff, Antonio Atencia Puado

Plaintiff Testa.................................... Plaintiff, Marcelo Guillermo Testa

Prince ................................................. Gilles Prince

PwC Bermuda .................................... Defendant PricewaterhouseCoopers Bermuda

PwC Defendants ................................ Defendants PwC Bermuda, PwC U.S., and PwC International

PwC Guide.......................................... April 2007 PwC Audit Guide Entitled "Auditing Alternative Investments - A Practical Guide for Investor Entities, Investee Fund Managers and Auditors"

PwC International ............................... Defendant PricewaterhouseCoopers International Ltd.

PwC Ireland ....................................... Defendant PricewaterhouseCoopers (Dublin)

PwC Madoff Report........................... Report of PwC Meeting with Madoff in December 2004

PwC Netherlands Letter..................... Letter from PwC Rotterdam (Netherlands) Recounting Audit Procedures Conducted on Madoff in December 2004

PwC U.S.............................................. Defendant PricewaterhouseCoopers LLP

S&P 100.............................................. The Standard & Poor's 100

Sacerdote............................................ Diego Sacerdote

SAM ................................................... Santander Asset Management

San Javier International ..................... San Javier International Limited

Santander .......................................... Banco Santander, S.A.

Santander Bahamas ............................ Santander Bank & Trust Ltd.

Santander Defendants ........................ Defendants Banco Santander S.A., Banco Santander Miami, Optimal Investment Services S.A., Manuel Echeverría Falla, Anthony L.M. Inder Rieden and Brian Wilkinson

Santander Miami ................................ Banco Santander International

Santander Switzerland ....................... Banco Santander (Suisse) S.A.

SCH ................................................... Santander Central Hispano, the predecessor entity to the Santander Group

SCM .................................................. Second Courvoisier Memorandum, Memorandum from Karine Courvoisier to Echeverría re Meeting with Madoff September 18-19, 2002

SEC ................................................... Securities and Exchange Commission

Second Courvoisier Memorandum .... Memorandum from Karine Courvoisier to Echeverría re Meeting with Madoff September 18-19, 2002

SIPA ................................................. Securities Investor Protection Act

SIPC ................................................. Securities Investor Protection Corporation

SIPC Trustee ..................................... Irving H. Picard

SocGen .............................................. Société Générale

Suarez ............................................... Daniel Suarez

Trustee Kingate Action ..................... Irving H. Picard v. Kingate Global Fund, Ltd. et al., No. 08-01789, Adv. Pro. No. 09-1161, S.D.N.Y.

Valdez .............................................. Plaintiff, Juan Gonzalo Pérez Valdez

Waterhouse ....................................... Patricio Waterhouse

Wilkinson ............................................ Defendant Brian Wilkinson

Yangüela ............................................ Martín Yangüela

Zihnali ................................................ Balkir Zihnali

Plaintiffs, individually and on behalf of all others similarly situated, by their undersigned counsel, allege the following based upon personal knowledge and counsels' investigation.

## I.    NATURE OF THE ACTION

1.    Plaintiffs' claims arise from the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") through his investment firm Bernard L. Madoff Investment Securities LLC ("BMIS").  As the public learned on December 11, 2008, Madoff stole hundreds of millions of dollars for personal enrichment and misappropriated billions more to perpetuate the scheme, in what is, undoubtedly, the largest heist in financial history.  As a result, Madoff has been sentenced to one-hundred fifty years in prison.  The Securities and Exchange Commission ("SEC") and numerous financial agencies are vigorously searching for the stolen funds.  And the final tally to date indicates that approximately $65 billion have disappeared.

2.    Madoff, however, did not act alone.  Madoff deployed a web of sales teams throughout the world, but based in the United States in this instance, that captured tens of billions of dollars in investment vehicles, commonly referred to as feeder funds.  These feeder funds were established exclusively for the purpose of investing with Madoff, in New York, in what was effectively one integrated and coordinated operation.  For this reason, the feeder funds had no offices, employees, or existence, aside from the corporate form and bank account in an offshore jurisdiction.  A bank account that merely served as a pass through to wire monies to Madoff.  All investment operations were carried out by Madoff in New York.

3.    To lure investors, however, the feeder funds marketed themselves as sophisticated financial institutions that would safeguard investors' monies and conduct strict oversight of Madoff.  But the feeder funds were making hundreds of millions of dollars in fees, and these fees were being paid in real cash that was not fictitious.  Cash that they have kept to this day.  Not surprisingly, those enormous fees served as a sufficient incentive for the feeder funds to

1

intentionally ignore the blatant signs of Madoff's wrongdoing, given that the real risk of loss was borne by the investors, not the funds. Madoff had essentially paid off the feeder funds to stop asking questions.

4. Documentary evidence uncovered by Plaintiffs shows that that is precisely what occurred in this instance. When Defendants effectively asked Madoff to see where the cash was, they were rebuffed. But instead of withdrawing Plaintiffs' monies, Defendants simply sought to change the disclosures in the investment prospectuses to supposedly, and improperly, protect their own liability, instead of protecting investors.

**The Santander Defendants' Wrongful Conduct**

5. Plaintiffs and other members of the Class invested in a feeder fund called Optimal Multiadvisors Ltd. ("Optimal Multiadvisors"). Optimal Multiadvisors had two sub funds: Optimal Strategic U.S. Equity Ltd. ("Optimal SUS") and Optimal Arbitrage Ltd. ("Optimal Arbitrage," together with Optimal SUS, the "Optimal Funds"). Optimal SUS was exclusively established to invest with Madoff and was nothing more than a pass-through vehicle that gave one-hundred percent of its assets to Madoff. Optimal Arbitrage invested a substantial percentage of its assets with Madoff, but not all.

6. Optimal Investment Services, S.A. ("OIS") served as the investment manager of Optimal Multiadvisors and controlled the investments with Madoff. Banco Santander, S.A. ("Santander") owned 99% of OIS. Banco Santander International, which is based in Miami, Florida ("Santander Miami"), was principally responsible for selling Optimal Multiadvisors to investors. Santander Miami is also a wholly-owned subsidiary of Santander.

7. In September 2002, Santander became concerned about a "number of issues that [might] involve legal risks for the [Santander] Group" with respect to Madoff. Santander ordered

OIS to send a team to investigate and meet with Madoff and a number of New York law firms. The investigation resulted in at least two internal memoranda written by an OIS employee, Karine Courvoisier (the "Courvoisier Memoranda") (attached as Exhibits 14 & 15). The issues raised in the memoranda went to the heart of Madoff's Ponzi scheme because they concerned the existence of the assets supposedly held by Madoff. (*See infra* ¶¶ 65-90).

8.      As set forth in the Courvoisier Memoranda, Santander and OIS were concerned that Madoff was the custodian of his own funds. While investment advisers almost universally have a third-party custodian that assures independence, Madoff was an extremely rare exception who demanded that he, through BMIS, be the custodian. This unusual arrangement squarely raised the critical concern of how to verify the existence of assets as well as the integrity of the account statements issued by BMIS. As renowned securities expert and Columbia Law School Professor John Coffee said, "[b]eing your own custodian violates the first rule of common sense, you can't be your own watchdog."[1] In addition, because BMIS was also a broker-dealer, BMIS generated its own trading confirmations for investors as well. By combining the broker-dealer entity with an investment custodian, BMIS created an insulated, self-sustaining financial enterprise which generated all reporting to its investors – including the Optimal Funds – without any third-party oversight. This concern was flagged by OIS, but pointedly ignored, to the detriment of Plaintiffs and the Class.

9.      In light of the heightened concern expressed by the Courvoisier Memoranda about Madoff's unusual operation, Santander and OIS met with Madoff on September 18 and 19, 2002. At these meetings, they asked Madoff to use an external custodian. But Madoff refused.

---

[1]   Cristina McEachern Gibbs, "Proposed Bill: $100 Million to Crack Down on Wall Street Fraud," Advanced Trading, January 27, 2009; http://www.advancedtrading.com/regulations/showArticle.jhtml?articleID=212902968.

10.     Instead of withdrawing the funds, however, Santander and OIS took no action to protect the investors or verify that the Optimal Funds' assets still existed.  For example, Santander and OIS never confirmed with any of Madoff's purported counterparties that the billions of dollars in trades that Madoff claimed he executed every year actually took place.  Although Madoff was a broker-dealer and custodian of the Optimal Funds, Madoff still had to supposedly buy stocks, bonds, and options from the outside world.  We now know that he never did.  But Santander and OIS never once, since 1996, contacted a single counterparty to confirm that Madoff had traded with them.  (If they did call, however, then they knew that Madoff was running a Ponzi scheme.)

11.     In addition, Madoff claimed that BMIS was subject to an annual audit.  The supposed auditors, however, were a small, unknown firm with only three employees called Friehling & Horowitz ("F&H").  F&H's offices were located in a strip mall in New City, New York, and were no larger than a small coffee shop.  Santander and OIS not only never contacted F&H to confirm or to inquire about the extent of the supposed audit, but they also never checked F&H's status with the American Institute of Certified Public Accountants ("AICPA").  Had they done so, they would have discovered that F&H filed a form every year with the AICPA certifying that F&H **did not** conduct any audits.  David Friehling, the sole practitioner at F&H, has since been criminally charged by the U.S. Attorney in the Southern District of New York.

12.     Accordingly, it is patently clear that Santander and OIS took no action to confirm the existence of the assets or Madoff's assertions, even though they knew that this was a serious concern.  Instead, Santander and OIS merely sought to add disclosures to the investing documents distributed to investors in an unsuccessful effort to reduce their own liability. In the prospectuses distributed after the now infamous September 2002 meeting with Madoff, a section appeared for the first time that essentially said that there was a "possibility," or "risk," that Madoff could abscond

4

with the assets.  But merely disclosing the supposed "possibility" of misappropriation did not, and does not, exonerate Defendants here from conducting the minimal procedures necessary to ensure that that was not the case – especially given that Santander and OIS sold Optimal Multiadvisors to Plaintiffs by representing in the offering documents that, "[t]he Investment Manager [OIS] bases its investment decisions on a ***careful analysis*** of many investment managers"  (*See, e.g., infra* ¶ 162).

13.     Indeed, OIS's own internal guidelines for conducting a "careful analysis" are set forth in documents obtained by Plaintiffs, and attached to this Complaint (*See infra* ¶¶ 91-131).  These documents leave no doubt that OIS violated its own internal due diligence policies.  For example, OIS supposedly had to confirm with Madoff's counterparties that Madoff executed the trades he claimed to have made.  The internal guidelines even noted that another OIS fund had suffered a substantial loss in 1998 because a counterparty had failed to honor its obligations.  The internal guidelines thus emphasized that, at a minimum, OIS had to investigate the identity of the counterparties to evaluate the credit risk.  Having lost millions of dollars at least once before, OIS knew how critical an appropriate review of counterparties was to protecting investors assets.  (*See infra* ¶ 94).

14.     OIS's own internal due diligence guidelines also required the use of certain complex quantitative programs that sought to find statistical discrepancies between a manager's representations about the execution of his strategy and the supposed results.  OIS used a tool known as FOFIX.  The company that created FOFIX used the tool after Madoff's Ponzi scheme was disclosed, and concluded that FOFIX was effectively flashing red and ringing alarm bells with respect to Madoff well before December 2008.  (*See infra* ¶¶ 101-108).

5

15.     Despite these numerous red flags, OIS and Santander remained undeterred in their quest for fees and continued to sell the Optimal Funds to unsuspecting investors.  OIS and Santander sold the Optimal Funds based on the mistaken belief that, if they merely said that it was "possible" that Madoff could steal the money, there was nothing else OIS and Santander needed to do – except collect their own fees.  OIS and Santander thus centralized the selling efforts of the Optimal Funds through Santander Miami's activities in the United States.  Based on evidence obtained in the course of Plaintiffs' investigation, OIS, Santander, and Santander Miami, completely disregarded the corporate form of the various entities and indiscriminately sold the Optimal Funds through Santander Miami.

16.     Santander Miami was the logical central point for selling the Optimal Funds to Latin America for many reasons. It is the functional headquarters for Latin American operations, with hundreds of employees at Brickell Avenue (Miami, Florida), compared with significantly smaller offices in Latin America.  Also, accounts at Santander Miami, and thus based in the United States, had already invested hundreds of millions of dollars in Madoff through Optimal Multiadvisors.

17.     Importantly, Santander Miami did not limit its activities and services to only those investors that had accounts in Miami.  Santander Miami also conducted the operations and sales of the many smaller and, essentially, mere outposts in Latin America.  For example, Plaintiff Marcelo Guillermo Testa and thousands of other investors in Optimal Multiadvisors had accounts in Santander's affiliate in the Bahamas.  But the Bahamas affiliate was principally an offshore corporate vehicle with virtually no operations.  Indeed, Plaintiff Testa's account statements on Bahamian letterhead were mailed from Miami every single month, and have been mailed from Miami every month since at least April 2005.  The envelopes are postmarked "U.S. Mail," pay U.S. metered prices, and have a return address to a Miami Post Office Box.  (*See infra* ¶ 329 and copy of

6

envelope as Ex. 5). Lead Counsel has obtained additional copies of Miami postmarked envelopes from other Santander account holders who had accounts outside the United States.

18.     Santander Miami's banking operations on behalf of foreign affiliates were not limited to ministerial functions. Santander Miami also opened bank accounts at offshore affiliates for purposes of investing in the Optimal Funds. In emails obtained by Plaintiffs, a Vice President at Santander Miami offered a client to invest in Optimal Multiadvisors and to open an account in either Santander Bahamas or Santander Switzerland. The emails even attached all thirteen forms that the investor needed to fill out to open a Swiss bank account, and all five forms needed to open a Bahamian bank account. Not a single employee or officer of Santander Switzerland or Santander Bahamas is included in the emails. The emails and forms are attached to this Complaint. (*See infra* ¶¶ 327-331).

19.     Santander Miami's employees were also the most important sellers of Optimal Multiadvisors, especially Patricio Waterhouse ("Waterhouse"), Alfredo López ("López"), and Diego Sacerdote ("Sacerdote"), in addition to Martín Yangüela ("Yangüela") and Fernando Diez ("Diez"). These Santander Miami employees would regularly travel to Latin America from Miami and sell investments in Madoff through Optimal Multiadvisors to Latin American investors. Patricio Waterhouse was rewarded with a meeting with Madoff for being the top Madoff salesman. All five employees were based in Miami for a substantial amount of time starting in 2002. Waterhouse, Yangüela, and Diez remained based in Miami as of December 2008. (*See infra* ¶¶ 332-334).

20.     In addition to selling the Optimal Funds from the United States, the due diligence and oversight of Madoff, or lack thereof, was conducted in the United States. Santander and OIS had, and continue to have, offices in New York City, at 45 East 53rd Street. Madoff's offices were

located at 885 Third Avenue (at 53rd Street), New York City, less than three blocks away from OIS's offices.

21.     At these offices, OIS had a team of at least four investment and due diligence officers for a substantial period of time after 2001, including, Messrs. Hugh Burnaby Atkins ("Atkins"), Balkir Zihnali ("Zihnali"), Jonathan Clark ("Clark"), and Tom Lileng ("Lileng"). Based on documents obtained by Plaintiffs, as well as interviews with some of these former OIS employees, Atkins and Clark were specifically hired and tasked with supervising Madoff out of New York.

22.     As part of their alleged due diligence of Madoff, Atkins and Clark would receive trade confirmations from Madoff by facsimile.  These paper copies of trade confirmations, however, did not include time stamps nor prices for each individual trade.  Instead, the paper confirmations listed average prices for purchases and sales of stocks on a daily basis.  OIS's reliance on paper confirmations was entirely inconsistent with OIS's internal documents and presentations to investors.  These documents and presentations said that Madoff was one of the most technologically advanced broker-dealers.  Madoff had even told OIS (and Defendant PricewaterhouseCoopers Ireland, the Optimal Funds' auditor) that 99% of his trades were electronic. If so, why couldn't Madoff provide electronic trade confirmations with precise time stamps and prices? The confirmations also did not include the name of the counterparty with whom Madoff had supposedly traded.  In effect, OIS accepted Madoff's pieces of paper that said that Madoff had executed certain transactions without any verification, validation, or independent review.  OIS accepted these representations from Madoff for over a decade without ever checking that a single transaction had actually occurred.

23.     Defendant Manuel Echeverría (OIS's chief executive officer and chief investment officer) regularly visited New York to meet with Madoff on behalf of the Optimal Funds.  In fact, it appears that Echeverría met Madoff in New York as many as four times each year.  This is consistent with the importance of Optimal SUS for the OIS family of funds, and the fact that Optimal SUS was OIS's flagship fund, out of fourteen other funds.  By December 2008, Optimal SUS supposedly had $3.1 billion in assets with Madoff, which represented approximately 30% of all of OIS's assets under management – about $10 billion.

24.     Echeverría's close oversight of Madoff and frequent meetings with him is also consistent with their long history.  Optimal SUS had begun investing with Madoff very early on, in February 1997, before OIS had even been established as an independent unit within Santander.  From its inception, Optimal SUS was a Madoff dedicated fund which invested one-hundred percent of its assets with him.  Optimal SUS was "Echeverría's baby," according to interviews with former OIS employees.  In fact, Echeverría received directly, as salary, an amount of 0.15% of Optimal SUS's assets under management, which was part of the annual commissions paid by investors.

25.     Echeverría, Santander Miami, Santander, and OIS, however, were not the only Defendants who ignored the obvious red flags surrounding Madoff.  So did PricewaterhouseCoopers Ireland ("PwC Ireland"), which served as Optimal SUS's auditor, together with PwC Bermuda, PwC U.S., and PwC International ("PwC Defendants"), which assisted PwC Ireland with the audit.

**The PwC Defendants' Wrongful Conduct**

26.     As set forth in detail below, the PwC Defendants collaborated in providing the audit opinions issued by PwC Ireland to investors in Optimal SUS.  The PwC Defendants were required to obtain independent confirmation that Madoff had custody of the Optimal SUS assets.  The PwC

Defendants, however, never confirmed that the assets existed – ignoring the most critical aspect of any audit.  Instead, the PwC Defendants simply accepted Madoff's assertion that he held all $3 billion worth of Optimal SUS's monies, without ever obtaining independent confirmation.  The failure to conduct this routine and most basic auditing procedure is sufficient to establish that the PwC Defendants conducted no audit at all.  (*See, e.g., infra* ¶ 249).

27.     Plaintiffs have sued PwC Bermuda and PwC U.S. here, in part, because Plaintiffs have obtained an internal PwC report concerning the auditing procedures conducted on Madoff by partners from PwC Bermuda and PwC U.S.  (*See infra* ¶¶ 250-261; Ex. 6; the "PwC Madoff Report").  The PwC Madoff Report shows that PwC Bermuda and PwC U.S. met with Madoff in New York, and that that report formed the basis for PwC Ireland's audit that year.  According to the PwC Madoff Report, PwC Bermuda and PwC U.S. asked Madoff certain critical questions, including, where he kept the billions of dollars in U.S. Treasury Bills which he claimed represented all the monies of Optimal SUS as of December 31 every year.  (Madoff had always claimed that when he was not in the market, executing his split strike conversion strategy, he had all the money invested in government securities, and that this was the case every single year-end).

28.     Madoff replied that the U.S. Treasury Bills were traded through the Government Securities Clearing Corporation ("GSCC") and held at Bank of New York ("BONY").  While Madoff was a broker-dealer for stocks, he was not a broker-dealer for government securities and, therefore, could not take custody of U.S. Treasury Bills.  None of the PwC Defendants ever contacted GSCC or BONY to confirm the existence of the billions of dollars in U.S. Treasury Bills reported in Optimal SUS's balance sheet at the end of each year.

29.     The PwC Defendants also never communicated with Madoff's auditors F&H, nor investigated F&H's credentials.  One of the first procedures mandated by the auditing standards at

issue here (discussed in detail below) required the PwC Defendants to vet Madoff's auditor. This was due to the fact that Optimal SUS had one-hundred percent of its funds invested in Madoff and, in effect, Optimal SUS was nothing more than a pass-through vehicle into Madoff. Accordingly, an audit opinion of Optimal SUS required that the PwC Defendants conduct certain procedures on the reliability of Madoff's financial statements. Those financial statements, however, were completely phony. Had the PwC Defendants conducted even a minimal investigation of F&H, they would have discovered that F&H had never audited BMIS. PwC Ireland, however, never communicated, directly or indirectly, nor sought to communicate with F&H. That, in and of itself, is also sufficient to establish that the audit by PwC Ireland amounted to no audit at all.

30.     PwC Ireland was paid about $26,000 and $37,000 to audit Optimal SUS in 2006 and 2007, respectively. This was barely enough to cover travel expenses to New York. As a result, PwC Ireland joined numerous PwC affiliates throughout the world which also audited Madoff feeder funds. Plaintiffs are aware of at least eight other Madoff feeder funds audited by PwC affiliates that, as of December 2008, had approximately $17 billion invested with Madoff. Instead of having each PwC affiliate travel to New York and conduct its own procedures, the PwC affiliates centralized the work with PwC Bermuda and PwC U.S.

31.     One partner from each of these two firms met with Madoff in New York to conduct procedures that would then be reported back to each PwC affiliate that had to issue an audit opinion regarding a Madoff feeder fund. But in this effort to minimize costs and centralize the review for all Madoff feeder funds, however, PwC Bermuda and PwC U.S. did nothing more than meet with Madoff and accept his assertions without any independent verification. An auditor's acceptance of representations without confirmation or performance of testing procedures violates Independent Standards for Auditing ("ISA"). (*See infra* ¶¶ 215-237).

32.     In sum, the crux of the allegations in this Complaint are that Defendants (i) admittedly had serious concerns about the custody of Plaintiffs' assets invested with Madoff, (ii) asked Madoff critical questions about the custody of Plaintiffs' assets, but (iii) failed investigate further.  This egregiously wrongful conduct took place almost exclusively in the United States.

33.     Accordingly, Plaintiffs assert common law claims for, *inter alia*, breach of fiduciary duty, gross negligence, negligence, and unjust enrichment, as well as, claims under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b5, promulgated thereunder by the SEC.

34.     Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of Optimal SUS, Optimal Arbitrage, Optimal SUS (Ireland), or Optimal Arbitrage (Ireland) on December 10, 2008, or (ii) purchased shares of Optimal SUS, Optimal Arbitrage, Optimal SUS (Ireland), or Optimal Arbitrage (Ireland) from January 27, 2004 to December 10, 2008 (the "Class Period"), and were damaged thereby due to the wrongful conduct alleged in this Complaint (the "Class").  Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

## II.     THE PARTIES

### A.     PLAINTIFFS

35.     Court-appointed Co-Lead Plaintiff, **Inversiones Mar Octava Limitada** ("Mar Octava"), is, and was at all times relevant hereto, a company based in Talcahuano, Chile.  During the Class Period, Mar Octava invested in Optimal SUS and Optimal Arbitrage through its bank account with Santander Miami, in Miami, Florida, as set forth in the attached certification (Ex.

1).  Due to the activities alleged herein, Mar Octava has lost all, or substantially all, of its investment in Optimal SUS, a substantial amount of its investment in Optimal Arbitrage, and has paid substantial advisory fees for illusory services.

36.     Court-appointed Co-Lead Plaintiff, **International Harvester Limited** ("International Harvester"), is, and was at all times relevant hereto, a company incorporated and based in the British Virgin Islands.  During the Class Period, International Harvester invested in Optimal SUS and Optimal Arbitrage through its bank account with Banco Santander (Suisse) S.A. ("Santander Switzerland"), as set forth in the attached certification (Ex. 2).  International Harvester never had any contact with any employees of Santander Switzerland until August 2008, at least ten years after opening the account.  Due to the activities alleged herein, International Harvester has lost all, or substantially all, of its investment in Optimal SUS, a substantial amount of its investment in Optimal Arbitrage, and has paid substantial advisory fees for illusory services.

37.     Court-appointed Co-Lead Plaintiff, **San Javier International Limited** ("San Javier International"), is, and was at all times relevant hereto, a company incorporated and based in the British Virgin Islands.

(a)     During the Class Period, San Javier International invested in Optimal SUS through its bank account with Santander Miami, in Miami, Florida, as set forth in the attached certification (Ex. 3).  Due to the activities alleged herein, San Javier International has lost all, or substantially all, of its investment in Optimal SUS, and has paid substantial advisory fees for illusory services.

(b)     Plaintiff San Javier International also invested in Optimal Arbitrage in September 2003.  This purchase occurred more than five years from the commencement of this

action and therefore does not form the basis for any Exchange Act claims, only common law claims.  Due to the activities alleged herein, San Javier International has lost a substantial percentage of its investment in Optimal Arbitrage, and has paid substantial advisory fees for illusory services.

38.     Plaintiff, **Juan Gonzalo Pérez Valdez** ("Valdez"), is, and was at all times relevant hereto, a resident of Mexico. During the Class Period, Valdez invested in Optimal Strategic US Equity Ireland through his bank account with Santander Miami, in Miami, Florida, as set forth in the attached certification.  (Ex. 4).

(a)     Plaintiff Valdez also invested in Optimal Arbitrage (Ireland) in May 2003. This purchase occurred more than five years from the commencement of this action and therefore does not form the basis for any Exchange Act claims, only common law claims.

(b)     Due to the activities alleged herein, Valdez has lost all, or substantially all, of his investment in Optimal SUS (Ireland), and lost a substantial amount of his investment in Optimal Arbitrage (Ireland) as a result of the wrongdoing alleged in this Complaint, and has paid substantial advisory fees for illusory services.

39.     Mar Octava, International Harvester,  San Javier International, and Valdez will be collectively referred to as the "Exchange Act Plaintiffs."

40.     Plaintiff, **Marcelo Guillermo Testa** ("Testa"), is, and was at all times relevant hereto, a resident of Buenos Aires, Argentina who invested assets in Optimal SUS and Optimal Arbitrage.  These investments occurred more than five years from the commencement of this action and therefore do not form the basis for any Exchange Act claims, only common law claims.  Due to the activities alleged herein, Plaintiff Testa has lost all, or substantially all, of his investment in Optimal SUS, and lost a substantial amount of his investment in Optimal Arbitrage

as a result of the wrongdoing alleged in this Complaint.  Plaintiff Testa has paid substantial advisory fees for illusory services.

41.     Plaintiff, **Antonio Atencia Puado** ("Puado"), is, and was at all times relevant hereto, a resident of Spain who invested assets in Optimal SUS.  Plaintiff Puado invested in Optimal SUS through his bank account with Santander Switzerland.  These investments occurred more than five years from the commencement of this action and therefore do not form the basis for any Exchange Act claims, only common law claims.  Due to the activities alleged herein, Plaintiff Puado has lost all, or substantially all, of his investment in Optimal SUS, and has paid substantial advisory fees for illusory services.

### B.     DEFENDANTS

42.     Defendant **Banco Santander, S.A.** ("Santander") is the parent bank of Grupo Santander, the leading financial institution in Spain, and one of the largest financial conglomerates in the world.  As of the end of the second quarter 2009, Santander had total assets exceeding $1.5 trillion dollars, more than 132,000 employees, and the largest market capitalization of any bank in continental Europe.  Through wholly-owned subsidiaries, Santander has hundreds of offices in the United States, including Miami, New York, Houston, Los Angeles, San Diego and Seattle.

(a)     Santander has submitted annual reports to the SEC pursuant to the Exchange Act since 1999 by filing Forms 20-F.  As set forth in the Form 20-F filed on June 30, 2009, for the annual period ending December 31, 2008, Santander had three different securities registered with the SEC: (i) American Depositary Receipts, each representing the right to receive one Share of Capital Stock of Santander ("ADRs"), (ii) shares of Capital Stock, and (iii) Non-cumulative guaranteed preferred stock of Santander Finance.  The ADRs trade on the New York

Stock Exchange.  There were 8.0 billion shares of capital stock outstanding as of December 31, 2008.

(b)      Santander has permanent offices located at 45 East 53rd Street, New York, New York 10022, and according to its Form 20-F for the period ending December 31, 2007 and filed June 30, 2008, has "significant operations in New York."

(c)      An SEC No Action Letter, dated August 18, 2008, states that Santander also conducts securities business in the continental U.S. through Santander Investment Securities Inc., Banesto Securities, Inc., and Abbey National Securities, Inc.

(d)      Santander has at least 28 different subsidiaries in the United States, as set forth in its 2007 Form 20-F.[2]

---

[2]   The 28 subsidiaries are:  (1) Abbey National (America) Holding, Inc., 100% indirectly-owned, holding company; (2) Abbey National Employment Services Inc., 100% indirectly-owned, employment services; (3) Abbey National North America Corporation, 100% indirectly-owned, finance; (4) Abbey National North America LLC, 100% indirectly-owned, finance; (5) ANSI, 100% indirectly-owned, Broker-Dealer;  (6) ANFP (US) LLC, 100% indirectly-owned, finance; (7) Santander Miami, 95.89% directly, banking;  (8) Santander Puerto Rico, 90.59% indirectly-owned, banking;  (9) Banesto Delaware Inc., 89.19% indirectly-owned, finance; (10) Banesto Securities, 89.19% indirectly-owned, finance; (11) BST International Bank, Inc., 99.72% indirectly-owned, banking; (12) Crefisa, Inc., 100% directly, finance; (13) Island Insurance Corporation, 90.59% indirectly-owned, insurance; ( 14) NW Services CO, 88.40% indirectly-owned, e-commerce; (15) Santander Asset Management Corporation, 90.59% indirectly-owned, asset management; (16) Santander BanCorp, indirectly-owned, holding company; (17) Santander Central Hispano Finance (Delaware) Inc., 100% directly owned, finance; (18) Santander Consumer USA Inc., 90% directly owned, finance; (19) Santander Financial Services, Inc., 90.59% indirectly-owned; lending company; (20) Santander Insurance Agency, Inc., 90.59% indirectly-owned; insurance brokerage; (21) Santander International Bank of Puerto Rico, Inc., 90.59% indirectly-owned; banking; (22) SIS, 100% indirectly-owned, registered broker-dealer; (23) Santander Overseas Bank, Inc., 100% indirectly-owned; banking; (24) Santander PR Capital Trust I, 90.59% indirectly-owned; finance; (25) Santander Private Advisors, Ltd., 100% directly owned, holding company; (26) Santander Securities Corporation, 90.59% indirectly-owned; broker-dealer; (27) Totta & Açores Inc. Newark, 99.72% indirectly-owned; banking; and (28) Universia Puerto Rico, 100% indirectly-owned; internet.  (See 2007 Form 20-F at F-206-217).

(e)     On January 30, 2009, Santander acquired Sovereign Bank.  Sovereign Bank was the 19th largest financial institution in the Unites States, by assets, as of December 31, 2007, per its last annual report.  Its current home page on the Internet states, at the top and in bold red letters, "**Santander**, Sovereign is now part of **one of the world's largest and safest banks**." (emphasis in original).  Sovereign has 750 branches and 2,300 ATMs in the United States.

(f)     Santander has been registered to conduct business in Florida since May 9, 1980, and files annual reports with the Florida Department of State.  Its registered agent is John Villamil Morel, c/o Santander Miami, 1401 Brickell Avenue, Suite 1500, Miami, Florida 33131.

43.     Defendant **Banco Santander International** ("Santander Miami") is a wholly-owned subsidiary of Santander, which conducts business in the United States as an Edge Act corporation organized under Section 25A of the Federal Reserve Act, 12 U.S.C. §§ 611 *et seq*. Santander Miami is supervised by the Federal Reserve Board.  Its headquarters are in Miami, at 1401 Brickell Avenue, Miami, Florida 33131.  It also has offices in New York, Houston, Los Angeles, San Diego, and Seattle.  In 2007, it earned $233 million in net income, had total assets of $42 billion, and had loans outstanding of approximately $32 billion.

44.     Defendant **Optimal Investment Services S.A.** ("OIS") is an investment management company, incorporated in Switzerland in July 2001, with almost $10 billion in assets under management as of January 7, 2008.  Its principal offices are located at 5-7 Rue Ami-Lévrier, CH-1201, Geneva, Switzerland, with additional offices located in New York, Miami, and Madrid.  OIS was, and continues to be, the investment manager for Optimal Multiadvisors, Optimal SUS, and Optimal Arbitrage.

45.     Defendant **Manuel Echeverría Falla** ("Echeverría") was the Chief Executive Officer and Chief Investment Officer of OIS from its inception, in June 2001, until June 2008, when Echeverría left OIS.  Echeverría was also one of three Directors of Optimal Multiadvisors during the majority of the time relevant to this Complaint.  Prior to that, beginning in 1989, he was Executive Vice President of Santander (Suisse) S.A. and served as manager of the Portfolio Management and Fund Management Group for the International Private Banking Division of Grupo Santander.  During this time, Echeverría built Santander's expertise in alternative investment strategies, i.e., hedge funds.

46.     Defendant **Anthony L.M. Inder Rieden** ("Inder Rieden") is a Director of Optimal Multiadvisors.  Inder Rieden served as a director of the prior administrator of Optimal SUS, Fortis Fund Services (Bahamas) Ltd., until 2002.  Inder Rieden's address is Euro-Dutch Trust Company (Bahamas) Ltd., Charlotte House, Charlotte Street, P.O. Box N-9204, Nassau, Bahamas.

47.     Defendant **Brian Wilkinson** ("Wilkinson," together with Echeverría and Inder Rieden the "Director Defendants") is a Director of Optimal Multiadvisors.  Between October 2001 and March 2006, Wilkinson was a Managing Director of HSBC Services.

48.     Defendants Santander, Santander Miami, OIS, and the Director Defendants are collectively referred to as the "**Santander Defendants**."

49.     Defendant **PricewaterhouseCoopers International Ltd.** ("PwC International") is a United Kingdom membership-based company.  PwC International controls constituent PricewaterhouseCoopers offices, self-described as member firms, which "comprise a vigorous global network," according to the global PwC Website.  The chairman of PwC International maintains his offices in New York City.

50.     Defendant **PricewaterhouseCoopers (Dublin**) ("PwC Ireland") served as Optimal Multiadvisors' auditors, including Optimal SUS and Optimal Arbitrage.  PwC Ireland is the largest professional services firm in Ireland and one of the "Big Four" auditing firms.  PwC Ireland's office is located at One Spencer Dock, North Wall Quay, Dublin 1, Ireland.

51.     Defendant **PricewaterhouseCoopers LLP** ("PwC U.S.") participated in the audit of Optimal SUS and conducted critical procedures relating to Madoff in New York City.  PwC U.S. is headquartered at 300 Madison Avenue, New York, New York.  PwC U.S. also maintains offices in six cities in Florida (Fort Lauderdale, Jacksonville, Miami, Orlando, Tampa and West Palm Beach).

52.      Defendant **PricewaterhouseCoopers Bermuda** ("PwC Bermuda") participated in the audit of Optimal SUS and conducted critical procedures relating to Madoff in New York City.  PwC Bermuda maintains offices in Hamilton, Bermuda.

53.     Defendants PwC International, PwC Ireland, PwC U.S., and PwC Bermuda are collectively referred to as the "**PwC Defendants**."  The PwC Defendants are only being sued in connection with the audit of Optimal SUS and are not being sued in connection with the audit of Optimal Arbitrage.

54.     Defendant **HSBC Securities Services (Ireland) Limited** ("HSBC Services" or the "Administrator") was the administrator, registrar, and transfer agent of Optimal Multiadvisors, including Optimal SUS and Optimal Arbitrage.   The Administrator had responsibility for the administration of Optimal Multiadvisors, which includes Optimal SUS and Optimal Arbitrage, such as the calculation of Net Asset Value and preparation of accounts.  The Administrator also served as Company Secretary to Optimal Multiadvisors.  The Administrator

is an indirect, wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.

55. Defendant **HSBC Institutional Trust Services (Ireland) Limited** ("HSBC Trust" or the "Custodian") was the custodian for Optimal Multiadvisors, which includes Optimal SUS and Optimal Arbitrage. The Custodian is an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.

## III. RELEVANT NON-PARTIES

56. Optimal Multiadvisors, Ltd. ("Optimal Multiadvisors"), which is ***not*** a Defendant in this action, was incorporated in 1995 as an International Business Company under the laws of the Commonwealth of the Bahamas. Optimal Multiadvisors is an investment fund classified as a Standard Fund pursuant to the provisions of the Investment Funds Act and Regulations of The Bahamas. The registered address of Optimal Multiadvisors is Fort Nassau Centre, Marlborough Street, P.O. Box N-4875, Nassau, Bahamas.

57. Optimal Strategic US Equity Ltd. ("Optimal SUS") and Optimal Arbitrage Ltd. ("Optimal Arbitrage," together with Optimal SUS, the "Optimal Funds"), which are ***not*** Defendants in this action, are Trading Companies of Optimal Multiadvisors (effectively, sub funds). Optimal Multiadvisors offered non-voting participating shares ("Participating Shares") in Optimal SUS and Optimal Arbitrage to Plaintiffs and other similarly situated investors.

58. Optimal Multiadvisors Ireland Public Limited Company ("Optimal Multiadvisors Ireland") is an open-ended investment company with variable capital organized under the laws of Ireland. Optimal Multiadvisors Ireland is an umbrella fund with underlying funds, including:

(a) Optimal Strategic US Equity Ireland US Dollar Fund and Optimal Strategic US Equity Ireland Euro Fund (together, "Optimal SUS Ireland"). Optimal SUS Ireland invested one-hundred percent of its assets with Optimal SUS, the Bahamian fund.

(b)       Optimal Arbitrage Ireland US Dollar Fund and Optimal Arbitrage Ireland Euro Fund, (together, "Optimal Arbitrage Ireland").  Optimal Arbitrage Ireland invested one-hundred percent of its assets with Optimal Arbitrage, the Bahamian fund.

(c)       Optimal SUS Ireland and Optimal Arbitrage Ireland were the mirror images of Optimal SUS and Optimal Arbitrage and were simply an investment vehicle into Optimal SUS and Optimal Arbitrage for European investors.  Optimal SUS Ireland and Optimal Arbitrage Ireland are *not* Defendants in this action.   (November 2008 Prospectus, Optimal Multiadvisors Ireland, Ex. 7).

## IV.       BACKGROUND FACTS

### A.       MADOFF'S PONZI SCHEME

59.       Madoff founded BMIS in 1959 as a New York limited liability company and was its chairman and chief executive officer.  Madoff ran BMIS mainly through his family, including his brother Peter, and sons Andrew and Marc.  BMIS had three business units: market making, proprietary trading, and investment advisory ("Investment Advisory").

60.       The Investment Advisory business purportedly invested using a split strike conversion strategy.  The strategy involved the purchase and sale of equity securities, options, and government securities.  Although investors in the Investment Advisory business received monthly or quarterly statements purportedly showing the equity securities, options, and government securities that the investor owned, as well as the growth of and profit from those accounts over time, these statements were a complete fabrication.  There is no record of BMIS or Madoff having cleared a single purchase or sale of securities at the Depository Trust & Clearing Corporation ("DTC"), the clearing house for such transactions, or any other trading platform on which BMIS could have reasonably traded securities.

61.     Additionally, there is no evidence that Madoff or BMIS ever purchased or sold any of the options claimed to have been purchased or sold and reported to BMIS's Investment Advisory investors.  Options related to the Standard & Poor's 100 ("S&P 100") companies are typically traded on the Chicago Board Options Exchange ("CBOE").  There are no records of Madoff or BMIS ever having purchased or sold any options on the CBOE.

## B.     MADOFF'S ARREST AND GUILTY PLEA

62.     On December 11, 2008, federal authorities arrested Madoff and charged him with violations of the securities laws after Madoff admitted that his money management operation was "a giant Ponzi scheme."  Madoff further admitted that "there [was] no innocent explanation" and estimated that investors' losses reached $50 billion.  That same day, the SEC filed an emergency action to halt all ongoing activities by Madoff and BMIS.  The action is styled, *SEC v. Bernard L. Madoff*, 08 Civ. 10791 (S.D.N.Y. Dec. 11, 2008).

63.     On December 15, 2008, the Securities Investor Protection Corporation ("SIPC") filed an application in the United States District Court for the Southern District of New York alleging that BMIS was not able to meet its obligations to investors as they came due and, accordingly, that the investors needed the protection afforded by the Securities Investor Protection Act ("SIPA").  The Court granted the SIPC application and appointed Irving H. Picard as the Trustee to liquidate BMIS (the "SIPC Trustee" or "Mr. Picard").

64.     At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*, Case No. 09-CR-213 (DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney for the Southern District of New York.  Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]," and that "I knew what I was doing was wrong, indeed criminal."

## V.     SUBSTANTIVE ALLEGATIONS CONCERNING THE SANTANDER DEFENDANTS

### A.     IN 2002, SANTANDER AND OIS IDENTIFIED MADOFF'S SUBSTANTIAL COUNTERPARTY AND CUSTODIAL RISK

65.     In the Summer and Fall of 2002, Santander and OIS became extremely concerned about Madoff's counterparty and custodial risk.  In two memoranda prepared by Courvoisier to Echeverría, Courvoisier explained the concerns and proposed a plan of action (the "First Courvoisier Memorandum," or "FCM,"  and "Second Courvoisier Memorandum," or "SCM," Exs.  14  &  15).[3]   The  memoranda  were  prepared  on  OIS  and  Santander  Central  Hispano letterhead ("SCH").[4]

### 1.     The First Courvoisier Memorandum

66.     According to the First Courvoisier Memorandum, the concern over Madoff originated at Santander:

> In reviewing the legal documentation related specifically to the management of Optimal Strategic US Equity Ltd. and Optimal Arbitrage Ltd. (specifically "Infiltrator") (together "the Funds"), the Santander Central Hispano Group (hereafter "SCH") has detected **a number of issues that may involve legal risks for the Group**.  These issues need to be analysed and resolved.

(FCM, Ex. 14 at 1; emphasis supplied).

67.     Accordingly, Courvoisier and Santander's principal concern was the "legal risks for the Group," rather than the investors' assets.

---

[3]   These memoranda were publicly quoted in a Bloomberg article on June 18, 2009, by Warren Giles, entitled, "Geneva Probes Santander Madoff Links As Investor Alleges Scam." Mr. Giles has copies of these memoranda.

[4]   SCH is the predecessor entity to the Santander Group.

68.     The First Courvoisier Memorandum described the legal relationship between Optimal Multiadvisors and Madoff/BMIS.   It explained that BMIS had executed certain contracts on January 31, 1996, with the "Optimal Fund, including:

> 1.     Opening Account Document whereas the Optimal Fund has established a brokerage account for the Funds at Madoff.
>
> 2.     Customer Agreement relating to the opening or maintaining of the accounts opened with Madoff. This Agreement should be considered as a Custody Agreement;
>
> 3.     Trading Authorization Limited to Purchases and Sales of Securities whereby the Optimal Fund authorizes Madoff as his agent and attorney in fact to buy, sell and trade in stocks, bonds and any other securities for its account.  This Agreement should be considered as a general power of attorney (discretionary);
>
> [4.]     Option Agreement which states the terms and conditions and risks of transactions in option contracts."

(FCM, Ex. 14 at 1-2).

69.     Courvoisier raised a number of "issues," many of which focused squarely on the concern that BMIS was its own custodian:

> According to the Customer Agreement, we understand that the assets of the Funds are held by Madoff itself.  In this regard, when asked why a client could not custody securities elsewhere, i.e. outside the Madoff organisation, Madoff offers two reasons:
>
> A) Unforeseen operational issues such as trade settlement could compromise the strategy.    For example, if the 30 or so stocks that compose the basket fail to settle at the same time then the basket's correlation to the S&P 100 may be jeopardized.
>
> B) If the securities were to be delivered to an external custodian a client could conceivably sell out any leg of a trade, which would compromise the strategy.
>
> **In our process of improving the contractual relationship with Madoff, we have achieved part of the disclosure above-**

> **mentioned by the text our auditors of the Optimal Fund (PricewaterhouseCoopers Bahamas) have included in their audit,** clearly stating that the assets of the Funds are held by Madoff.

(FCM, Ex. 14 at 2; emphasis supplied).   After having identified the critical fact on which Madoff's entire Ponzi scheme hinged (self-custody), Courvoisier's main concern had thus turned to self-preservation and attempts to disclaim liability for the dangers they saw – and foresaw – rather than the safety of the investment.

70.    The First Courvoisier Memorandum identified many additional dangers about Madoff and proposed the following courses of action:

> 2)  To ask for a legal opinion regarding the legal status of Madoff as a Broker-Dealer, Custodian and "investment manager" of the Optimal Fund under the laws of New York.
>
> 4)  To disclose in the Prospectus of the Optimal Fund, in particular under the section related to the Funds that their assets of [sic] are held by Madoff and not by SCHT
>
> o   [sic] change the contractual party of the Agreements and have separate agreements between Madoff and the Funds.
>
> * * *
>
> 7)  To prepare a revised text describing the Investment Strategy applied to the Funds included in the Prospectus of the Optimal Fund.  It is decided to then send it to Madoff for any comments and/or written approval.

(FCM, Ex. 14 at 2-3).

71.    Immediately following point 7, the First Courvoisier Memorandum proposed that the prospectus, entitled Explanatory Memorandum ("EM"), include a description of Madoff and his split strike conversion strategy.  This description is virtually identical to the one set forth in the EMs beginning in June 2004, and set forth below in paragraph 173.  There were only two significant differences between the text proposed in the First Courvoisier Memorandum and the

text ultimately included in the EMs: (i) the substitution of Madoff's name with the generic form "Broker-Dealer," and (ii) the inclusion of a sentence saying that "the assets of the fund are deposited with the Broker-Dealer." (FCM, Ex. 14 at 2-3; *infra* ¶ 173).

72.     The First Courvoisier Memorandum further reflected concern that arose from the fact that Madoff had to buy and sell options from private counterparties (the so-called over-the-counter market) and not through an exchange. The risk of operating with counterparties rather than an exchange is that Madoff (and therefore Optimal SUS) had counterparty risk – *i.e.*, risk that the other side would not perform due to bankruptcy or other liquidity problems. Accordingly, Courvoisier proposed the following disclaimer for the EM: "The options transactions executed [by Madoff] for the benefit of Optimal SUS are effected, primarily, in the over-the-counter market, not on the registered options exchange. BLM [*i.e.*, Madoff] is not a market maker in options." (FCM, Ex. 14 at 4). The EMs ultimately included this identical disclaimer except that the reference to Madoff as "BLM" was deleted, and only referred to as "the Broker-Dealer." (*infra* ¶ 173).

73.     Courvoisier concluded the memorandum by proposing a meeting with "the lawyers in New York." The purpose of the meeting was to revise "all the contractual documentation with Madoff and redraft its Investment Strategy applied to the Funds." (FCM, Ex. 14 at 4).

### 2.     The Second Courvoisier Memorandum

74.     The Second Courvoisier Memorandum, entitled, "Meetings with Bernard Madoff and lawyers in New York – September 18-19, 2002," is again addressed to Echeverría. (SCM, Ex. 15 at 1). The memorandum begins as follows:

> The purpose of the meetings was to discuss the actual contractual arrangements between Bernard L. Madoff Investment Securities ("MIS") and Optimal Strategic US Equities Ltd. and Optimal

> Arbitrage Ltd. . . . . [and] to reduce any potential exposure of Optimal Investment Management Ltd., Optimal Multiadvisors Ltd, the Funds, [OIS] **and the reputation of the Santander Group generally**.

(SCM, Ex. 15 at 1; emphasis supplied)

75.     The memorandum described Madoff's compensation: "[Madoff] is not paid any kind of advisory, management or performance fee.  The brokerage charges appear very small, and **we assume** he makes his income on these fees or a spread." (SCM, Ex. 15 at 1; emphasis supplied).  OIS and Santander had failed to even confirm how Madoff supposedly earned money.

76.     The next section addressed the "Contractual Agreement with Madoff/MIS" and based its conclusions on Madoff's recommendations to OIS:

> In reviewing the Information Memorandum of Fairfield Sentry Ltd, Madoff explains that it is not correct to say that Fairfield has a "discretionary account" at MIS, as stated under the "Investment Policies" of this document.  If this was the case, Madoff/MIS would choose what security to buy (as an investment advisor would do).  However, if he only chooses the time when he trades, then he has no "discretion."  The only decision/discretion he makes/has is on the <u>timing</u> and the <u>price</u>.  In other words, Madoff/MIS only executes the investment strategy that the investment adviser gives him to implement.

(SCM, Ex. 15 at 2).

77.     Madoff and OIS then executed an "additional letter" documenting the understanding that Madoff had discretion with respect to the timing and price of the stocks, but was limited to purchasing stocks included in the S&P 100.  (SCM, Ex. 15 at 3).  The June 2004 EM issued by Optimal SUS stated that Madoff had discretion only with respect to the timing and price.  In effect, Madoff was dictating the disclosures for OIS.

78.     The Second Courvoisier Memorandum also expressed concerns about the custody of the assets – the critical piece of due diligence that had OIS verified with a simple telephone

call would have led to a cessation of the investment of the Optimal Funds' assets with Madoff.

In a section titled "Custody/Segregation of Assets," the memorandum said:

> When asked why we could not custody the securities with an external custodian, Madoff replies that logistically it would have been impossible for him to ensure errorless **delivery** ["Delivery Risk"]. In executing sell orders he would need to have physical control of the assets, and if the assets were somewhere else, there could be delays (as he actively trades) and additional costs.
>
> Another reason for being his own custodian is that he does not want anybody to know when he is in the market and to be able to **copy** his investment strategy ["Copying Risk"]. The fact that people would have this information could jeopardize the strategy.

(SCM, Ex. 15 at 4; emphasis supplied).

79.     OIS never pressed Madoff further and accepted these explanations about supposed Delivery and Copying Risk at face value, without any confirmation, verification, or investigation.

80.     Madoff's simplistic explanations, however, were logically flawed. Even under Madoff's supposed explanation of how his operation worked, and OIS's understanding of it, Madoff had to execute large volumes of options with counterparties, which exposed Madoff to Delivery and Copying Risk. The fact that Madoff had counterparties to execute option contracts was **the** critical component of the "split strike conversion" strategy because it provided the downside protection which Madoff and OIS touted as the strategy's centerpiece. If Madoff traded the options with counterparties, he would face "Delivery Risk" and "Copying Risk" with them.

81.     Moreover, financial markets are built to ensure proper delivery. The settlement and delivery processes is fairly standardized and any failures are typically rectified with counterparties on a timely basis. Otherwise, every single trader in the financial markets would

have a strong interest in self-custody.  Self-custody, however, is an extremely rare exception. The fact that Delivery and settlement risks were purportedly an issue raised by Madoff should have heightened OIS's due diligence of Madoff's internal systems to understand why those systems carried risks not seen in the industry.

82.     Yet, neither OIS, nor any of the Defendants, who were all sophisticated financial market participants, ever investigated this inconsistency.   The Second Courvoisier Memorandum, thus, demonstrates that OIS had more interest in "papering" the file with a routine memorandum that parroted Madoff's incongruous statements, rather than in conducting meaningful due diligence.  OIS saw the dangers and, rather than properly investigate them, as due diligence requires, ignored them.

83.     OIS failed to confirm additional representations made by Madoff concerning custody.  "Madoff confirmed that there is no margin arrangement with the Funds and that the assets of these funds under the control of MIS are segregated and held in the DTC ('Depository Trust Co.') in the name of the Funds." (SCM, Ex. 15 at 4).  A single phone call to the DTC to inquire about the existence of the assets, or even more simply to inquire whether Madoff, indeed, had a segregated account in the Optimal Funds' names, would have led to the recognition that the Optimal Funds' assets (and thus, Plaintiffs and the Class's investments) were more than simply at risk.

84.     The fact that neither Courvoisier, nor OIS, had a genuine interest in ensuring that Madoff had actual custody of the assets, and had not stolen them, is clear from the conclusion of the custody section of the Second Courvoisier Memorandum.  The memorandum concluded that the liability was the custodian's, not the "Santander's entities:"

> It has to be noted that the custody of Optimal Multiadvisors Ltd (including the Funds) is in the process of being changed to

> Bermuda Trust (Dublin) Ltd (from the Bank of Bermuda Group). This entity had agreed to appear in the Prospectus as the official custodian of the fund above mentioned. This entity will then delegate its duties to MIS and appoint it as sub-custodian. **The new custodian will keep all the exposure/responsibility in case of liquidation of the fund as neither Madoff nor any of the Santander entities will be disclosed in the Prospectus as custodian**.

(SCM, Ex. 15 at 4).

85. Courvoisier's only concern was clearly for the "Santander entities," not for Plaintiffs and the Class.

86. The Second Courvoisier Memorandum also shows that OIS sought legal advice from law firms in New York. These law firms provided certain recommendations concerning the red flags identified above, including very simple procedures designed to verify that Madoff was not a Ponzi scheme and was actually conducting real operations, and that the Optimal Funds assets still existed. (SCM, Ex. 15 at 4). For example, the law firm of KMZ Rosenman made two critical recommendations:

> - Clarify if the Funds are held in a segregated omnibus account and if they are commingled with securities held for others;
>
> - Review a transaction confirmation (ticket) for option transactions regarding the counterparty risk issue (see attachment B).[5]

(SCM, Ex. 15 at 5).

87. Both recommendations sought confirmation of a critical issue: did Madoff actually interact with the outside world? The confirmation ticket for option transactions with a counterparty sought to ensure that counterparties existed and that they were reliable counterparties that would not default. Confirmation tickets would have identified the

---

[5] Plaintiffs have not been able to locate a copy of attachment B.

counterparty.  Again, a simple phone call to the supposed counterparty seeking confirmation that the trade purportedly documented by the phony Madoff ticket had actually been executed would have undermined Madoff's representations to Defendants upon which they had unquestionably relied.  Similarly, a call to DTC where Madoff said the assets were held in segregated accounts would have led to a similar discovery.

88.   Other law firms further identified the counterparty risk as important.  For example, Shearman & Sterling recommended that OIS "review [over-the-counter] option status, counterparty risk would be eliminated if option transactions are 'crossed' through the exchange." Accordingly, two different law firms had raised a red flag with respect to counterparty risk, yet OIS either never contacted a single counterparty in over a decade of investing with Madoff or, worse, did contact a counterparty and discovered that Madoff did not trade with them and ignored the red flag.  (SCM, Ex. 15 at 4).

89.   The final section of the Second Courvoisier Memorandum sets forth a series of "Conclusions," including the following:

> We have chosen KMZ Rosenman as the law firm to work with. We will work with them on the following issues:
>
> 1)  Legal opinion on the precise regulatory status of MIS/Madoff under US State and federal laws;
>
> 2)  Legal opinion on the compatibility of such regulatory status with the existing contractual arrangements between the Funds and MIS;
>
> 3)  Clarify the segregation of assets;
>
> 4)  **Legal assistance on some of the lawyers' suggestions mentioned above** such as reviewing the [Broker-Dealer] form from NASD, the Focus Reports from the SEC, **the [over the counter] options status and transaction confirmation**;

31

> 5) Legal assistance on some general issues such as redrafting the Offering Memorandum of Optimal Multiadvisors Ltd and,
>
> 6) Any future issue related to our new business in New York.
>
> [] We have decided to appoint Bermuda Trust (Dublin) Ltd (Bank of Bermuda Group) as custodian of Optimal Multiadvisors Ltd . . . . the name of the custodian will be disclosed in the Offering Memorandum and Madoff/MIS will be appointed as sub-custodian.

(SCM, Ex. 15 at 5; emphasis supplied)

90.     The Second Courvoisier Memorandum, thus, indicated that OIS would supposedly follow up on the critical red flags.  The list of "conclusions" even provided a due diligence road map, including obtaining confirmation from external counterparties. Yet, OIS never conducted the requisite due diligence.

### B.     OIS VIOLATED ITS OWN INTERNAL DUE DILIGENCE PROCEDURES, AMONG OTHER THINGS, BY FAILING TO CONTACT MADOFF'S COUNTERPARTIES

#### 1.     The OIS 2005 Due Diligence Questionnaire

91.     On June 6, 2005, OIS submitted a 28-page form entitled AIMA's Illustrative Questionnaire For Due Diligence ("DDQ") of Multimanagers Fund Managers (the "2005 DDQ," Ex. 16).[6]  The 2005 DDQ was prepared and reviewed by Amélie Fontvieille at OIS.  (2005 DDQ, Ex. 16 at 28).

92.     In response to the many questions in the DDQ, OIS showed that it knew how to conduct thorough due diligence:

> Q: What is the company's competitive edge in the strategy and style allocation process?
>
> A: We stress the importance of performing **thorough due diligence** – **on an ongoing basis** – on the managers with whom

---

[6]   AIMA is the acronym for the Alternative Investment Management Association.

> we invest.  We want to know how the manager makes money and how he or she is able to protect capital in difficult times. **We want to challenge the manager in face-to-face meetings, to see how he would react in a given situation.  Our careful attention in this area has allowed us to avoid the well-publicized cases of manager fraud.**

(2005 DDQ, Ex. 16 at 16; emphasis supplied).

> Q:  Please describe, in detail, the company's due diligence process including the investment, legal and compliance and operational due diligence procedures.  Provide examples of reports and working papers, where available.

> A:  [OIS] uses an **intensive and thorough due diligence** process that has been developed and "fine tuned" through our many years of experience over the last decade . . . . Our risk manager and in-house legal counsel will ensure all non-investment due diligence (operational and legal) and risk control for all new/existing investments.  They will provide an opinion on all managers from an operational risk perspective to the Investment Committee prior to investment decisions are made.

(2005 DDQ, Ex. 16 at 18; emphasis supplied).

> Q:  How much time is spent with each manager [e.g., Madoff] during the due diligence process?  Before initial investment?  After initial investment?

> A:  The due diligence process before initial investment takes approximately 2 months.  After initial investment, we have three to five meetings on-site, and regular phone calls and other means of communication.

*Id.*

93.     Additional answers provided by OIS further evidence that, as part of its regular due diligence process, OIS contacted counterparties and third-party vendors of the underlying funds in which it invested.

> Q:  Do you perform operational due diligence on the middle and back office operations?

> A:  Yes, both on middle and back office.

> Q:  Do you perform due diligence checks on the administrator or any other service provided to the targeted funds? If so, please describe:
>
> A:  Yes, we do carry due diligence on the fund's administrator to see how they price the portfolio and where they obtain their prices from.  **We also talk to the prime brokers the fund uses as any other third party providers**.
>
> Q:  Do you contact the outside audit company prior to approval?
>
> A:  The analysis of audit reports is integrated in the due diligence process.  We may contact the outside audit company, but it is not a condition *sine qua non* for approval.

(2005 DDQ, Ex. 16 at 19; emphasis supplied).

94.     The critical importance of contacting the underlying fund's third-party providers (such as counterparties, prime brokers, and auditors), and of being comfortable with who they were, was obvious to OIS because it had already suffered serious losses in the past.  As set forth in the 2005 DDQ, during the Russian debt default in August 1998, one of the funds in which OIS had invested collapsed because of a counterparty's failure to honor its obligations:

> In August 1998, we [OIS] were invested in the III High Risk Opportunities Fund.  This fund was partly invested in Russian debt.  **They had contracted a "Non Deliverable Forward" (Dollar/Ruble) as their hedge with two reputable financial institutions.  As the Russian crisis unfolded, the two institutions refused to honour the NDFs and the fund collapsed**.  This issue is still in litigation today[, seven years later].

(2005 DDQ, Ex. 16 at 23; emphasis supplied).

## 2.     The OIS 2008 Due Diligence Questionnaire

95.     In the course of their investigation, Plaintiffs also obtained a copy of the 2008 Due Diligence Questionnaire (the "2008 DDQ," Ex. 17).  It is dated April 30, 2008, and was completed by Amélie Fontvieille and reviewed by Toby Gauvain ("Gauvain").  Gauvain was

Head of Global Business Development for OIS.  The 2008 DDQ is virtually identical in format to the 2005 DDQ and presents an update of the information previously provided.

96.     Once again, the 2008 DDQ shows that OIS knew how to conduct thorough due diligence but utterly failed to do so with Madoff.  The answers to the questions are very similar to the ones provided in 2005.

> Q: What is the company's competitive edge in the strategy and style allocation process?
>
> A: We have the resources, processes and experience to conduct **thorough due diligence** on target funds.

(2008 DDQ, Ex. 17 at 13; emphasis supplied).

> Q: Summarise your manager selection process:
>
> A: The typical criteria a manager should meet to qualify for selection [includes] . . . . risk controls . . . .
>
> * * *
>
> Q: Please describe, in detail, the company's due diligence process including the investment, legal and compliance and operational due diligence procedures.  Provide examples of reports and working papers, where available.
>
> A: The due diligence process is split into investment and non-investment processes.
>
> Investment processes include . . .
> - Due diligence is performed on both middle and back office operations
>
> Non-investment processes include . . .
> - Review of business structures and terms
> - Evaluation of manager's business plans and **operational infrastructure**
>
> * * *
>
> Q: Where does your due diligence process differ from that of others in the marketplace?

35

> A:  . . . .  We have a defined investment and risk control process that can be replicated for any review done on a manager.
>
> We have the resources, market intelligence and procedures and controls of a world class financial institution/recognised bank which is in the global top 10

(2008 DDQ, Ex. 17 at 14).

> Q:  Do you have a dedicated operational due diligence team?
>
> A:  Yes. Optimal is committed to building a dedicated independent operational risk management team which will deal with operational risk and due diligence.  It is one of a handful of asset managers in the alternative asset space with dedicated resources in this area.

(2008 DDQ, Ex. 17 at 15).

97.    Indeed, OIS had an Operational Risk Management team of five people with extensive experience, led by the Chief Risk Officer, Gilles Prince ("Prince").  Prince had worked as a consultant for PricewaterhouseCoopers' financial risk management unit.  Other members of the team included Michelle Perry (Operational Risk Analyst), Kearstin Meadows (Operational Risk Lawyer), Jocelyn Bean (Operational Risk Analyst) and Alicia Garrido (Operational Risk Analyst).  (2008 DDQ, Ex. 17 at 16).

98.    Additional responses in the 2008 DDQ showed that OIS understood the critical importance of checking with outside vendors and service providers when conducting operational due diligence:

> Q:  Do you perform reference checks on the manager?  If so, how are these done?
>
> A:  Yes, reference checks are performed through contact with … related people in the industry, such as other hedge funds, or service providers as prime brokers.  Where we cannot gather enough information on the manager, we use specialised companies such as Back Track.

36

* * *

> Q: Explain both the ODD [operational due diligence] prior to investment and the ongoing ODD after investment (if any). Are all visits written up in structured reports?

> A: Prior to investment, control reviews of the managers operations are performed. On an ongoing basis, manager visits are performed. The frequency of the visits is based on an assessment of the risks presented by the Managers' operations. Reports are prepared on these visits.

> Q: Do you perform due diligence checks on the administrator or any other service provider to the targeted funds? If so, please describe:

> A: **Yes, we have a programme of reviews for service providers to targeted funds such as the funds administrators, lawyers and auditors**.

> Q: Do you contact the outside audit company prior to approval?

> A: An attempt to make contact with the auditors to the fund **will always** be made.

(2008 DDQ, Ex. 17 at 15; emphasis supplied).

99.     The 2008 DDQ further showed that OIS understood that operational due diligence was an important risk mitigation task. In describing its risk management approach, OIS explained that operational risks required that OIS fully analyze Madoff's counterparties, although it failed to do so with respect to the Optimal Funds' investments with Madoff:

> Q: Describe how risk management is structured within your organisation?

> A: We have a distinctive approach to Risk Management as we organize these functions along two dimensions. First, risks are mapped by category such as investment, non-investment, operations and compliance, legal & regulatory risks. Second, risks are identified for hedge funds, portfolios of hedge funds, legal structures and operations. Clear parameters are set for

each of the elements in the form of exposure reports, automatised controls and risk limits.

Risks are dealt across various departments as it lies at the heart of our investment process. **Our thorough due diligence process ensures that the highest standards of quality are met when selecting hedge funds.** The application of our investment process is controlled by our legal & compliance unit. This unit is also responsible for checking the compliance of Optimal funds with their prospectus, investment philosophy and regulators. Investment risks are dealt by our dedicated quantitative analysis & investment risk management team. They focus their analysis on market risk, control of risk limits and analysis of the underlying hedge fund risk management organization. The third category or risk is operational risks at the level of hedge funds. As this is not a rewarding risk for our investors, **our operational risk analysis analyze in detail the business structure of each hedge fund in the portfolio, their legal setup, documentation, or counterparties** . . . .

Optimal Risk Committee is central in our risk management organization as it represents all the points mentioned in the above paragraph. Members are senior key and experienced professionals heading and representing Quantitative Research & Investment Risk, Operational Risk, Legal & Compliance and Operations teams. It is Chaired by Gilles Prince, our Chief Risk Officer.

Q: What risk management concepts does the company apply to its underlying managers/funds?

A: . . . . Qualitative risk analysis:
Three main areas are being analyzed: investment risk management and operational risk at the level of hedge funds. **Operational risk covers**, among others, the constituent documents of the fund, the prospectus, contracts, agreements, **counterparties**, business organisation, reference checks, corporate actions, regulatory filings, NAV calculation process, pricing policies. The objective is to understand which liabilities may the fund have and may imply risks . . . . **These risk analyses are performed with detailed desk analysis, conference calls with managers, CFOs, COOs, CROs and on-site visits**.

Quantitative risk analysis:

Hedge funds are analysed quantitatively by our dedicated team. State of the art statistics are calculated so that we can assess if the hedge fund possesses the desired characteristics that we seek, like for example capital protection, participation in the upside performance of markets, low correlation, liquidity. **This analysis is completed by a complex statistical non-linear style analysis with our FOFIX tool. Risk profiles are calculated for each hedge fund in order to estimate the systematic factors influencing the returns of the fund. These are then compared with the qualitative analysis of our research analyst and deviation from expected risk profiles need to be explained. . . .**

Potential breaches of the risk parameters would be immediately notified to the Chief Operating Officer and if appropriate to the Chief Executive Officer. Breaches would be reported and presented at the Investment Committee Meeting and reported to the **Group's Risk Monitoring Division in Madrid.**

(2008 DDQ, Ex. 17 at 20; emphasis supplied).

100. The involvement of Group's Risk Monitoring Division in Madrid was further detailed in additional responses included in the 2008 DDQ, especially in terms of risk controls:

Q: Does the company use any formal risk limits? Or informal risk guidelines? If so, please describe how they are used.

A: The Company agrees risk control criteria on the portfolio with Santander Asset Management Central Risk Control unit based **in Madrid**.

\* \* \*

Q: What on going assurance does the firm provide to clients over the effectiveness of its operational risk framework? If a SAS70 or FRAG 21 . . . has been completed please list the key weaknesses identified in the last 5 years.

A: The Company does not prepare SAS 70 or FRAG 21 reports, but it is subject to regular review by the Santander Group Internal Audit and is also subject to the Group's Compliance policies and procedures and Risk Framework.

(2008 DDQ, Ex. 17 at 20, 22; emphasis supplied).

### 3.     OIS's Quantitative Analytics Tools Raised Red Flags

101.     The 2008 DDQ admitted that OIS relied on a quantitative analytics tool called FOFIX.  (2008 DDQ, Ex. 17 at 20).  FOFIX is a statistical model that seeks to identify hidden risks in a portfolio.  In effect, FOFIX serves to confirm that the supposed investing strategy of a portfolio is being executed, otherwise the results of the FOFIX analysis would show deviations from the expected risk profiles.

102.     FOFIX was created by a company called Riskdata that specializes in providing quantitative risk management tools to hedge funds, funds of funds (such as OIS), mutual funds, and other institutional investors.  Riskdata developed FOFIX specifically for funds of funds that invest in hedge funds.

103.     On February 9, 2009, shortly after Madoff's Ponzi scheme unraveled, Riskdata published the results of its analysis of Madoff's supposed split strike conversion strategy using FOFIX.  ("FOFIX-Madoff Results," Ex. 18).  The February 2009 analysis was entitled "The Madoff Case: Quantitative Beats Qualitative!"  The subheading said, "Two Red Flags: Bias Ratio and Risk Profile Clearly Pointed to Problems With Madoff."  (*Id.* at 1).  The introductory section summarized Riskdata's findings as follows:

> **Numbers tell a story and clearly have an order that should be hard to fake**.  What appears to be too good to be true can be measured . . . . anyone paying attention to quantitative advances in hedge fund risk management suspected that Madoff was a scam to be avoided.  Amongst the quant techniques useful in detecting fraud, the most efficient is the Bias Ratio, invented by Adil Abdulali of Protégé Partners and available in Riskdata's suite of analytics.  **In Madoff's case, a calculation of the Bias Ratio points to the fallacy of Madoff's returns**.  **In addition, an accurate analysis of Madoff investment Risk Profile is inconsistent with its style and peer group.**

("FOFIX-Madoff Results," Ex. 18 at 2; emphasis supplied).

104.    In measuring the Bias Ratio, the FOFIX-Madoff Results applied that measurement to 2,290 funds that executed a somewhat similar strategy to Madoff.  (*Id.* at 2).  Over 2,200 funds had a Bias Ratio of 3 or below.  Sixty-five additional funds exhibited Bias Ratios between three and six.  (*Id.* at 2-3).  Only twenty funds had Bias Ratios of six or above.  Among them was Bayou, with a Bias Ratio of approximately 6.3, and which had admitted in 2005 that it had fabricated its returns – just like Madoff.  **Madoff had a higher Bias Ratio than Bayou – a Bias Ratio exceeding 6.5.**  (Id.)

105.    The second quantitative parameter that clearly showed that something was seriously wrong with Madoff was the Risk Profile.  The Risk Profile explained,

> which market factors are the most important drivers and how the fund reacts to changes in these factors.  It is [Riskdata's] experience that, even when performances themselves cannot be replicated, the risk profile stays the same, i.e. relevant risk factors are the same between the original fund returns and the replication.  In the present case, an option strategy like the one described by Madoff . . . has certain characteristics.  (*Id.* at 5).

106.    The Risk Profile showed that Madoff's option strategy should have been highly sensitive to volatility and equity prices.  In other words, large swings in volatility and equity prices should have had strong effects on Madoff's reported returns.  Yet, Madoff's returns were effectively immune to volatility and equity prices.  (*Id.*)  Even more telling, the Risk Profile of Madoff's returns showed it was "quite unstable: factors to which it [was] sensitive tend to change from month to month, which is surprising given that the strategy announced [was] stable with very little space for discretionary choices."  (*Id.* at 6).  Madoff's "risk profile[] [was] a total mismatch for the advertised trading strategy."  (*Id.*)

107.    OIS, admittedly, had FOFIX and purportedly relied on it when conducting due diligence.  Indeed, OIS's 2008 DDQ specifically noted that when quantitative measurements

flashed red and showed that a manager was not executing the advertised strategy, this information was sent to Madrid:

> **Potential breaches of the risk parameters would be immediately notified to the Chief Operating Officer and if appropriate to the Chief Executive Officer.  Breaches would be reported and presented at the Investment Committee Meeting and reported to the Group's Risk Monitoring Division in Madrid.**

(2008 DDQ, Ex. 17 at 20; emphasis supplied).

108.    Yet, either OIS failed to use FOFIX when conducting due diligence on Madoff, or ignored the FOFIX results, to the detriment of Plaintiffs and the Class.

### 4.    A January 2008 Internal Presentation By OIS To Santander Asset Management Highlighted The Profitability Of Optimal SUS To Santander

109.    In January 2008, OIS made a detailed internal presentation about Optimal SUS (the "January 2008 Presentation," Ex. 19).  In a slide featuring key statistics about Optimal SUS, one of the bullet points read: "Very **profitable** business for the **Group**, average management **fee** above **2%**." (January 2008 Presentation, Ex. 19 at 3; emphasis in original).  OIS, thus, sought to highlight the profitability of Optimal SUS to incentivize its sales force to sell more.

110.    The January 2008 Presentation also touted Madoff as being at the forefront of financial technology:

> [BMIS's] position at the forefront of **computerized trading** is widely acknowledged in the US financial community and it is very well known for its fine pricing as well as its ability to execute most orders in seconds with sophisticated proprietary automation and enhanced execution.

(January 2008 Presentation, Ex. 19 at 15; emphasis in original).

111.    Despite Madoff's supposed technological prowess, Madoff did not send OIS trading confirmations electronically, or in real time.  In addition, the paper confirmations mailed

by Madoff did not include specific trading prices.  Instead, Madoff only provided average prices for entire trading days.  These facts are completely at odds with Madoff's supposed "computerized trading" prowess and was a massive red flag that OIS completely ignored.

112.    The January 2008 Presentation provided further details about Madoff's supposed trading operation that OIS failed to confirm.  The "Trading operational procedure" section stated:

> - The fund diversifies risk with over twelve trading counterparties
>
> - **Client assets** are held at the [Depositary Trust Company] DTC in **segregated accounts** designated as Madoff Client Accounts in accordance with SEC Rule 15(c)(3)(3).
>
> - This segregation effectively **eliminates** the ability to **use client assets** to finance proprietary activities, such as market making.

(January 2008 Presentation, Ex. 19 at 19; emphasis in original).

113.    OIS failed to contact any of the counterparties with whom Madoff purportedly invested and failed to confirm with DTC that Madoff had segregated Madoff Client Accounts.  Indeed, had OIS or any of the Defendants called to confirm the segregation of accounts, and found that that was not the case, they would have avoided investing the Optimal Funds' assets with Madoff – at a minimum to avoid the stated concern that Madoff could be "using client assets to finance proprietary activities, such as market making."  (January 2008 Presentation, Ex. 19 at 19).

114.    Further, according to the January 2008 Presentation, "legal ownership [sic] US T-Bills and Interest on Cash Balances must vest in the Optimal funds."  (January 2008 Presentation, Ex. 19 at 21).  This suggests that Madoff invested in U.S. T-Bills (as Madoff and the EMs asserted that Madoff did when not using the split strike conversion strategy), but that the U.S. T-Bills were registered in Optimal SUS's or Optimal Arbitrage's name.  As a practical matter, however, this was impossible. The legal ownership of the U.S. T-Bills could not have

vested in the Optimal Funds because the investments in Treasury securities never existed.  OIS never confirmed that the billions of dollars it had invested with Madoff were, in fact, in Optimal SUS's name.  Indeed, OIS did not even confirm the existence of the T-Bills which were reflected on Optimal SUS's financial statements.

> **5.**     **Santander Documents Show That In Other Contexts Santander And OIS Knew How To Take Adequate Precautions With Respect To Custodial And Counterparty Risk**

> **(a)**     **The 2002 Custodian And Administration Agreement**

115.   On November 28, 2002, Optimal SUS, together with Optimal Arbitrage and certain other Optimal funds, entered into a custodian agreement with Bermuda Trust (Dublin) Limited ("Bermuda Trust") (the "Custodian Agreement" or "CA," Ex. 20).  Defendant Inder Rieden signed the Custodian Agreement on behalf of all the Optimal Funds.

116.   The Custodian Agreement is virtually contemporaneous with the Courvoisier Memoranda written only two months earlier.  Yet, the contrast could not be starker with respect to the care and oversight that OIS had over the custody of the funds by Bermuda Trust compared to the custody and administration of the investment with Madoff.

117.   One of the areas of oversight concerned proxies and the voting of the shares held by Bermuda Trust.  Because Bermuda Trust would hold equity securities in the name of the Optimal Funds, these equity securities provided the beneficial owner (*i.e.*, the Optimal Funds) with the right to vote in company matters.  Accordingly, the Custodian Agreement specified the rights and procedures of the Optimal Funds and Bermuda Trust in connection with proxies and voting.  In a section of the agreement entitled "Voting and Other Action," the Custodian Agreement stated:

> The Custodian shall deliver, or cause to be delivered, to the Company [e.g., Optimal Multiadvisors] and/or the Trading Companies [i.e., Optimal SUS] copies of all notices, proxies and

> proxy soliciting materials received by it or its nominee or agent appointed hereunder in relation to any of the Securities held by any of them for the account of the Company or the relevant Trading Company.  The Custodian shall not, and shall procure that no nominee of the Custodian shall, vote in respect of any of the Securities held by any of them for the account of the Company or the relevant Trading Company, except in accordance with proper instructions.

(CA ¶ 10(A), Ex. 20 at 13).

118.   Pursuant to the Custodian Agreement, the Optimal funds could thus vote the shares they owned but that were held indirectly by the Custodian.  Neither OIS, Santander, nor Optimal SUS, however, could have ever voted the shares supposedly held by Madoff because Madoff never owned any shares.  During the time Optimal SUS invested with Madoff, which exceeded a decade, no one at Optimal SUS, OIS, or Santander ever asked Madoff for the proxy materials.  They never asked to vote a single one of the shares they owned even though Optimal SUS held investments worth more than $3 billion in U.S. equities as of December 2008.  Yet, Optimal SUS had such rights expressly provided for in the Custodian Agreement with Bermuda Trust.

**(b)     The Currency Overlay Agreement**

119.   Another agreement that evidenced the care that OIS took to set up controls and procedures with third-party vendors that far surpassed those with Madoff was the Currency Overlay Agreement (the "Currency Overlay Agreement" or "COA," Ex. 21). Optimal Multiadvisors had entered into a Currency Overlay Agreement with Overlay Asset Management S.A. ("Overlay Management") as of October 2006. (October 2006 EM, Ex. 11 at 11).  Plaintiffs have obtained a copy of the agreement dated October 1, 2008.

120.   The purpose of the Currency Overlay Agreement was for OIS to outsource its currency hedging requirements.  OIS needed to hedge its currency risk because the supposed

underlying investments by Madoff were in U.S. dollars, but OIS and Santander offered some shares in Optimal SUS denominated in Euros and Japanese Yen.  To prevent currency swings from distorting the returns supposedly provided by Madoff in U.S. dollars to the Optimal SUS investors in Yen and Euros, OIS needed to hedge that risk.

121.    Importantly, Overlay Management only executed the hedging strategy – just like Madoff only executed the split strike conversion strategy.  Overlay Management was not the ultimate counterparty with which Optimal SUS hedged its currency exposure.  Instead, Overlay Management simply was the expert in executing the hedge.

122.    Because Overlay Management was not the ultimate counterparty, the Currency Overlay Agreement specified the counterparty with whom Overlay Management could trade. Given that Optimal SUS had billions of dollars invested in U.S. dollars and hundreds of millions in Euros and Yen, the counterparty had to be sufficiently sound, financially.  Accordingly, the specified counterparty was HSBC Bank Plc - HSBC Services in London.  (COA Appendix C, Ex. 21 at 14).   In addition, the Currency Overlay Agreement also required that Overlay Management send Optimal a "copy of all trade confirmations."  (COA ¶ 5, Ex. 21 at 3).

123.    Optimal could, thus, easily confirm and verify that Overlay Management was actually hedging Optimal's currency exposure. Not only would Optimal receive trade confirmations, but Optimal also knew that the trades were carried out with HSBC Bank in London.  Accordingly, Optimal could always regularly check by calling or contacting HSBC London and confirming that, indeed, HSBC London had the other leg of the currency hedge.

124.    In sharp contrast, OIS had no similar clause in its contract with Madoff to ensure that Madoff's counterparties were acceptable.

### C.   CONDUCT BY THE SANTANDER GROUP IN 2008 INDICATES GROWING CONCERNS ABOUT MADOFF

#### 1.   Santander Miami And Santander Bahamas Asked Investors In Optimal SUS To Sign Waivers Purporting To Ratify Madoff As The Sole Manager

125.   In the course of 2008, Santander affiliates implemented certain procedures that indicated growing concerns about Madoff.  One of those procedures consisted of having private banking clients who had invested in Optimal SUS sign a waiver if they wished to remain in the fund ("Waiver," Ex. 22).  Nothing had changed with respect to the supposed risk parameters of Madoff to warrant the execution of this new waiver.  Madoff was supposedly still executing his split strike conversion strategy. And, Madoff was still the only manager for Optimal SUS. Nevertheless, the Santander affiliates sought to obtain additional waivers.

126.   The Waiver said, in relevant part:

> With respect to your investment in Optimal SUS, you understand and accept the following:
>
> Santander Bank & Trust Ltd. (the "Bank") [*i.e.,* Santander (Bahamas)] has informed you that your investment in Optimal SUS may exceed the concentration limits recommended by the Bank, based specifically in the investment profile you have selected for your account with the Bank, **for investments in Hedge Funds managed by one manager**.

(Waiver, Ex. 22; emphasis supplied).

127.   The Waiver further explained that Santander (Bahamas) (i) had advised the client to redistribute the portfolio by investing in investments other than Optimal SUS; (ii) provided the client the opportunity to review the clients' investments and reduce the exposure to Optimal SUS; (iii) provided various opportunities to ask questions and receive answers concerning Optimal SUS; and (iv) explained that the investment in Optimal SUS was not guaranteed by the

Bank, any of its affiliates, or any private or governmental entity, and could result in the total loss of investment.  (Waiver, Ex. 22).

128.    The Waiver was therefore quite clear: invest in Optimal SUS at your own risk.

129.    While the Waiver exhibited the dry terminology of legal forms, emails from Santander Miami bank representatives to their clients translate Santander Miami's concerns into plain language.  In an email from Vanessa Redmond at Santander Miami's offices, in Miami, Florida, dated September 30, 2008, Ms. Redmond told a client that:

> Banco Santander is recommending liquidating one of your investments.  The name is "OPTIMAL SUS EQ IRL A USD." The bank considers that it is **highly risky** and **due to the volatility** in the market we prefer to be conservative and liquidate the investment.
>
> Please call me to discuss this issue.

(September 30, 2008, V. Redmond Email, Ex. 23, emphasis supplied).[7]

130.    The claim that the volatility in the market was the reason Santander Miami recommended exiting Optimal SUS was flatly contradicted by OIS's own report for Optimal SUS for the quarter ending September 30, 2008 ("Optimal SUS 3Q'08 Report," Ex. 24).   OIS actually touted the volatile environment as providing opportunities for Madoff.  In a slide entitled "Summary of Fund Achievements," OIS stated:

> Review and outlook:
>
> - The manager's market timing [i.e., Madoff's] was impeccable during the recent period, as he was able to find great entry points and exit points to benefit investors
>
> - **The current volatile environment continues to provide opportunities for the strategy to outperform its equity index benchmark**

---

[7]    This email has been redacted to protect the identity of the recipient.

- [Optimal SUS] navigated one of the most difficult periods in recent market history successfully, managing to produce a gain in the face of high market volatility.

(Optimal SUS 3Q'08 Report, Ex. 24 at 10; emphasis supplied).

131.    Additional slides in the report provided additional statistics to make the same point that volatility in the market did not affect Optimal SUS.

(a)    One slide on "Current Performance" showed that Optimal SUS had supposedly obtained a 2.39% return in the third quarter of 2008 while the S&P 500 had dropped 8.88%.  (Optimal SUS 3Q'08 Report, Ex. 24 at 9).

(b)    Another slide on "Statistics Relative to Various Markets" listed the correlation between Optimal SUS and the S&P500 at a "very low" 0.26.  (*Id.* at 12).  Indeed, the whole point of the statistics presented was that "Optimal Strategic U.S. Equity's Performance Is Highly Uncorrelated With the U.S. Equity Market As Well As Hedge Fund Returns In General." (Optimal SUS 3Q'08 Report, Ex. 24 at 12).

(c)    Yet another slide showed that "[Optimal SUS] Ha[d] Outperformed During Crisis Periods."  (Optimal SUS 3Q'08 Report," Ex. 24 at 15).  The chart on the slide then showed how Optimal SUS had obtained positive returns compared to negative returns by the S&P 500 during the (i) 1998 Long Term Capital Management collapse; (ii) 2000 Tech Bubble Burst; (iii) 9/11 attack; (iv) 2002 WorldCom bankruptcy: (v) 2002-2003 Iraq War; and (vi) 2008 credit bubble burst.  (*Id.*).

**2.    Echeverria Left OIS In June 2008 And Santander Sent A Director To Meet With Madoff On Thanksgiving Day 2008**

132.    On June 30, 2008, Echeverría left OIS after nearly a 20-year career with Santander and its affiliated entities.  Echeverría had been OIS's CEO and CIO during its entire existence.  He had built the hedge fund group in Geneva that ultimately became OIS.  And, as

described in the EMs, "he built Grupo Santander's expertise in the major alternative investment styles . . . and several other sub-strategies, building a US and European presence for Grupo Santander."   (October 2006 EM, Ex. 11 at 9). Echeverría is currently under criminal investigation in Switzerland.

133.    With Echeverría gone and unable to sell OIS, the Santander Group made one last-ditch effort to salvage what it could from Madoff.  In late-November 2008, Santander dispatched a senior member of its Board of Directors, Rodrigo Echenique, to meet with Madoff face-to-face in New York.  Echenique is widely known to be one of Emilio Botín's ("Botín") most trusted advisors.  Botín is the Chairman and CEO of Santander, has been a director since 1964, and succeeded his father and grandfather who both had run the Bank before him.  Echenique had served under Botín as President of Santander between 1988 and 1994, but has remained a Director on the Board ever since.

134.    Echenique and his team met with Madoff on Thanksgiving Day 2008.  According to a *Financial Times* article dated January 23, 2009, and entitled, "Santander Fund Praised Impeccable Madoff," what happened during the meeting is "disputed."  However, a banker "with knowledge of the meeting" described it as "a 'routine' inspection" that resulted in Santander remaining satisfied with BMIS.  The Spanish newspaper *El Mundo* reported on December 18, 2008, meanwhile, that Echenique's visit was prompted by "rumors about the possible problems" at BMIS which had been "going around for a few months in a small number of Santander's offices," and noted the abrupt departures of several high level executives of OIS in June 2008, including Defendant Echeverría.   Regardless of the "rumors," *El Mundo* reported that Santander's delegation purportedly "returned from New York with a complete report that theoretically removed any doubt about the solvency" of BMIS.

### D.   SANTANDER AND ITS AFFILIATES WERE DEEPLY INVOLVED IN OIS AND PROFITED IN THE FORM OF COMMISSIONS

#### 1.   Santander And It Affiliates Oversaw Risk Management At OIS

135.   Santander and its affiliates in Madrid were deeply involved in risk management at OIS, especially with respect to Optimal SUS.  In an October 2008 presentation about Optimal SUS entitled, "Optimal Investment Services: Optimal Strategic US Equity," OIS emphasized repeatedly the pervasive role of its corporate parent.   ("Optimal SUS October 2008 Presentation," Ex. 25).

136.   The first section of the presentation asked, "Why Optimal?"  The answer relied heavily on Grupo Santander, with one slide immediately afterwards listing the advantages of the "Presence of Grupo Santander" in OIS.  These advantages included the fact that Santander was the seventh largest bank in the world in terms of market capitalization, the fifth most profitable bank, had more than 132,000 employees, and earned record profits in 2007 of about $10 billion. (*Id.* at Ex. 25 at 3).

137.   Santander's role was described in even more detail with respect to risk control. One of the critical risk-controls included "Internal Audit" at Grupo Santander.  (*Id.* at Ex. 25 at 23).  Internal Audit was an additional control layer on top of all the risk control procedures supposedly carried out by OIS.  As set forth in the presentation, risk control procedures included supervision by (i) the risk control committee at OIS; which included OIS's CEO and CIO, and the head of operational risk, among others; (ii) the non-investment, operational due diligence, and quantitative research teams; and (iii) Optimal SUS's outside auditors, PwC.

138.   Grupo Santander's Internal Audit functions were further specified in another slide, entitled "Operational Control: 6 Levels of Control and Audit."  (*Id.* at Ex. 25 at 26).   "The Risk Control Division at Santander Asset Management controls all risk controls and procedures

at OIS." (*Id.*).  This "control" was carried out on a "continuous" and "annual" basis.  (*Id.*). Indeed, Santander's Internal Audit group had a team member permanently based in Geneva. (*Id.* at Ex. 25 at 26).

### 2.    Santander Miami Profited From The Sale Of The Optimal Funds

139.    Santander Miami benefited economically from the sale of the Optimal Funds to Plaintiffs and the Class.  Santander Miami charged Plaintiffs and the Class a sales charge at the time of the investment in the funds that was a percentage of the amount invested.  This sales charge was in addition to the annual management fee charged by OIS based on the market value of the Optimal Funds each year.  Santander Miami also benefited economically because it shared the annual management fee with OIS as compensation for Santander Miami's sales efforts. Santander Miami has kept these sales charges, fees, and commissions, and has not returned the monies to Plaintiffs and the Class.

### E.    THE SANTANDER DEFENDANTS SETTLED THE CLAW BACK SUIT FILED BY THE SIPC TRUSTEE PREMATURELY TO PREVENT THE RELEASE OF INCRIMINATING INFORMATION

140.    In early May 2009, the SIPC Trustee filed a number of lawsuits in bankruptcy court against several Madoff feeder funds. The suits sought to claw back hundreds of millions of dollars that the feeder funds had withdrawn from their Madoff accounts (the "Claw Back Lawsuits").  The SIPC-Trustee alleged that these monies belonged to other victims of Madoff's Ponzi scheme.

141.    The Claw Back Lawsuits further alleged that the feeder funds ignored critical red flags.  For example, in a law suit filed against the Kingate feeder fund,[8] the SIPC Trustee presented the following evidence in support of his claim:

---

[8] *Irving H. Picard v. Kingate Global Fund, Ltd. et al.*, No. 08-01789, Adv. Pro. No. 09-1161, S.D.N.Y., Cmpt. at 15 ("Trustee Kingate Action").

> Hedge funds and funds of funds like the Defendants were sophisticated investors that accepted fees from their customers based on purported assets under management and/or stock performance in consideration for the diligence they were expected to exercise in selecting and monitoring investment managers like Madoff.   The Defendants failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme.  Among other things, the Defendants were on notice of the following **indicia of irregularity** and fraud but failed to make sufficient inquiry.

(Trustee Kingate Action, Cmpt. at 13; emphasis supplied).

142.     The evidence of indicia of irregularity alleged by the SIPC Trustee was that Madoff repeatedly reported to the feeder funds, such as the Optimal Funds, trades that were **outside of the daily trading range**.  By May 2009, Mr. Picard had combed BMIS's internal records for almost six months and had been able to conduct a thorough examination.  This examination culminated in the finding that Madoff had reported hundreds of trades that could never have been executed and that should have alerted the individuals controlling the feeder funds that something was terribly wrong.  The Trustee Kingate Action thus alleged as follows:

> At times, the Defendants' monthly statements reflected trades purchased or sold on behalf of the Defendants' accounts in certain securities that were allegedly executed at prices outside the daily range of prices for such securities traded in the market on the days in question . . . . Defendants Kingate Global and Kingate Euro received monthly account statements that displayed **185 trades that were purportedly executed at a price outside the daily price range**.

(Trustee Kingate Action, Cmpt. at 15-16; emphasis supplied).

143.     Despite this strong piece of evidence against the feeder funds, the vast majority of them (if not all, except the Santander Funds) chose to litigate with the SIPC Trustee rather than settle and return hundreds of millions of dollars.  Indeed, prior to filing the lawsuits in May 2009, the SIPC Trustee sought to settle with the feeder funds for an amount close to one hundred cents

on the dollar.  Accordingly, the basic calculus that drove the feeder funds to litigate, and not settle, was the fact that they had little to lose given the high demand made by the SIPC Trustee.

144.    The Santander Defendants decided differently, however, and on May 26, 2009, agreed to a settlement with the SIPC Trustee before a complaint had even been filed (the "SIPC Trustee-Optimal Agreement").  The settlement had been the result of months of negotiations after Optimal Multiadvisors had been served with a subpoena on February 27, 2009.  Optimal Multiadvisors agreed to return over $235 million.  This amount represented 85% of the claim.

145.    No other Madoff feeder fund has agreed to settle with the SIPC Trustee prior to initiation of a claw back lawsuit.  In fact, to date, Plaintiffs are not aware of a single feeder fund that has settled a claw back claim with the SIPC Trustee.

146.    The SIPC Trustee touted the settlement as a resounding victory.  In a press release issued on May 26, 2009, he stated, "I am very pleased that we reached **such a favorable settlement** with Optimal and that Optimal will pay more than $235 million to resolve the claims against it." (emphasis supplied).  The press release also emphasized the high percentage of recovery, "Optimal will pay the Trustee more than $235 million, an amount equal to 85% of the amount of the Trustee's claims against Optimal."

147.    The investors in Optimal Multiadvisors were not consulted in connection with the agreement with the SIPC Trustee, nor did they approve the agreement.  In fact, the entire settlement negotiations were conducted in secret and the investors in Optimal Multiadvisors were not even notified of the negotiations until the agreement had been executed and publicly filed in court on May 26, 2009.

148.    But the settlement itself was not the only revelation contained in the SIPC Trustee-Optimal Agreement.  The agreement further revealed two critical pieces of information

which had not been disclosed to investors. First, there had been no disclosure that the Arbitrage Fund had invested with Madoff until then. Indeed, in a January 27, 2009 press release, OIS had announced that Arbitrage would be liquidated citing "adverse market conditions." But there was no mention that Arbitrage had invested in Madoff and had withdrawn approximately $125 million in the fall of 2008. There also was no mention that Arbitrage had lost about $14.5 million with Madoff, which was the amount that remained at BMIS as of November 30, 2008.

149.    Second, there had been no disclosure that Optimal SUS had more than $150 million in cash in its bank account based on withdrawals from its BMIS's account prior to its collapse. In all public disclosures concerning Optimal SUS's losses due to Madoff, the crux of the disclosures was that all monies had been lost. Indeed, the Santander Defendants negotiated releases with hundreds of investors that failed to disclose that Optimal SUS had more than $150 million. There also was no consultation with the investors of Optimal SUS with respect to whether the settlement agreement with the SIPC Trustee was in the best interest of the investors.

150.    The Santander Defendants thus carried out the negotiations of the agreement with the SIPC Trustee, and reached an agreement, to the detriment of, and contrary to, the best interests of investors. The Santander Defendants forced Optimal Multiadvisors to settle with the SIPC Trustee to preempt a public lawsuit in which the SIPC Trustee would have accused Optimal Multiadvisors, and by imputation the Defendants in this action, of essentially the same wrongdoings asserted in this lawsuit. Most importantly, by settling with the SIPC Trustee, the Santander Defendants kept secret the information about the trades reported by Madoff outside of the daily trading range. Simply put, the Santander Defendants paid the SIPC Trustee, with monies belonging to Plaintiffs here, to protect their own liability.

### F.   THE FAILURE OF INDER RIEDEN AND WILKINSON TO EVER COMMUNICATE WITH MADOFF OR BMIS WAS WRONGFUL

151.   As two of the three Directors of Optimal SUS and Optimal Arbitrage, Inder Rieden and Wilkinson had principal responsibility for safeguarding Plaintiffs' assets.   Neither Optimal SUS nor Optimal Arbitrage had employees, offices, or any operations of their own.   All functions were contracted out to third-parties.   OIS was the investment manager, HSBC Services (the administrator), PwC the auditor, and HSBC Trust (the custodian).   Optimal SUS and Optimal Arbitrage were thus nothing more than a bank account controlled by third-parties.   The only parties that constituted a physical presence for these funds were the Director Defendants. Accordingly, as directors, Inder Rieden and Wilkinson had a fiduciary duty and duty of care to Plaintiffs.

152.   Inder Rieden and Wilkinson's fiduciary duty and duty of care required that they safeguard Plaintiffs' investment, among other things, by ensuring that OIS conducted adequate due diligence and oversight of Madoff.   Inder Rieden and Wilkinson knew that:

(a)   One-hundred percent of Optimal SUS was to be invested with Madoff and under his control;

(b)   Madoff had custody of the assets and was also the broker-dealer;

(c)   Madoff utilized a strategy which incorporated a "unique investment program [that] is often not well followed by the Wall Street community;"[9] and

(d)   by the end of 2008, Madoff controlled over $3 billion which Inder Rieden and Wilkinson had a fiduciary duty to safeguard.

153.   Yet, Inder Rieden and Wilkinson never communicated with Madoff – not once. They admitted this in their responses to jurisdictional discovery.   They did not speak with him on

the telephone, exchange letters or emails, visit his offices, or meet with him.  Inder Rieden and Wilkinson did not even have meetings in OIS's offices in New York with the OIS due diligence officers who oversaw Madoff's day-to-day operation.

154.   This failure to even conduct the most minimal diligence of Madoff and BMIS, while knowing that Madoff controlled $3.1 billion of investor money over which they had fiduciary responsibility, constituted a breach of fiduciary duty and duty of care to Plaintiffs and the Class.

### G. THE SANTANDER DEFENDANTS SOLD THE OPTIMAL FUNDS PURSUANT TO THE EXPLANATORY MEMORANDA

#### 1. The July 2001 Explanatory Memorandum

155.   The Santander Defendants sold investments in Optimal Multiadvisors pursuant to the EMs.  The earliest EM obtained by  Plaintiffs in the course of their investigation is dated July 2001 (the "July 2001 EM," Ex. 8).  The July 2001 EM was distributed to investors worldwide from Miami, Florida, as evidenced by a cover letter dated August 15, 2001, from Santander Central Hispano International ("BSCH International") listing its address on Brickell Avenue in Miami, Florida, and enclosing the EM (Ex. 8).  BSCH International was the predecessor entity to Santander Miami.

156.   The August 15 letter also announced the creation of a new hedge fund unit, Defendant OIS, with "headquarters in Geneva and divisions in Miami and New York."  The new hedge fund unit "had been created with a group of professionals with more than ten years of experience at Banca Privada Internacional [BPI] specialized in the analysis and selection of hedge funds."  As a result, the name of the master fund changed from BPI Multiadvisors Limited to Optimal Multiadvisors Limited, as of July 1, 2001.

---

[9]   October 2008 EM, Ex. 13 at 32.

157.    The July 2001 EM set forth the terms of the investments in Optimal SUS and

Optimal Arbitrage.   It first described the legal structure of the fund:

> Optimal Multiadvisors, Ltd. ("the Fund") is a multi-portfolio
> investment company incorporated under the laws of the
> Commonwealth of the Bahamas in August 15, 1995, under the
> provisions of the International Business Companies Act, 1989 (No.
> 2 of 1990) with limited liability and unlimited duration.  The Funds
> principal office is located at Montague Sterling Centre, East Bay
> Street, Nassau, Bahamas.  The Trading Companies [i.e., the sub
> funds, such as Optimal SUS and Optimal Arbitrage] were
> incorporated in the Commonwealth of Bahamas, under the same
> regulation, in October 1999.

(July 2001 EM, Ex. 8 at 6).

158.    Optimal Multiadvisors had a Board of Directors composed of two members at the

time, Defendant Inder Rieden and Ms. Dawn E. Davies ("Davies").  Defendant Inder Rieden was

the Chairman of Fortis Fund Services (Bahamas) Limited ("Fortis Bahamas"), which served as

Optimal Multiadvisors' administrator in 2001.

159.    The investment manager at the time was Optimal Investment Management Ltd.

("OIM").  Defendant Inder Rieden and Davies were also directors of OIM.  While OIM was

legally the investment manager, the July 2001 EM explained that the investment decisions were

made by Santander and OIS:

> [OIM had appointed an Advisory Committee] to assist in its
> investment decisions and in the allocation of funds.  The Advisory
> Committee [would] assist the Investment Manager by coordinating
> and conducting due diligence work and by providing financial
> research to the Investment Manager.  Members of the advisory
> committee are qualified investment professionals of the research
> advisory team of the **International Private Banking** Units of
> Santander Central Hispano, S.A.[10]   (July 2001 EM, Ex. 8 at 8).

---

[10]   Santander Central Hispano, S.A. was the predecessor to Santander.

58

160.   This is the same International Private Banking Unit which had been converted into OIS in July 2001, pursuant to the August 15, 2001 cover letter.  There is no indication, and it is highly unlikely, that OIM had any employees or offices, given that its address was a Post Office Box and the same as the address of Optimal Multiadvisors and the administrator (Fortis Bahamas).

161.   To leave no doubt that the Santander name was behind the entire enterprise, in the section describing the role and functions of the investment manager, the July 2001 EM added:

> The Investment Manager [OIM] is a wholly owned subsidiary of Santander Central Hispano Bank & Trust (Bahamas) Ltd. Santander Central Hispano Bank & Trust (Bahamas) Ltd. provides management and advisory services to the offshore institutional clients of Santander Central Hispano SA.  It has approximately $750 million in assets under management.  (July 2001 EM, Ex. 8 at 9).

162.   The July 2001 EM further stated that OIM conducted a careful analysis of the ultimate investment managers – i.e., Madoff:

> The Investment Manager shall select managers with varied investment styles who have established records of success or who the Investment Manager believes demonstrate the potential to become outstanding investment managers. . . . The Investment Manager, with the assistance of the advisory committee, bases its investment decisions on a **careful analysis** of many investment managers.

(July 2001 EM, Ex. 8 at 9; emphasis supplied).

163.   There was no disclosure of Madoff or BMIS, however, nor any meaningful description of the split strike conversion strategy.  The July 2001 EM limited its explanation of the investment strategy of Optimal SUS to the following two statements:

> The investment objective of OPTIMAL Strategic US Equity Ltd. is to achieve long-term capital appreciation.  This Trading Company seeks to achieve this objective by investing in a single investment

> manager that invests primarily in equity securities of S&P 500 companies.

(July 2001 EM, Ex. 8 at 6).

* * * *

> OPTIMAL Strategic US Equity Series invests its assets with a single fund manager. The manager invests primarily in a basket of S&P 100 stocks. The manager also employs an index option overlay as a hedge against adverse market movements and to preserve existing investor capital. The strategy is quantitative in nature and seeks to achieve consistent mid-teen annual returns over a long-term horizon.

(July 2001 EM, Ex. 8 at 7).

164.    Similarly terse were the risk disclosures. The most relevant risk disclosure concerned "Counterparty Risk." It recognized that if Madoff traded with other market participants (*e.g.*, Bear Stearns or Lehman) Madoff could lose money if the counterparty went bankrupt or did not honor its side of the transaction. Any such loss would be incurred by the ultimate investor here, Plaintiffs and the Class.

165.    The Counterparty Risk disclosure set forth in the July 2001 EM leaves no doubt that the Santander Defendants understood,[11] at the time, the importance of Madoff's counterparties. Even assuming that Madoff had not been running a Ponzi scheme, and assuming that Madoff actually had executed the split strike conversion strategy, one of the major risks to Madoff and Optimal SUS were the counterparties. If the counterparties to Madoff failed to honor their obligations, these Defendants understood that Optimal SUS would lose money. Accordingly, if there was one critical aspect to the due diligence here, it was the counterparties.

166.    The disclosures in the July 2001 EM were the only representations allowed to be relied on by investors. The EM said, "[N]o person has been authorised in connection with this

offering to give any information or make any representations other than as contained in this Explanatory Memorandum."  (July 2001 EM, Ex. 8 at 2).

167.    The auditor and administrator of Optimal SUS, in 2001 (Ernst & Young Bahamas and Fortis Bahamas, respectively), were subsequently replaced with the current Defendants, as alleged below, and are therefore not named in this action.

### 2.    The May 2002 Explanatory Memorandum

168.    The May 2002 Explanatory Memorandum (the "May 2002 EM," Ex. 9) is substantially similar to the July 2001 EM and does not have any meaningful additional disclosures.  Indeed, most of the disclosures are identical, including the disclosures concerning the legal structure of Optimal Multiadvisors (*supra* ¶ 157; May 2002 EM, Ex. 9 at 6), investment objectives (*supra* ¶ 163; May 2002 EM, Ex. 9 at 7, 25), Directors (*supra* ¶ 158; May 2002 EM, Ex. 9 at 8), Counterparty Risk (*supra* ¶ 164; May 2002 EM, Ex. 9 at 17), due diligence to be conducted (*supra* ¶ 162; May 2002 EM, Ex. 9 at 10); and exclusivity of representations in the EM (*supra* ¶ 166; May 2002 EM, Ex. 9 at 2).

### 3.    The June 2004 Explanatory Memorandum

169.    The June 2004 Explanatory Memorandum (the "June 2004 EM," Ex. 10) includes risk disclosures which clearly reflect the meeting between Madoff and OIS in September 2002. For the first time, the June 2004 EM warned in the section dedicated to Optimal SUS that Madoff could abscond with the monies because he was the custodian and broker of Optimal SUS:

> Possibility of Fraud or Misappropriation
>
> Neither the Fund, Optimal SUS nor the Custodian has actual custody of the assets.  Such actual custody rests with the Broker-Dealer [Madoff] and/or its affiliated broker-dealer.  Therefore,

---

[11]  Except Wilkinson who was not a Director of Optimal SUS in 2001.

> there is the risk that the Broker-Dealer could abscond with those assets. There is always the risk that the assets with the Broker-Dealer could be misappropriated. In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent. The Investment Manager [OIS] and the Administrator are entitled to rely on such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.

(June 2004 EM, Ex. 10 at 35).

170.    The boilerplate disclosure that "[t]here is always risk. . . ." says little about the probability of that risk materializing. Indeed, that disclosure was meaningless given that, at the time of the "disclosure," the possibility had already occurred. OIS, the investment manager for Optimal SUS, had already either failed to conduct any due diligence to determine the scope of that possibility, or conducted the due diligence and ignored its results.

171.    The June 2004 EM further identified Madoff's options trading counterparty risk to be critical:

> *Risk of Over-the-Counter Options Trading*. The Broker-Dealer may execute options transactions in the over-the-counter market. Trading equity and options in the over-the-counter market is subject to counterparty risk and is without the protection afforded with respect to options transactions on regulated exchanges through the Options Clearing Corporation.

(June 2004 EM, Ex. 10 at 34).

172.    That statement only suggested the risk of **actual** options trading. OIS, as the Investment Manager for the Optimal Funds, failed to conduct any due diligence or ignored the results of any due diligence it did conduct. Accordingly, the risk that **actual** options trading could result in losses was irrelevant, as **no** options trading ever occurred, a fact that OIS failed to confirm, or meaningfully investigate.

173.     Another important change introduced in the June 2004 EM was a much more complete and thorough description of Madoff and his investment strategy, although without naming Madoff or BMIS.  This description is nearly identical to the description suggested by the Courvoisier Memoranda in 2002.  In the section dedicated to Optimal SUS, the EM stated:

> [Optimal SUS] seeks to obtain long-term capital appreciation of its assets through the utilization of non-traditional options trading strategies.  In attempting to achieve its investment objective, the Fund and Optimal SUS have established a discretionary account with a US broker-dealer (the "Broker-Dealer") registered with both the [SEC] and [NASD].  The Broker-Dealer is responsible for the execution of the fund's trading strategy and all investment decisions in the account at the Broker-Dealer are effected by the Investment Manager.
>
> * * * *
>
> The assets of the fund are deposited with the Broker-Dealer.
>
> * * * *
>
> The Broker-Dealer, which employs approximately 200 people, acts as a market maker in stocks and convertible securities.  Most of the stocks for which it acts as a market maker are also listed on the New York Stock Exchange.
>
> * * * *
>
> The strategy utilized by the Broker-Dealer is called "split-strike conversion" and entails:
>
> (i) purchasing a basket of thirty (30) to forty (40) large capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;
>
> (ii) purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount;
>
> (iii) selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying index equivalent to the dollar amount of the basket of shares purchased
>
> The strategy aims to limit losses when stock prices decline while still affording an upside potential that is capped to the strike price of the short call when stock prices rise.  The long/short call

63

position constitutes a "synthetic" short of the market, which provides a hedge against the long stock positions. Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost. Put and call option positions are actively managed as strike prices and maturities are adjusted in response to relative valuations and general market movements.

\* \* \* \*

**The options transactions executed for the benefit of Optimal SUS are effected, primarily, in the over-the-counter market, not on a registered options exchange.** The Broker-Dealer is not a market maker in options.

(June 2004 EM, Ex. 10 at 30-31; emphasis supplied).

174.    Critically, the EM claimed that all investment decisions were made by OIS, while

the Broker-Dealer (Madoff) was purportedly merely responsible for execution.

All decisions with respect to the general management of the fund are made by [OIS] who has complete authority and discretion in the management and control of the business of the fund . . . . As a result, the success of the fund for the foreseeable future will depend largely upon the ability of [OIS], and no person should invest in the fund unless willing to entrust all aspects of the management of the fund to [OIS], having evaluated their capability to perform such functions.

\* \* \*

Although the ***Broker-Dealer has limited investment discretion*** as to the selection of securities or other property purchased or sold by or for the fund's account, the Broker-Dealer has discretion with respect to the timing and size of transactions and to the extent described in the agreement entered in between the Broker-Dealer, the Fund and Optimal SUS.

(June 2004 EM, Ex. 10 at 32; emphasis supplied).

175.    The June 2004 EM further disclosed that Madoff served as an agent of Optimal

SUS. "The Broker-Dealer acts as the agent and attorney-in-fact of Optimal SUS in connection

with its sale of securities to Optimal SUS and the purchase of securities from Optimal SUS."
(June 2004 EM, Ex. 10 at 30).

176.    The Memorandum further reassured investors about the due diligence and care
that OIS would take in selecting and monitoring the managers to whom it entrusted the Funds'
assets (including the so-called "Broker-Dealer"), and emphasized that OIS "specialised" in such
selection:

(a)    "[OIS] bases its investment decisions on a careful analysis of many
investment managers," (June 2004 EM, Ex. 10 at 12);

(b)    "[OIS] shall select managers with varied investment styles who have
established records of success or who [OIS] believes demonstrate the potential to become
outstanding investment managers," (June 2004 EM, Ex. 10 at 12);

(c)    "[OIS] specialises in advising multi-manager and multi-strategy
portfolios," (June 2004 EM, Ex. 10 at 10); and

(d)    "Custodial risk . . . . [Optimal SUS] must satisfy itself to ensure that such
third party [such as Madoff] has and maintains the necessary competence, standing and expertise
appropriate to hold the assets concerned."  (June 2004 EM, Ex. 10 at 22).

177.    As further reassurances of OIS's capabilities, the June 2004 EM emphasized that
Santander stood behind OIS.  "The Investment Manager is an indirect wholly owned subsidiary
of the Santander Central Hispano Group and provides research, advisory and investment
management services in alternative investment strategies to its clients with over US$2.5 billion
in assets under management."  OIS has "offices located in Geneva, **New York**, and Madrid."
(June 2004 EM, Ex. 10 at 10; emphasis supplied).

178.   The June 2004 EM also identified Defendants Echeverría and Wilkinson as Directors of Optimal Multiadvisors together with Inder Rieden.  (June 2004 EM, Ex. 10 at 9).  Defendant PwC (Ireland) had replaced PwC (Bahamas) as auditor.  (June 2004 EM, Ex. 10 at 1).

179.   Pursuant to the June 2004 EM, Optimal SUS's annual investment management fee for the Class A, B, and C shares sold to Plaintiffs and the Class increased to 2.15%, 1.65%, and 1.15%, respectively (June 2004 EM, Ex. 10 at 31).  Of this fee, 0.15% was directly allocated to Echeverría's personal compensation.  The June 2004 commissions represented an increase ranging from 65% to 25% compared to the May 2002 commissions of 1.50%, 1.00%, and 0.80%, for the Class A, B, and C shares, respectively.  These commissions ostensibly charged by OIS were shared by OIS with other Santander affiliates (particularly, Santander Miami) to compensate their sales efforts.

180.   Optimal Arbitrage charged a similar annual investment management fee of 2.15% for Class A shares and 1.65% for Class B shares.  Optimal Arbitrage did not offer Class C shares.  (June 2004 EM, Ex. 10 at 25).  The June 2004 EM did not disclose that Optimal Arbitrage invested with Madoff or BMIS.

181.   Finally, the June 2004 EM reflected a change of address for Optimal Multiadvisors to:

> Fort Nassau Centre
> Marlborough Street
> P.O. Box N-4875
> Nassau, Bahamas

182.   This is the same address as the address of the fund's attorneys, Lennox Paton.  This reflects the fact that the Optimal Funds had no independent operations, offices, employees, or personnel, and were nothing more than an investment vehicle – in substantial measure, an investment vehicle to invest solely with Madoff.  (June 2004 EM, Ex. 10 at 1).

### 4.     The October 2006 Explanatory Memorandum

183.     The October 2006 Explanatory Memorandum is substantially similar to the June 2004 EM  (the "October 2006 EM," Ex. 11).  Indeed, most of the disclosures are identical to those in the June 2004 EM, including the disclosures concerning the,

(a)      "Possibility of Fraud or Misappropriation" (*supra* ¶ 169; October 2006 EM, Ex. 11 at 36);

(b)      "Risk of Over-the-Counter Options Trading" (*supra* ¶ 170; October 2006 EM, Ex. 11 at 35);

(c)      Directors (*supra* ¶ 178; October 2006 EM, Ex. 11 at 9);

(d)      Counterparty Risk (June 2004 EM, Ex. 10 at 22; October 2006 EM, Ex. 11 at 22);

(e)      description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 172; October 2006 EM, Ex. 11 at 31);

(f)      limited discretion of the Broker-Dealer (*supra* ¶ 174; October 2006 EM, Ex. 11 at 33-34);

(g)      Broker-Dealer was an agent and attorney-in-fact of Optimal SUS (*supra* ¶ 175; October 2006 EM, Ex. 11 at 31);

(h)      due diligence and care to be carried out by OIS (*supra* ¶ 175; October 2006 EM, Ex. 11 at 12, 22); and

(i)      exclusivity of representations in the EM (June 2004 EM, Ex. 10 at 2; October 2006 EM, Ex. 11 at 2).

184.     The October 2006 EM further reiterated that OIS had offices in New York and that it was a wholly-owned subsidiary of Santander Central Hispano S.A.  (October 2006 EM, Ex. 11 at 10).

185.    There were, however, a number of important additions:

(a)    Defendant HSBC Services had replaced Management International (Dublin) Ltd. as the administrator (October 2006 EM, Ex. 11 at 1);

(b)    Defendant HSBC Trust had replaced Bermuda Trust (Dublin) Ltd. as the custodian (October 2006 EM, Ex. 11 at 1);

(c)    The Subscription Form stated that the subscription was based "solely on the [EM] together (where applicable) with the most recent annual report and accounts of the Fund and (if issued after such reports and accounts) its most recent unaudited semi-annual report" (October 2006 EM, Ex. 11 at 43); and

(d)    A new discretionary "Subscription fee (sales charge) and redemption fee of up to 5% of the subscription price/redemption," had been added (October 2006 EM, Ex. 11 at 19).

### 5.    The January 2008 Explanatory Memorandum

186.    The January 2008 Explanatory Memorandum is substantially similar to the October 2006 EM (the "January 2008 EM," Ex. 12).   Indeed, most of the disclosures are identical to those in the October 2006 EM, including the disclosures concerning the:

(a)    "Possibility of Fraud or Misappropriation" (*supra* ¶ 183(a); January 2008 EM, Ex. 12 at 33);

(b)    "Risk of Over-the-Counter Options Trading" (*supra* ¶ 183(b); January 2008 EM, Ex. 12 at 32);

(c)    Directors (*supra* ¶ 183(c); January 2008 EM, Ex. 12 at 9);

(d)    Counterparty Risk (*supra* ¶ 183(d); January 2008 EM, Ex. 12 at 22);

(e)    description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 183(e); January 2008 EM, Ex. 12 at 28);

68

(f)     limited discretion of the Broker-Dealer (*supra* ¶ 183(f); January 2008 EM, Ex. 12 at 31);

(g)     Broker-Dealer was an agent and attorney-in-fact of Optimal SUS; (*supra* ¶ 183(g); January 2008 EM, Ex. 12 at 28)

(h)     due diligence and care to be carried out by OIS (*supra* ¶ 183(h); January 2008 EM, Ex. 12 at 11-12, 22); and

(i)     exclusivity of representations in the EM (*supra* ¶ 183(i); January 2008 EM, Ex. 12 at 2, 39).

### 6.    The October 2008 Explanatory Memorandum

187.    The last EM prior to the revelation of Madoff's Ponzi scheme on December 11, 2008, is dated October 2008 (the "October 2008 EM," Ex. 13).   The October 2008 EM is substantially similar to the October 2006 and January 2008 EMs, and most of the disclosures are identical to those in the October 2006 EM, including the disclosures concerning the:

(a)     "Possibility of Fraud or Misappropriation" (*supra* ¶ 183(a); October 2008 EM, Ex. 13 at 34);

(b)     "Risk of Over-the-Counter Options Trading" (*supra* ¶ 183(b); January 2008 EM, Ex. 12 at 33);

(c)     Directors, but only with respect to Defendants Wilkinson and Inder Rieden (*supra* ¶ 183(c); January 2008 EM, Ex. 12 at 9).

(d)     description of the Broker-Dealer (i.e., Madoff) (*supra* ¶ 183(e); October 2008 EM, Ex. 13 at 29);

(e)     Broker-Dealer was an agent and attorney-in-fact of Optimal SUS; (*supra* ¶ 183(g); October  2008 EM, Ex. 13 at 29)

(f)      limited discretion of the Broker-Dealer (*supra* ¶ 183(f); October 2008 EM, Ex. 13 at 31-32); and

(g)      exclusivity of representations in the EM (*supra* ¶ 183(i); January 2008 EM, Ex. 12 at 2, 40).

188.    One change concerned Defendant Echeverría, who had left OIS in the Summer of 2008 and was no longer a Director of Optimal Multiadvisors.  Defendant Echeverría was replaced by Esteban Estévez who had also been named CEO of OIS.  (January 2008 EM, Ex. 12 at 9).

189.    There were a number of additional critical changes, however, that evidenced Defendants' serious concern about Madoff.  The counterparty risk disclosure included a new paragraph about the possibility of default by, or complete collapse of, Madoff.  (October 2008 EM, Ex. 13 at 22).  Similarly, the "Custodial Risk" disclosure also added a new paragraph about broker-dealer insolvency.  (October 2008 EM, Ex. 13 at 22-23).

190.    These purported "disclosures," however, did not adequately inform investors of the extent of Defendants' own concerns about Madoff and BMIS.  Nor did those purported "disclosures" obviate Defendants' obligations to conduct necessary due diligence  on Madoff on behalf of Plaintiffs and the Class.  In fact, Defendants continued to fail to conduct any due diligence or, alternatively, continued to ignore the results of their due diligence to determine the probability of the risk materializing.  Indeed, the risk of failure or insolvency of the custodian (i.e., Madoff) was imminent.

## VI.   SUBSTANTIVE ALLEGATIONS CONCERNING THE PwC DEFENDANTS

### A.   PwC OPERATED AS A UNITARY INTERNATIONAL PROFESSIONAL ORGANIZATION

191.   PwC International serves as an umbrella organization coordinating the accounting and auditing activities of the various PwC accounting firms.  PwC International's literature and its global Website refer to its constituent members, including PwC Ireland, PwC Bermuda, and PwC U.S., as PricewaterhouseCoopers or PwC.  For example, PwC's 2008 Annual Report, entitled "Global Annual Review," states that "the terms PricewaterhouseCoopers, PwC, *our* and *we* are used to refer to the network of member firms."  (Global Annual Review, Ex. 26 at 2). Accordingly, Lead Plaintiffs are referring to all PricewaterhouseCoopers entities when using the term PwC.

192.   The Global Annual Review leaves no doubt that PwC functions as one integrated entity with centralized control.  The section entitled "Making structural changes," states:

> After a comprehensive review of the future needs of PwC and our clients, our firms around the world recently approved a new internal structure.  This has created three major clusters of PwC firms – East, Central, and West – led by the senior partner of the leading national firm in each cluster, namely, China, the United Kingdom and the United States.

> At the same time, we have made changes to the leadership of the PwC global network.  The **network is now led by a new leadership team comprising myself (Samuel A. DiPiazza Jr., former chairman of PwC US) as Chairman and CEO**; Silas Yang, senior partner of PwC China; Ian Powell, senior partner of PwC UK; Dennis Nally, senior partner of PwC US, and Hans Wagener, senior partner of PwC Germany. Additionally, the standards **each PwC member firm is obliged to follow** have been updated and expanded to reflect the increasingly global nature of our services and the need for worldwide consistency across an ever-widening range of areas.

\* \* \*

71

> Our new structure will improve the integrated services we offer and more closely align our strategy around the world.
>
> * * *
>
> We are making these changes for the most fundamental of reasons: to ensure that our organisation is positioned to provide clients with the distinctive, premier service they expect from our brand.

(Global Annual Review, Ex. 26 at 4; emphasis supplied).

193.    As all hierarchical entities with centralized control, PwC has one Chairman and CEO, Mr. DiPiazza, and member firms have obligations to PwC.

194.    The Global Annual Review further confirms that the network is structured like a corporation.  (Global Annual Review, Ex. 26 at 34, 50-51).  The Network Leadership Team is effectively the Board of Directors and comprised of five members – the five members set forth above.  Mr. DiPiazza is, as stated in the Global Annual Review, Chairman and CEO.  The Network Leadership Team "sets the strategy and standards that the PwC network **will** follow." (Global Annual Review, Ex. 26 at 34; emphasis supplied).

195.    Directly reporting to the Network Leadership Team is, effectively, management, the "Network Executive Team."  This Network Executive Team includes the heads of eleven key areas, the equivalent of key divisions in a corporation: (i) Clients and Markets; (ii) Operations; (iii) Risk and Quality; (iv) Tax; (v) People and Culture, Brand and Communications; (vi) Strategy and Network Transformation; (vii) Assurance; (viii) Strategic Sourcing; (ix) Advisory; (x) General Counsel; and (xi) Public Policy and Regulatory Matters.  (Global Annual Review, Ex. 26 at 50).

196.    Two other bodies further control the actions of the various PwC member firms throughout the world, the Global Board and the Strategy Council.  (Global Annual Review, Ex. 26 at 34).  The Global Board's role is "to ensure accountability, protect the

PricewaterhouseCoopers International Limited network, and ensure effective **governance**.**"** (Global Annual Review, Ex. 26 at 34; emphasis supplied).  The Strategy Council includes the "senior partners of some of the largest PwC firms" and "agrees strategic direction and ensures alignment in the execution of strategy."  (Global Annual Review, Ex. 26 at 34).

197.    These four governance bodies (the Network Leadership Team, Network Executive Team, Global Board, and Strategy Council) provide a global governance structure that is housed within PwC International.  In effect, the PwC member firms (including PwC Ireland, PwC Bermuda, and PwC U.S.) act as agents of PwC International.  PwC International controls its agents through a series of agreements that govern and enforce standards across PwC member firms.  The enforcement of standards is clear from the Global Annual Review.

> Quality procedures.  PwC has a number of globally developed methodologies and work programmes for many of its services. These are designed to assist partners and staff in delivering work of the expected quality. . . .
>
> Managing risk and quality.  A firm's membership of the PwC network depends on its ability to comply with common risk and quality standards. . . . Territory Senior Partners **sign** an annual compliance confirmation with a set of risk management standards covering a range of risk areas. . . . These confirmations follow an assessment of compliance supported by local testing and quality review.

(Global Annual Review, Ex. 26 at 35).

198.    To complete the parallel between PwC and any corporation, the Global Annual Review provides aggregate results for PwC that are the hallmarks of the annual report of any Fortune 500 company.  For example, the Global Annual Review states that PwC is composed of more than 155,000 people in 153 countries (at 2; 46), and generated $28.2 billion in total worldwide revenues in 2008 (at 5; 41).  It breaks down the revenue by geographic area, service line, and industry group (at 41).  And it provides all kind of statistics about PwC's clients,

including size, industry groups, and geographic location.  The Global Annual Review of PwC is, thus, no different than the annual report of McDonalds, Exxon, Microsoft, or Santander.

## B.   PWC IRELAND ISSUED UNQUALIFIED (CLEAN) AUDIT OPINIONS

199.   PwC Ireland audited Optimal SUS every year between 2003 and 2007.  Each year it issued an unqualified audit opinion – also commonly referred to as a "clean audit opinion" – stating that the financial statements at issue conformed with the requisite auditing standards. *See, e.g.,* Optimal SUS's financial statements for the year ending December 31, 2007, which are attached hereto as Ex. 27 ("2007 Financial Statements" or "2007 FS").

200.   The 2007 Financial Statements included PwC's Ireland unqualified audit opinion with respect to Optimal SUS.  (2007 FS, Ex. 27 at 3).  The opinion is entitled:

Optimal Multiadvisors, Ltd.<br>
Optimal Strategic US Equity Fund<br>
Independent Auditors' Report<br>
As At 31 December 2007

201.   The opinion is addressed "To the Shareholders of Optimal Multiadvisors, Ltd. – Strategic US Equity Series" – that is, to Plaintiffs and the Class here.  It states, in relevant part:

> We have audited the accompanying financial statements of Optimal Multiadvisors, Ltd. – Strategic US Equity Series (the "Series") which comprise the Consolidated Statement of Net Assets as of 31 December 2007, Consolidated Income Statement, Consolidated Statement of Changes in Net Assets Attributable to Holders of Redeemable Participating Shares and Consolidated Statement of Cash Flows for the year then ended and a summary of significant accounting policies and other explanatory notes.

* * *

> *Auditors' Responsibility*
> Our responsibility is to express an opinion on these financial statements based on our audit.  **We conducted our audit in accordance with International Standards on Auditing**.  Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance whether the financial statements are free from material misstatement.

74

* * *

> *Opinion*
>
> **In our opinion, the accompanying financial statements present fairly, in all material respects, the financial position of the Series as of 31 December 2007, its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards**.  In forming our opinion, which is not qualified, we draw your attention to Note 10 which describes the fact that 100% of the assets of the Series are held with Bernard L. Madoff Investments LLC.

(2007 FS, Ex. 27 at 3; emphasis supplied).

202.    The audit opinion is signed, "PricewaterhouseCoopers, Dublin," and dated 23 April 2008.  (2007 FS, Ex. 27 at 3).

### C.    THE 2007 FINANCIAL STATEMENTS

#### 1.    The Schedule of Investments, Net Assets, Income Statement, and Statement of Cash Flows

203.    The 2007 Financial Statements included a Consolidated Schedule of Investments as of December 31, 2006, and 2007.  (2007 FS, Ex. 27 at 6-7).  This schedule reflected how the funds of Optimal SUS were supposedly being held at the end of each respective year.

(a)    In 2006, Optimal SUS supposedly held: (i) $2.27 billion in U.S. Treasury Bills; (ii) $0.76 million in unrealized gains on forward exchange contracts; and (iii) $99.70 million in other assets that were not specified.  Total net assets at the end of 2006 attributable to the putative Class were supposedly $2.37 billion.  (2007 FS, Ex. 27 at 7).

(b)    In 2007, Optimal SUS supposedly held: (i) $2.66 billion in U.S. Treasury Bills; (ii) $8.59 million in unrealized gains on forward exchange contracts; and (iii) $96.93 million in other assets that were not specified.  Total net assets at the end of 2007 attributable to the putative Class were supposedly $2.77 billion.  (2007 FS, Ex. 27 at 6).

204.    The 2007 Financial Statements also included a Consolidated Statement of Net Assets as of December 31, 2006, and 2007, which was signed by Defendants Echeverría and Wilkinson.  (2007 FS, Ex. 27 at 8).  This Statement of Net Assets reflected the same amount of supposed net assets as the Schedule of Investments, $2.37 billion for 2006, and $2.77 billion for 2007.  (*Id*.)

205.    The 2007 Financial Statements also included a Consolidated Income Statement for 2006 and 2007, which was also signed by Echeverría and Wilkinson. (2007 FS, Ex. 27 at 9). The Income Statement reflected a purported "net realised and unrealised gain" of $247.0 million in 2006 and $287.0 million in 2007.   The Income Statement also reflected the following expenses:

(a)    "Investment Manager's fees" (OIS) of $43.3 million in 2006 and $52.7 million in 2007;

(b)    "Support Services fees" to OIS of $0.5 million in 2007;

(c)    "Administrator and Custodian fees" (*i.e.,* HSBC Services and HSBC Trust) of $0.41 million in 2006 and $0.46 million in 2007; and

(d)    "Audit fees" (*i.e.,* PwC Ireland) of approximately $22,000 in 2006 and $37,000 in 2007.

206.    The 2007 Financial Statements also included a Consolidated Statement of Cash Flows for 2006 and 2007.  (2007 FS, Ex. 27 at 11).  The Cash Flow Statement reflected:

(a)    "Realised gain on financial assets" of supposedly $224.3 million in 2006 and $233.6 million in 2007;

(b)    "Dividends received" of supposedly $24.8 million in 2006 and $12.9 million in 2007;

(c)     "Interest received" of supposedly $3.7 million in 2006 and $6.6 million in 2007;

(d)     "Proceeds from sale of securities" of supposedly $21.2 billion in 2006 and $29.2 billion in 2007; and

(e)     "Payments for purchase of securities" of supposedly $21.5 billion in 2006 and $29.4 billion in 2007.

### 2.     The Notes To The 2007 Financial Statements

207.    The Notes to the 2007 Financial Statements included Note 4: "Derivatives and other financial instruments." (2007 FS, Ex. 27 at 16).[12]  As set forth below, PwC Ireland understood that there were significant risks concerning Madoff holding one-hundred percent of the monies as well as the counterparty risk involved in executing the split strike conversion strategy.

> The main risks arising from [Optimal SUS's] financial instruments are market price, foreign currency, interest rate, liquidity and credit risk.  The main risks relating to [Optimal SUS's] use of financial derivative instruments are **counterparty** risk, credit risk, and liquidity risk.

(2007 FS, Ex. 27 at 16; emphasis supplied).

208.    Note 4 to the 2007 Financial Statements continued as follows:

> The Fund's Board of Directors [Echeverría, Wilkinson and Inder Rieden] has delegated the risk management function to Optimal Investment Services ("OIS"), the Investment Manager.  **As such, OIS has taken the necessary steps taken to ensure that risk is properly identified controlled and managed.**
>
> * * *
>
> [Optimal SUS's] positions are monitored by OIS on a regular basis against pre-set risk parameters which have been created by the

---

[12]  The Notes to the financial statements are part of the financial statements and encompassed within the auditor's opinion.  (ISA 200.34).

Investment Committee and the Risk Committee within OIS in coordination with the Control Unit of Santander Asset Management. Breaches are reported to the Risk Committee and presented at the Investment Committee meetings of OIS and reported to the Control of Santander Asset Management.

The analysis of underlying positions invested by [Optimal SUS] includes the use of a complex statistical non-linear style analysis tool (FOFIX from Riskdata SA). Risk profiles are calculated for each underlying position in order to estimate factors influencing the returns of the Series. These are then compared with the qualitative analysis of the research analyst and deviations from expected risk profiles are explained.

(2007 FS, Ex. 27 at 16-17; emphasis supplied).

209.     With respect to "Counterparty Risk," Note 4 added:

[Optimal SUS's] is exposed to a credit risk on the counterparties with whom it trades, that these counterparties may not perform their obligations and that settlement of transactions may not occur. [Optimal SUS] is also exposed to a credit risk on the prefunding of investments in underlying schemes. [Optimal SUS] is also exposed to a default risk where cash may not be returned by the counterparty in a situation whereby no contract is in place and an investment transaction is not completed.

(2007 FS, Ex. 27 at 19).

210.     The Credit Risk disclosure was conceptually similar, stating:

Credit risk is defined as the risk that one party to a financial instrument will cause a financial loss for the other party by failing to discharge an obligation. Credit risk arises from [Optimal SUS's] counterparties such as the credit facility provider, or **bank where cash accounts are deposited. [Optimal SUS] selects only established counterparties that have sufficient experience, knowledge and creditworthiness. . . .**

(2007 FS, Ex. 27 at 19; emphasis supplied).

211.     All these statements in Note 4 of the 2007 Financial Statements showed that both OIS and PwC Ireland understood the risk that one of the parties that held assets on behalf of Optimal SUS, or that had obligations to Optimal SUS, would not perform. Yet, contrary to the

78

statements in Note 4 to the 2007 Financial Statements and the 2007 PwC Ireland audit opinion,

neither OIS, nor PwC Ireland, ever confirmed any of Madoff's purported trades with

counterparties because the counterparties never existed.

212.    Note 4 to the 2007 Financial Statements also described Madoff's operation as

follows:

> [Optimal SUS] has delegated the execution of all investment management decisions to Bernard L. Madoff Investment Securities LLC (the "Broker-Dealer").  **The Broker-Dealer holds 100% of the assets of [Optimal SUS]**.  As a result, the success of Optimal SUS for the foreseeable future will depend on the ability of the Broker-Dealer to achieve [Optimal SUS's] investment objective. Although the Broker-Dealer has limited investment discretion as to the selection of the securities or other property purchased or sold by or for [Optimal SUS's] account, the Broker-Dealer has discretion with respect to the timing and size of the transactions and to the extent described in the agreement entered into between the Broker-Dealer, [Optimal Multiadvisors], and [Optimal SUS].

> \* \* \*

> The strategy utilized by the Broker-Dealer is described as split strike conversion which generally consists of purchasing equity shares, selling related call options representing a number of underlying shares equal to the number of shares purchased, and buying related put options representing the same number of underlying shares.  This entails purchasing a basket of 30 to 40 large-capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market.  It also entails purchasing out-of-the money or at-the-money S&P Index put options in the same dollar amount and selling out-of-the money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased.

(2007 FS, Ex. 27 at 16; emphasis supplied).

213.    Note 10 to the 2007 Financial Statements recognized that Madoff served as his

own custodian, one who held one-hundred percent of Optimal SUS's assets:

Broker-Dealer and Custody agreements

Pursuant to an agreement dated 31 January 1996, Bernard L. Madoff Investment Securities LLC was authorised to act as the Broker-Dealer for all US equities, US Treasury and option transactions.  As at 31 December 2007, **100% of the assets were held with the Broker-Dealer**.  For the services provided, the Broker-Dealer received the principal spread on all security transactions executed for [Optimal SUS].  **The assets of [Optimal SUS] are deposited with the Broker-Dealer**.  For the year ended 31 December 2007, the Broker-Dealer executed transactions of approximately US$32.3 billion (2006: US$45.2 billion).

[Optimal Multiadvisors] has appointed HSBC Trust Services (Ireland) Limited ("the Custodian") a limited liability company as custodian of such of its assets as are delivered to it pursuant to the Custodian Agreement. . . . The Custodian has no responsibility for assets of the Fund or any trading Company, which are held by any US registered broker dealer.

(2007 FS, Ex. 27 at 23; emphasis supplied).

### D.   PwC IRELAND'S AUDIT FAILED TO CONFORM TO INTERNATIONAL STANDARDS ON AUDITING

214.   A fundamental premise of every accounting audit is that the auditors have to verify the assertion that the assets actually exist.  (ISA 500.16) ("The auditor uses assertions in assessing risks by considering the different types of potential misstatements that may occur, and thereby designing audit procedures that are responsive to the assessed risks").   Assertions include, "existence – assets, liabilities, and equity interests exist."  (ISA 500.17(b)(i)).

### 1.   PwC Ireland's Audit Violated ISA

215.   The International Federation of Accountants, through the International Auditing and Assurances Standards Board ("IAASB"), promulgates the International Standards on Auditing, or ISA.  The IAASB is the equivalent of the AICPA in the United States.  ISAs are the equivalent of the generally accepted auditing standards in the U.S., commonly known as GAAS.  These are the rules the auditor must follow in conducting an audit.  (ISA 200.06).

216. When following ISA, the auditor must also consider the International Auditing Practice Statements ("IAPS").  IAPSs provide "interpretive guidance and practical assistance to auditors in implementing ISAs."  (ISA 200.08).

### (a) Overall Accounting Framework Under The ISAs

217. ISA 200 sets forth the "objective and general principles governing an audit of financial statements." (ISA 200.01).  The critical objective of an audit is to express an opinion regarding whether the financial statements were prepared in accordance with the applicable financial reporting framework in all material respects.  (ISA 200.02).

218. ISA 200.14 prohibits auditors from expressing an affirmative opinion that the financial statements comply with ISA "unless the auditor has complied fully with all of the International Standards on Auditing relevant to the audit."

219. One of the fundamental principles in every audit is that the auditor must exercise "**professional skepticism,** recognizing that circumstances may exist that cause the financial statements to be materially misstated."  (ISA 200.15; emphasis supplied).

> An attitude of professional skepticism means [that] . . . . [w]hen making inquiries and performing other audit procedures, the auditors is not satisfied with less-than persuasive audit evidence based on a belief that management and those charged with governance are honest and have integrity. Accordingly, representations from management are not a substitute for obtaining **sufficient appropriate audit evidence** to be able to draw reasonable conclusions on which to base the auditor's opinion. (ISA 200.16; emphasis supplied).

Accordingly, pursuant to ISA, PwC Ireland could not accept Madoff's representations absent "sufficient appropriate audit evidence."

220. ISAs go even further and require that every audit consider the possibility of fraud. *See* ISA 240, "[t]he Auditors Responsibility To Consider Fraud In An Audit of Financial Statements."  The first paragraph of ISA 240 concerns, "the auditor's responsibility to consider

fraud in an audit of financial statements and expand on how the standards and guidance in ISA 315, 'Understanding the Entity and its Environment and Assessing the Risks of Material Misstatement' . . . are to be applied in relation to the risks of material misstatement due to fraud." (ISA 240.1).

221.    ISA 240.57 then explicitly requires that the auditor identify the risk of fraud concerning account balances: "When identifying and assessing the risks of material misstatement at the financial statement level, and at the assertion level for classes of transactions, account balances and disclosures, the auditor should identify and assess the risks of material misstatements due to fraud."  (ISA 240.57).

222.    Similarly, under ISA 315, the auditor must assess the risks of material misstatement specifically with respect to account balances as part of the auditor's understanding of the entity and its environment.   Pursuant to ISA 315, "the auditor should obtain an understanding of the entity and its environment, including its internal controls, sufficient to identify and assess the risks of material misstatement of the financial statements whether due to fraud or error, and sufficient to design and perform further audit procedures."   With respect to account balances, ISA 315.100 states, "the auditor should identify and assess the risks of material misstatement at the financial statement level, and at the assertion level for classes of transactions, account balances, and disclosures.  For this purpose, the auditor: Identifies risks . . . . [and] relates the identified risks to what can go wrong at the assertion level."

223.    Further, ISA 315 requires that the auditor identify whether the account balances constitute a significant risk.  "As part of the risk assessment as described in [315.100], the auditor should determine which of the risks identified are, in the auditor's judgment, risks that require special audit consideration (such risks are defined as 'significant risks')."  (ISA 315.108)

224.    In sum, the overall auditing framework set forth in ISAs 200, 240, and 315 is extremely clear.  The auditor must be skeptical, obtain a global understanding of the entity and the environment (here, BMIS), remain vigilant for fraud, and **refuse to accept assertions without verification**.

> **(b)     PwC Ireland's Audit Not Only Failed To Apply ISA General Principles, But Also Failed To Apply Specific Procedures**

225.    ISA 402 concerns "Audit Considerations Relating to Entities Using Service Organizations."   ISA 402 effectively requires auditors like PwC Ireland to determine the importance of a service organization like BMIS to the financial statements of the entity audited – Optimal SUS.   "Service organization" is therefore the auditing term-of-art for BMIS with respect to Optimal SUS.

226.    Pursuant to ISA 402, the auditor must first "consider how an entity's use of a service organization affects the entity's internal control so as to identify and assess the risk of material misstatement and to design and perform further audit procedures."  (ISA 402.02).  This consideration required that PwC Ireland assess BMIS's significance:

> In obtaining an understanding of the entity and its environment, the auditor should determine the significance of service organization activities to the entity and the relevance to the audit.  In doing so, the auditor obtains an understanding of the following, as appropriate:
>
> •     Nature of the services provided by the service organization.
>
> •     Terms of contract and relationship between the entity and the service organization.
>
> •     Extent to which the entity's internal control interact with the systems at the service organization.
>
> •     The entity's internal control relevant to the service organization activities such as:

    ◦      Those that are applied to the transactions processed by the service organization.

    ◦      How the entity identifies and manages risks related to use of the service organization.

• **Service organization's capability and financial strength, including the possible effect of the failure of the service organization on the entity.**

(ISA 402.05; emphasis supplied)

227.    "If the auditor concludes that the activities of the service organization are significant to the entity and relevant to the audit, the auditor should obtain a sufficient understanding of the service organization and its environment, including its internal control, to identify and assess the risks of material misstatement and design further audit procedures in response to the assessed risk."  (ISA 402.07).  The risk of material misstatement here was total and absolute given that Madoff controlled, operated, and held **all** of Optimal SUS's assets.

228.    PwC Ireland should have concluded that Madoff's activities were significant to Optimal SUS, and thus should have executed appropriate procedures.

        (i)    **PwC Ireland Had To Critically Assess The Qualifications And Audit Conducted By Madoff's Purported Auditors, Friehling & Horowitz**

229.    One of the additional audit procedures that PwC Ireland was supposed to implement involved Madoff's own auditors, F&H.  As set forth in ISA 402.06, "[t]he auditor would also consider the existence of third-party reports from the service organization auditors, internal auditors, or regulatory agencies as a means of obtaining information about the internal control of the service organization and about its operation and effectiveness."

230.    PwC Ireland, however, had to review Madoff's auditor and audit critically, and could not simply accept the audit without review and analysis:

> If the auditor [PwC Ireland] uses the report of a service organization auditor [F&H], the auditor should consider making inquiries concerning that auditor's professional competence in the context of the specific assignment undertaken by the service organization auditor.  (ISA 402.09).

> When using a service organization auditor's report [F&H's], the auditor [PwC Ireland] should consider the nature of and content of that report.  (ISA 402.11).

> The auditor [PwC Ireland] should consider the scope of work performed by the service organization auditor [F&H] and should evaluate the usefulness and appropriateness of reports issued by the service organization auditor.  (ISA 402.13).

### (ii)   PwC Had to Obtain Independent Verification That Optimal SUS's Assets Existed

231.    There were two additional auditing pronouncements that required PwC to obtain external confirmation of the existence of Optimal SUS's assets.

232.    The first, IAPS 1012, concerned "Auditing Derivative Financial Instruments," such as the puts and calls used by Madoff to supposedly implement the split strike conversion strategy.  IAPS 1012 specifically flagged the importance for the auditor of verifying the existence of the asset when based on management's assertions.   Under the sub-heading "Assertions to Address," IAPS 1012.22 stated:

> Financial statement assertions are assertions by management, explicit or otherwise, embodied in the financial statements prepared in accordance with the applicable financial reporting framework.  They can be categorized as follows:

> •    Existence: An asset or liability exists at a given date.  For example, the derivatives reported in the financial statements through measurement or disclosure exist at the date of the balance sheet.

233.    Under the sub-heading, "Substantive Procedures Related to Assertions – Existence and Occurrence," IAPS 1012.77 stated:

Substantive tests for existence and occurrence assertions about derivatives may include:

- **Confirmation with the holder of or the counterparty to the derivative**.

- Inspecting the underlying agreements and other forms of supporting documentation, including confirmations received by an entity, in paper or electronic form, for amounts reported

- Inspecting supporting documentation for subsequent realization or settlement after the end of the reporting period; and

- Inquiry and observation.

(IAPS 1012.77; emphasis supplied).

234.    Similarly, IAPS 1012.79 required the auditor to confirm that the assertions by Madoff were complete and that, for example, Madoff had not failed to disclose to the auditor liabilities that would have changed the value of the asserted assets:

Substantive tests for completeness assertions about derivatives may include:

- Asking the holder of or counterparty to the derivative to provide details of all derivatives and transactions with the entity.  In sending confirmation requests, the auditor determines which part of the counterparty's organization is responding, and whether the respondent is responding on behalf of all aspects of its operations;

- Sending zero-balance confirmations to potential holders or counterparties to derivatives to test the completeness of derivatives recorded in the financial records;

- Reviewing brokers' statements for the existence of derivative transactions and positions held;

- Reviewing counterparty confirmations received but not matched to transaction records . . . .

(IAPS 1012.79).

235.    The second additional auditing pronouncement required PwC Ireland to confirm the existence of Optimal SUS's assets.  *See* ISA 505, "External Confirmations."  ISA 505 states: "The auditor should determine whether the use of external confirmations is necessary to obtain sufficient appropriate audit evidence at the assertion level.  In making this determination, the auditor should consider the assessed risk of material misstatement at the assertion level and how the audit evidence from other planned audit procedures will reduce the risk of material misstatement at the assertion level to an acceptably low level."  (ISA 505.02).

236.    ISA 500.03 emphasized that external confirmations were more reliable than internal ones: "audit evidence is more reliable when it is obtained from independent sources outside the entity," and, "audit evidence obtained directly by the auditor is more reliable than audit evidence obtained indirectly or by inference."  (ISA 500.03).

237.    ISA 500 even specifically addresses the usefulness of external confirmations in the precise situation at issue with Madoff – bank balances.  "Other examples of situations where external confirmations may be used include the following: Bank balances and other information from bankers."  (ISA 500.05).  As set forth on the PwC Madoff Report, Madoff supposedly held U.S. Treasuries at BONY.  PwC Ireland should have followed ISA 500 and performed procedures to obtain confirmations from BONY.  Had PwC Ireland done so, it would have discovered the inaccuracy of the Funds' financial statements it purported to audit.

**2.      The PwC U.S. Practice Guide Concerning Audits Of Hedge Funds, Such As The Feeder Funds, Highlighted The Importance Of Confirming That The Assets Listed On The Optimal SUS Financial Statements Existed, Which PwC Failed To Do**

238.    In April 2007, PwC issued a fifty-page audit guide for auditing hedge funds, called "Auditing Alternative Investments – A Practical Guide For Investor Entities, Investee Fund Managers and Auditors."  ("PwC Guide," Ex. 28).   One of the central purposes of the

Guide was to provide guidance for auditors of fund-of-funds (such as Optimal SUS) about their auditing obligations with respect to the underlying hedge funds (such as Madoff) in which the fund-of-funds had invested.

239.    The PwC Guide's first concern was the existence of assets at the underlying hedge fund.  The main focus of the new guidance was as follows:

> With respect to existence, the question is: **Do the investor entity's alternative investments exist at the financial statement date, and have the related transactions occurred during the period?**  While confirming the existence of assets that are held by third parties generally provides adequate audit evidence, the Interpretation and AICPA Practice Aid say that, by itself, a confirmation in the aggregate does not constitute adequate audit evidence.

(PwC Guide, Ex. 28 at "Our perspective," emphasis supplied).

240.    Because "confirmation in the aggregate" that the assets existed was no longer sufficient, the auditor had an obligation to "confirm [Madoff's] holdings on a security-by-security basis."  (*Id.* at 1).  And even then, the PwC Guide warned that was not always enough, and additional procedures were necessary in certain circumstances.  "Even if the auditor obtains a detailed confirmation of [Madoff's] holdings, the AICPA Practice Aid states that the auditor may need to perform additional procedures, depending on the significance of the [Madoff] investments to [Optimal SUS's] financial statements.  Considerable auditor judgment is required to determine whether the auditor has sufficient evidence to satisfy the existence assertion."  (*Id.* at 24).

241.    One of the "illustrative alternative or additional procedures" consisted in checking with the banks that the assets actually existed.  "Comparing cash activity in the records of the investor entity with the corresponding cash movements reflected in bank or brokerage statements generally provides the auditor with valuable audit evidence."  (*Id.* at 26).  Madoff never provided

trade tickets or statements from third parties – only statements from "Madoff Securities."  Yet, the PwC Guide clearly said, "**simply receiving a confirmation from [Madoff]** of its underlying investments, either in the aggregate or on a security-by-security basis, **does not, in and of itself, constitute adequate audit evidence** with respect to the valuation assertion."  (*Id.* at 27; emphasis supplied).

242.    PwC further failed to conduct an additional basic confirmation procedure listed in the PwC Guide concerning Madoff's auditors.  The guide said that, if PwC was going to rely on Madoff's financial statements audited by F&H, PwC had to conduct some basic due diligence on F&H and its supposed audit of Madoff.  The first critical factor was the "professional reputation and standing of [F&H]."  (*Id.* at 30).  For auditors whose reputation was not sufficient (such as F&H) the PwC Guide listed "illustrative additional procedures," any of which would have uncovered the fact that Optimal SUS's financial statements were incorrect if PwC had carried them out:

- • Investigate the professional reputation and standing of [F&H].

- • Request that [Optimal SUS] apply, or have [F&H] apply, appropriate procedures to [Madoff's] financial statements and/or the underlying records

- • Request that [Optimal SUS] call or visit [F&H] to discuss audit procedures followed and the results thereof.  Review the audit program and/or working papers of [F&H], to the extent permissible.

### E.    INTERNAL PwC DOCUMENTS SHOW THAT PwC's AUDIT VIOLATED ISA

243.    Optimal SUS was not the only Madoff feeder fund audited by PwC.  Plaintiffs are aware of at least eight additional feeder funds audited by PwC with more than $16 billion invested in Madoff in 2007.

| Madoff Feeder Funds Audited By PwC | Assets Under Management - 2007 |
|---|---|
| Fairfield Sentry (includes Fairfield Lambda & Sigma) | $ 7,277,386,000 |
| Greenwich Sentry, LP | $ 262,531,000 |
| Kingate Global, Ltd | $ 2,754,291,825 |
| Kingate Euro Fund, Ltd | $ 766,322,771 |
| Optimal Strategic US Equity, Ltd. | $ 2,770,250,674 |
| Thema International Fund, PLC | $ 1,447,688,803 |
| Zeus Partners, Ltd | $ 300,000,000 |
| Defender Fund Ltd | $ 312,282,024 |
| Plaza Investments International Ltd. | $ 657,241,006 |
| **Total** | **$16,547,994,103** |

244.    According to Madoff's form ADV publicly filed with the SEC on January 7, 2008, BMIS represented that its assets under management totaled $17,091,640,696.   PwC audited feeder funds with assets under management at the end of 2007 of $16.547 billion – or about 96% of BMIS's supposed entire Investment Advisory business.   Accordingly, PwC's audits of Madoff's feeder funds provided PwC with a unique ability and opportunity to verify information about BMIS.   That information, particularly in the aggregate, should have raised significant suspicions about Madoff.   These suspicions also should have been obvious because PwC coordinated the audits of the feeder funds and visits to Madoff's offices on a global basis.

245.    Starting at least as early as 2004, PwC Bermuda and PwC U.S. conducted procedures on Madoff which were then communicated in written form to the various PwC

member firms that actually issued the audit opinions for the Madoff feeder funds, such as PwC Ireland for Optimal SUS. These procedures on Madoff were conducted at least twice, in December 2004 and again in December 2006.

246.     The procedures conducted in December 2004 are the subject of a letter from PwC Rotterdam ("PwC Netherlands"), dated March 15, 2005, to another feeder fund (Fairfield Greenwich Advisors, LLC ("Fairfield Greenwich")). ("PwC Netherlands Letter," Ex. 29). The letter discloses PwC Bermuda's involvement in meeting with Madoff, but does not mention PwC U.S. In relevant part, the letter states as follows:

> In our previous conference call, we have informed you about the fact that PwC Bermuda had a meeting in December 2004 with Bernard L. Madoff Investments Securities LLC (hereinafter 'BLM') in order to obtain and/or update PwC's understanding of the procedures in place at BLM. PwC Bermuda has shared with PwC Rotterdam their procedures program, notes of meeting and conclusions for the purpose of our audit of Fairfield Sentry Limited.
>
> The procedures performed by PwC Bermuda were only directed towards obtaining an understanding of certain procedures and organisation aspects of BLM for **the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by BLM.**

("PwC Netherlands Letter," Ex. 29 at 1; emphasis supplied).

247.     The letter also included an appendix entitled, "Summary of procedures performed at BLM." ("PwC Netherlands Letter," Ex. 29 at 3). The appendix stated that "[b]y means of an interview with [Madoff], the following controls and procedures were discussed. . . ." ISA is clear that discussions alone do not suffice to provide appropriate audit evidence. The controls and procedures discussed were the following:

> (a) segregation of the advisory/front office function from the broker, accounting and custodial departments;

(b) trading process strategy . . .

\* \* \*

(d) controls in place to ensure that trading levels are maintained within those prescribed in the brokerage agreement (i.e., the controls to ensure cash accounts are not margined);

(e)  reporting to clients (copies of trade confirmations and blotters and what level of reports summarising investment transactions, receipts and disbursements, asset holdings, and income are provided on regular basis to the client);

(f) inquire about grouping or bunching of orders and the procedures for the Advisor authorising the order size for our clients, the Advisor's procedures for monitoring the allocation of bunched trades, and the monitoring in place at the trading department for ensuring accurate allocation of bunched orders;

(g)  Monitoring of Advisory of the results of the Fund against expectations (roles and responsibilities);

(h) Procedures in respect of review by the Advisor if own trading records matches with the broker-generated listing of daily trades (P&S), and monthly activity statements.

(*Id.*)

248.    PwC also discussed with Madoff his "Custodian function," which was described in the PwC Netherlands Letter as follows:

(a) What entity acts as custodian within Madoff's group of companies;

(b) Are there any other sub-custodial or clearing arrangements;

(c) Segregation of the custodian function from the Advisory and Brokerage functions (both physically and through access);

(d) Frequency of reconciliations (daily, weekly) performed with the sub-custodian, taking inventory of securities and subsequent reconciliation to stock and treasury holdings and reconciliation of activity reports to records maintained by depositories and sub-custodians . . . .

92

(*Id.* at 4).

249.     PwC blindly accepted, and never confirmed, verified, or independently ascertained, any of the information provided by Madoff.  Particularly with respect to sub-custodians, the PwC Netherlands Letter further explained that according to Madoff "there [were] agreements with other US custodians."  (*Id.* at 5).  PwC never confirmed who the "other US custodians" were, and accepted all of Madoff's representations at his word.

250.     PwC Ireland received an even more detailed report concerning Optimal SUS from PwC Bermuda and PwC U.S. about the same meeting with Madoff in December 2004.  ("PwC Madoff Report," Ex. 6).  The report is on "PricewaterhouseCoopers" letterhead and labeled "Strictly Private And Confidential."  (*Id.*).  PwC Ireland paid a fee to obtain the PwC Madoff Report.  PwC Ireland obtained a similar report for the 2006 audit, but Plaintiffs have not been able to locate a copy of the December 2006 report.

251.     The PwC Madoff Report concerning the 2004 audit follows a similar structure to the appendix included in the PwC Netherlands letter, but provides additional information.  For example, the attendees to the meeting with Madoff are disclosed as, Linda McGowan ("McGowan") and Scott-Watson Brown ("Brown").  McGowan is a partner at PwC U.S., and based in PwC's office in New York City at 300 Madison Avenue – about ten blocks from Madoff's offices in the Lipstick Building.  Brown was a partner at PwC Bermuda, based in Hamilton, Bermuda.

252.     The PwC Madoff Report states that "99% of all trades [were] electronic, therefore records are updated daily and all reconciliations [were] performed daily (automated process)." ("PwC  Madoff Report," Ex. 6 at 1).  Yet, OIS received all trade confirmations in paper format with a considerable time lag that allowed Madoff to fabricate the trades.  Indeed, the paper

records did not include time stamps for each trade nor individualized prices.  Instead, the paper

confirmation tickets only reflected average prices for the day.  This inconsistency between the

fact that virtually all Madoff's purported trades were electronic and the fact that all trade

information from Madoff was sent in paper format was irreconcilable.  Accordingly, PwC's

inability to obtain electronic confirmations, and having access only to the paper confirmations

received by OIS, should have raised a red flag regarding the assets claimed on the Optimal

Funds' financial statements.

253.     The PwC Madoff Report further explained how the fictitious trading process

supposedly functioned:

> **Trades are initiated by the system without trader intervention**
> and routed in accordance with the firms routing priority.  Trades
> are bunch but the system maintains detail by account, which upon
> electronic confirmation of execution is automatically posted to
> each individual account in accordance with the original trade break
> out.  Bunched trades are allocated on a prorate basis.  Performance
> is the same across all funds/accounts for which this strategy is
> employed.  Madoff received 4 cents a share mark up on all trades.
> The system chooses the trades by generally using 35 of the S&P
> 100 stocks and hedges the positions with S&P options . . . . The
> parameters of the strategy require the correlation to be in the 90's.
> Based on the **models** matrix, positions are adjusted as correlative
> factors dictate.  If the **model** determines that there is not a current
> factor conducive to positioning, the cash will be invested in US
> Treasury securities.  The **model** runs on a dynamic basis and is
> adjusted periodically as market conditions dictate.

("PwC  Madoff Report," Ex. 6 at 2; emphasis supplied)

254.     Because PwC could have only reviewed paper copies of the trades purportedly

executed for and sent to the Optimal Funds, PwC never confirmed that the electronic trading for

the Optimal Funds' assets in fact occurred.

255.     According to the PwC Madoff Report, "all securities are segregated in accordance

with US brokerage rules (primarily at DTC for equities and **BONY for governments, GSCC**

**clears governments**).” (“PwC  Madoff Report,” Ex. 6 at 4; emphasis supplied).  The phrase, “BONY for governments, GSCC clears governments,” meant that BONY (the Bank of New York) held the government securities, or U.S. Treasury bills, and that GSCC (Government Securities Clearing Corporation) was the clearing agent for the purchase and sales of U.S. Treasuries.  The U.S. Treasuries were purportedly held at BONY and cleared through GSCC because Madoff was not an authorized broker-dealer for government securities, only for equity securities.  FINRA’s 2008 report on BMIS specifically stated that BMIS was a broker dealer, but **not** a “government securities broker or dealer.”  (FINRA BrokerCheck Report – BMIS, Ex. 30 at 6).

256.    PwC Ireland’s audit opinion concerning Optimal SUS represented that $2.70 billion, which was 96% of Optimal SUS’s total assets, were held in U.S. Treasuries as of December 31, 2007.  In fact, every year-end and every financial statement audited by PwC reflected that virtually all the assets were being supposedly held in U.S. Treasuries, and the rest in cash.  Yet, PwC never confirmed, for example, that the Treasury bills that were reflected on the Optimal Funds’ financial statements – in which the Optimal Funds’ assets were invested when not investing in the split strike conversion strategy – in fact existed.

257.    PwC Ireland audited Optimal SUS starting in 2003.  Every single year Madoff told PwC that hundreds of millions of dollars were held in U.S. Treasuries.  And every single year PwC failed to check to make sure that these assets – the U.S. Treasuries – existed.  Yet, the assertion that the assets existed and that Optimal SUS’s monies were safe because they were being held in U.S. Treasuries was **the** critical assertion of the financial statements and of PwC Ireland’s audit opinion.

258.    The PwC Madoff Report also indicated that "all securities [were] segregated in accordance with US brokerage rules (primarily at DTC for equities)." ("PwC Madoff Report," Ex. 6 at 4). PwC never confirmed that there existed a "segregated" account at DTC for the benefit of the Optimal Funds.

259.    In purporting to obtain an understanding of the Optimal Funds' business (as required by ISA) and of the internal control framework at BMIS where the Optimal Funds entrusted the monies of Plaintiffs and the Class, PwC failed to obtain confirmations from yet another critical set of third parties: Madoff's supposed-trading counterparties.

260.    PwC knew that the put counterparties were critical and questioned Madoff on this point during the December 2004 meeting. The PwC Madoff Report states that according to Madoff, **"all options [were] traded [over-the-counter], but use same expiration date as listed index options; Madoff uses various, numerous counterparties"** ("PwC Madoff Report," Ex. 6 at 7; emphasis supplied).

261.    Over-the-counter traded options meant that Madoff entered into private contracts with other market players and that Madoff did not purchase exchange-traded options. Exchange-traded options carry no credit risk because the exchange ensures that all exchange participants are credit worthy. In the event they are not, the exchange suffers the loss. Accordingly, PwC knew that Madoff supposedly did not purchase any puts in an exchange, and that all its puts consisted of direct, private transactions.

### F.    PwC IRELAND, PwC U.S., AND PwC BERMUDA SHARED INFORMATION BETWEEN AND AMONG THEMSELVES REGARDING MADOFF THAT AFFECTED THE AUDITS OF THE OPTIMAL FUNDS

262.    Optimal SUS's financial statements show that PwC Ireland was paid a mere $22,785 in 2006, and $37,052 in 2007. These paltry sums reflect the very limited work conducted, and that it was not profitable for PwC Ireland to dedicate substantial resources to the

audit.  Travel expenses alone would have amounted to a substantial portion of the entire audit fee.

263.    In order to curtail costs, PwC Ireland worked with PwC U.S. and PwC Bermuda to provide what was effectively an illusory audit of Optimal SUS.  PwC U.S. and PwC Bermuda visited BMIS, in New York City, on at least two separate occasions and conducted cursory audit procedures of Optimal SUS's assets being managed by BMIS.  In December 2004, PwC partners McGowan (PwC U.S.) and Brown (PwC Bermuda) visited Madoff at BMIS's offices in New York City.  The purpose of the visit was to review the investment procedures employed by Madoff concerning BMIS's management of Optimal SUS's assets.  Indeed, the Report ("PwC Madoff Report," Ex. 6) generated from that meeting expressly states that the review was being conducted on behalf of Optimal Multiadvisors, which includes Optimal SUS.  Although the report, printed on generic PwC letterhead, purports to "document" BMIS's management "procedures," the conclusions contained therein are based exclusively on PwC's interview with Madoff himself and his own, self-serving representations.

264.    Neither McGowan nor Brown made any attempt to verify Madoff's statements, and instead simply transcribed his unsubstantiated assertions into the Report and turned it over to PwC Ireland.  PwC Ireland then, notwithstanding the cursory nature of the review, relied almost exclusively on PwC U.S. and PwC Bermuda's December 2004 visit to BMIS, and the resulting Report, to sign-off on its 2004, purportedly comprehensive, audit of Optimal SUS.

## VII.   SUBSTANTIVE ALLEGATIONS CONCERNING THE HSBC DEFENDANTS

### A.   HSBC SERVICES VIOLATED ITS OBLIGATIONS AS ADMINISTRATOR TO PLAINTIFFS AND THE CLASS

#### 1.   HSBC Services' Obligations To Verify Pricing Information

265.   HSBC Services served as the Administrator of Optimal Multiadvisors since at least June 2005, and had "responsibility for the administration of the Fund including the calculation of the Net Asset Value, preparation of the accounts and registrar and transfer agency services."  (October 2008 EM, Ex. 13 at 12).  In calculating the NAV, HSBC Services had an obligation to verify pricing information: "The Administrator shall use reasonable endeavors to verify any pricing information, including estimates of prices supplied by the underlying funds or any connected person thereof (including a connected person which is a broker, market maker or other intermediary)."  (October 2006 EM, Ex. 11 at 15).  HSBC Services carried out these obligations pursuant to an Administration Agreement with Optimal Multiadvisors.

266.   In the EMs, HSBC Services touted its expertise in administrative services by highlighting that it formed part of HSBC Holdings plc, which is one of the largest financial institutions in the world.  The October 2006 and 2008 EMs said, "[t]he Administrator is an indirect wholly-owned subsidiary of HSBC Holdings plc, a public company incorporated in England.  As at 30 June 2007 [and 30 June 2006,] HSBC Holdings plc had consolidated gross assets of approximately USD 2,150 billion[/1,738 billion, respectively]," or $2.15 trillion/$1.738 trillion.  (October 2008 EM, Ex. 13 at 12; October 2006 EM, Ex 11 at 12).

267.   For its services, HSBC Services collected fees, as follows:

> Pursuant to the Administration Agreement, the Administrator shall be entitled to the following fees:
>
> - in respect to Series which are fund of funds [i.e., Arbitrage] the administration fee is 2 basis points per annum subject to a minimum of USD 10,000.

- in respect to Series which are feeder funds investing in a single managed account such as Optimal SUS, the administration fee is 2.5 basis points subject to a maximum of USD 200,000 per annum per account.  The Administrator is also entitled to charge an investment service fee of USD 35 per transaction.

The Administrator shall be entitled to be reimbursed all reasonable out of the pocket expenses not exceeding USD 300 per month per series.

(October 2006 and October 2008 EMs, Exs. 11 & 13 at 12).

268.    The difference in the administrative fees charged to Optimal Arbitrage compared to Optimal SUS shows that HSBC Services demanded a premium for the risk of administering a fund solely invested in Madoff.  While HSBC Services charged Optimal Arbitrage two basis points, it charged Optimal SUS 2.5 basis points.  Yet, Optimal SUS was easier to administer given that the information originated from only one single fund manager, instead of multiple fund managers, as was the case with Optimal Arbitrage.

269.    One of the critical functions performed by HSBC Services consisted in calculating the NAV that was then reported to investors on a monthly basis.  A central component of the NAV calculation included the value of the securities held by Madoff. Between October 2006 and September 2008, OIS reported that Optimal SUS purportedly remained invested at month end in the equities markets (and not invested in U.S. Treasuries) at least eight different times.  (October 2008 Presentation, Ex. 25 at 19).  The NAV calculated by HSBC Services for each one of these eight month-ends, therefore, depended on Madoff's trade confirmations.

270.    The fact that HSBC Services relied on Madoff's trade confirmations is evidenced by the PwC Madoff Report and the DDQs.  According to the PwC Madoff Report, "the administrator receive[d] copies of trade confirmations and customer statements in standard

industry form, from [Madoff's] back office function."   (PwC Madoff Report, Ex. 6 at 3).

Similarly, according to OIS's 2005 DDQ:

> The fund administration is performed independently by external service providers.   However, we [i.e., OIS] have an operational team that verifies the work executed by these service providers.
>
> The role of the Fund Admin department is to conduct **in parallel** to our designated external administrators the calculation of monthly NAVs, shareholder registry control, **pricing of all underlyings** as well as all relevant information flow.   Discrepancies are highlighted and reconcile [sic] in order to insure accuracy and integrity of data.

(2005 DDQ, Ex. 16 at 24; emphasis supplied).

## 2. HSBC Services Received Trade Confirmations From Madoff That Were Outside The Trading Range For The Period Reported

271.   HSBC Services received trade confirmations from Madoff that were outside the trading range for the period reported.   This is based on the findings of the SIPC Trustee, as set forth in the lawsuits the SIPC Trustee has filed against feeder funds for refusing to return monies withdrawn from BMIS within the preferential time period under the Bankruptcy Code (the "Claw Back Lawsuits").

272.   In most of these Claw Back Lawsuits, the SIPC Trustee makes the same factual assertion in support of the claim that the feeder funds ignored red flags.   Mr. Picard asserts that Madoff reported hundreds of trades to the feeder funds and their administrators that were supposedly executed at prices outside the daily range of prices such securities traded in the market on the days in question.

273.   The SIPC Trustee has relied in most of its lawsuits on the same example to show that many different feeder funds received fictitious, but indeed verifiably fictitious, trading confirmations:

[All three] Defendants' December 2006 account statements reported sales of 169,224 shares, 21,315 shares and 27,191 shares of Merck (MRK) respectively, each of which were purportedly executed at a price of $44.61 on the trade date of December 22, 2006 with a settlement date of December 28, 2006.  The daily price for Merck on December 22 ranged from a low of $42.78 to a high of $43.42, more than $1 below the price reported on the statements. . . .

The Trustee's investigation to date has revealed over 500 instances between January 1998 to November 2008 in which Defendants' account statements displayed trades purportedly executed at a price outside the daily price range.

(*Irving H. Picard v. J. Ezra Merkin et al.*, No. 08-01789, S.D.N.Y., Cmpt. at 16).[13]

274.    The reason the SIPC Trustee can use the same example for all feeder funds is because Madoff supposedly "bunched" trades – that is, Madoff supposedly made one aggregate split strike conversion trade, which Madoff then fictitiously apportioned among all his investors.  In other words, assuming Madoff had falsely claimed that he had sold one million shares of Merck on December 22, 2006, Madoff then supposedly apportioned these one million shares pro-rata among all his customers.  Because Madoff had supposedly executed one trade, the price was the same for all customers, only the number of shares changed.

275.    The Claw Back Lawsuits filed by the SIPC Trustee, thus, show that Madoff reported the same fictitious trades to all his investors.  Optimal SUS's own documents show that Madoff had reported to Optimal SUS that it had executed the split strike conversion strategy in October 2006 and exited in December 2006.  (October 2008 Presentation, Ex. 25 at 19).  This is consistent with the allegations by the SIPC Trustee that Madoff reported a sale of Merck stock on December 22, 2006, that could never have occurred at the price Madoff reported.  Given that

---

[13]  The SIPC Trustee relies on the same Merck trade in several other law suits.  *See, e.g.,* (i) Trustee Kingate Action, Cmpt. at 15; (ii) *Irving H. Picard v. Harley Int'l (Cayman) Ltd.*, No. 08-

HSBC Services received the trade confirmations from Madoff, and that hundreds of these trade confirmations reflected prices which did not exist, HSBC Services knew or was reckless in not knowing that Madoff could not have executed hundreds of trades at the listed prices.

**B. HSBC TRUST VIOLATED ITS OBLIGATIONS AS CUSTODIAN TO PLAINTIFFS AND THE CLASS**

276. HSBC Trust served as custodian of Optimal Multiadvisors and was responsible for the "safe custody . . . , and control of, the [Optimal Multiadvisors'] assets it [held]." (October 2008 EM, Ex. 13 at 13). For the assets it did not hold, HSBC Trust's responsibilities included the following:

> The Custodian may appoint sub-custodians, agents or delegates ("Correspondents") to hold the assets of the Fund. The Custodian will act with reasonable skill, care and diligence in the appointment and monitoring of Correspondents and shall be responsible to the Fund, for the duration of any agreement with a Correspondent, for satisfying itself periodically as to the ongoing suitability of any such Correspondents to provide custodial services to the Fund. The Custodian will maintain an appropriate level of supervision over any Correspondent and will make appropriate enquiries periodically to confirm that the obligation of any Correspondent continue to be competently discharged.

(October 2008 EM, Ex. 13 at 13).

277. HSBC Trust held itself out as an expert in the custody of assets. The EMs said: "The principal activity of the Custodian is to provide trustee and custodial functions for investment funds such as [Optimal Multiadvisors.] The Custodian was incorporated in Ireland on 29 November 1991 [sic] an indirect wholly-owned subsidiary of HSBC Holdings plc." (October 2008 EM, Ex. 13 at 13).

278. For the discharge of its duties, HSBC Trust charged the following fees:

---

01789, Adv. Pro. No. 09-01187, S.D.N.Y., Cmpt. at 14; and (iii) *Irving H. Picard v. Alpha Prime Fund Ltd. et al.*, No. 08-01789, Adv. Pro. No. 09-1364, Cmpt. at 15.

- in respect to Series which are fund of funds [*i.e.*, Optimal Arbitrage], the custody fee is one basis point subject to a minimum of USD 10,000 per annum.  In addition, there is a custody transaction fee of USD 175.

- In respect to Series which are feeder funds [*i.e.,* Optimal SUS], the custody fee is one basis point.  Custody's transaction fees are waived.

(October 2008 EM, Ex. 13 at 13).

279.    These disclosures in the EMs establish that HSBC Trust charged a fee of one basis point with respect to Optimal SUS for its supervisory responsibilities over Madoff. HSBC Trust did not hold the Optimal SUS assets, so it could not be charging a fee for that.  HSBC Trust's only role, and the reason it charged a fee, was to "act with reasonable skill, care and diligence in the appointment and monitoring" of other custodians.  HSBC Trust was further obligated to "satisfy[] itself periodically as to the ongoing suitability" of Madoff as a custodian.

280.    HSBC Trust failed to discharge its duties and to conduct the necessary procedures to adequately appoint and monitor BMIS, and to ensure the safeguard of the assets entrusted by Plaintiffs and the Class.  Had HSBC Trust not breached its duties, Plaintiffs and the Class would not had been damaged.

## VIII.   SUBSTANTIVE ALLEGATIONS CONCERNING OBVIOUS RED FLAGS THAT ALL DEFENDANTS IGNORED

### A.      RED FLAGS

#### 1.       Madoff's Custody of Equity Securities

281.    Madoff failed to trade through an independent broker and, instead, self-cleared all trading activities through his wholly-owned company, BMIS.  In addition, Madoff served as his own custodian for the Funds' assets, even though this greatly increased the risk of self-dealing and of Madoff perpetrating a Ponzi scheme.  At a minimum, this arrangement should have

alerted Defendants to the need for heightened scrutiny, monitoring, and verification of transactions, yet Defendants ignored this risk.

### 2.     Madoff's Non-Existent Counterparties

282.    Madoff refused to identify the counterparties with whom he traded equity securities and options when executing the split strike conversion strategy.  Alternatively, if Madoff did identify them, Defendants failed to learn that Madoff had never traded with any of them.

### 3.     Defendants Failed To Confirm The Existence Of Government Securities At The End Of Each Year

283.    Another warning sign was the fact that Madoff supposedly held **all assets**, **one-hundred percent, in government securities at the end of every year**.  While a possible coincidence, it is extremely suspicious.  Not one, single year-end coincided with an opportune time to be invested in the split-strike conversion strategy?  In light of this recurring pattern the obvious concern should have been that Madoff was hiding from the auditors so that at year-end the auditors would only audit government securities.  At a minimum, this should have caused Defendants to confirm the existence of the government securities.

284.    Madoff claimed that government securities were cleared through GSCC and held by BONY, but Defendants never confirmed this assertion with GSCC or BONY.  Had Defendants contacted GSCC or BONY they would have learned that Madoff had not conducted a single trade in any of these years.

### 4.     Madoff's Unknown Auditing Firm

285.    Madoff supposedly used F&H, an unknown accounting firm that was plainly unequipped to audit a company of BMIS's purported size.  F&H had only three employees – a retired partner living in Florida, a secretary, and one active certified public accountant.  While

F&H was a member of the AICPA, it had not been the subject of a peer review since 1993 – which is a membership requirement – because F&H represented to the AICPA, in writing, that it did not conduct any audits.

### 5. Madoff's Secretive Operation

286.   Madoff refused to answer even basic questions about BMIS, leading OIS's own internal memoranda to describe Madoff as secretive.   Madoff thus refused to provide the minimum level of transparency necessary to conduct reasonable due diligence.   The lack of transparency was even more suspicious in light of the fact that the Santander Defendants knew that Optimal SUS was one of Madoff's largest investors.

287.   Madoff's secrecy was exacerbated by the fact that Madoff family members controlled key positions at BMIS, thus limiting third party involvement.   Defendants knew about this arrangement, yet ignored the risk it clearly represented.

### 6. Madoff's Paper Trading Records

288.   Madoff claimed that BMIS was technologically advanced.   Yet, Madoff reported his trades to Defendants using only paper confirmation forms which did not include the exact time of the trade nor the exact price of each trade.   Instead, the paper confirmations only provided average prices for the transactions that had supposedly been executed each day.   Based on standard industry practice, the lack of access to real-time electronic reporting should have raised significant concerns about Madoff.   The use of delayed paper confirmations, which are patently susceptible to manipulation, was yet another red flag ignored by Defendants.

### 7. Madoff's Consistent Returns

289.   The impossible consistency of Madoff's reported results using the split strike conversion strategy and the resulting investment returns was another warning sign.   Among other things: (1) Madoff generally reported that he bought near daily lows and sold near highs with

uncanny consistency; (2) Madoff reported trades at prices that were outside of the stocks' actual trading ranges or took place on weekends, both of which are impossible; (3) Madoff always claimed to be fully invested in U.S. Treasury bills at the end of each year; and (4) Madoff reported results were inconsistent with the split strike conversion strategy, which might reduce volatility but could not produce gains in a declining stock market. Madoff's reported results were unattainable and not repeatable by others, yet the Santander Defendants ignored this warning sign.

### 8.    Madoff's Fee Structure

290.    Equally suspicious was Madoff's fee structure, which was extremely unusual and perhaps unique. A typical investment firm like BMIS charged two percent of assets annually, plus twenty percent of profits. "Two-twenty," as this arrangement is commonly referred to in the hedge fund world is the industry standard. On Optimal SUS's $3 billion investment with Madoff in 2008, a "two-twenty" fee arrangement would have entitled Madoff to a $90 million fee, assuming a low five percent annual return. Madoff did not charge any such fees and effectively relinquished tens of millions of dollars every year. There was no explanation for this apparent generosity.

291.    Instead, Madoff supposedly charged a commission per trade. PwC U.S. and PwC Bermuda reported to PwC Ireland that Madoff supposedly charged four cents a share on each trade. But if Madoff was not charging for results, as a "two-twenty" fee structure does, and charged only for trading, Madoff had an incentive to churn the account. This perverse incentive structure was a serious red flag.

### B.     OTHER FINANCIAL INSTITUTIONS DID NOT IGNORE THE RED FLAGS AND REFUSED TO DEAL WITH MADOFF

292.     Multiple other financial market participants reviewed Madoff's operations and refused to invest in light of the high number of red flags.  In 2007, hedge fund investment adviser Aksia LLC ("Aksia") urged its clients not to invest in Madoff feeder funds after performing due diligence on Madoff.  Aksia identified the following concerns:

(a)     Madoff's auditor, F&H, was a three-person accounting firm located in a 13-by-18 foot office in New City, New York.  A financial institution of the size of BMIS is typically audited by a big-four accounting firm, or other larger and more reputable auditor.  In addition, while F&H purportedly audited BMIS, F&H filed annual forms with the AICPA attesting that it had ***not*** performed audits for the past fifteen years;

(b)     The comptroller of BMIS was based in Bermuda.  Most mainstream hedge fund investment advisers have their comptroller in-house; and

(c)     BMIS had no outside clearing agent that could confirm its trading activity.

293.     Société Générale ("SocGen") also concluded that Madoff was not legitimate after sending its own due diligence team to New York in 2003.  As reported by *The New York Times* on December 17, 2008, in an articled entitled, *European Banks Tally Losses Linked To Fraud*, SocGen's due diligence "was conducted by three people who visited Mr. Madoff's headquarters in the red-granite skyscraper on Third Avenue in Manhattan."  The bankers concluded that "something wasn't right. . . . . It's a strategy that can lose sometimes, but the monthly returns were almost all positive."

294.     Acorn Partners ("Acorn"), an investment advisory firm, also concluded that the steadiness of the returns that Madoff reported did not make sense, and that the size of Madoff's auditor raised serious concerns.  According to Robert Rosenkranz, a principal at Acorn, "[o]ur

due diligence, which got into both account statements of his customers and the audited statements of Madoff Securities which he filed with the SEC, made it seem highly likely that the account statements themselves were just pieces of paper that were generated in connection with some sort of fraudulent activity." (*The New York Times*, December 12, 2008, *Look at Wall St. Wizard Finds Magic Had Skeptics*).

295.    Jeffrey S. Thomas, chief investment officer at Atlantic Trust, which manages $13.5 billion, said that on several occasions over the years it had "reviewed and declined to invest with Madoff."  In studying where to place its clients' funds, the firm said it spotted a number of "red flags" in Madoff's operation.  Chief among those was a lack of an outside firm to handle trades and accounting for the funds, and the inability to document how Madoff made profits.

## IX.    JURISDICTION AND VENUE

296.    This Court has jurisdiction over the Exchange Act claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.

297.    This Court has jurisdiction over the state law claims pursuant to,

(a)    the Court's supplemental jurisdiction, 28 U.S.C. § 1367(a); and

(b)    the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2) ("CAFA").

With respect to CAFA, (i) the amount in controversy exceeds the jurisdictional amount of $5,000,000, (ii) the Class consists of hundreds, and perhaps thousands of individuals, and (iii) at least one Plaintiff is a citizen of a foreign state and one Defendant is a citizen of Florida.

298.    The exercise of personal jurisdiction over the Defendants by this Court is appropriate and will not offend traditional notions of fair play and substantial justice because each of the Defendants sued under Florida law had sufficient minimum contacts with Florida, and each of the Defendants sued under New York law had sufficient minimum contacts with

New York.  In addition, Defendants Santander, Santander Miami, OIS, and Echeverría have consented to personal jurisdiction.

299.   Venue in this judicial District is proper pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b), because substantial acts in furtherance of the alleged wrongdoing and/or its effects have occurred within this District.  Additionally, Defendants maintain offices and conduct substantial business in this District.

300.   Venue in this judicial District is also proper pursuant to the Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation, dated August 11, 2009, transferring all related actions to this Court pursuant to 28 U.S.C. § 1407.

## A.   THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EDGE ACT

301.   The Court has subject matter jurisdiction pursuant to Section 632 of the Edge Act, 12 U.S.C. § 632, which provides that:

> Notwithstanding any other provision of law, all suits of a civil nature at common law or in equity to which any corporation organized under the laws of the United States shall be a party, arising out of transactions involving international or foreign banking, or banking in a dependency or insular possession of the United States, or out of other international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries, shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such suits.

302.   Plaintiffs meet all elements required by § 632.  First, this suit brings common law claims.  Second, Santander Miami is an Edge Act banking corporation organized under Section 25A of the Federal Reserve Act, 12 U.S.C. §§ 611 *et seq.*[14]  Third, the suit herein arises out of

---

[14]   Santander Miami is one of the three largest Edge Act corporations.

transactions involving international or foreign banking and out of other international or foreign financial operations.  Accordingly, this Court has original jurisdiction of all common law claims which are deemed to arise under the laws of the United States.

**B.      THE COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE EXCHANGE ACT**

**1.      Defendants Purposefully Availed Themselves Of The Benefits Of Having Plaintiffs And The Class Invest 100% Of Optimal SUS In The United States; It Was Foreseeable That Defendants Would Be Haled Into Court In The United States**

303.     The EMs explained that the Optimal SUS fund was to be invested, exclusively and entirely, in the United States with a U.S. registered Broker-Dealer.  The sole purpose of investing in Optimal SUS was to invest in the United States and in United States equities that are part of the Standard & Poor's 100 Index.  The name itself, Optimal SUS, denotes a U.S. based investment. The June 2004 EM, and every subsequent EM, in sum or substance, said:

> the Fund [Optimal Multiadvisors] and Optimal SUS have established a discretionary account with a US broker-dealer ("Broker-Dealer") registered with both the U.S. Securities and Exchange Commission (the "SEC") and the National Association of Securities Dealers, Inc. ("NASD").
>
> * * *
>
> The assets of the fund are deposited with the Broker-Dealer [in the United States].
>
> * * *
>
> Most of the stocks for which [the Broker-Dealer] acts as a market maker are also listed on the New York Stock Exchange.
>
> * * *
>
> The strategy utilized by the Broker-Dealer . . . entails. . . purchasing a basket of thirty to forty large-capitalization S&P 100 stocks . . . . purchasing. . . S&P Index put options. . . . selling S&P 100 Index call options.
>
> * * *
>
> In practice the Broker-Dealer [in the United States] usually invests in US Treasury Bills [when not executing the split strike conversion strategy].

(June 2004 EM, Ex. 10 at 30).

304.     The Explanatory Memoranda further reassured investors that the investments by the Broker-Dealer were made pursuant to the regulations and the laws of the United States: "[Optimal Multiadvisors], Optimal SUS, [OIS], and the Broker-Dealer must comply with various legal requirements, including requirements imposed by the federal securities laws, tax laws and pension laws." (June 2004 EM, Ex. 10 at 35).

305.     Defendants, thus, knew that the sole objective of Optimal SUS was for 100% of the monies to be invested with Madoff in New York.  All significant conduct (including trading and due diligence on Madoff) was supposed to take place in New York.  Defendants, as well as Plaintiffs and the Class, all understood that Optimal SUS was run by a Broker-Dealer in New York because that is precisely what the EMs said.  While the EMs said that "investment decisions" were made by OIS (June 2004 EM, Ex. 10 at 35), the "investment decisions" by OIS were limited to agreeing to the "split strike conversion" strategy.  Having made that decision and agreed to ascribe to the "split strike conversion strategy," which really was a decision made by the investor in accepting to invest in Optimal SUS, Madoff decided which stocks to buy and sell, when, and in what amounts.  There were no real investment decisions made by OIS and that was clear from the EMs.

306.     Further, in creating a fund whose sole objective was to invest in the United States, Defendants took advantage of the exemplary reputation of the laws and securities markets of the United States as being the best regulated and most efficient markets in the world.  Having benefited from the advantages of the United States, they cannot seek now to disavow the concomitant obligations which include being subject to the laws of the United States.

307.     Accordingly, all Defendants availed themselves of the benefits and privileges of investing in the United States, pursuant to its laws and regulations.  It was foreseeable that, having chosen to operate an investment fund that was 100% invested in the United States, all Defendants would be haled into Court in the United States.

### 2.     The Conduct And Effects Tests Are Both Met

#### (a)     Defendants' Conduct In The United States Was "More Than Merely Preparatory," And The "Culpable Failures To Act Within The United States Directly Caused The Losses"[15]

##### (i)     Santander, Santander Miami, OIS, And Echeverria Had A Substantial Presence In New York And Their Conduct In New York Establishes Subject Matter Jurisdiction

308.     Santander and Santander Miami had offices located at 45 East 53rd Street in New York City.  OIS had offices on the 6th floor of that building.

309.     OIS's presentations and EMs all confirmed that OIS had offices and personnel based in New York City.  For example, the October 2008 EM stated that OIS's "principal office is located [in] Geneva, Switzerland with further offices located in Geneva, New York, and Madrid."  (October 2008 EM, Ex. 13 at 10).  Many of the presentations prepared by OIS, including those concerning Optimal SUS, listed on the cover of the presentations the cities in which OIS had offices, and always included New York.  (*See, e.g.,* 3rd Quarter 2008 Portfolio Analysis).

310.     Another presentation titled, "Optimal Investment Services: Optimal Strategic US Equity," and dated October 2008, showed that OIS had raised the number of analysts dedicated

---

[15] The standard under the "conduct test" varies among the Circuits, but the Eleventh Circuit has not adopted one specifically.  *In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1313 (11th Cir. 2009).  The Second Circuit standard requires (i) "more than merely preparatory [conduct]," and (ii) "culpable failures to act" within the United States to directly cause the losses.  *Id.*  Plaintiffs'

to due diligence in New York from four to six.  (Ex. 13 at 4).  This was the highest number of professionals, together with London, dedicated to due diligence outside of OIS's headquarters in Geneva.  (*Id.*).  Similarly, the 2005 DDQ also stated that, "[i]n 1995 [OIS] established a presence in New York to perform analysis and due diligence on managers and to complement the already existing effort of the Geneva analysts team.  In August 1995, we launched our first Optimal Multiadvisors fund in Bahamas, Optimal Arbitrage . . . . In 1997, Optimal Strategic US Equity was launched."  (2005 DDQ, Ex. 16 at 6).

311.    Because of OIS's presence in New York, Madoff sent the trade confirmations to OIS's offices there.  A trade confirmation that appears in the January 2008 internal presentation made by OIS to Santander sales officers shows that the trade confirmations were addressed as follows:

> Optimal SUS
> Banco Santander
> 45 East 53rd Street, 6th Floor
> New York, New York 10022

(January 2008 Presentation, Ex. 19 at 19).

312.    OIS had key senior officers based in New York, including officers specifically dedicated to due diligence of US based funds – *e.g.*, Optimal SUS.  According to a presentation prepared by OIS in or about 2006, the following OIS analysts were based in New York:

> **Hugh Burnaby Atkins**, CFA, FRM, Senior Research Analyst
> Mr. Burnaby-Atkins is **based in New York and responsible for research, due diligence**, fund monitoring and selection of a full range of hedge fund strategies . . . .
>
> **Balkir Zihnali**, CFA, Senior Research Analyst

---

allegations suffice to meet the Second Circuit standard, which is the most stringent, but Plaintiffs do not waive the right to argue that the Court should apply a different standard.  *Id.* at 1317, n.11.

> Mr. Zihnali is **based in New York and responsible for research, due diligence**, fund monitoring and selection of US-based managers focusing on equity strategies . . . .
>
> **Jonathan Clark**, Research Analyst
> Mr. Clark is a Research Analyst in **New York responsible for research, due diligence**, and fund monitoring of US-based managers, focusing on relative value and event-driven strategies.
>
> **Tom Lileng**, Research Analyst
> Mr. Lileng is a Research Analyst based in **New York responsible for research, fund monitoring and due diligence of US-based managers**, focusing on long/short equity and event driven strategies.

(OIS 2006 Presentation, Ex. 31 at 18-20; emphasis supplied).

313.    In the course of Lead Plaintiffs investigation, Lead Counsel interviewed several of these key OIS employees based in New York.  One of those employees was Hugh Burnaby-Atkins ("Atkins").  Atkins said that he was head of the OIS office in New York from 2003 through 2008.

314.    Atkins, however, sought to disclaim his own personal involvement in Optimal SUS, although interviews with other OIS New York employees, recounted below, suggest otherwise.  According to Atkins, Echeverría was the one that "maintained and managed" the relationship with Madoff and regularly met with Madoff.  Atkins further pointed the finger at "another analyst" who was also in New York and who Atkins claims reported directly to Echeverría about Optimal SUS.

315.    The "other analyst" Atkins was referring to is likely to be Jonathan Clark ("Clark").  Lead Counsel interviewed Clark who confirmed that he worked at OIS in New York from the Summer of 2003 until the Summer of 2008.  Clark said that he and Atkins were hired in 2003 to monitor Madoff.  Clark reported to Atkins and Echeverría.  Clark, together with Atkins and the rest of the New York office, handled Optimal SUS day-to-day.  These daily activities

were documented in numerous regularly issued reports, presentations, memoranda, and other documentation which were kept at OIS's New York office.  Clark further stated that he met with Madoff at least once a year in Madoff's office and many years he met Madoff more than once.

316.    Lead Counsel also interviewed another analyst based in OIS's New York office who requested that his/her name not be made public ("Confidential Witness 1" or CW1).  CW1 held a similar position to Atkins between 2007 and the time when Madoff's Ponzi scheme was revealed.  CW1 confirmed the information provided by Clark and Atkins.  According to CW1, Echeverría was the "ultimate guy" with respect to Madoff and visited New York's office two to four times per year, meeting Madoff on most occasions.

317.    Echeverría's recurring visits to New York were confirmed by yet another former due diligence officer at OIS's New York Office, Zihnali.  Zihnali was employed by OIS, in New York, from 2005 through the Summer of 2008.  Zihnali confirmed that Echeverría went to New York once or twice a year and was principally in charge of Optimal SUS.

318.    The day-to-day supervision of Optimal SUS, however, was handled by Clark in the New York office.  According to CW1, Clark received trade tickets from Madoff via fax – not electronically.  These trade tickets were used by Clark to ensure that Optimal SUS followed the supposed split strike conversion strategy.  Shortly after Clark left OIS in the Summer of 2008, CW1 said that at least one additional meeting with Madoff took place, in addition to the November 2008 meeting attended by Rodrigo Echenique and others, which is described further below.  The meeting took place in August or September 2008, and included Madoff and Echeverría's replacement (Esteban Estevez), as well as Louay Mikdashi ("Mikdashi") and Oleg Langport ("Langport") from OIS New York.  Mikdashi had replaced Atkins and Langport had replaced Clark.

319.     Meetings between OIS and Madoff in New York were further confirmed by the former Chief Investment Officer of OIS after Echeverría left, Terrence Owen Jones ("Jones"). OIS hired Jones in November 2008.  Jones confirmed that Madoff met with Estevez, Prince and another high level Santander executive (referring to Echenique) in New York on Thanksgiving Day in 2008.  The reason for the meeting was that OIS had submitted redemption requests to Madoff for about $400 million.

320.     According to Jones, it was not possible to conduct meaningful due diligence on Madoff.  Madoff's trade confirmations did not list the counterparties and OIS could not "see the other side of the trades."  Jones also believed that Madoff was extremely secretive and refused to provide the names of the supposed counterparties as well as where he deposited his funds.  For this reason, Jones did not believe that relying on Madoff's own trade tickets and SEC reports constituted sufficient due diligence.

321.     Accordingly, based on these documents and interviews, Lead Plaintiffs have established that OIS conducted and/or failed to conduct the requisite due diligence in New York with respect to Madoff.  As set forth in detail herein, the due diligence conducted in New York did not meet the adequate standard of care and, thus, (i) constituted conduct that was more than merely preparatory to the wrongdoing; and (ii) directly caused the losses.

> **(ii)     Santander Miami Sent Communications And
> Information From Miami Even To Clients With
> Accounts Not Based In Miami**

322.     Santander Miami's office on Brickell Avenue in Miami, Florida, served as the headquarters for Santander's International Private Bank in Latin America.  Santander Miami began selling OIS investments as early as 1996, before OIS was created in 2001.  In 1996, the Santander funds were sold under the brand name BPI, which stood for Banca Privada

Internacional – Spanish for International Private Bank.  Optimal SUS at the time was called "BPI M.STRATEGIC."

323.    Santander Miami mailed bank statements, explanatory memoranda, and other documents relating to Optimal SUS regardless of whether the investor had an account at Santander Miami or at a non-U.S.-based Santander banking affiliate.

- **Santander Miami Opened**
  **Bank Accounts In Bahamas and Switzerland**

324.    Santander Miami employees based in Miami would regularly offer to open bank accounts at Santander affiliates in the Bahamas or Switzerland, and invest in Optimal SUS.  For example, on December 7, 2007, Marcelo Charul ("Charul") who was a Vice President at Santander Miami, in Miami, sent an email to a Latin American investor, Sergio Desuque, offering to open bank accounts in either Santander Bank & Trust Ltd. in the Bahamas ("Santander Bahamas") or Santander (Suisse), S.A. ("Santander Switzerland").  The subject line read, "Account Openings."  Charul's email said: "Attached are the documents necessary to open bank accounts in Bahamas or Switzerland (in zip files).  In both cases it is necessary to add copies of the passports with a clear picture of each signator.  Regards."  (Ex. 32).

325.    The attached files to Charul's email included five different documents to open accounts in Santander Bahamas, including an account agreement and signature card on Santander Bahamas letterhead.  (Santander Bahamas Account Agreement, Ex. 33).  The attached files also included thirteen different documents to open accounts in Santander Switzerland, including an "account opening form" on Santander Switzerland letterhead.   (Santander Switzerland Account Form, Ex. 34).

326.    The email by Charul from Miami did not offer to open an account with Santander Miami, nor did it include any recipients at Santander Bahamas or Santander Switzerland.  The

only other recipient was Daniel Suarez ("Suarez") who was also an employee of Grupo Santander.  Based on the email address Suarez appears to be based in Uruguay.

327.     In a prior email dated December 4, 2007, Charul had sent the client a thirty-one page OIS brochure of all Optimal funds, dated October 2007.  (December 4, 2007 Email, Ex. 41; Optimal brochure dated October 2007, Ex. 35).  Among the funds offered was Optimal SUS.

- **Santander Miami Officers Made Loans On Behalf Of Santander Switzerland.**

328.     Santander Miami officers also made loans on behalf of Santander Switzerland. Plaintiff International Harvester negotiated a loan granted by Santander Switzerland with Alfredo López ("López") in May 2004 when López was a Vice President based in Miami. (López Business Card dated approximately 2004, Ex. 36).  Plaintiff International Harvester never had a single conversation with anyone from Santander Switzerland with respect to the loan.

- **Santander Bahamas Account Statements Were Mailed From Miami**

329.     Plaintiff Testa regularly received his bank statements mailed from Miami. Plaintiff Testa's bank account, however, is at Santander Bahamas.  For example, on March 17, 2005, Santander Bahamas mailed Plaintiff Testa a letter dated March 15 concerning his account. The letter is attached as an exhibit hereto (March 17, 2005 Letter, Ex. 5), although the content is redacted to protect Plaintiff Testa's privacy.   The letter is on letterhead labeled, "Banca Privada Internacional, Grupo Santander," and "Santander Bank & Trust Ltd."  The mailing envelope, however, is (i) postmarked "Miami, Florida;" (ii) stamped "March 17, 2005;" (iii) reflects metered "U.S. Postage" of $0.10; (iv) labeled "PB Meter 6712771;" and (v) lists as a return address a Post Office Box in Miami, Florida.  (Ex. 5).

330.     This course of conduct continued throughout the time relevant to this Complaint. On December 9, 2008, Plaintiff Testa's monthly statement for November 2008 for his account in

Santander Bahamas was once again mailed from Miami, Florida.  The account statement and envelope are attached hereto but appropriately redacted to protect his privacy.  (Ex. 37)[16].   The envelope is (i) postmarked December 9, 2008; (ii) stamped "Mailed From Zip Code 331__ [unreadable]; (iii) reflects metered "United States Postage" of $0.15; and (iv) lists the same return address in Miami, Florida as the March 2005 envelope.

331.    In addition to bank statements and account information, the Santander Group also mailed from Miami, Florida, copies of the Optimal SUS Explanatory Memorandum.  In a cover letter dated August 15, 2001, Santander Miami mailed from Miami, Florida, a copy of the Optimal SUS Explanatory Memorandum, dated July 2001.  (Ex. 8).  The letterhead states "Banca Privada Internacional, Santander Central Hispano," and includes Santander Miami's address on Brickell Avenue and telephone numbers in Miami.

- **Santander Miami Officers Sold Optimal SUS In Latin America**

332.    Based on direct, personal knowledge of Plaintiff International Harvester, Santander Miami officers based in Miami, Florida sold Optimal SUS in Latin America.  One of the most successful salesmen of Optimal SUS was Waterhouse. Waterhouse was based in Miami, Florida, after 2002 until approximately March 2009, and had monthly discussions with Echeverría about the Optimal Funds during this period.  Waterhouse also participated in the monthly conference calls out of Miami in which the monthly results of the Optimal Funds were discussed.  These calls typically occurred about five days after the end of the month. Waterhouse would regularly travel to Latin America from his Miami office to meet with investors in the Optimal funds and would regularly speak from his Miami office with investors

---

[16] The destination address is not printed on the envelope because the envelope has a see-through window, allowing the address printed on the account statement to be seen.  The account

who resided in Latin America.   Plaintiff International Harvester's understanding is that Waterhouse was allowed to meet Madoff, in person, as a reward for being the best salesman of Optimal SUS.

333.   Another successful Santander Miami employee was Diego Sacerdote ("Sacerdote").   Sacerdote was a Vice President of Santander Miami but had his offices in New York City, at 45 East 53rd Street.   This is the same address at which OIS had officers conducting due diligence on Madoff.   Sacerdote worked at the New York office from approximately the end of 2001, through 2004.

334.   Additional Santander Miami officers who were based in Miami, Florida, but who regularly traveled to Latin America to sell Optimal funds and who regularly spoke from Miami to their clients in Latin America about the Optimal funds, included: Fernando Diez and Martín Yanguela.   They both remain based in Miami.

- **Santander Miami Officers Made Offers and Negotiated Agreements On Behalf of Santander Switzerland**

335.   Santander Miami officers made offers and negotiated legal agreements on behalf of Santander Switzerland.   Specifically, after December 2008, when Santander announced that all monies in Optimal SUS had been lost, Santander and its affiliates offered to settle any claims arising from that loss.   They offered to do so through an "Exchange Agreement."   Pursuant to that agreement, investors in Optimal SUS were to exchange their Optimal SUS shares (now worthless) for a Santander hybrid security that was worth approximately twenty percent of the original investment.

336.   The Exchange Agreement was to be executed between the account holder (*i.e.,* the investor in Optimal SUS) and the Santander affiliate at which the account was held.   Plaintiff

statement is included as part of the exhibit for this reason.

Mar Octava's draft of the Exchange Agreement reflected Santander Miami as the Santander entity making the agreement, while Plaintiff Testa's draft reflected Santander Bahamas.

337.    In the case of Plaintiff International Harvester, the account was with Santander Switzerland.  Yet, officers of Santander Miami met with International Harvester and negotiated, unsuccessfully, the Exchange Agreement that was to be executed between Santander Switzerland and International Harvester.  Specifically, International Harvester met on January 29, 2009, with Carlos Rodriguez Aspirichaga ("Aspirichaga"), who is a Senior Vice President at Santander Miami and resides in Coral Gables, Florida.  Aspirichaga handed International Harvester the proposed Exchange Agreement to be executed, if accepted, by Santander Switzerland.

338.    Another critical person involved in the unsuccessful negotiations with International Harvester was Francisco Félix-Rodríguez ("Rodríguez").  Rodríguez is currently the Commercial Director for America at Santander, and based in Miami, Florida.  Suarez described Rodríguez as the "number one guy at the International Private Bank," in an email dated March 1, 2009, to International Harvester.  As the "number one guy," Rodríguez had authority to execute the Exchange Agreement.  In an internal email dated February 28, 2009, at 9:01 p.m., Rodríguez tells Suarez: "I would like to meet [International Harvester], tell him that if we see each other we will undoubtedly reach a solution that he will like."

### (iii)    OIS's Own Documents State That Santander Miami Was Not Authorized To Distribute Any Information About Optimal SUS From Miami

339.    Despite Santander Miami's pervasive and continuous activity selling Optimal SUS from Miami, Florida, OIS's own documents admitted that such activity was prohibited. OIS provided monthly booklets to investors of its various funds.  (*See, e.g.*, July 2006 Booklet, Ex. 38).  The cover page typically explained the contents of the booklet: "This booklet contains detailed and relevant monthly data about Optimal funds.  In particular, it groups in one printable

page the following information [for each fund]: NAV, fund description, portfolio allocation, structure, monthly performance, statistical analysis, cumulative return, distribution of returns and distribution by strategy." (Ex. 38 at 1). In each one of those pages, including the page dedicated to Optimal SUS and the page dedicated to Optimal Arbitrage, the booklet stated:

> Units in the Optimal Funds and any other funds described in this document may not be offered, sold or distributed in or **from** the UK, the USA and their territories. Not FDIC insured – no bank guarantee – may lose value.

(Ex. 38 at 3-4; emphasis supplied). OIS repeated this in virtually every similar booklet obtained by Plaintiffs and attached hereto, (*See, e.g.,* the "OIS Monthly Booklets," Ex. 39).

340. These booklets were distributed to investors by Santander Miami because very few investors had direct communications with OIS. Most investors (including Plaintiffs here) communicated with their banking representative and obtained monthly reports and updates from the bank, principally Santander Miami. Santander Miami simply disregarded the fact that they were not authorized to offer, sell or distribute the Optimal Funds from the United States and did so anyway. The best example is the email sent by Charul to Desuque on December 4, 2007. (Ex. 41; *see also supra* ¶ 327). In that email, Charul offered Desuque to invest in the Optimal Funds and included a thirty-one page booklet of all Optimal funds. That booklet itself included the language stating that it was prohibited to offer Optimal Funds from the United States. (Ex. 35 at 9).

341. This is another example that illustrates the Santander Defendants' complete disregard for any separation and segregation of duties among the Santander Group entities. All the Santander Group entities functioned as one, regardless of location and local regulations.

(iv)     **The PwC Defendants Had Substantial Conduct In The United States That Was More Than Merely Preparatory And Directly Caused The Losses**

342.     The PwC Defendants' conduct in the United States represented the centerpiece and fundamental aspect of the wrongful conduct at the heart of the claims against the PwC Defendants.  PwC U.S. and PwC Bermuda held repeated meetings with Madoff in New York which served as the central basis for the faulty audits.  PwC Ireland would not have been able to issue unqualified audit opinions if PwC U.S. or PwC Bermuda performed audit procedures in conformity with the requisite auditing standards, the results of which they shared with PwC Ireland and upon which PwC Ireland based its audit report.

343.     As set forth in detail above, PwC U.S. and PwC Bermuda held numerous meetings with Madoff and routinely exchanged information necessary for PwC Ireland to issue audit opinions:

(a)     Partners from the PwC U.S. and PwC Bermuda affiliates met with Madoff at his offices in New York in December 2004;

(b)     Partners from the PwC U.S. and PwC Bermuda affiliates met with Madoff at his offices in New York in December 2006;

(c)     PwC Bermuda held telephonic conversations with PwC Ireland in connection with the 2005 and 2007 audits;

(d)     Each year between 2003 and 2007, PwC Ireland received a written confirmation letter enclosing year-end brokerage account statements for Madoff;

(e)     PwC Ireland had a number of e-mail communications with partners of PwC U.S. in New York in connection with Madoff and the Optimal SUS audits;

(f)     PwC Ireland had a number of e-mail and telephonic communications with OIS's office in New York concerning Optimal SUS;

(g)    PwC obtained critical documents in the United States necessary for PwC Ireland to issue an audit opinion, including, (i) the PwC Madoff Report for 2004, (ii) a similar report, in 2006, to the PwC Madoff Report; (iii) a copy of F&H's Independent Auditor' Report on Internal Control for Madoff pursuant to SEC Rule 17a-5(g)(1), received in connection with the 2004, 2006, and 2007 audits; (iv) a copy of Madoff's Statement of Financial Condition, with an Independent Auditors Report on Internal Control for Madoff from F&H, received in connection with the 2006 and 2007 audits; and (v) a FINRA BrokerCheck report for the 2004 and 2006 audits.

344.    The PwC U.S. affiliate was involved in meeting Madoff and assisting PwC Ireland issue an audit opinion concerning Optimal SUS.  McGowan, a PwC U.S. partner, was present at the two key meetings with Madoff in 2004 and 2006.  At least two other PwC U.S. partners, communicated with PwC Ireland concerning Madoff.

345.    PwC Ireland also has had substantial contacts with the United States:

(a)    PwC Ireland has clients and provides professional services in the United States and Florida;

(b)    PwC Ireland has received payments from clients in the United States and Florida;

(c)    PwC Ireland regularly visited the office of PwC U.S. in the United States;

(d)    PwC Ireland regularly seconded staff to PwC U.S. in the United States;

(e)    PwC U.S. staff regularly visited the offices of PwC Ireland;

(f)    PwC U.S. regularly seconded staff to PwC Ireland;

(g)    PwC communicated with OIS's offices in New York; and

(h)     PwC Ireland communicated with Madoff in New York in the form of written trade confirmations from Madoff.

> (b)     **Effects Test: Defendants' Conduct Had A Substantial Effect In The United States**

346.    According to the SIPC Trustee, Madoff's Ponzi scheme caused investors to believe they had approximately $65 billion in assets when in reality those assets did not exist. Billions of dollars of these fictitious assets caused substantial harm to thousands of United States citizens whose supposed wealth evaporated overnight.  This wealth had served to collateralize investments and assets of thousands United States citizens who had to liquidate these assets and suffer real losses.

347.    Defendants' wrongful conduct permitted Madoff to perpetuate the Ponzi scheme. The nature of a Ponzi scheme required that Madoff use the funds from new investors to pay old ones.  Optimal Multiadvisors provided Madoff with billions of dollars to continue the Ponzi scheme.  But for the billions of dollars that Optimal Multiadvisors gave to Madoff, the scheme would have unraveled substantially earlier and not damaged thousands of United States citizens. Similarly, but for the withdrawal of hundreds of millions of dollars from Madoff in the later years of the Ponzi scheme which were effectively taken from United States citizens, substantially less United States citizens would have been harmed by Madoff's Ponzi scheme.  Optimal Multiadvisors would not have invested with Madoff but for Defendants' wrongful conduct.

348.    The effect of the feeder funds in perpetuating Madoff's Ponzi scheme has been widely reported in the press. According to The Wall Street Journal's article, "Mad Men," published on January 7, 2009, "[f]eeder funds appear to explain [ ] the longevity of money manager Bernie Madoff."   Other news agencies issued similar reports:

(a)     Time Magazine published an article entitled, "How Madoff's Feeder Funds Stole My Retirement," which said that, "Bernard Madoff built his $65 billion Ponzi empire at least half on the backs of his feeder funds."[17]  The feeder funds allowed Madoff "to keep his house of cards standing much longer than he otherwise could have with his ragtag band of family members, small time accountants," according to the same article.

(b)     The New York Times published an article entitled, "In Fraud Case, Middlemen in Spotlight," which reported that the feeder funds "were essentially pouring billions of dollars each into Bernard L. Madoff Investment Securities."[18]

349.   Madoff's Ponzi scheme had additional substantial and direct effects on U.S. citizens:

(a)     It is estimated that the Internal Revenue Service ("IRS") will lose up to $17 billion in lost tax revenue.  In some instances, the IRS may have to refund filers who paid taxes on fictitious gains from Madoff.  Individual states may also lose substantial tax revenue due to Madoff.[19]

(b)     The effect of Madoff on U.S. charities and their respective beneficiaries is substantial and well-documented.  The collateral effect of Madoff's Ponzi scheme has sent "shock waves throughout the medical and scientific communities – with far-reaching implications for everything from diabetes research to palliative care.  Philanthropy experts say that **the negative effect of the Madoff scandal on health care could ultimately affect millions**

---

[17]  Time, April 5, 2009, *How Madoff's Feeder Funds Stole My Retirement*.

[18]  The New York Times, December 17, 2008, *In Fraud Case, Middlemen in Spotlight*.

[19]  Huffington Post, December 18, 2008, *Madoff's Ponzi Scheme Could Cost IRS $17 Billion In Lost Tax Revenue*.

**of people**."[20] As a result, "hospitals, food banks, schools and community outreach programs throughout the world are being forced to cut life-giving services as they watch millions of dollars in grants from large Jewish charities dry up in the wake of Bernard Madoff's alleged $50 billion Ponzi scheme."[21]

(c)     The insurance industry has reported that it will be affected by Madoff's scheme in the "range of direct insured losses . . . between $760 million and $3.8 billion . . . with the maximum potential exposed insurance limits at more than $6 billion."[22]

(d)     United States banks have also been affected by Madoff,  including lending institutions, like Wells Fargo, who recently recorded losses of $294 million related to customers who were unable to pay their mortgages because they were wiped out by Madoff.[23]  Similarly, hedge funds have seen substantial redemptions: "The Madoff scandal has contributed to redemptions that could shrink the hedge fund industry by half, to $1 trillion, by the end of the year."[24] and

(e)     Investors who suffered enormous losses at the hands of Madoff included, "pensioners, municipal workers, students on scholarship, and middle class Americans, not just wealthy investors."[25]

---

[20]  The Wall Street Journal, February 12, 2009, *Madoff Scandal's Deep Impact on Funding For Health, Science* (emphasis supplied).

[21]  Fox News online report, December 18, 2008, *Long Tentacle of Madoff's Scheme Impacting Life-Giving Programs*.

[22]  Medill Reports, January 15, 2009, *Aon Estimates Madoff's Alleged Ponzi Scheme Could Cost Insurers Billions*.

[23]  New York Times, January 28, 2009, *Wells Fargo Says Madoff Scheme Cost It $294 Million*.

[24]  Reuters, March 27, 2008, *Hedge Fund Industry Still Feeling Madoff Effect*.

[25]  Newsweek, December, 17, 2008, *Did Bernie Madoff Steal Your Money?*

350.    Accordingly, all Defendants' wrongful conduct had a substantial effect in the United States and upon United States citizens.

### C.    INDER RIEDEN HAS HAD CONTINUOUS AND SYSTEMATIC CONTACTS WITH FLORIDA SINCE 1979

351.    Defendant Inder Rieden's continuous and systematic contacts with Florida are sufficient to establish general jurisdiction.  Inder Rieden has had continuous and systematic contacts with Florida since 1979.

352.    In  1979  Inder  Rieden  incorporated  Intercontinental  Estates,  Inc. ("Intercontinental") with a principal address at 2221 N.E. 62nd Street, Fort Lauderdale, Florida 33308.  Inder Rieden was the sole officer and director.  Intercontinental remained active through 1986.  Upon information and belief, Intercontinental had bank accounts in Florida and executed financial transactions through those accounts.

353.    In 1983 Inder Rieden incorporated Antique Holdings, Inc. ("Antiques") with a principal address at 1 SE 3rd Avenue, Amerifirst Building, 30th floor, Miami, Florida 33131. Inder Rieden was the sole officer and director.  Antique remained active through 1985.  Upon information and belief, Antique had bank accounts in Florida and executed financial transactions through those accounts.

354.    In 1987 Inder Rieden incorporated Commercial Property Investors (Palm Bay) Inc. ("Commercial") with a principal address at 250 Catalonia Avenue, Suite 303, Coral Gables, Florida 33134.  Inder Rieden was the sole officer and director.  Inder Rieden personally signed the annual reports filed every year with the Florida Department of State, Division of Corporations ("Florida Division of Corporations").  Inder Rieden's address between 1987 and 2005 is listed as the same as the principal address for Commercial in Coral Gables.  Upon

information and belief, Commercial had bank accounts in Florida and executed financial transactions through those accounts.

### 1.     Inder Rieden Owns Property In Florida Through Buttswell Corporation

355.     In 1999, Inder Rieden incorporated Buttswell Corporation ("Buttswell") with a principal address at 1686 W. Hisbiscus Boulevard, Melbourne, Florida 32901.  Inder Rieden was one of two officers and directors.  Every year, starting in 1999, Buttswell has filed an annual report with the Florida Division of Corporations.  Buttswell remains active today and Inder Rieden remains listed in the latest filings.

356.     Based on a search of county property records, Buttswell owns property in Florida, specifically, a strip mall located at 4175 W. New Haven Avenue 1, West Melbourne, Florida 32904.  The property is currently valued at $5 million and occupies approximately 20,000 square feet.  Buttswell also has bank accounts in Florida and has executed financial transactions through those accounts.  Those transactions include, a (i) loan from Indian River National Bank n/k/a RBC Bank in the amount of $360,000; and (ii) mortgage in the amount of $1.350 million from the same bank secured by a commercial property.

357.     Prior to conducting business in Florida through Buttswell, Inder Rieden did so through an entity with a similar name to Buttswell, but incorporated in Bahamas – Buttswell Corporation N.V.  ("Buttswell N.V.").   Inder Rieden was managing director of Buttswell N.V. and purchased a property in Brevard County, Florida, in 1988, as evidenced by a Grant Deed dated January 29, 1988.  On March 7, 2000, a Warranty Deed signed by Inder Rieden transferred this same property from Buttswell N.V. to Buttswell.

358.     Inder Rieden, through Buttswell, has benefited from the protection and benefits of Florida law and has enforced its rights in the Florida Courts of law.  In 2008, Buttswell sued

Stokes & Stokes, Inc. for unpaid rent in the Circuit Court of the Eighteenth Judicial Circuit In and For Brevard County Florida, (Case No. 05-2008-CA-12866).  On October 23, 2008, said Court entered a default judgment in Buttswell's favor.  Buttswell filed a similar lawsuit in the same Court in 2007 against Home & Patio of Brevard County, Inc., which settled and was dismissed without prejudice in 2009 (Case No. 05-2007-CA-027506).

> ### 2. Inder Rieden Owned A Broker-Dealer In Florida Until The Broker-Dealer Was Caught Funneling Monies To A Company Controlled By Inder Rieden In The Bahamas

359.   In addition to all these companies through which Inder Rieden conducted personal business, Inder Rieden also was the founder and majority owner of a broker-dealer in Florida, called Intercoastal Financial Services Corp. ("Intercoastal").  Intercoastal was incorporated in 1997, and its initial address was listed in the records of the Florida Division of Corporations at 701 Giles Court, Palm Beach Gardens, Florida 33418.  It subsequently moved offices to 400 S. U.S. Highway One, Suite 3, Jupiter, Florida 33477.  Intercoastal had bank accounts in Florida and executed financial transactions through those accounts.

360.   Intercoastal was a market-maker in over-the-counter stocks.  Intercoastal was registered with the SEC and filed reports with FINRA (formerly the NASD).  According to these reports, Inder Rieden owned 75% or more of Intercoastal.  Given that the only two individuals listed in the report both had ownership of less that 5% respectively, Inder Rieden is likely to have owned 90% of Intercoastal.  Inder Rieden ownership was exercised indirectly through Fernshaw Investments Ltd. and Intercoastal Holdings LLC.

361.   The report filed with FINRA further shows that between 2002 and 2006, Intercoastal committed four separate regulatory violations and was fined over $70,000.  Three of the four violations resulted in censures.  One of these violations resulted in a fine of $48,000 and was the result of a number of transgressions, including front-running.  Intercoastal executed a

130

transaction for its own account ahead of a transaction requested by a customer at a price that was advantageous to Intercoastal but that would have satisfied the customer's order.

362.   After these repeated, but regularly occurring, transgressions, Intercoastal was caught in a far more egregious scheme.   In 2008, Intercoastal's Chief Financial Officer was sanctioned by the Securities Division of the Illinois Secretary of State for improperly funneling millions of dollars to a company in which Inder Rieden was a Managing Director – Euro-Dutch Management Ltd. ("Euro Dutch") (Consent Order of Revocation, Ex. 40).   The Illinois Securities Division further found that Inder Rieden, as Managing Director of Euro Dutch, signed a services agreement with Intercoastal pursuant to which Euro Dutch agreed to provide services worth $50,000 per month to Intercoastal. (Consent Order of Revocation, Ex. 40 at 2).   But the services were never provided and the services agreement was nothing but a sham transaction through which Inder Rieden funneled money to himself.   The Illinois Securities Division revoked Intercoastal's license in Illinois and stated:

> During the thirty-four months that the Services Agreement was in effect, Intercoastal Holdings paid Euro Dutch approximately $1.5 million.   But Euro Dutch never provided any services pursuant to the Services Agreement.
>
> * * *
>
> To fund the payments to Euro Dutch, [money was wired] from Intercoastal to Intercoastal Holdings [LLC].   Then, usually within a short period of time, [money was wired] from Intercoastal Holdings offshore to Euro Dutch for "research services."

(Consent Order of Revocation, Ex. 40 at 3)

363.   Inder Rieden thus benefited by deriving revenues from Florida.

364.   Euro-Dutch is also a defendant in another Madoff feeder fund case because it acted as the investment manager for the Santa Clara I fund, which also lost all its money with

131

Madoff.  *See Tradex Global Master Fund SPC Ltd. v. Inder Rieden et al.*, (S.D.N.Y. 09-cv-

6395).  Inder Rieden was therefore a director in at least two Madoff feeder funds.

> ### D.    THE COURT HAS PERSONAL JURISDICTION OVER PwC IRELAND BECAUSE PwC U.S. AND PwC BERMUDA ACTED AS PwC IRELAND'S AGENTS FOR PURPOSES OF JURISDICTION PURSUANT TO NEW YORK'S LONG ARM STATUTE

365.    PwC U.S. and PwC Bermuda met with Madoff in New York City in 2004 and

2006, with the specific purpose of providing information for PwC Ireland to issue an audit

opinion with respect to Optimal SUS's financial statements.  PwC U.S. and PwC Bermuda

issued a report on at least two occasions to PwC Ireland providing their findings about Madoff.

PwC Ireland paid for these reports.

366.    PwC Bermuda also conducted telephone meetings with BMIS in New York for

purposes of providing information to PwC Ireland, allowing PwC Ireland to issue an audit

opinion with respect to Optimal SUS's financial statements.

367.    PwC U.S. and PwC Bermuda acted in New York for the benefit of, on behalf of,

and with the knowledge and consent of, PwC Ireland.  PwC Ireland is subject to New York's

long-arm statute, N.Y. C.P.L.R. § 302.

> ### E.    THE COURT HAS SUBJECT MATTER JURISDICTION AND PERSONAL JURISDICTION (UNDER NEW YORK LAW) OVER ECHEVERRIA, INDER RIEDEN, AND WILKINSON, BECAUSE BMIS ACTED AS AGENT AND ATTORNEY-IN-FACT OF OPTIMAL SUS IN NEW YORK

368.    Pursuant to the EMs dated June 2004 and thereafter, BMIS acted as the agent and

attorney-in-fact of Optimal SUS.  Echeverría, Inder Rieden, and Wilkinson served as directors of

Optimal SUS during the time that BMIS served as agent and attorney-in-fact of Optimal SUS.

BMIS thus acted in New York for the benefit of, on behalf of, and with the knowledge and

consent of the Director Defendants. Accordingly, this Court has personal jurisdiction over the

Director Defendants under New York's long arm statute (N.Y. C.P.L.R. § 302).  In addition, the Court has subject matter jurisdiction pursuant to the Exchange Act over the Director Defendants because BMIS's conduct in New York can be imputed to the Director Defendants.

### F. THE COURT HAS PERSONAL JURISDICTION UNDER NEW YORK LAW OVER THE HSBC DEFENDANTS

369.    The HSBC Defendants availed themselves of the benefits and privileges of earning fees from Plaintiffs' and the Class' investment in New York, pursuant to its laws and regulations.  It was foreseeable that, having chosen to provide services to Optimal SUS, which was one-hundred percent invested in New York, that the HSBC Defendants would be haled into Court in New York.

370.    This is especially the case because the EMs represented that HSBC Services and HSBC Trust would have obligations and duties based in, and originating from, New York. HSBC Trust represented that it would supervise and oversee, with skill, diligence, and care, the custody of the Optimal Funds' assets with BMIS in New York.  The carrying out of that supervision and oversight over Madoff, or the failure thereof, created a reasonable expectation that HSBC Trust would be haled into court in New York pursuant to the laws and regulations of New York.

371.    HSBC Services' represented that, in conducting its administrative duties of the Optimal Funds, it would calculate the NAV and verify the trading information obtained from Madoff in New York.  As part of the calculation and verification process HSBC Services interacted, directly or indirectly, with Madoff in New York.  HSBC Services' duties and obligations required that it verify and confirm that the information was correct and that it do so with Madoff in New York.

372.    The HSBC Defendants also selected its U.S. affiliate to receive all investments in the Optimal Funds denominated in U.S. dollars.  As set forth in the EMs, HSBC Bank USA, Inc. was the entry point for all U.S. dollars investments, regardless of the origin of the investment, and even though banks across the world accept dollar deposits, including foreign HSBC affiliates.  HSBC Securities was the beneficiary of an account for these purposes with HSBC Bank USA, Inc.[26]

373.    Santander Miami has admitted, pursuant to jurisdictional discovery, that it transferred U.S. dollar investments in Optimal Multiadvisors to Santander Switzerland which would then transfer that money to HSBC Bank USA, Inc.  During 2008, a substantial part of the $109 million that Santander Miami accounts invested in Optimal Multiadvisors were transferred through this process to HSBC Bank USA, Inc.

374.    The principal executive offices of HSBC Bank USA, Inc. are located at 452 Fifth Avenue, New York, New York. HSBC Bank USA, Inc. operates over three hundred branches in New York.  HSBC Bank USA, Inc. acted in New York for the benefit of, on behalf of, and with the knowledge and consent of, HSBC Securities and HSBC Trust.  Accordingly, the HSBC Defendants are subject to New York's long-arm statute, N.Y. C.P.L.R. § 302.

## CLASS ACTION ALLEGATIONS

375.    Plaintiffs bring this action as a class action pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of all persons or entities who, (i) owned shares of Optimal SUS, Optimal Arbitrage, Optimal SUS (Ireland), or Optimal Arbitrage (Ireland) on December 10, 2008, or (ii) purchased shares of Optimal SUS, Optimal Arbitrage, Optimal SUS (Ireland), or Optimal Arbitrage (Ireland) from January 27, 2004 to December 10, 2008 (the

---

[26] October 2008 EM, Ex. 13 at 37-38; January 2008 EM, Ex. 12 at 37; October 2006; Ex. 11

"Class Period"), and were damaged thereby due to the wrongful conduct alleged in this Complaint (the "Class").  Excluded from the Class are the Defendants, any entity in which Defendants have a controlling interest, and the officers, directors, affiliates, legal representatives, heirs, successors, subsidiaries, assigns, or immediate family members of any such individual or entity.

376.    The Class is so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that Class members number in the hundreds and perhaps thousands.

377.    Plaintiffs will fairly and adequately protect the interests of the members of the Class.  Plaintiffs are members of the Class, their claims are typical of the claims of all Class members, and they do not have interests antagonistic to, or in conflict with, those of the Class. In addition, Plaintiffs have retained competent counsel experienced in class action litigation.

378.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal and common law.

379.    There are numerous questions of law and fact which are common to the Class and which predominate over any questions affecting individual members, including:

(a)    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    Whether the common law was violated by Defendants' acts as alleged herein;

at 40.

(c)     Whether Defendants conduct alleged herein was intentional, reckless, grossly negligent, or negligent in violation of duties owed to Plaintiffs and the Class and, therefore, in violation of the common law;

(d)     Whether the Court has personal and subject matter jurisdiction over Defendants; and

(e)     Whether, and to what extent, Plaintiffs and the Class were damaged.

380.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy since a multiplicity of actions could result in an unwarranted burden on the judicial system and could create the possibility of inconsistent judgments. Moreover, a class action will allow redress for many persons whose claims would otherwise be too small to litigate individually.  There will be no difficulty in the management of this action as a class action.

## COUNT 1

### BREACH OF FIDUCIARY DUTY
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST THE SANTANDER DEFENDANTS

381.   Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against the Santander Defendants for breach of fiduciary duty pursuant to Florida common law.

382.   Plaintiffs and the Class entrusted their assets to the Santander Defendants by investing in the Optimal Funds and reposed confidence in the Santander Defendants with respect to the management of those assets.  The Santander Defendants were in a superior position as to the management and control of those assets, in their capacities as the Investment Manager, its parent, its selling agent, the directors of the Optimal Funds, and in a superior position to manage, control, and oversee Madoff.  As a result, Plaintiffs and the Class placed their trust and confidence in the Santander Defendants.

383.   The Santander Defendants accepted that repose of trust and confidence and held themselves out as providing superior client investment services and as having policies and procedures in place to ensure that:

(a)   the Broker-Dealer for Optimal SUS (i.e., Madoff) would follow Optimal SUS's policies and investment guidelines;

(b)   sufficient operational controls were in place to safeguard Plaintiffs' and the Class' assets; and

(c)   transactions would be properly conducted.

384.    For example, the Santander Defendants accepted that repose of trust and confidence and held themselves out and represented their services in the following manner:

(a)    OIS was the Investment Manager of the Optimal Funds, which provided "management and investment advisory" services to the Optimal Funds as required by an "investment management agreement" with the Optimal Funds (the "Investment Management Agreement");[27]

(b)    Optimal Investment, as the Investment Manager, made all investment decisions for Optimal SUS;

> All decisions with respect to the general management of the fund [Optimal SUS] are made by the Investment Manager [Optimal Investment] who has complete authority and discretion in the management and control of the business of the fund, including the authority to delegate all investment management activities to any selected investment advisor and/or Broker Dealer. . . . **As a result, the success of the fund for the foreseeable future will depend largely upon the ability of the Investment Manager**, and no person should invest in the fund unless willing to entrust all aspects of the management of the fund to the Investment Manager, having evaluated their capability to perform such functions. (Emphasis added.)

> \* \* \*

> Although the Broker-Dealer has limited investment discretion as to the selection of securities or other property purchased or sold by or for the fund's [Optimal SUS's] account, the Broker-Dealer has discretion with respect to the timing and size of transactions….[28]

(c)    OIS agreed to exercise the requisite level of care in selecting and monitoring investment managers to whom it entrusted the investment assets of Optimal SUS, stating, among other things:

---

[27] October 2008 EM, Ex. 13 at 10; January 2008 EM, Ex. 12 at 10; October 2006 EM, Ex. 11 at 10;  June 2004 EM, Ex. 10 at 11.

(i)      "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[29]

(ii)     "[Optimal Investment] specialises in advising multi-manager and multi-strategy portfolios;"[30]

(iii)    "The Investment Manager [Optimal Investment] shall select managers with varied investment styles who have established records of success or who the Investment Manager believes demonstrate the potential to become outstanding investment managers;"[31]

(iv)     "The Investment Manager [Optimal Investment] bases its investment decisions on a careful analysis of many investment managers;"[32] and

(v)      "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[33]

385.    Plaintiffs and the Class reasonably and foreseeably trusted the Santander Defendants' purported expertise and skill.

---

[28]  October 2008 EM, Ex. 13 at 31-32; January 2008 EM, Ex. 12 at 30-31; October 2006 EM, Ex. 11 at 33-34; June 2004 EM, Ex. 10 at 32; emphasis supplied.

[29]  October 2008 EM, Ex. 11 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

[30]  October 2008 EM, Ex. 13 at 10; January 2008 EM, Ex. 12 at 10; October 2006 EM, Ex. 11 at 10; June 2004 EM, Ex. 10 at 10.

[31]  October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12;  June 2004 EM, Ex. 10 at 12.

[32] October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12;  June 2004 EM, Ex. 10 at 12.

[33]  October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22;  June 2004 EM, Ex. 10 at 22.

386.    The Santander Defendants therefore owed a fiduciary duty to Plaintiffs and the Class with respect to the management, oversight, and protection of Plaintiffs' the Class' assets invested in the Optimal Funds.

387.    In accordance with their fiduciary duties to Plaintiffs and the Class, the Santander Defendants were obligated to:

(a)    deal fairly and honestly with the Plaintiffs and the Class;

(b)    act with loyalty and good faith towards Plaintiffs and the Class;

(c)    manage and operate the investments of Plaintiffs and the Class exclusively for the best interest of the Plaintiffs and the Class;

(d)    make recommendations and execute transactions in accordance with the goals, investment objectives, and permissible degree of risk and instruction of Plaintiffs and the Class; and

(e)    oversee the investment of Plaintiffs' and the Class' assets to confirm they were maintained in a prudent and professional manner.

388.    The Santander Defendants breached their fiduciary duties to Plaintiffs and the Class by:

(a)    failing to act with reasonable care to ensure that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with their investment goals and intentions;

(b)    failing to perform adequate due diligence, including following their own internal due diligence protocols, before allowing Madoff to serve as the Broker-Dealer for Optimal SUS;

140

(c)      failing to invest Plaintiffs' and the Class' assets with adequate diligence or monitoring;

(d)      failing to monitor Madoff on an ongoing basis to any reasonable degree, or to comply with their own internal protocols for monitoring the Optimal Funds' assets entrusted to Madoff;

(e)      failing to take adequate steps to confirm BMIS's purported account statements, transactions, and holdings of the Optimal Funds' assets;

(f)      failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds;

(g)      profiting and allowing their affiliates to unlawfully profit at the expense of Plaintiffs and the Class; and

(h)      engaging in transactions that were designed to and did result in a profit to Santander Defendants at the expense of Plaintiffs and the Class.

389.   As a result of the Santander Defendants' breach of their fiduciary duties, the Plaintiffs and the Class have lost all, or substantially all, of their respective investments in Optimal Multiadvisors.

390.   As a result of the Santander Defendants' breaches of their fiduciary duties, the Plaintiffs and the Class, have been forced to pay excessive investment, performance, and management fees in exchange for investment services that were never provided.

391.   Santander is also liable for the breach of fiduciary duty by OIS pursuant to the doctrine of *respondeat superior* based on Santander's ability and authority (as the parent of wholly-owned OIS) to control and direct OIS and by virtue of having controlled and directed OIS.

392.    The damages suffered by the Class were a direct and foreseeable result, proximately caused by the Santander Defendants' breach of fiduciary duty.

393.    By reason of the foregoing, the Santander Defendants are jointly and severally liable to Plaintiffs and the Class.

394.    As a result of the Santander Defendants' breach of fiduciary duty, the Class has suffered damages with respect to the investments in the Optimal Funds in an amount to be determined at trial.

## COUNT 2

### GROSS NEGLIGENCE
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST THE SANTANDER DEFENDANTS

395.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against the Santander Defendants for gross negligence pursuant to Florida common law.

396.    The Santander Defendants had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets invested in the Optimal Funds and in the selection and monitoring of the Broker-Dealer for Optimal SUS.

397.    This special relationship arose from, among other things, the following:

(a)    the Broker-Dealer was responsible for executing trading activities on behalf of Optimal SUS under the direction of Optimal Multiadvisors, Optimal SUS, and OIS:

(i)      "The [Optimal] Fund and Optimal SUS have delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer;"[34] and

(ii)      "The Investment Manager [OIS] has delegated the execution of the trading strategy of the fund to the Broker-Dealer and the overall success of the fund depends upon the ability of the Broker-Dealer to be successful in the fund's strategy;"[35]

(b)      The Santander Defendants agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom they entrusted the investment assets of Optimal SUS, stating, for example:

(i)      "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[36]

(ii)      "[Optimal Investment] specialises in advising multi-manager and multi-strategy portfolios;"[37]

(iii)      "The Investment Manager [Optimal Investment] shall select managers with varied investment styles who have established records of success or who the

---

[34]  October 2008 EM, Ex. 13 at 31; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 33; June 2004 EM, Ex. 10 at 32.

[35]  October 2008 EM, Ex. 13 at 32; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 34; June 2004 EM, Ex. 10 at 33.

[36]  October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

[37]  October 2008 EM, Ex. 13 at 10; January 2008 EM, Ex. 12 at 10; October 2006 EM, Ex. 11 at 10; June 2004 EM, Ex. 10 at 10.

Investment Manager believes demonstrate the potential to become outstanding investment managers;"[38]

(iv) "The Investment Manager [Optimal Investment] bases its investment decisions on a careful analysis of many investment managers;"[39] and

(v) "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[40]

398. The Santander Defendants grossly failed to exercise due care, and acted in disregard of their duties, and thereby injured Plaintiffs and the Class.

399. The Santander Defendants grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

400. The Santander Defendants grossly failed to:

(a) perform necessary and adequate due diligence, before allowing Madoff to serve as the Broker-Dealer for Optimal;

(b) monitor Madoff on an ongoing basis to any reasonable degree;

(c) take adequate steps to confirm Madoff's purported account statements, transactions and holdings of the Optimal Funds' assets;

(d) take reasonable steps to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

---

[38]  October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12;  June 2004 EM, Ex. 10 at 12.

[39]  *Id.*

[40]  October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22;  June 2004 EM, Ex. 10 at 22.

(e)      take reasonable steps to preserve the value of Plaintiffs and the Class investments; and

(f)      exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

401.    If the Santander Defendants had not been grossly negligent with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, the Santander Defendants would not have entrusted Plaintiffs' and the Class' assets invested in the Optimal Funds to Madoff.

402.    Santander is also liable for the gross negligence of OIS pursuant to the doctrine of *respondeat superior* based on Santander's ability and authority (as the parent of wholly-owned OIS) to control and direct OIS and by virtue of having controlled and directed OIS.

403.    As a direct and proximate result of the Santander Defendants' gross negligence with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Plaintiffs and the members of the Class have lost all, or substantially all, their investment in the Optimal Funds.

404.    By reason of the foregoing, the Santander Defendants are jointly and severally liable to Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 3

### NEGLIGENCE
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST THE SANTANDER DEFENDANTS

405.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against the Santander Defendants for negligence pursuant to Florida common law.

406.    The Santander Defendants had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets

invested in the Optimal Funds, and in the selection and monitoring of the Broker-Dealer for Optimal SUS.

407.    This special relationship arose from, among other things, the following:

(a)    the Broker-Dealer was responsible for executing trading activities on behalf of Optimal SUS under the direction of Optimal Multiadvisors, Optimal SUS, and OIS:

(i)    "The [Optimal] Fund and Optimal SUS have delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer;"[41] and

(ii)    "The Investment Manager [OIS] has delegated the execution of the trading strategy of the fund to the Broker-Dealer and the overall success of the fund depends upon the ability of the Broker-Dealer to be successful in the fund's strategy."[42]

(b)    The Santander Defendants agreed that they would exercise the requisite level of care in selecting and monitoring investment managers to whom they entrusted the investment assets of Optimal SUS, stating, for example:

(i)    "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[43]

(ii)    "[Optimal Investment] specializes in advising multi-manager and multi-strategy portfolios;"[44]

---

[41] October 2008 EM, Ex. 13 at 31; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 33; June 2004 EM, Ex. 10 at 32.

[42]  October 2008 EM, Ex. 13 at 32; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 34; June 2004 EM, Ex. 10 at 33.

[43]  October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

(iii)   "The Investment Manager [Optimal Investment] shall select managers with varied investment styles who have established records of success or the Investment Manager believes demonstrate the potential to become outstanding investment managers;"[45]

(iv)   "The Investment Manager [Optimal Investment] bases its investment decisions on a careful analysis of many investment managers;"[46] and

(v)   "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[47]

408.   The Santander Defendants failed to exercise reasonable due care, and acted in disregard of their duties, and thereby injured Plaintiffs and the Class.

409.   The Santander Defendants failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

410.   The Santander Defendants failed to:

(a)   perform necessary and adequate due diligence, before allowing Madoff to serve as the Broker-Dealer for Optimal;

(b)   monitor Madoff on an ongoing basis to any reasonable degree;

(c)   take adequate steps to confirm Madoff's purported account statements, transactions, and holdings of the Optimal Funds' assets;

---

[44]  October 2008 EM, Ex. 13 at 10; January 2008 EM, Ex. 12 at 10; October 2006 EM, Ex. 11 at 10; June 2004 EM, Ex. 10 at 10.

[45]  October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12; June 2004 EM, Ex. 10 at 12.

[46]  *Id.*

[47]  October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22; June 2004 EM, Ex. 10 at 22.

(d)     take reasonable steps to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(e)     take reasonable steps to preserve the value of Plaintiffs and the Class investments; and

(f)     exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

411.    If the Santander Defendants had not been negligent with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, the Santander Defendants would not have entrusted Plaintiffs' and the Class' assets invested in the Optimal Funds to Madoff.

412.    Santander is also liable for the negligence of OIS pursuant to the doctrine of *respondeat superior* based on Santander's ability and authority (as the parent of wholly-owned OIS) to control and direct OIS and by virtue of having controlled and directed OIS.

413.    As a direct and proximate result of the Santander Defendants' negligence with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Plaintiffs and other members of the Class have lost all, or substantially all, their investment in the Optimal Funds.

414.    By reason of the foregoing, the Santander Defendants are jointly and severally liable to Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 4

### UNJUST ENRICHMENT
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST THE SANTANDER DEFENDANTS

415.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is

asserted against the Santander Defendants for unjust enrichment pursuant to Florida common law.

416.    Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that the Santander Defendants obtained at the expense of Plaintiffs and the Class, and to which the Santander Defendants were not entitled, including, but not limited to, as specified in the EMs, which provided as follows with respect to Optimal SUS:

> Optimal SUS shall pay the Investment Manager an investment management fee calculated monthly and payable quarterly in arrears on the last Business Day of each quarter with respect to each Class, equal to (in respect of each month) a maximum of one-twelfth of 2.15% of the net asset value of the shares for the month for the Class A USD Shares and the Class A EUR Shares and (in respect of each month) one-twelfth of 1.65% of the net asset value of the shares for the month for the Class B USD Shares and the Class B EUR and (in respect of each month) one-twelfth of 1.15% of the net asset value of the shares for the month for the Class C USD Shares.[48]

417.    Plaintiffs and the Class also base their unjust enrichment claim on the receipt or retention of fees and other monies that the Santander Defendants obtained at the expense of Plaintiffs and the Class, and to which the Santander Defendants were not entitled, including, as specified in the EMs, which provided as follows with respect to Optimal Arbitrage:

> Optimal Arbitrage shall pay the Investment Manager an investment management fee calculated monthly and payable quarterly in arrears on the last Business Day of each quarter with respect to each Class, equal to (in respect of each month) a maximum of one-twelfth of 2.15% of the net asset value of the shares for the month for the Class A USD Shares and the Class A EUR Shares, the Class A CHF Shares and the Class A JPY Shares and (in respect of each month) one-twelfth of 1.65% of the net asset value of the

---

[48] October 2008 EM, Ex. 13 at 30; January 2008 EM, Ex. 12 at 29; October 2006 EM, Ex. 11 at 32; June 2004 EM, Ex. 10 at 31.

shares for the month for the Class B USD Shares and the Class B EUR Shares.[49]

418.   Plaintiffs and the Class further base their unjust enrichment claim on the receipt or retention of commissions and other monies that Santander Miami charged Plaintiffs and the Class at the time of investment in Optimal SUS and Optimal Arbitrage, and to which Santander Miami was not entitled, including, but not limited to the commissions authorized in the October 2006 EM and subsequent EMs, as follows: "A Subscription fee (sales charge) and redemption fee of up to 5% of the subscription price/redemption price may be charged to shareholders who subscribe for/redeem their shareholdings in the Funds (for the benefit of the Investment Manager or any distributor appointed to the Company)."

419.   The Director Defendants were unjustly enriched because they received unfair compensation for the performance of their duties as Directors.

420.   Defendant Echeverría was unjustly enriched because he received substantial compensation for the exercise of his duties at OIS in the form of salary and bonuses.

421.   The Santander Defendants were enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of commissions and other fees for their purported management of Plaintiffs' and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

422.   Plaintiffs and the Class involuntarily conferred a benefit upon the Santander Defendants without Plaintiffs and the Class receiving adequate benefit or compensation in return. The Santander Defendants appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

---

[49]   October 2008 EM, Ex. 13 at 26; January 2008 EM, Ex. 12 at 25; October 2006 EM, Ex. 11 at 25; June 2004 EM, Ex. 10 at 25.

423.    Equity and good conscience require the Santander Defendants to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

## COUNT 5

### IMPOSITION OF CONSTRUCTIVE TRUST
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST THE SANTANDER DEFENDANTS

424.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against the Santander Defendants for imposition of a constructive trust pursuant to Florida common law.

425.    The Santander Defendants had a fiduciary or confidential relationship with Plaintiffs and the Class.

426.    The Santander Defendants agreed to manage Plaintiffs' and the Class' investment capital in the Optimal Funds in accordance with that fiduciary relationship.

427.    The Santander Defendants were compensated by Plaintiffs and the Class, including by the receipt or retention of improperly calculated fees and other monies.

428.    The Santander Defendants were unjustly enriched by the receipt or retention of monies, including management and performance fees that were predicated on fictitious profits, and other compensation.

429.    Plaintiffs and the Class are entitled to have a constructive trust imposed on the amount of all monies and other compensation in the possession of the Santander Defendants, which relate to their fees or any other monies from Plaintiffs and the Class, the amount of which is yet to be determined.

## COUNT 6

### BREACH OF CONTRACT
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST OIS AND THE DIRECTOR DEFENDANTS

430.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against OIS and the Director Defendants for breach of contract pursuant to Florida common law.

431.    Plaintiffs and the Class had a contractual relationship with OIS and the Director Defendants, as evidenced by the Subscription Form, executed in connection with their investment in the Optimal Funds, which stated:  "This Subscription Form should be read in context of and together with the Explanatory Memorandum…."

432.    By virtue of the contractual relationship between the parties, OIS and the Director Defendants agreed that, (i) Plaintiffs' and the Class' monies would be invested in legitimate enterprises with a potential for capital appreciation, and (ii) that the selection of investment managers such as Madoff was based on "careful analysis."

433.    These obligations were material terms of the agreement.

434.    These obligations were also fundamental assumptions of the agreement embraced by both Plaintiffs and the Class on the one hand, and OIS and the Director Defendants on the other.

435.    Plaintiffs and the Class fully performed their contractual obligations to OIS and the Director Defendants.

436.    OIS and the Director Defendants breached their contract with Plaintiffs and the Class.

437.    By reason of the foregoing, OIS and the Director Defendants are jointly and severally liable to the Plaintiffs and the Class in an amount to be determined at trial.

**COUNT 7**

**BREACH OF FIDUCIARY DUTY
PURSUANT TO NEW YORK LAW
AGAINST WILKINSON**

438.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Wilkinson for breach of fiduciary duty pursuant to New York law.

439.    Plaintiffs and the Class entrusted their assets to Wilkinson by investing in the Optimal Funds and reposed confidence in Wilkinson with respect to the management of those assets.  Wilkinson was in a superior position as to the management and control of those assets, in his capacity as director of the Optimal Funds, and in a superior position to manage, control, and oversee Madoff.  As a result, Plaintiffs and the Class placed their trust and confidence in Wilkinson.

440.    Wilkinson accepted that repose of trust and confidence and held himself out as providing superior client investment services and as having policies and procedures in place to ensure that:

(a)    the Broker-Dealer for Optimal SUS (i.e., Madoff) would follow Optimal SUS's policies;

(b)    sufficient operational controls were in place to safeguard Plaintiffs' and the Class' assets; and

(c)    transactions would be properly conducted.

441.    For example, Wilkinson (as Director of Optimal Multiadvisors) accepted that repose of trust and confidence and held himself out and represented his services in the following manner:

(a)    "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[50] and

(b)    "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[51]

442.    Plaintiffs and the Class reasonably and foreseeably trusted Wilkinson's purported expertise and skill.

443.    Wilkinson therefore owed a fiduciary duty to Plaintiffs and the Class with respect to the management, oversight, and protection of Plaintiffs' and the Class' assets invested in the Optimal Funds.

444.    In accordance with his fiduciary duties to Plaintiffs and the Class, Wilkinson was obligated to:

(a)    deal fairly and honestly with Plaintiffs and the Class;

(b)    act with loyalty and good faith towards Plaintiffs and the Class;

(c)    discharge his duties as director exclusively for the best interest of Plaintiffs and the Class; and

---

[50]  October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

[51]  October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22; June 2004 EM, Ex. 10 at 22.

.

(d)      oversee the investment of Plaintiffs' and the Class' assets to confirm they were maintained in a prudent and professional manner.

445.      Wilkinson breached his fiduciary duties to Plaintiffs and the Class by:

(a)      failing to act with reasonable care to ensure that the investment opportunity presented to Plaintiffs and the Class was suitable and in accordance with their investment goals and intentions;

(b)      failing to ensure that adequate due diligence had been conducted, including following OIS's own internal due diligence protocols, before allowing Madoff to serve as the Broker-Dealer for Optimal SUS;

(c)      failing to ensure that the investment of Plaintiffs' and the Class' assets was done with adequate diligence or monitoring;

(d)      failing to ensure the monitoring of Madoff on an ongoing basis to any reasonable degree, or the compliance with OIS own internal protocols for monitoring the Optimal Funds' assets entrusted to Madoff;

(e)      failing to ensure that adequate steps had been taken to confirm BMIS's purported account statements, transactions, and holdings of the Optimal Funds' assets;

(f)      failing to exercise the degree of prudence, diligence, and care expected of financial professionals managing client funds;

(g)      profiting at the expense of Plaintiffs and the Class; and

(h)      engaging in transactions that were designed to and did result in a profit to Wilkinson at the expense of Plaintiffs and the Class.

446.      As a result of Wilkinson's breach of his fiduciary duties, Plaintiffs and the Class have lost all, or substantially all, of their respective investments in Optimal.

447.    As a result of Wilkinson's breach of his fiduciary duties, Plaintiffs and the Class, have been forced to pay excessive investment, performance and management fees in exchange for investment services that were promised but never provided.

448.    The damages suffered by the Class were a direct and foreseeable result, proximately caused by Wilkinson's breaches of fiduciary duty.

449.    As a result of Wilkinson's breaches of fiduciary duty, the Class has suffered damages with respect to the investments in the Optimal Funds in an amount to be determined at trial.

## COUNT 8

### GROSS NEGLIGENCE
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST WILKINSON

450.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Wilkinson for gross negligence pursuant to New York law.

451.    Wilkinson had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets invested in the Optimal Funds and in the selection and monitoring of the Broker-Dealer for Optimal SUS.

452.    This special relationship arose from, among other things, the following:

(a)    the Broker-Dealer was responsible for executing trading activities on behalf of Optimal SUS under the direction of Optimal Multiadvisors, Optimal SUS, and OIS:

(i)      "The [Optimal] Fund and Optimal SUS have delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer;"[52] and

(ii)     "The Investment Manager [OIS] has delegated the execution of the trading strategy of the fund to the Broker-Dealer and the overall success of the fund depends upon the ability of the Broker-Dealer to be successful in the fund's strategy."[53]

(b)      Wilkinson (as Director of Optimal Multiadvisors) agreed to exercise the requisite level of care in selecting and monitoring investment managers to whom it entrusted the investment assets of Optimal SUS, stating, for example:

(i)      "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[54] and

(ii)     "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[55]

453.    Wilkinson grossly failed to exercise due care, and acted in disregard of his duties, and thereby injured Plaintiffs and the Class.

454.    Wilkinson grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

---

[52] October 2008 EM, Ex. 13 at 31; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 33; June 2004 EM, Ex. 10 at 32.

[53] October 2008 EM, Ex. 13 at 32; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 34; June 2004 EM, Ex. 10 at 33.

[54] October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

455.   Wilkinson grossly failed to:

(a)   ensure that necessary and adequate due diligence had been performed before allowing Madoff to serve as the Broker-Dealer for Optimal;

(b)   ensure the monitoring of Madoff on an ongoing basis to any reasonable degree;

(c)   ensure that adequate steps had been taken to confirm Madoff's purported account statements, transactions and holdings of the Optimal Funds' assets;

(d)   ensure that reasonable steps had been taken to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(e)   ensure that reasonable steps had been taken to preserve the value of Plaintiffs and the Class investments; and

(f)   exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

456.   If Wilkinson had not been grossly negligent with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Wilkinson would not have entrusted Plaintiffs' and the Class' assets invested in the Optimal Funds to Madoff.

457.   As a direct and proximate result of Wilkinson's gross negligence with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Plaintiffs and the members of the Class have lost all, or substantially all, their investment in the Optimal Funds.

458.   By reason of the foregoing, Wilkinson is liable to Plaintiffs and the Class in an amount to be determined at trial.

---

[55]   October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex.

## COUNT 9

## NEGLIGENCE
## PURSUANT TO NEW YORK COMMON LAW
## AGAINST WILKINSON

459.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Wilkinson for negligence pursuant to New York law.

460.    Wilkinson had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the management of Plaintiffs' and the Class' assets invested in the Optimal Funds and in the selection and monitoring of the Broker-Dealer for Optimal SUS.

461.    This special relationship arose from, among other things, the following:

(a)    the Broker-Dealer was responsible for executing trading activities on behalf of Optimal SUS under the direction of Optimal Multiadvisors, Optimal SUS, and OIS:

(i)    "The [Optimal] Fund and Optimal SUS have delegated the execution of all investment management decisions with regard to Optimal SUS to the Broker-Dealer;"[56] and

(ii)    "The Investment Manager [OIS] has delegated the execution of the trading strategy of the fund to the Broker-Dealer and the overall success of the fund depends upon the ability of the Broker-Dealer to be successful in the fund's strategy;"[57]

---

11 at 22; June 2004 EM, Ex. 10 at 22.

[56] October 2008 EM, Ex. 13 at 31; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 33; June 2004 EM, Ex. 10 at 32.

[57]  October 2008 EM, Ex. 13 at 32; January 2008 EM, Ex. 12 at 31; October 2006 EM, Ex. 11 at 34; June 2004 EM, Ex. 10 at 33.

(b)      Wilkinson (as Director of Optimal Multiadvisors) agreed that he would exercise the requisite level of care in selecting and monitoring investment managers to whom it entrusted the investment assets of Optimal SUS, stating, for example:

(i)      "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[58] and

(ii)      "The [Optimal] Fund must satisfy itself to ensure that such third party has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned."[59]

462.      Wilkinson failed to exercise reasonable due care, and acted in disregard of his duties, and thereby injured Plaintiffs and the Class.

463.      Wilkinson failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable investment professional.

464.      Wilkinson failed to:

(a)      ensure that necessary and adequate due diligence had been performed, including before allowing Madoff to serve as the Broker-Dealer for Optimal;

(b)      ensure the monitoring of Madoff on an ongoing basis to any reasonable degree;

(c)      ensure that adequate steps had been taken to confirm Madoff's purported account statements, transactions and holdings of the Optimal Funds' assets;

---

[58]   October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

[59]   October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22; June 2004 EM, Ex. 10 at 22.

(d)      ensure that reasonable steps had been taken to ensure that the investment of the assets of Plaintiffs and the Class were made and maintained in a prudent and professional manner;

(e)      ensure that reasonable steps had been taken to preserve the value of Plaintiffs and the Class investments; and

(f)      exercise generally the degree of prudence, caution, and good business practices that would be expected of any reasonable investment professional.

465.    If Wilkinson had not been negligent with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Wilkinson would not have entrusted Plaintiffs' and the Class' assets invested in the Optimal Funds to Madoff.

466.    As a direct and proximate result of Wilkinson's negligence with respect to Plaintiffs' and the Class' assets invested in the Optimal Funds, Plaintiffs and other members of the Class have lost all, or substantially all, their investment in the Optimal Funds.

467.    By reason of the foregoing, Wilkinson is liable to Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 10

### UNJUST ENRICHMENT
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST WILKINSON

468.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Wilkinson for unjust enrichment pursuant to New York law.

469.    Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that the Santander Defendants obtained at the expense of

Plaintiffs and the Class and to which the Santander Defendants were not entitled, including, but not limited to, as specified in the EMs, which provided as follows with respect to Optimal SUS:

> Optimal SUS shall pay the Investment Manager an investment management fee calculated monthly and payable quarterly in arrears on the last Business Day of each quarter with respect to each Class, equal to (in respect of each month) a maximum of one-twelfth of 2.15% of the net asset value of the shares for the month for the Class A USD Shares and the Class A EUR Shares and (in respect of each month) one-twelfth of 1.65% of the net asset value of the shares for the month for the Class B USD Shares and the Class B EUR and (in respect of each month) one-twelfth of 1.15% of the net asset value of the shares for the month for the Class C USD Shares.[60]

470.    Plaintiffs and the Class also base their unjust enrichment claim on the receipt or retention of fees and other monies that the Santander Defendants obtained at the expense of Plaintiffs and the Class, and to which the Santander Defendants were not entitled, including, as specified in the EMs, which provided as follows with respect to Optimal Arbitrage:

> Optimal Arbitrage shall pay the Investment Manager an investment management fee calculated monthly and payable quarterly in arrears on the last Business Day of each quarter with respect to each Class, equal to (in respect of each month) a maximum of one-twelfth of 2.15% of the net asset value of the shares for the month for the Class A USD Shares and the Class A EUR Shares, the Class A CHF Shares and the Class A JPY Shares and (in respect of each month) one-twelfth of 1.65% of the net asset value of the shares for the month for the Class B USD Shares and the Class B EUR Shares.[61]

471.    Wilkinson was unjustly enriched because he received unfair compensation for the performance of his duties as Director.

---

[60]  October 2008 EM, Ex. 13 at 30; January 2008 EM, Ex. 12 at 29; October 2006 EM, Ex. 11 at 32; June 2004 EM, Ex. 10 at 31.

[61]  October 2008 EM, Ex. 13 at 26; January 2008 EM, Ex. 12 at 25; October 2006 EM, Ex. 11 at 25; June 2004 EM, Ex. 10 at 25.

472.     Plaintiffs and the Class involuntarily conferred a benefit upon Wilkinson without Plaintiffs and the Class receiving adequate benefit or compensation in return.   Wilkinson appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

473.     Equity and good conscience require that Wilkinson refund all compensation and other monies he received at Plaintiffs' and the Class' expense.

## COUNT 11

### IMPOSITION OF CONSTRUCTIVE TRUST
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST WILKINSON

474.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.   This Count is asserted against Wilkinson for imposition of a constructive trust pursuant to New York law.

475.     Wilkinson had a fiduciary or confidential relationship with Plaintiffs and the Class.

476.     Wilkinson agreed to manage and oversee Plaintiffs' and the Class' investment capital in the Optimal Funds in accordance with that fiduciary relationship.

477.     Wilkinson was compensated by Plaintiffs and the Class.

478.     Wilkinson was unjustly enriched by the receipt or retention of monies, including director compensation.

479.     Plaintiffs and the Class are entitled to have a constructive trust imposed on the amount of all monies and other compensation in Wilkinson's possession, which relate to any monies from Plaintiffs and the Class, the amount of which is yet to be determined.

## COUNT 12

### BREACH OF CONTRACT
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST WILKINSON

480.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Wilkinson for breach of contract under New York law.

481.     Plaintiffs and the Class had a contractual relationship with Wilkinson (as Director of the Optimal Funds), as evidenced by the Subscription Form, executed in connection with their investment in the Optimal Funds, which stated:  "This Subscription Form should be read in context of and together with the Explanatory Memorandum . . .."

482.     By virtue of the contractual relationship between the parties, Wilkinson agreed that, (i) Plaintiffs' and the Class' monies would be invested in legitimate enterprises with a potential for capital appreciation, and (ii) that the selection of investment managers such as Madoff was based on "careful analysis."

483.     These obligations were material terms of the agreement.

484.     These obligations were also fundamental assumptions of the agreement embraced by both Plaintiffs and the Class on the one hand, and Wilkinson on the other.

485.     Plaintiffs and the Class fully performed their contractual obligations to Wilkinson.

486.     OIS and the Director Defendants (including Wilkinson) breached their contract with Plaintiffs and the Class.

487.     By reason of the foregoing, Wilkinson is liable to the Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 13

### THIRD PARTY BENEFICIARY CLAIM
### PURSUANT TO FLORIDA COMMON LAW
### FOR BREACH OF CONTRACT AGAINST OIS

488.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted on behalf of Plaintiffs and the Class as third-party beneficiaries to the contractual relationship existing between Optimal Multiadvisors and OIS pursuant to Florida common law.

489.    The Optimal Funds entered into an Investment Management Agreement with OIS. For example, according to the October 2006 EM, OIS, as the Investment Manager of Optimal Multiadvisors, provided "management and investment advisory" services to Optimal Multiadvisors as required by an "investment management agreement" with Optimal Multiadvisors.[62]

490.    Pursuant to the Investment Management Agreement, OIS assumed the responsibility to fulfill certain contractual obligations as to Optimal Multiadvisors for the intended immediate benefit of Plaintiffs and the Class.

491.    OIS breached the Investment Management Agreement by committing the above-alleged misconduct, including specifically, failing to:

    (a)    ensure adherence to the investment policies and objectives;

    (b)    monitor the Optimal Funds' investments;

    (c)    conduct meaningful due diligence of Madoff;

    (d)    meaningfully monitor and oversee Madoff; and

---

[62] October 2006 EM, Ex. 11 at 10.

(e)      confirm with the counterparties and third-party custodians of U.S. Treasury Bills the existence of the assets.

492.    These contractual breaches resulted in significant losses to Plaintiffs and the Class, as described in this Complaint.

493.    OIS's breach of the Investment Management Agreement injured Plaintiffs and the Class as third-party beneficiaries to that contract in an amount to be determined at trial.

## COUNT 14

### CONVERSION
### IN CONNECTION WITH THE SIPC TRUSTEE-OPTIMAL AGREEMENT
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST SANTANDER, OIS, AND THE DIRECTOR DEFENDANTS

494.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Santander, OIS, and the Director Defendants for conversion pursuant to Florida common law.

495.    Specific and identifiable monies belonging to Plaintiffs and the Class were deposited into individual or commingled accounts under the control of the Optimal Funds. However, the Optimal Funds retained Plaintiffs' and Class' monies and subsequently transferred those monies to the SIPC Trustee pursuant to the SIPC Trustee-Optimal Agreement.

496.    Optimal Multiadvisors improperly and without the authorization of Plaintiffs and the Class transferred and used the monies of Plaintiffs and the Class to others for purposes other than those authorized.

497.    Plaintiffs and the Class requested the return of their monies from Optimal Multiadvisors, but Optimal Multiadvisors refused.

498.     Santander, OIS, and the Director Defendants exerted complete domination over Optimal Multiadvisors in connection with the SIPC Trustee-Optimal Agreement.  Santander, OIS, and the Director Defendants exerted complete domination, in part, through:

(a)     the Director Defendants, who include all directors of the Optimal Funds and therefore controlled the Optimal Funds in such capacity;

(b)     Santander's direct, or indirect but actual, ownership of a majority, or all, Ordinary voting non-participating shares of Optimal Multiadvisors; and

(c)     Esteban Estévez, who served as director of Optimal Multiadvisors and Chief Executive Officer of OIS at the time that the SIPC Trustee-Optimal Agreement was executed.

499.     Santander, OIS, and the Director Defendants used the monies of Optimal Multiadvisors (and of Plaintiffs and the Class) to consent to the SIPC Trustee-Optimal Agreement.  The SIPC Trustee-Optimal Agreement was against the interests of Optimal Multiadvisors, Plaintiffs and the Class.

500.     Santander's, OIS's, and the Director Defendants' complete domination of Optimal Multiadvisors allowed Santander, OIS, and the Director Defendants to commit a wrong against Plaintiffs and the Class, namely cause Optimal Multiadvisors to enter into the SIPC Trustee-Optimal Agreement.

501.     Santander, OIS, and the Director Defendants exerted their complete domination of Optimal Multiadvisors for purposes of avoiding a lawsuit by the SIPC Trustee.  This lawsuit would have made public, evidence showing that Santander, OIS, and the Director Defendants had failed to properly oversee Madoff and failed to conduct due diligence over Madoff pursuant to their duties and obligations to Plaintiffs and the Class.

502.     For their participation in, and complete domination and control over Optimal Multiadvisors, Santander, OIS, and the Director Defendants are liable to Plaintiffs and the Class under corporate veil piercing and alter ego doctrines.

503.     By reason of the foregoing, Santander, OIS, and the Director Defendants are jointly and severally liable to the Plaintiffs and the Class in an amount to be determined at trial.

## COUNT 15

### BREACH OF FIDUCIARY DUTY
### IN CONNECTION WITH THE SIPC TRUSTEE-OPTIMAL AGREEMENT
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST SANTANDER, OIS, AND THE DIRECTOR DEFENDANTS

504.     Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Santander, OIS, and the Director Defendants for breach of fiduciary duty in connection with the SIPC Trustee-Optimal Agreement pursuant to Florida common law.

505.     Plaintiffs and the Class entrusted their assets to Optimal Multiadvisors by investing in Optimal Multiadvisors and reposed confidence in Optimal Multiadvisors with respect to the management of those assets.  Optimal Multiadvisors was in a superior position as to the management and control of those assets and had control of those assets.  As a result, Plaintiffs and the Class placed their trust and confidence in Optimal Multiadvisors.

506.     Optimal Multiadvisors accepted that repose of trust and confidence.

507.     Optimal Multiadvisors therefore owed a fiduciary duty to Plaintiffs and the Class with respect to the management, oversight, and protection of Plaintiffs' and the Class' assets invested in Optimal Multiadvisors.

508.     In accordance with their fiduciary duties to Plaintiffs and the Class, Optimal Multiadvisors was obligated to:

(a)     deal fairly and honestly with Plaintiffs and the Class;

(b)     act with loyalty and good faith towards Plaintiffs and the Class; and

(c)     manage and operate the investments of Plaintiffs and the Class exclusively for the best interest of Plaintiffs and the Class.

509.    Optimal Multiadvisors breached its fiduciary duties to Plaintiffs and the Class by entering into the SPIC Trustee-Optimal Agreement.

510.    Santander, OIS, and the Director Defendants exerted complete domination over Optimal Multiadvisors. Santander, OIS, and the Director Defendants exerted complete domination, in part, through:

(a)     the Director Defendants, who include all directors of the Optimal Funds and therefore controlled the Optimal Funds in such capacity;

(b)     Santander's direct, or indirect but actual, ownership of a majority, or all, Ordinary voting non-participating shares of Optimal Multiadvisors; and

(c)     Esteban Estévez, who served as director of Optimal Multiadvisors and Chief Executive Officer of OIS at the time that the SIPC Trustee-Optimal Agreement was executed.

511.    Santander's, OIS's, and the Director Defendants' complete domination of Optimal Multiadvisors allowed Santander, OIS, and the Director Defendants to commit a wrong against Plaintiffs and the Class, namely cause Optimal Multiadvisors to enter into the SIPC Trustee-Optimal Agreement.

512.    The SIPC Trustee-Optimal Agreement was against the interests of Optimal Multiadvisors, Plaintiffs, and the Class.

513.    Santander, OIS, and the Director Defendants exerted their complete domination of Optimal Multiadvisors for purposes of avoiding a lawsuit by the SIPC Trustee.  This lawsuit would have made public, evidence showing that Santander, OIS, and the Director Defendants had failed to properly oversee Madoff and failed to conduct due diligence over Madoff pursuant to their duties and obligations to Plaintiffs and the Class.

514.    For their participation in, and complete domination and control over Optimal Multiadvisors, Santander, OIS, and the Director Defendants are liable to Plaintiffs and the Class under corporate veil piercing and alter ego doctrines.

515.    By reason of the foregoing, Santander, OIS, and the Director Defendants are jointly and reasonably liable to Plaintiffs and the Class in an amount to be determined at trial.

516.    The damages suffered by the Class were a direct and foreseeable result, proximately caused by Optimal Multiadvisors' breach of fiduciary duty.

## COUNT 16

### GROSS NEGLIGENCE
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA

517.    Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland, PwC U.S., and PwC Bermuda for gross negligence pursuant to Florida common law.

518.    PwC Ireland, PwC U.S., and PwC Bermuda had a special relationship with Plaintiffs that gave rise to a duty of care.  PwC Ireland issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in Optimal SUS.  PwC U.S. and PwC Bermuda conducted procedures that PwC U.S. and PwC Bermuda knew would form the basis for the audit

opinions provided by PwC Ireland.  PwC Ireland, PwC U.S., and PwC Bermuda knew that the audit opinions about Optimal SUS would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in Optimal SUS in that, among other things, PwC Ireland addressed its audit opinions to shareholders in Optimal SUS, and PwC Ireland, PwC U.S., and PwC Bermuda knew that Optimal SUS, OIS, and Santander Miami advised Plaintiffs and other members of the Class that PwC Ireland audited Optimal SUS's financial statements and had given Optimal SUS unqualified audit opinions.

519.    Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC Ireland, PwC U.S., and PwC Bermuda to exercise such care as ordinarily exercised by auditors generally and as required by ISA and other applicable auditing and accounting standards in conducting the audits of Optimal SUS.

520.    PwC Ireland was grossly negligent in knowingly failing to properly audit Optimal SUS in accordance with ISA and other applicable auditing and accounting standards.  PwC Ireland nevertheless was grossly negligent in issuing unqualified audit opinions that Optimal SUS's financial statements fairly represented the financial condition of Optimal SUS.

521.    PwC U.S. and PwC Bermuda acted with gross negligence by failing to conduct the requisite procedures concerning BMIS.  Among other things, PwC U.S. and PwC Bermuda failed to perform any procedures to gain an understanding of BMIS's business – other than speaking with Madoff – for purposes of providing the information obtained from those procedures to PwC Ireland, pursuant to ISA.

522.    PwC Ireland, PwC U.S., and PwC Bermuda ignored numerous red flags surrounding Madoff.  These defendants acted with gross negligence as to the consequences of Optimal SUS's incorrect financial statements.

523.     Had PwC Ireland, PwC U.S., and PwC Bermuda not acted with gross negligence, PwC Ireland would not have issued the unqualified audit opinions.

524.     PwC Ireland, PwC U.S., and PwC Bermuda are jointly and severally liable to Plaintiffs and the Class.

525.     As a result of the gross negligence of PwC Ireland, PwC U.S., and PwC Bermuda, Plaintiffs and the Class have lost all, or substantially all, of their investment in Optimal SUS.

## COUNT 17

### NEGLIGENCE
### PURSUANT TO FLORIDA COMMON LAW
### AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA

526.     Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland, PwC U.S., and PwC Bermuda for negligence pursuant to Florida common law.

527.     PwC Ireland, PwC U.S., and PwC Bermuda had a special relationship with Plaintiffs that gave rise to a duty of care.  PwC Ireland issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in Optimal SUS.  PwC U.S. and PwC Bermuda conducted procedures that PwC U.S. and PwC Bermuda knew would form the basis for the audit opinions provided by PwC Ireland.  PwC Ireland, PwC U.S., and PwC Bermuda knew that the audit opinions about Optimal SUS would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in Optimal SUS in that, among other things, PwC Ireland addressed its audit opinions to shareholders in Optimal SUS, and PwC Ireland, PwC U.S., and PwC Bermuda knew that Optimal SUS, OIS, and Santander Miami advised Plaintiffs and other

members of the Class that PwC Ireland audited Optimal SUS's financial statements and had given Optimal SUS unqualified audit opinions.

528.    Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC Ireland, PwC U.S., and PwC Bermuda to exercise such care as ordinarily exercised by auditors generally and as required by ISA and other applicable auditing and accounting standards in conducting the audits of Optimal SUS.

529.    PwC Ireland was negligent in failing to properly audit Optimal SUS in accordance with ISA and other applicable auditing and accounting standards.  PwC Ireland nevertheless negligently issued unqualified audit opinions that Optimal SUS's financial statements fairly represented the financial condition of Optimal SUS.

530.    PwC U.S. and PwC Bermuda acted negligently by failing to conduct the requisite procedures concerning BMIS.  Among other things, PwC U.S. and PwC Bermuda failed to perform any procedures to gain an understanding of BMIS's business – other than speaking with Madoff – for purposes of providing the information obtained from those procedures to PwC Ireland, pursuant to ISA.

531.    PwC Ireland, PwC U.S., and PwC Bermuda ignored numerous red flags surrounding Madoff.  These defendants acted with negligence as to the consequences of Optimal SUS's incorrect financial statements.

532.    Had PwC Ireland, PwC U.S., and PwC Bermuda not acted negligently, PwC Ireland would not have issued the unqualified audit opinions.

533.    PwC Ireland, PwC U.S., and PwC Bermuda are jointly and severally liable to Plaintiffs and the Class.

534.    As a result of the negligence of PwC Ireland, PwC U.S., and PwC Bermuda, Plaintiffs and the Class have lost all, or substantially all, of their investment in Optimal SUS.

## COUNT 18

### GROSS NEGLIGENCE AND NEGLIGENCE PURSUANT TO FLORIDA COMMON LAW AGAINST PwC INTERNATIONAL

535.    Plaintiffs repeat and reallege as if fully set forth in this Count, (i) all counts against PwC Ireland, PwC Bermuda, and PwC U.S., and (ii) the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC International for gross negligence pursuant to Florida common law.

536.    PwC Ireland, in the conduct of its audits of Optimal SUS's financial statements, and PwC U.S. and PwC Bermuda, in the conduct of procedures "directed towards obtaining an understanding of certain procedures and organization aspects of [BMIS] for the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by [BMIS] . . .," were performing the duties expected and provided for by PwC to its audit clients.

537.    The PwC Code of Conduct acknowledges:

> The PricewaterhouseCoopers network includes any entity which is authorised to carry on business under a name which includes all or part of the PricewaterhouseCoopers name, is a direct or indirect affiliate or subsidiary of a PricewaterhouseCoopers entity or is otherwise within (or associated or connected with an entity within) or is a correspondent firm of the worldwide network of PricewaterhouseCoopers firms, where "entities" or an "entity" includes partnerships, firms, corporations or other entities wherever located.

538.    PwC Ireland, PwC U.S., and PwC Bermuda are member firms of PwC International and use its trade name, "PwC."

539.   PwC presents itself to the public as a unified entity.

(a)   PwC's   Website   (www.pwc.com)   discusses   "Upholding   the PricewaterhouseCoopers name," and states:

- Our clients and colleagues trust PricewaterhouseCoopers based on our professional competence and integrit[y]— qualities that underpin our reputation. We uphold that reputation.

\* \* \*

- When speaking in a forum in which audiences would reasonably expect that we are speaking as a representative of PricewaterhouseCoopers, we generally state only PricewaterhouseCoopers' view and not our own.

(b)   The PwC Website (www.pwc.com) in referring to its locations, states: "No matter where you're located, chances are there's a PwC office near you," and lists nations worldwide where PwC maintains its offices.

(c)   The PwC Website (www.pwc.com) provides access to PwC's Code of Conduct which states in part: "we also have a **Code of conduct** for all PwC people and firms." (Bold in original.)

(d)   PwC has established a Global Assurance Leader which heads the Audit and Assurance Services that PwC provides to its clients. The Global Assurance Leader, Donald McGovern, is located in New York.

540.   PwC International does not provide services to clients.  Instead, "[i]ts primary activities are to: identify broad market opportunities and develop associated strategies; strengthen PwC's internal product, skill, and knowledge networks; promote the PwC brand; and develop and work for the consistent application of common risk and quality standards by member firms, including compliance with independence processes."

541.    PwC is governed by a Global Board, Network Leadership Team, Strategy Council, and Network Executive Team.

542.    The Global Board's role is "to ensure accountability, protect the PricewaterhouseCoopers International Limited network, and ensure effective governance."

543.    PwC's Network Leadership Team "sets the strategy and standards that the PwC network will follow," and is comprised of five members, including the Global CEO Sam DiPiazza, and Dennis Nally, the Chairman and Senior Partner of PwC U.S., both of whom maintain offices in New York.

544.    PwC's Strategy Council is comprised of "the senior partners of some of the largest PwC firms, [and] agrees on strategic direction and ensures alignment in the execution of strategy."  Dennis Nally, the Chairman and Senior Partner of PwC U.S. is the Chairman of PwC's Strategy Council.

545.    By virtue of PwC International's control, directly or indirectly through the Global Board, Network Leadership Team or Strategy Council, or the imposition of the Code of Conduct, over its member firms (including PwC Ireland, PwC U.S., and PwC Bermuda), PwC International is liable for the gross negligence or negligence of PwC Ireland, PwC U.S., and PwC Bermuda.


**COUNT 19**

**UNJUST ENRICHMENT**
**PURSUANT TO FLORIDA COMMON LAW**
**AGAINST PwC IRELAND**

546.    Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland for unjust enrichment pursuant to Florida common law.

547.    Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that PwC Ireland obtained at the expense of Plaintiffs and the Class and to which PwC Ireland was not entitled.  PwC Ireland was enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of fees for their audits of Optimal SUS.

548.    Plaintiffs and the Class involuntarily conferred a benefit upon PwC Ireland without Plaintiffs and the Class receiving adequate benefit or compensation in return.  PwC Ireland appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

549.    Equity and good conscience require PwC Ireland to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

## COUNT 20

### GROSS NEGLIGENCE
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA

550.    Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland, PwC U.S., and PwC Bermuda for gross negligence pursuant to New York common law.

551.    PwC Ireland, PwC U.S., and PwC Bermuda had a special relationship with Plaintiffs that gave rise to a duty of care.  PwC Ireland issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in Optimal SUS.  PwC U.S. and PwC Bermuda conducted audit procedures that PwC U.S. and PwC Bermuda knew would form the basis for the audit opinions provided by PwC Ireland.  PwC Ireland, PwC U.S., and PwC Bermuda knew that

the audit opinions about Optimal SUS would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in Optimal SUS in that, among other things, PwC Ireland addressed its audit opinions to shareholders in Optimal SUS, and PwC Ireland, PwC U.S., and PwC Bermuda knew that Optimal SUS, OIS, and Santander Miami advised Plaintiffs and other members of the Class that PwC Ireland audited Optimal SUS's financial statements and had given Optimal SUS unqualified audit opinions.

552.    Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC Ireland, PwC U.S., and PwC Bermuda to exercise such care as ordinarily exercised by auditors generally and as required by ISA and other applicable auditing and accounting standards in conducting the audits of Optimal SUS.

553.    PwC Ireland was grossly negligent in knowingly failing to properly audit Optimal SUS in accordance with ISA and other applicable auditing and accounting standards.  PwC Ireland nevertheless, and with gross negligence, issued unqualified audit opinions that Optimal SUS's financial statements fairly represented the financial condition of Optimal SUS.

554.    PwC U.S. and PwC Bermuda acted with gross negligence by failing to conduct the requisite procedures concerning BMIS.  Among other things, PwC U.S. and PwC Bermuda failed to perform any procedures to gain an understanding of BMIS's business – other than speaking with Madoff – for purposes of providing the information obtained from those procedures to PwC Ireland, pursuant to ISA.

555.    PwC Ireland, PwC U.S., and PwC Bermuda also ignored numerous red flags surrounding Madoff.  PwC Ireland, PwC U.S., and PwC Bermuda acted with heedlessness and wanton disregard of the consequences of Optimal SUS's incorrect financial statements.

556.    Had PwC Ireland, PwC U.S., and PwC Bermuda not acted with gross negligence PwC Ireland would not have issued the unqualified audit opinions.

557.    PwC Ireland, PwC U.S., and PwC Bermuda are jointly and severally liable to Plaintiffs and the Class.

558.    As a result of the gross negligence of PwC Ireland, PwC U.S., and PwC Bermuda, Plaintiffs and the Class have lost all, or substantially all, of their investment in Optimal SUS.

## COUNT 21

### NEGLIGENCE
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST PwC IRELAND, PwC U.S., AND PwC BERMUDA

559.    Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland, PwC U.S., and PwC Bermuda for negligence pursuant to New York common law.

560.    PwC Ireland, PwC U.S., and PwC Bermuda had a special relationship with Plaintiffs that gave rise to a duty of care.  PwC Ireland issued audit opinions directly to Plaintiffs and the Class as investors and shareholders in Optimal SUS.  PwC U.S. and PwC Bermuda conducted audit procedures that PwC U.S. and PwC Bermuda knew would form the basis for the audit opinions provided by PwC Ireland.  PwC Ireland, PwC U.S., and PwC Bermuda knew that the audit opinions about Optimal SUS would be relied upon by Plaintiffs and the Class in deciding to make or retain their investments in Optimal SUS in that, among other things, PwC Ireland addressed its audit opinions to shareholders in Optimal SUS, and PwC Ireland, PwC U.S., and PwC Bermuda knew that Optimal SUS, OIS, and Santander Miami advised Plaintiffs

and other members of the Class that PwC Ireland audited Optimal SUS's financial statements and had given Optimal SUS unqualified audit opinions.

561.     Plaintiffs and the Class foreseeably and reasonably relied, directly or indirectly, on PwC Ireland, PwC U.S., and PwC Bermuda to exercise such care as ordinarily exercised by auditors generally and as required by ISA and other applicable auditing and accounting standards in conducting the audits of Optimal SUS.

562.     PwC Ireland was negligent in failing to properly audit Optimal SUS in accordance with ISA and other applicable auditing and accounting standards.   PwC Ireland nevertheless negligently issued unqualified audit opinions that Optimal SUS's financial statements fairly represented the financial condition of Optimal SUS.

563.     PwC U.S. and PwC Bermuda acted negligently by failing to conduct the requisite procedures concerning BMIS.   Among other things, PwC U.S. and PwC Bermuda failed to perform any procedures to gain an understanding of BMIS's business – other than speaking with Madoff – for purposes of providing the information obtained from those procedures to PwC Ireland, pursuant to ISA.

564.     PwC Ireland, PwC U.S., and PwC Bermuda also ignored numerous red flags surrounding Madoff.   PwC Ireland, PwC U.S., and PwC Bermuda were negligent of the consequences of Optimal SUS's incorrect financial statements.

565.     Had PwC Ireland, PwC U.S., and PwC Bermuda not acted negligently, PwC Ireland would not have issued the unqualified audit opinions.

566.     PwC Ireland, PwC U.S., and PwC Bermuda are jointly and severally liable to Plaintiffs and the Class.

567.    As a result of the negligence of PwC Ireland, PwC U.S., and PwC Bermuda, Plaintiffs and the Class have lost all, or substantially all, of their investment in Optimal SUS.

## COUNT 22

### GROSS NEGLIGENCE AND NEGLIGENCE PURSUANT TO NEW YORK COMMON LAW AGAINST PwC INTERNATIONAL

568.    Plaintiffs repeat and reallege as if fully set forth in this Count, (i) all counts against PwC Ireland, PwC Bermuda, and PwC U.S., and (ii) the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC International for gross negligence pursuant to New York common law.

569.    PwC Ireland, in the conduct of its audits of Optimal SUS's financial statements, and PwC U.S. and PwC Bermuda, in the conduct of procedures "directed towards obtaining an understanding of certain procedures and organization aspects of [BMIS] for the purpose of gaining comfort thereon for the audits by several PwC offices of a number of funds having moneys managed by [BMIS] . . .," were performing the duties expected and provided for by PwC to its audit clients.

570.    The PwC Code of Conduct acknowledges:

> The PricewaterhouseCoopers network includes any entity which is authorised to carry on business under a name which includes all or part of the PricewaterhouseCoopers name, is a direct or indirect affiliate or subsidiary of a PricewaterhouseCoopers entity or is otherwise within (or associated or connected with an entity within) or is a correspondent firm of the worldwide network of PricewaterhouseCoopers firms, where "entities" or an "entity" includes partnerships, firms, corporations or other entities wherever located.

571.    PwC Ireland, PwC U.S., and PwC Bermuda are member firms of PwC International and use its trade name, "PwC."

572.     PwC presents itself to the public as a unified entity.

(a)     PwC's  Website  (www.pwc.com)  discusses  "Upholding  the PricewaterhouseCoopers name," and states:

- Our clients and colleagues trust PricewaterhouseCoopers based on our professional competence and integrit[y]— qualities that underpin our reputation. We uphold that reputation.

* * *

- When speaking in a forum in which audiences would reasonably expect that we are speaking as a representative of PricewaterhouseCoopers, we generally state only PricewaterhouseCoopers' view and not our own.

(b)     The PwC Website (www.pwc.com) in referring to its locations, states: "No matter where you're located, chances are there's a PwC office near you," and lists nations worldwide where PwC maintains its offices.

(c)     The PwC Website (www.pwc.com) provides access to PwC's Code of Conduct which states in part: "we also have a **Code of conduct** for all PwC people and firms." (Bold in original.)

(d)     PwC has established a Global Assurance Leader which heads the Audit and Assurance Services that PwC provides to its clients. The Global Assurance Leader, Donald McGovern, is located in New York.

573.     PwC International does not provide services to clients. Instead, "[i]ts primary activities are to: identify broad market opportunities and develop associated strategies; strengthen PwC's internal product, skill, and knowledge networks; promote the PwC brand; and develop and work for the consistent application of common risk and quality standards by member firms, including compliance with independence processes."

574.     PwC is governed by a Global Board, Network Leadership Team, Strategy Council, and Network Executive Team.

575.     The Global Board's role is "to ensure accountability, protect the PricewaterhouseCoopers International Limited network, and ensure effective governance."

576.     PwC's Network Leadership Team "sets the strategy and standards that the PwC network will follow,"  and is comprised of five members, including the Global CEO Sam DiPiazza, and Dennis Nally, the Chairman and Senior Partner of PwC U.S., both of whom maintain offices in New York.

577.     PwC's Strategy Council is comprised of "the senior partners of some of the largest PwC firms, [and] agrees on strategic direction and ensures alignment in the execution of strategy."  Dennis Nally, the Chairman and Senior Partner of PwC U.S. is the Chairman of PwC's Strategy Council.

578.     By virtue of PwC International's control, directly or indirectly through the Global Board, Network Leadership Team or Strategy Council, or the imposition of the Code of Conduct, over its member firms (including PwC Ireland, PwC U.S., and PwC Bermuda), PwC International is liable for the gross negligence or negligence of PwC Ireland, PwC, and PwC Bermuda.


## COUNT 23

### UNJUST ENRICHMENT
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST PwC IRELAND

579.     Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380.  This Count is asserted against PwC Ireland for unjust enrichment pursuant to New York common law.

580.    Plaintiffs and the Class base their unjust enrichment claim on the receipt and/or retention of fees and other monies that PwC Ireland obtained at the expense of Plaintiffs and the Class and to which PwC Ireland was not entitled.  PwC Ireland was enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of fees for their audits of Optimal SUS.

581.    Plaintiffs and the Class involuntarily conferred a benefit upon PwC Ireland without Plaintiffs and the Class receiving adequate benefit or compensation in return.  PwC Ireland appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

582.    Equity and good conscience require PwC Ireland to refund all fees and other monies they received at Plaintiffs' and the Class' expense

## COUNT 24

### BREACH OF FIDUCIARY DUTY
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC SERVICES

583.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count asserts claims against HSBC Services for breach of fiduciary duty pursuant to New York common law.

584.    In providing administrative services to Optimal Arbitrage and Optimal SUS, HSBC Services was responsible for accounting, registrar, and transfer services, including reporting the Optimal Funds' NAV.  HSBC Services occupied a superior position over Plaintiffs and the Class because it had superior access to confidential information about Madoff's purported investments, including the purported location, security, and value of the purported assets.

585.    HSBC Services held itself out as providing superior administrative services to financial firms.  Specifically, HSBC Services held itself out, in its role as administrator, as part of HSBC Holdings plc, one of the world's largest financial institutions, with an obligation, among other things, to verify pricing information and to calculate the NAV reported to investors on a monthly basis.

586.    HSBC Services charged a premium for its administration of Optimal SUS.

587.    HSBC Services' superior position necessitated that Plaintiffs repose their trust and confidence in HSBC Services to fulfill its duties, and Plaintiffs and the Class did so by investing and continuing to invest in the Optimal Funds.

588.    HSBC Services accepted Plaintiffs' and the Class' repose of trust and confidence.

589.    Plaintiffs and the Class reasonably and foreseeably trusted HSBC Services' purported expertise and skill, and HSBC Services recognized that Plaintiffs and the Class would rely on and repose their trust in HSBC Services when deciding to invest and retain their investments in the Optimal Funds.

590.    HSBC Services' superior position over Plaintiffs and the Class gave rise to a fiduciary duty and duty of care on the part of HSBC Services to Plaintiffs and the Class who invested in the Optimal Funds.

591.    HSBC Services breached its fiduciary duties to Plaintiffs and the Class by, *inter alia*, failing to discharge properly its responsibilities as administrator, including the calculation of the NAVs and review of information provided by Madoff.

592.    Plaintiffs and the Class have been damaged as a proximate result of HSBC Services' breach of fiduciary duties.

**COUNT 25**

**GROSS NEGLIGENCE**
**PURSUANT TO NEW YORK COMMON LAW**
**AGAINST HSBC SERVICES**

593.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count asserts claims against HSBC Services for gross negligence pursuant to New York common law.

594.    In providing administrative services to Optimal Arbitrage and Optimal SUS, HSBC Services had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

595.    HSBC Services' duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to verify pricing information and to calculate the Optimal Funds' NAV reported to investors on a monthly basis.

596.    HSBC Services knew or was reckless in not knowing that Plaintiffs and the Class were relying on it to exercise reasonable care in providing its services to Optimal Arbitrage and Optimal SUS, and Plaintiffs and the Class did reasonably and foreseeably rely on HSBC Services to exercise such care by investing and continuing to invest in Optimal Arbitrage and Optimal SUS.

597.    HSBC Services was grossly negligent in its duties as administrator.  HSBC Services relied, with gross negligence, on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Plaintiffs and the Class without scrutiny, verification, confirmation or review of the information.  HSBC Services was obligated to scrutinize, verify, confirm or review independently the information it was providing in calculating the NAV, but grossly failed to do so.  HSBC Services grossly failed to exercise the

186

degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

598.    HSBC Services was not entitled to rely on the information provided by Madoff because of the red flags surrounding Madoff, the consolidation of the role of investment manager, custodian and execution agent in Madoff, and because the information was manifestly incorrect.

599.    Plaintiffs' and the Class' investment in Optimal Arbitrage and Optimal SUS has been completely, or substantially, lost and, thus, Plaintiffs and the Class have been damaged as a proximate result of HSBC Services' gross negligence.

## COUNT 26

### NEGLIGENCE
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC SERVICES

600.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count asserts claims against HSBC Services for negligence pursuant to New York common law.

601.    In providing administrative services to Optimal Arbitrage and Optimal SUS, HSBC Services had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

602.    HSBC Services' duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to verify pricing information and to calculate the NAV reported to investors on a monthly basis.

603.    HSBC Services knew or was reckless in not knowing that Plaintiffs and the Class were relying on it to exercise reasonable care in providing its services to Optimal Arbitrage and

Optimal SUS, and Plaintiffs and the Class did reasonably and foreseeably rely on HSBC Services to exercise such care by investing and continuing to invest in Optimal Arbitrage and Optimal SUS.

604.   HSBC Services was negligent in its disregard for its duties as administrator of the Optimal Funds.   HSBC Services negligently relied on information provided by Madoff in calculating the NAV, and relayed such incorrect information to Plaintiffs and the Class without scrutiny, verification, confirmation, or review of the information.   HSBC Services failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

605.   HSBC Services was not entitled to rely on the information provided by Madoff because of the red flags surrounding Madoff, the consolidation of the role of investment manager, custodian and execution agent in Madoff, and because the information was manifestly incorrect.

606.   Plaintiffs' and the Class' investment in Optimal Arbitrage and Optimal SUS has been completely, or substantially, lost and, thus, Plaintiffs and the Class have been damaged as a proximate result of HSBC Services' negligence.

## COUNT 27

### UNJUST ENRICHMENT
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC SERVICES

607.   Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.   This Count is asserted against HSBC Services for unjust enrichment pursuant to New York common law.

608.    Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that HSBC Services obtained at the expense of Plaintiffs and the Class and to which HSBC Services was not entitled, including, as specified in the EMs, which provided as follows with respect to Optimal Arbitrage and Optimal SUS:

> Pursuant to the Administration Agreement, the Administrator shall be entitled to the following fees:
>
> -    In respect to Series which are fund of funds [i.e., Optimal Arbitrage], the administration fee is 2 basis points per annum subject to a minimum of USD 10,000.
>
> -    In respect to Series which are feeder funds investing in a single managed account such as Optimal SUS, the administration fee is 2.5 basis points subject to a maximum of USD 200,000 per annum per account.   The Administrator is also entitled to charge an investment service fee of USD 35 per transaction.
>
> The Administrator shall be entitled to be reimbursed all reasonable out of pocket expenses not exceeding USD 300 per month per Series.[63]

609.    HSBC Services was enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of fees for their purported administration of Plaintiffs' and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

610.    Plaintiffs and the Class involuntarily conferred a benefit upon HSBC Services without Plaintiffs and the Class receiving adequate benefit or compensation in return. HSBC Services appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

---

[63] October 2008 EM, Ex. 13 at 12; January 2008 EM, Ex. 12 at 12; October 2006 EM, Ex. 11 at 12.

611.    Equity and good conscience require HSBC Services to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

## COUNT 28

### BREACH OF FIDUCIARY DUTY
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC TRUST

612.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count asserts claims against HSBC Trust for breach of fiduciary duty pursuant to New York common law.

613.    In providing custodial services to the Optimal Funds, HSBC Trust was responsible for acting with reasonable skill, care, and diligence in the appointment and monitoring of BMIS, and was responsible for the periodic oversight of BMIS in connection with the custody of the assets of the Optimal Funds.

614.    HSBC Trust held itself out as providing superior custodian services to financial firms.  Specifically, HSBC Trust held itself out, in its role as custodian, as part of HSBC Holdings plc, one of the world's largest financial institutions, with an obligation, among other things, to monitor and oversee the custody of assets held by other entities other than HSBC Trust.

615.    HSBC Trust charged a fee for the oversight and supervision of BMIS.

616.    HSBC Trust's superior position necessitated that Plaintiffs and the Class repose their trust and confidence in HSBC Trust to fulfill its duties, and Plaintiffs and the Class did so by investing and continuing to invest in the Optimal Funds.

617.    HSBC Trust accepted Plaintiffs' and the Class' repose of trust and confidence.

618. Plaintiffs and the Class reasonably and foreseeably trusted HSBC Trust's purported expertise and skill, and HSBC Trust recognized that Plaintiffs and the Class would rely on and repose their trust in HSBC Trust when deciding to invest and retain their investments in the Optimal Funds.

619. HSBC Trust's superior position over Plaintiffs and the Class gave rise to a fiduciary duty and duty of care on the part of HSBC Trust to Plaintiffs and the Class who invested in the Optimal Funds.

620. HSBC Trust breached its fiduciary duties to Plaintiffs and the Class by, *inter alia*, failing to discharge properly its responsibilities as custodian, including the oversight and supervision of BMIS in holding the assets of Optimal Multiadvisors.

621. Plaintiffs and the Class have been damaged as a proximate result of HSBC Trust's breach of fiduciary duties.

## COUNT 29

### GROSS NEGLIGENCE
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC TRUST

622. Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count. This Count asserts claims against HSBC Trust for gross negligence pursuant to New York common law.

623. In providing custodial services to Optimal Arbitrage and Optimal SUS, HSBC Trust had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

624.    HSBC Trust's duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to oversee and monitor BMIS's custody of the assets of Optimal Multiadvisors.

625.    HSBC Trust knew or was reckless in not knowing that Plaintiffs and the Class were relying on HSBC Trust to exercise reasonable care in providing its services to Optimal Arbitrage and Optimal SUS, and Plaintiffs and the Class did reasonably and foreseeably rely on HSBC Trust to exercise such care by investing and continuing to invest in Optimal Arbitrage and Optimal SUS.

626.    HSBC Trust was grossly negligent in its duties as custodian.  HSBC Trust was grossly negligent in failing to oversee and monitor whether BMIS held the assets of Optimal Multiadvisors.  HSBC Trust was obligated to act with reasonable skill, care, and diligence in its oversight and supervision of BMIS, but grossly failed to do so.  HSBC Trust grossly failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

627.    Plaintiffs' and the Class' investment in Optimal Arbitrage and Optimal SUS has been completely, or substantially, lost and, thus, Plaintiffs and the Class have been damaged as a proximate result of HSBC Trust's gross negligence.

**COUNT 30**

**NEGLIGENCE**
**PURSUANT TO NEW YORK COMMON LAW**
**AGAINST HSBC TRUST**

628.    Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count asserts claims against HSBC Trust for negligence pursuant to New York common law.

629.    In providing custodian services to Optimal Arbitrage and Optimal SUS, HSBC Trust had a special relationship with Plaintiffs and the Class that gave rise to a duty to exercise due care in the performance of its duties.

630.    HSBC Trust's duty of care to Plaintiffs and the Class was based on and arose from, among other things, its duty to oversee and monitor BMIS's custody of the assets of Optimal Multiadvisors.

631.    HSBC Trust knew or was reckless in not knowing that Plaintiffs and the Class were relying on HSBC Trust to exercise reasonable care in providing its services to Optimal Arbitrage and Optimal SUS, and Plaintiffs and the Class did reasonably and foreseeably rely on HSBC Trust to exercise such care by investing and continuing to invest in Optimal Arbitrage and Optimal SUS.

632.    HSBC Trust was negligent in its duties as custodian.  HSBC Trust was negligent in failing to oversee and monitor whether BMIS held the assets of Optimal Multiadvisors. HSBC Trust was obligated to act with reasonable skill, care, and diligence in its oversight and supervision of BMIS, but negligently failed to do so.  HSBC Trust negligently failed to exercise the degree of prudence, caution, and good business practice that would be expected of any reasonable financial professional.

633.    Plaintiffs' and the Class' investment in Optimal Arbitrage and Optimal SUS has been completely, or substantially, lost and, thus, Plaintiffs and the Class have been damaged as a proximate result of HSBC Trust's negligence.

## COUNT 31

### UNJUST ENRICHMENT
### PURSUANT TO NEW YORK COMMON LAW
### AGAINST HSBC TRUST

634.   Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against HSBC Trust for unjust enrichment pursuant to New York common law.

635.   Plaintiffs and the Class base their unjust enrichment claim on the receipt or retention of fees and other monies that HSBC Trust obtained at the expense of Plaintiffs and the Class and to which HSBC Trust was not entitled, including, as specified in the EMs, which provided as follows with respect to fees paid by Optimal Arbitrage and Optimal SUS:

> - in respect to Series which are fund of funds [*i.e.*, Optimal Arbitrage], the custody fee is one basis point subject to a minimum of USD 10,000 per annum.  In addition, there is a custody transaction fee of USD 175.
>
> - In respect to Series which are feeder funds [*i.e.,* Optimal SUS], the custody fee is one basis point.  Custody's transaction fees are waived.[64]

636.   HSBC Trust was enriched at the expense of Plaintiffs and the Class, including by taking Plaintiffs' and the Class' monies in the form of fees for their purported custody or oversight of the custody of Plaintiffs' and the Class' investment, and the purported, but in fact non-existent, capital appreciation of such assets.

637.   Plaintiffs and the Class involuntarily conferred a benefit upon HSBC Trust without Plaintiffs and the Class receiving adequate benefit or compensation in return.  HSBC

---

[64]  October 2008 EM, Ex. 13 at 13; January 2008 EM, Ex. 12 at 13; October 2006 EM, Ex. 11 at 13.

Trust appreciated this benefit and accepted and retained the benefit under inequitable circumstances.

638.    Equity and good conscience require HSBC Trust to refund all fees and other monies they received at Plaintiffs' and the Class' expense.

### COUNT 32

### FOR VIOLATIONS OF RULE 10b-5(b) AND SECTION 10(b) OF THE EXCHANGE ACT AGAINST OIS AND THE DIRECTOR DEFENDANTS

639.    The Exchange Act Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against OIS and the Director Defendants and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

640.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

641.    Defendants subject to this Count recklessly or knowingly made various deceptive and untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading to the Exchange Act Plaintiffs and the Class.  The purpose and effect of said false and misleading statements, was, among other things, to induce the Exchange Act Plaintiffs and the Class to purchase shares in Optimal Arbitrage and Optimal SUS.

642.    During the Class Period, Defendants subject to this Count sold the Optimal Funds based on false and misleading statements and omissions.  Investors in the Optimal Funds or their nominees were provided copies of the prospectuses, called Explanatory Memoranda, or EMs.

These documents, however, contained uniform misrepresentations and material omissions and induced the Exchange Act Plaintiffs to invest in the Optimal Funds.

643.    The EMs specifically stated that only the representations in the EMs and annual reports for the Optimal Funds were to be relied upon by investors:

(a)    "No person has been authorised in connection with this Memorandum to give any information or make any representations other than as contained in this Memorandum."[65]

(b)    The subscription forms necessary to invest in the Optimal Funds and attached to many of the EMs required investors to agree that, "I/We, having received and considered a copy of the Memorandum, hereby confirm that this subscription is based solely on the Memorandum together (where applicable) with the most recent annual report and accounts of the Fund and (if issued after such report and accounts) its most recent unaudited semi-annual report."[66]

644.    The Defendants subject to this Count, as acknowledged in their own documents, recognized the fundamental importance of proper due diligence, strict monitoring, and oversight of the investment manager, broker, administrator and custodian, and their obligation to perform these functions.  Nevertheless, the Defendants subject to this Count recklessly or knowingly failed to perform due diligence that they recognized was essential and required by standard-industry practice.  Defendants subject to this Count also recklessly or knowingly disregarded the red flags surrounding Madoff and that should have alerted them, as experienced investment professionals, to the need for heightened scrutiny.

---

[65]  October 2008 EM, Ex. 13 at 2; January 2008, Ex. 12 at 2; October 2006 EM, Ex. 11 at 2; June 2004 EM, Ex. 10 at 2.

645.   As set forth below in this Count, the Defendants subject to this Count recklessly or knowingly misrepresented to the Exchange Act Plaintiffs and other members of the Class that their assets were being invested using a split strike conversion strategy.  Defendants subject to this Count further misrepresented that they and their financial services providers and auditors were conducting extensive due diligence and monitoring of Madoff's operations, which served as the Optimal Funds' investment advisors, as well as broker, execution agent, and custodian, and that they had full transparency with respect to all Madoff's operations.  The Defendants subject to this Count failed to disclose to the Exchange Act Plaintiffs and other members of the Class the material facts that in reality no one had conducted any meaningful due diligence on Madoff prior to establishing the Optimal Funds' investments with Madoff; no one was meaningfully monitoring verifying, or confirming Madoff's trade activity; effectively there was no transparency into Madoff's operations; and no one had an independent, factual basis for stating that Madoff was executing a split strike conversion strategy.

### 1.      False And Misleading Statements And Omissions About the Split Strike Conversion Strategy Used By Optimal SUS

646.   The EMs consistently described the investment strategy utilized by Optimal SUS as seeking to obtain "capital appreciation" through the split strike conversion strategy.  The EMs stated that:

> The strategy utilized by the Broker-Dealer is called "split-strike conversion" and entails:
>
> (i)      purchasing a basket of thirty (30) to forty (40) large-capitalization S&P 100 stocks which together account for the greatest weight of the Index and therefore, when combined, present a high degree of correlation with the general market;

---

[66] October 2008 EM, Ex. 13 at 40; January 2008 EM, Ex. 12 at 39; October 2006 EM, Ex. 11 at 43.

    (ii)   purchasing out-of-the-money or at-the-money S&P Index put options in the same dollar amount;

    (iii)  selling out-of-the-money S&P 100 Index call options representing a dollar amount of the underlying Index equivalent to the dollar amount of the basket of shares purchased.

* * *

Proprietary systems continuously optimize the basket of stocks to replicate the performance of the overall market at low cost.[67]

647.    These statements were false and misleading.  In reality, no such strategy was being executed because investors' assets were being funneled into Madoff's Ponzi scheme in which no legitimate securities transactions were ever conducted.  Further, the EMs failed to disclose to the Exchange Act Plaintiffs and other members of the Class the material fact that Defendants subject to this Count had no independent factual basis for their representations about the Optimal SUS's investment strategy because they had never undertaken any meaningful steps to confirm that the split strike conversion strategy was actually being implemented by Madoff.

    **2.**    **False And Misleading Statements And Omissions About Due Diligence For Optimal Arbitrage and Optimal SUS**

648.    The EMs falsely and misleadingly reassured investors about the care that OIS and the Director Defendants would purportedly take in selecting and monitoring the managers to whom it entrusted the Optimal Funds' assets, including the so-called "Broker-Dealer:"

    (a)    "[OIS] bases its investment decisions on a careful analysis of many investment managers;"[68]

---

[67]  October 2008 EM, Ex. 13 at 29; January 2008 EM, Ex. 12 at 28; October 2006 EM, Ex. 11 at 31; June 2004 EM, Ex. 10 at 30.

[68]  October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12; June 2004 EM, Ex. 10 at 12.

(b)     "Custodial risk . . . . The Fund must satisfy itself to ensure that such third party [such as Madoff] has and maintains the necessary competence, standing and expertise appropriate to hold the assets concerned;"[69]

(c)     "It is the [Optimal] Fund's task to select and diversify among the distinctive investment techniques and strategies of each portfolio manager to achieve the Fund's investment objectives;"[70]

(d)     "[Optimal Investment] specializes in advising multi-manager and multi-strategy portfolios;"[71] and

(e)     "The Investment Manager [Optimal Investment] shall select managers with varied investment styles who have established records of success or the Investment Manager believes demonstrate the potential to become outstanding investment managers."[72]

649.    These statements were false and misleading.  Defendants subject to this Count did not conduct a careful analysis of Madoff and failed to ensure that Madoff had the necessary competence, standing, and expertise to hold the Optimal Funds' assets.  Further, the EMs did not disclose that Defendants subject to this Count failed to conduct any meaningful due diligence of Madoff and had never independently verified with a third-party that any of the trade confirmations provided by Madoff were true and correct, and that the assets reported by Madoff existed.

---

[69]  October 2008 EM, Ex. 13 at 22; January 2008 EM, Ex. 12 at 22; October 2006 EM, Ex. 11 at 22; June 2004 EM, Ex. 10 at 22.

[70]  October 2008 EM, Ex. 13 at 8; January 2008 EM, Ex. 12 at 8; October 2006 EM, Ex. 11 at 8; June 2004 EM, Ex. 10 at 8.

[71]  October 2008 EM, Ex. 13 at 10; January 2008 EM, Ex. 12 at 10; October 2006 EM, Ex. 11 at 10; June 2004 EM, Ex. 10 at 10.

[72]  October 2008 EM, Ex. 13 at 11; January 2008 EM, Ex. 12 at 11; October 2006 EM, Ex. 11 at 12; June 2004 EM, Ex. 10 at 12.

### 3. False And Misleading Statements And Omissions About Madoff's Investments in U.S. Treasury Bills For Optimal SUS

650.    The EMs falsely and misleadingly stated that Madoff usually invested in U.S. Treasury Bills when not executing the split strike conversion strategy, "in practice the Broker-Dealer usually invests in U.S. Treasury Bills."[73]

651.    This statement was false.  Madoff never invested in U.S. Treasury Bills because he never executed a single transaction in his Investment Advisory business.  The EMs failed to disclose that the Defendants subject to this Count had no independent factual basis for their representations about the investments in U.S. Treasury Bills because they had never undertaken any meaningful steps to confirm that these government securities had actually been bought and were being held.

### 4. False And Misleading Statements And Omissions About Optimal SUS's "Deposits" With Madoff for Optimal SUS

652.    The EMs falsely and misleadingly stated that "the assets of [Optimal SUS] are deposited with the Broker-Dealer."[74]

653.    This statement was false.  Madoff did not hold the assets of Optimal SUS in deposit because Madoff stole the assets.  The EMs failed to disclose that the Defendants subject to this Count had no independent factual basis for their representations that the assets were deposited with Madoff because they had never undertaken any meaningful steps to confirm that.

### 5. Misleading Statements And Omissions About The "Possibility" That Madoff Will Abscond With Optimal SUS's Assets

654.    The EMs misleadingly stated as follows:

---

[73]  October 2008, Ex. 13 at 29;  January 2008 EM, Ex. 12 at 28; October 2006 EM, Ex. 11 at 31; June 2004 EM, Ex. 10 at 30.

[74]  October 2008 EM, Ex. 13 at 29;   January 2008 EM, Ex. 12 at 28; October 2006 EM, Ex. 11 at 31; June 2004 EM, Ex. 10 at 30.

Possibility of Fraud or Misappropriation

Neither [Optimal Multiadvisors], Optimal SUS nor the Custodian has actual custody of the assets. Such actual custody rests with the Broker-Dealer and/or its affiliated broker-dealer. Therefore, there is the risk that the Broker-Dealer could abscond with those assets. There is always the risk that the assets with the Broker-Dealer could be misappropriated. In addition, information supplied by the Broker-Dealer may be inaccurate or even fraudulent. The Investment Manager and the Administrator are entitled to rely in such information (provided they do so in good faith) and are not required to undertake any due diligence to confirm the accuracy thereof.[75]

655. This statement was misleading. The Defendants subject to this Count knew, or were reckless in not knowing, based on the numerous red flags of which they were aware that fraud or misappropriation was, in fact, taking place, and not a mere possibility.

656. This statement is also misleading because it fails to disclose the long list of red flags of which the Defendants subject to this Count were aware. Specifically, this statement failed to disclose that, (i) no one had confirmed the existence of Madoff's counterparties; (ii) no one had confirmed the existence of the U.S. Treasury Bills at the end of each year; (iii) Madoff's auditing firm was unknown, clearly unequipped to audit Madoff, and had not conducted a single audit of any entity since 1993; (iv) Madoff was extremely secretive; (v) key positions at BMIS were held by Madoff's family members; (vi) Madoff only provided paper confirmations of trading records despite telling the Defendants subject to this Count that 99% of the trades were conducted electronically; (vii) Madoff's consistent returns were impossible to replicate by others and materially outside the realm of possibility based on statistical analysis; and (viii) OIS had specifically asked Madoff for the assets to be held by an external custodian and Madoff had refused.

657.    By reason of the foregoing, Defendants subject to this Count directly violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder in that they recklessly or knowingly made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

658.    The Exchange Act Plaintiffs and the Class, in ignorance of the false and misleading statements and omissions made recklessly or knowingly by Defendants subject to this Count, relied, to their detriment, on such misleading statements and omissions in purchasing shares in the Optimal Funds.  The Exchange Act Plaintiffs and the Class have suffered substantial damages with respect to their investments in the Optimal Funds as a result of the wrongs alleged herein in an amount to be proven at trial.

## COUNT 33

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
### AGAINST SANTANDER AND ECHEVERRIA

659.    The Exchange Act Plaintiffs repeat and reallege (i) all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380), and (ii) the Counts pursuant to Rule 10b-5 and Section 10(b) of the Exchange Act against any of the Santander Defendants, as if fully set forth in this Count.  This Count is asserted against Defendants Santander and Echeverría pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78j(b).

660.    Defendants Santander and Echeverría acted as controlling persons within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

---

[75] October 2008 EM, Ex. 13 at 34; January 2008 EM, Ex. 12 at 33; October 2006 EM, Ex. 11 at 36; June 2004 EM, Ex. 10 at 35.

661.     Defendant Echeverría was Chief Executive Officer and Chief Investment Officer of OIS from its inception through July 2008, and a Director of Optimal Multiadvisors and the Optimal Funds. Echeverría had day-to-day control and exercised day-to-day control of OIS, Optimal Multiadvisors, and the Optimal Funds.  Accordingly,  Defendant Echeverría had the power to control the general business affairs of OIS, Optimal Multiadvisors, and the Optimal Funds, and the power to directly or indirectly control or influence the specific corporate policy (e.g., the failure to conduct due diligence) at OIS, Optimal Multiadvisors, and the Optimal Funds which resulted in primary liability.

662.     OIS was a wholly-owned subsidiary of Santander at all relevant times.  Santander had day-to-day control and exercised day-to-day control of OIS.  Accordingly,  Santander had (i) the power to control the general business affairs of OIS, and (ii) the power to directly or indirectly control or influence the specific corporate policy (e.g., the failure to conduct due diligence) at OIS which resulted in primary liability.

663.     As a direct and proximate result of the wrongful conduct alleged in this Count, the Exchange Act Plaintiffs and the Class suffered an economic loss and damages in connection with their purchases of shares in the Optimal Funds in an amount to be proven at trial.

## COUNT 34

### FOR VIOLATIONS OF RULE 10b-5(b)
### AND SECTION 10(b) OF THE EXCHANGE ACT
### AGAINST PwC IRELAND

664.     The Exchange Act Plaintiffs repeat and reallege as if fully set forth in this Count the allegations in the following paragraphs of this Complaint: 1-58(c); 191-264; and 281-380. This Count is asserted against PwC Ireland and is based only upon Rule 10b-5(b) promulgated pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

665.     The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

666.     PwC Ireland issued audit opinions that constituted the presentation of false and misleading information as to the assets of Optimal SUS.   Instead of billions of dollars, as represented, virtually no assets actually existed.   These statements were made recklessly or knowingly and constitute deceptive and untrue statements of material facts and omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.   These statements induced the Exchange Act Plaintiffs to invest in Optimal SUS.

667.     PwC Ireland made the following false and misleading statements: PwC Ireland issued audit opinions for every calendar year between 2003 and 2007 with respect to Optimal SUS's financial statements.[76]   In each of these opinions, PwC Ireland (i) stated that it conducted the audits in accordance with ISA, and (ii) expressed an unqualified opinion that Optimal SUS's "financial statements present fairly, in all material respects, the financial position of [Optimal SUS] as of December 31, 200[3-7], its financial performance and its cash flows for the year then ended in accordance with International Financial Reporting Standards."

668.     Each of those statements was false.   The statements were false for the following reasons:

(a)     PwC Ireland knew, or was reckless in not knowing that, Optimal SUS's financial statements did not reflect the financial position of Optimal SUS as of December 31, 200[3-7];

(b)     PwC Ireland knew, or was reckless in not knowing, that its audits of Optimal SUS did not meet, were in violation of, and were not in accordance with ISA;

(c)     PwC Ireland did not confirm the existence of Optimal SUS's supposed assets.  While purporting to conduct an audit pursuant to ISA, PwC Ireland did not take the most fundamental and obvious steps in confirming the existence of Optimal SUS's assets, and did not do so despite the requirements pursuant to ISA, as set forth above;

(d)     PwC Ireland acted recklessly in making the false statements alleged in this Count and its conduct in performing the audits was highly unreasonable and represented an extreme departure from the standards of ordinary care;

(e)     PwC Ireland knew facts or had access to information suggesting that their audit opinions were not accurate or failed to check information that PwC Ireland had a duty to monitor and which would have demonstrated the falsity of its statements when made; and

(f)     PwC Ireland knew that substantially all of Optimal SUS's assets were managed by Madoff, who as the investment advisor, the broker-dealer, and custodian of the assets held highly-unusual multiple roles that facilitated Madoff's fraud.  Yet, PwC Ireland failed, as described above, to conduct the minimal steps necessary to independently confirm the existence of Optimal SUS's assets, so that PwC Ireland's audits failed to uncover the fact that the assets did not exist.

669.    To issue unqualified audit opinions that Optimal SUS had hundreds of millions or billions of dollars of assets without any independent confirmation that any of the assets actually existed is a textbook definition of such reckless audit because it failed to comply with ISA and

---

[76] The Exchange Act Plaintiffs are only suing PwC Ireland for audit opinions issued within the last five years prior to the filing of this lawsuit on January 27, 2004, in light of the five year

the requisite accounting standards and constitutes, essentially, no audit at all.  Issuing clean audit opinions in the circumstances here, with the multiple red flags set forth above, is even more reckless yet.  The failure of PwC Ireland to acquire evidential matter from independent third parties, such as counterparties to the alleged trades by BMIS or the custodian of the U.S. Treasury Bills, or to acquire direct personal knowledge, such as by inspections and physical examination of the assets, not only was a blatant violation of auditing standards, but violated the most common sense and obvious purpose of an audit – to confirm that reported assets in fact exist.

670.     In ignorance of the false and misleading statements described in this Count, the Exchange Act Plaintiffs relied, to their detriment, on such misleading statements and omissions contained in PwC Ireland's unqualified audit opinions by investing in Optimal SUS.  The Exchange Act Plaintiffs have suffered substantial damages with respect to their investments in Optimal SUS as a result of the wrongs alleged herein in an amount to be proven at trial.

**COUNT 35**

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT
AGAINST PwC INTERNATIONAL**

671.     The Exchange Act Plaintiffs repeat and reallege as if fully set forth in this Count, the allegations in the following paragraphs of this Complaint, (i) 1-58(c); 191-264; and 281-380; and (ii) the Counts pursuant to Rule 10b-5 and Section 10(b) of the Exchange Act against any of the PwC Defendants.  This Count is asserted against Defendant PwC International pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78j(b).

---

statute of repose under the Exchange Act.  Audit opinions for any calendar year prior to 2003 would have been issued in 2003, or before, and would fall outside the five year statute of repose.

672.     Defendant PwC International is a controlling person within the meaning of Section 20(a) of the Exchange Act, as alleged herein.

673.     Defendant PwC International had the power to influence and control and did influence and control, directly or indirectly, the decision making of PwC Ireland, PwC U.S., and PwC Bermuda, including the content and dissemination of the audit opinions of Optimal SUS that were false and misleading, by virtue of PwC International's participation in, and control and awareness of, the operations, audit procedures, audit work, and audit standards of PwC Ireland, PwC U.S., and PwC Bermuda.

674.     PwC International had direct and supervisory involvement and control in the day-to-day operations, audit procedures, audit work, and audit standards of PwC Ireland, PwC U.S., and PwC Bermuda and, therefore, is presumed to have had the power to control or influence the audit statements, audit procedures, and conduct giving rise to the primary securities violations alleged in this Complaint.

675.     As a direct and proximate result of the wrongful conduct alleged in this Count, the Exchange Act Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Optimal Funds in an amount to be proven at trial.

**COUNT 36**

**FOR VIOLATIONS OF RULE 10b-5(b)
AND SECTION 10(b) OF THE EXCHANGE ACT
AGAINST HSBC SERVICES**

676.     The Exchange Act Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Defendant HSBC Services pursuant to Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b).

677.    The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

678.    HSBC Services issued false statements containing inflated NAV calculations and account balance information.  HSBC Services issued these statements, at a minimum, on a monthly basis throughout the Class Period.  In issuing these statements, HSBC Services acted recklessly or knowingly because HSBC Services knew or had access to information indicating that its statements were not accurate.  HSBC Services acted recklessly by failing to check or verify the information received from BMIS despite a duty to scrutinize and verify independently the information relating to the NAV and account balances.  HSBC Services' failure to check or verify the information was also reckless because HSBC Services was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

679.    HSBC Services also made the following false and misleading statement in the Explanatory Memoranda:

> The Administrator shall use reasonable endeavors to verify any pricing information, including estimates of prices supplied by the underlying funds or any connected person thereof (including a connected person which is a broker, market maker or other intermediary).[77]

680.    This statement was false and misleading because HSBC Services did not use reasonable endeavors to verify pricing information to the extent that BMIS reported to HSBC Services purchases and sales of securities at prices that were outside the daily trading range.  HSBC Securities knew, or was reckless in not knowing, that BMIS reported to HSBC Services purchases and sales of securities at prices that were outside the daily trading range.  HSBC

Services' failure to check or verify the information was also reckless, and lacked good faith, because HSBC Services was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

681.     The Exchange Act Plaintiffs justifiably relied on the information contained in the HSBC Services statements.  Further, HSBC Services was paid substantial fees for performing administrative services.

682.     As a direct and proximate result of the wrongful conduct alleged in this Count, the Exchange Act Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Optimal Funds in an amount to be proven at trial.

## COUNT 37

### FOR VIOLATIONS OF RULE 10b-5(b)
### AND SECTION 10(b) OF THE EXCHANGE ACT
### AGAINST HSBC TRUST

683.     The Exchange Act Plaintiffs repeat and reallege all the allegations in this Complaint that are not part of the Counts (paragraphs 1 through 380) as if fully set forth in this Count.  This Count is asserted against Defendant HSBC Trust pursuant to Rule 10b-5(b) promulgated under Section 10(b) of the Exchange Act, 15 U.S.C § 78j(b).

684.     The false and misleading statements and omissions alleged in this Count apply to this Count only and do not apply to any other Counts, or to any other part of this Complaint.

685.     HSBC Trust made the following false and misleading statements in the Explanatory Memoranda:

> The Custodian will act with reasonable skill, care and diligence in
> the selection, appointment and monitoring of Correspondents and
> shall be responsible to the Fund, for the duration of any agreement

[77] October 2008 EM, Ex. 11 at 15; January 2008 EM, Ex. 11 at 15; October 2006 EM, Ex. 11 at 15; June 2004 EM, Ex. 11 at 15.

with a Correspondent, for satisfying itself periodically as to the ongoing suitability of any such Correspondents to provide custodial services to the Fund.  The Custodian will maintain an appropriate level of supervision over any Correspondent and will make appropriate enquiries periodically to confirm that the obligation of any Correspondent continue to be competently discharged.[78]

686.    This statement is false because HSBC Trust did not act with reasonable skill, care, and diligence in the appointment and monitoring of BMIS and did not satisfy itself periodically that BMIS was a suitable custodian.  In issuing these statements, HSBC Trust acted recklessly or knowingly because HSBC Trust knew, or was reckless in not knowing, that the statements were not accurate.  HSBC Trust acted recklessly by failing to act with reasonable skill, care, and diligence in the appointment and monitoring of BMIS as custodian of all Optimal SUS assets and a substantial portion of Optimal Arbitrage's assets.

687.    HSBC Trust acted recklessly by failing to act with reasonable skill, care, and diligence in the appointment and monitoring of BMIS as holder of all Optimal SUS's assets and a substantial portion of Optimal Arbitrage's assets.  HSBC Trust was also reckless, and did not act in good faith, because HSBC Trust was aware of the red flags surrounding Madoff, including the consolidation of the roles of investment manager, custodian, and execution agent.

688.    The Exchange Act Plaintiffs and the Class justifiably relied on the information contained in the HSBC Trust statements.  Further, HSBC Trust was paid substantial fees for performing, monitoring, and overseeing BMIS's custody of the assets.

689.    As a direct and proximate result of the wrongful conduct alleged in this Count, the Exchange Act Plaintiffs and the Class suffered damages in connection with their purchases of shares in the Optimal Funds in an amount to be proven at trial.

---

[78]  October 2008, Ex. 13 at 13; January 2008, Ex. 12 at 13; October 2006, Ex. 11 at 13.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and other members of the Class demand judgment against Defendants as follows:

(a)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs proper Class representatives;

(b)     Awarding damages suffered by Plaintiffs and the Class as a result of the wrongs complained of herein, together with appropriate interest;

(c)     Awarding Plaintiffs and the Class punitive damages, where appropriate, suffered as a result of the wrongs complained of herein;

(d)     Declaring that Defendants have been unjustly enriched and imposing a constructive trust to recoup Defendants' fees, unjust benefits, and other assets for the benefits of Plaintiffs and the Class;

(e)     Enjoining Defendants from using Optimal Multiadvisors' or Optimal SUS's assets to defend this action or to otherwise seek indemnification from the Fund for their wrongful, deceitful, reckless, or negligent conduct as alleged herein;

(f)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and Class' counsel and experts, and reimbursement of expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs demand a jury trial of all claims and issues so triable.

Date: October 21, 2009

**COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**

_____s/ Jack Reise_____
Jack Reise
Stephen R. Astley
Michael L. Greenwald
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL  33432-4809
Tel: (561) 750-3000
Fax: (561) 750-3364

**COUGHLIN STOIA GELLER RUDMAN & ROBBINS LLP**
James Jaconette
655 West Broadway, Suite 1900
San Diego, CA  92101
Tel: (619) 231-1058
Fax: (619) 231-7423

**LABATON SUCHAROW LLP**
Joel H. Bernstein
Javier Bleichmar
Donald P. Delaney
140 Broadway
New York, New York 10005
Tel: 212-907-0700
Fax: 212-818-0477

*Lead Counsel and Counsel for Lead Plaintiffs*

**ACKERMAN, LINK & SATORY, P.A.**
Michael A. Hanzman
2525 Ponce de Leon Boulevard, Suite 700
Coral Gables, FL  33134
Tel: (305) 529-9100
Fax: (305) 529-1612

*Liaison Counsel*

212

**OF COUNSEL:**

**ZWERLING, SCHACHTER
& ZWERLING, LLP**
Robert S. Schachter
Jeffrey C. Zwerling
Hillary Sobel
Stephen L. Brodsky
Ana María Cabassa
David R. Kromm
41 Madison Avenue
New York, New York 10010
(212) 223-3900

**CRIDEN & LOVE, P.A.**
Kevin Bruce Love
7301 SW 57th Court, Suite 515
South Miami, Florida  33143
(305) 357-9010
(305) 357-9050

**LIEFF CABRASER HEIMANN &
BERNSTEIN LLP**
Steven E. Fineman
David S. Stellings
Daniel P. Chiplock
250 Hudson Street, 8th Floor
New York, New York 10013
(212) 355-9500

Richard M. Heimann
25 Battery Street, 30th Floor
San Francisco, California 94111
(415) 956-1000

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 21, 2009, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

_____s/ Jack Reise_____
Jack Reise
