# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 09-20215-CIV-HUCK/O'SULLIVAN

IN RE BANCO SANTANDER
SECURITIES–OPTIMAL LITIGATION

**JOINT MOTION TO DISMISS THE CONSOLIDATED AMENDED CLASS ACTION COMPLAINT FOR LACK OF EXTRATERRITORIAL APPLICATION OF THE SECURITIES EXCHANGE ACT AND MEMORANDUM OF LAW IN SUPPORT THEREOF OF DEFENDANTS OPTIMAL INVESTMENT SERVICES S.A., MANUEL ECHEVERRÍA FALLA, ANTHONY L.M. INDER RIEDEN, BRIAN WILKINSON, BANCO SANTANDER, S.A. AND PRICEWATERHOUSECOOPERS IRELAND**

Richard H. Critchlow (Bar No. 155227)
Harry R. Schafer (Bar No. 508667)
**KENNY NACHWALTER, P.A.**
Miami Center – Suite 1100
201 South Biscayne Boulevard
Miami, Florida 33131
Telephone: (305) 373-1000
Facsimile: (305) 372-1861
rhc@kennynachwalter.com
hrs@kennynachwalter.com

Thomas G. Rafferty (*Admitted Pro Hac Vice*)
Antony L. Ryan (*Admitted Pro Hac Vice*)
**CRAVATH, SWAINE & MOORE LLP**
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile: (212) 474-3700
trafferty@cravath.com
aryan@cravath.com

*Attorneys for PricewaterhouseCoopers Ireland*

November 18, 2009

Samuel A. Danon (Bar No. 892671)
Gustavo J. Membiela (Bar No. 0513555)
**HUNTON & WILLIAMS LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460
sdanon@hunton.com
gmembiela@hunton.com

*Attorneys for Banco Santander, S.A., Banco Santander International, Optimal Investment Services S.A., Manuel Echeverría Falla, Anthony L.M. Inder Rieden, and Brian Wilkinson*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................ ii

MEMORANDUM OF LAW ........................................................................................ 1

PRELIMINARY STATEMENT .................................................................................. 1

FACTUAL BACKGROUND ....................................................................................... 3

ARGUMENT ............................................................................................................... 5

I.      THE ALLEGEDLY WRONGFUL CONDUCT DID NOT OCCUR IN THE
        UNITED STATES. ......................................................................................... 6

        A.      For a Claim Under Section 10(b) and Rule 10b-5(b), the Conduct Test
                Focuses on the Conduct of Those Responsible for Making the Alleged
                Misrepresentations to Investors. ......................................................... 7

        B.      Plaintiffs Do Not Allege That the Alleged Misstatements to the Funds'
                Investors Were Made in the United States. ......................................... 10

II.     THE ALLEGED WRONGFUL CONDUCT HAD NO EFFECT IN THE
        UNITED STATES OR ON UNITED STATES RESIDENTS. ......................... 15

CONCLUSION ......................................................................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bersch v. Drexel Firestone, Inc.*,
519 F.2d 974 (2d Cir. 1975) ............................................................................ *passim*

*Butte Mining PLC v. Smith*,
76 F.3d 287 (9th Cir. 1991) ............................................................................ 11

*Cont'l. Grain (Aus.) Pty. Ltd. v. Pac. Oilseeds, Inc.*,
592 F.2d 409 (8th Cir. 1979) ....................................................................... 7, 15

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
542 U.S. 155 (2004) ...................................................................................... 5

*Fidenas AG v. Compagnie Internationale*,
606 F.2d 5 (2d Cir. 1979) .............................................................................. 6

*Green v. McCall*,
710 F.2d 29 (2d Cir. 1983) ............................................................................ 13

*Grunenthal GmbH v. Hotz*,
712 F.2d 421 (9th Cir. 1983) .......................................................................... 7

*IIT v. Vencap, Ltd.*,
519 F.2d 1001 (2d Cir. 1975) ......................................................................... 15

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 346 (S.D.N.Y. 2005) .............................................................. 17

*In re Bayer AG Sec. Litig.*,
423 F. Supp. 2d 105 (S.D.N.Y. 2005) .......................................................... 11, 17

*In re CP Ships Ltd. Sec. Litig.*,
578 F.3d 1306 (11th Cir. 2009) .................................................................. *passim*

*Itoba Ltd. v. LEP Group PLC*,
54 F.3d 118 (2d Cir. 1995) .......................................................................... 5-6

*Kaufman v. Campeau Corp.*,
744 F. Supp. 808 (S.D. Ohio 1990) ................................................................ 17

*Kauthar SDN BHD v. Sternberg*,
149 F.3d 659 (7th Cir. 1998) .......................................................................... 7

*Ledford v. Peeples*,
    568 F.3d 1258 (11th Cir. 2009) .................................................................................7

*Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*,
    530 F.3d 1339 (11th Cir. 2008) .................................................................................5

*MCG, Inc. v. Great W. Energy Corp.*,
    896 F.2d 170 (5th Cir. 1990) ...................................................................................16

*McNamara v. Bre-X Minerals Ltd.*,
    32 F. Supp. 2d 920 (E.D. Tex. 1999) .......................................................................17

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230, 1255 (11th Cir. 2008) .......................................................................1

*Morrison v. Nat'l. Aus. Bank, Ltd.*,
    547 F.3d 167 (2d Cir. 2008) ............................................................................ passim

*North South Fin. Corp. v. Al-Turki*,
    100 F.3d 1046 (2d Cir. 1996) ..................................................................................16

*Robinson v. TCI/US W. Commc'ns Inc.*,
    117 F.3d 900 (5th Cir. 1997) .................................................................................7, 8

*Santa Fe Indus., Inc. v. Green*,
    430 U.S. 462 (1977) ..................................................................................................8

*SEC v. Berger*,
    322 F.3d 187 (2d Cir. 2003) .....................................................................................6

*SEC v. Kasser*,
    548 F.2d 109 (3d Cir. 1977) ..................................................................................6-7

*Stoneridge Invstmt. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ..................................................................................................7

*Tamari v. Bache & Co. (Leb.) S.A.L.*,
    730 F.2d 1103 (7th Cir. 1984) ................................................................................15

*Tri-Star Farms Ltd. v. Marconi, PLC*,
    225 F. Supp. 2d 567 (W.D. Pa. 2002).................................................................11, 17

*Williams v. Brandt*,
    672 F. Supp. 507 (S.D. Fla. 1987) ............................................................................6

*Zoelsch v. Arthur Andersen & Co.*,
    824 F.2d 27 (D.C. Cir. 1987).....................................................................................7

iii

**Statutes & Rules**

Securities Exchange Act § 10(b), 15 U.S.C. § 78j(b) ............................................................1, 7, 10

Securities Exchange Act § 20(a), 15 U.S.C. § 78t(a) ..................................................................1

Rule 10b-5, 17 C.F.R. § 240.10b-5(b) ................................................................................ 7-8

Fed R. Civ. P. 12(b)(1) ...........................................................................................................5

Fed R. Civ. P. 12(b)(6) ...........................................................................................................5

Defendants Optimal Investment Services S.A. ("OIS"), Manuel Echeverría Falla ("Echeverría"), Anthony L.M. Inder Rieden ("Inder Rieden"), Brian Wilkinson ("Wilkinson"), Banco Santander, S.A., and PricewaterhouseCoopers Ireland ("PwC Ireland") respectfully request that this Court dismiss the federal securities claims in the Consolidated Amended Class Action Complaint (the "Complaint") on the ground that the Securities Exchange Act of 1934 (the "Exchange Act") does not apply to the conduct alleged in the Complaint. Pursuant to the Court's Order of November 5, 2009 (D.E. 162), Defendants submit this joint memorandum of law. In support of this Motion, Defendants state as follows:

## MEMORANDUM OF LAW

### PRELIMINARY STATEMENT

Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), should be dismissed because the Complaint relies on allegations of extraterritorial conduct that is beyond the jurisdiction of the Exchange Act.[1] The transactions at issue in this case are not subject to U.S. securities laws. The Exchange Act does not apply to foreign transactions in foreign securities unless the plaintiff makes out one of two exceptions: (1) the "conduct test", where the wrongful conduct under Section 10(b) occurred in the United States, or (2) the "effects test", where the wrongful conduct had a substantial effect in the United States or on U.S. residents. The Complaint here, on its face, does not allege facts that meet either exception.

*First*, Plaintiffs have not alleged, and cannot allege, that the relevant conduct— making allegedly misleading statements relating to investments in Optimal Strategic U.S. Equity Ltd. ("Optimal SUS"), Optimal Arbitrage Ltd. ("Optimal Arbitrage") or Optimal SUS (Ireland)

---

[1] Plaintiffs bring Section 20(a) "control person" claims against Banco Santander, S.A., Echeverría and PwC International Limited. (*See* Counts 33 and 35.) Because Section 20(a) secondary liability requires a primary violation of the Exchange Act, the Section 20(a) claims fail for the same reasons set forth herein with respect to the Section 10(b) claims. *See Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1255 (11th Cir. 2008).

(collectively the "Funds")[2]—occurred in the United States.  Optimal SUS and Optimal Arbitrage are trading companies of Optimal Multiadvisors, Ltd. ("Multiadvisors Bahamas"), a Bahamian investment company organized under the laws of The Bahamas, whose administrator, custodian and auditor were all in Ireland.  Optimal SUS (Ireland) is a sub-fund of Optimal Multiadvisors (Ireland) Public Limited Company ("Multiadvisors Ireland", and collectively with Multiadvisors Bahamas, "Optimal Multiadvisors"), an investment company organized under the laws of Ireland, whose administrator, custodian and auditor were all in Ireland.  Plaintiffs' Section 10(b) claims are based on Optimal Multiadvisors' offering statements (known as "Explanatory Memoranda" in The Bahamas)[3], the Optimal SUS audited financial statements and the Funds' monthly account statements, all of which were prepared outside of the United States.  While Plaintiffs allege U.S.-based conduct by certain Defendants, those allegations do not establish jurisdiction under the "conduct test" because none of that conduct relates to the allegedly misleading statements at issue.  (*See infra* Part I.)

    *Second*, there were no effects in the United States.  Neither Optimal Multiadvisors nor the Funds were registered under U.S. law, and interests in the Funds could not be offered, sold, transferred or delivered in the United States or to U.S. citizens or U.S. residents.  Thus, Plaintiffs and the class they wish to represent are all foreigners residing outside of the United States, and any loss in value of the Funds had no effect in the United States.  (*See infra* Part II.)

---

    [2] Although the Complaint refers to a fourth fund, Optimal Arbitrage (Ireland), none of the named Plaintiffs is bringing a Section 10(b) claim relating to shares in that fund.  (*See* Compl. ¶¶ 35-41.)

    [3] In Ireland, the Explanatory Memorandum is known as a "Prospectus".  (*See, e.g.*, Compl. Ex. 7.)  For ease of reference, the Explanatory Memorandum and the Prospectus issued by Optimal Multiadvisors will be referred to collectively as "Explanatory Memorandum".

2

### FACTUAL BACKGROUND

Plaintiffs attach to their Complaint copies of the Explanatory Memoranda for Optimal Multiadvisors, with various dates from July 2001 to October 2008. (*See* Compl. Exs. 7-13.) These offering statements for the securities at issue establish on their face the extraterritoriality of transactions in the Funds.

The Explanatory Memorandum states that Multiadvisors Bahamas is "incorporated . . . under the laws of the Commonwealth of the Bahamas" and has its registered office in Nassau, The Bahamas. (Compl. Ex. 12, at 1-2, 6.) The investment manager, Defendant OIS, is incorporated in Switzerland, and has its principal office in Geneva, Switzerland. (*Id.* at 1, 10.) The administrator, Defendant HSBC Securities Services (Ireland) Limited ("HSSI"), and the custodian, Defendant HSBC Institutional Trust Services (Ireland) Limited ("HTIE"), each have their offices in Dublin, Ireland. (*Id.* at 1, 12-13.) The auditor, Defendant PwC Ireland, is a firm of chartered accountants in Dublin, Ireland. (*Id.* at 1, 19.) Multiadvisors Bahamas' directors, Defendants Inder Rieden, Echeverría and Wilkinson, reside in The Bahamas, Switzerland, and Ireland, respectively.

The Explanatory Memorandum states that Multiadvisors Ireland is "organised under the laws of Ireland" and has its registered office in Dublin, Ireland. (Compl. Ex. 7, at 3-4, 11.) The investment manager, Defendant OIS, is incorporated in Switzerland, and has its principal office in Geneva, Switzerland. (*Id.* at 1, 10.) The administrator, Defendant HSSI, and the custodian, Defendant HTIE, each have their offices in Dublin, Ireland. (*Id.* at 1, 11.) The auditor, Defendant PwC Ireland, is a firm of chartered accountants in Dublin, Ireland. (*Id.* at 1, 19.)[4]

---

[4] Plaintiffs expressly limit their claims against PwC Ireland to claims in connection with its audits of Optimal Strategic US Equity Series, a series of Multiadvisors Bahamas. (Compl. ¶ 53.) With respect to the claims against PwC Ireland, "Optimal SUS" refers to that series. PwC Ireland is not being sued in connection with Optimal Arbitrage, Optimal SUS (Ireland) or Optimal Arbitrage (Ireland).

The Explanatory Memorandum for Multiadvisors Bahamas makes clear that U.S. citizens and residents may not invest. In block letters under the heading "INVESTMENT RESTRICTIONS", the Explanatory Memorandum states:

"NEITHER THE FUND NOR THE TRADING COMPANIES HAS BEEN REGISTERED UNDER THE US INVESTMENT COMPANY ACT OF 1940, AS AMENDED. IN ADDITION, THE PARTICIPATING SHARES OF THE FUND HAVE NOT BEEN REGISTERED UNDER THE US SECURITIES ACT OF 1933, AS AMENDED. PARTICIPATING SHARES OF THE FUND MAY NOT BE OFFERED, SOLD, TRANSFERRED OR DELIVERED DIRECTLY OR INDIRECTLY, IN THE UNITED STATES OR TO US PERSONS. PARTICIPATING SHARES THAT ARE ACQUIRED BY US PERSONS MAY BE MANDATORY [sic] REDEEMED BY THE FUND." (Compl. Ex. 12, at 3.)

Under the heading "Suitability Requirements", the Explanatory Memorandum reiterates:

"The sale or transfer of Participating Shares directly or indirectly in the United States or to 'United States Persons' is prohibited. A 'United States Person' is defined as: A CITIZEN OR RESIDENT OF THE UNITED STATES OR ITS TERRITORIES OR POSSESSIONS; [or] ANY CORPORATION OR OTHER ENTITY ORGANIZED UNDER THE LAWS OF OR EXISTING IN THE UNITED STATES OR ITS TERRITORIES OR POSSESSIONS . . . ." (Id. at 16.)

The Explanatory Memorandum for Multiadvisors Ireland similarly states that "[s]hares have not been, and will not be, registered under the 1933 Act" and that "[t]he [c]ompany is not open for investment by any US person . . . except in exceptional circumstances and then only with the prior consent of the Directors". (See Compl. Ex. 7, at 5.)

The Explanatory Memorandum for Multiadvisors Bahamas states, "There is no public market for the Participating Shares." (Compl. Ex. 12, at 2.) Likewise, there was no public market for shares in Multiadvisors Ireland.[5] The Explanatory Memorandum also directs that transactions in the Funds were to be effected outside the United States. For the purchase of shares in Optimal SUS, investors were provided with a Subscription Form, to be sent to HSSI in

---

[5] The Explanatory Memorandum states that "an application may be made to the Irish Stock Exchange" for a listing of those shares (see Compl. Ex. 7, at 4), but no such application was ever made.

4

Ireland. (*Id.* at 38.)  Likewise, the sale of shares was effected by means of a Redemption Form, also to be sent to HSSl in Ireland. (*Id.* at 46.)

Each year, Optimal SUS issued an Annual Report, which included the financial statements audited by PwC Ireland.  Plaintiffs have attached to their Complaint the 2007 report, dated April 23, 2008. (*See* Compl. Ex. 27.)  The Independent Auditors' Report on the Optimal SUS financial statements was signed by PwC Ireland in Dublin. (*Id.* at 3.)  The Explanatory Memorandum informed shareholders that "[c]opies of the Fund's latest Annual Report are available upon request at the offices of the Administrator [HSSI]", in Dublin. (Compl. Ex. 12, at 19.)

The Explanatory Memorandum also provided that "[t]he Fund's Net Asset Value per Participating Share will be computed as of the end of each month and made available to shareholders during the following month". (*Id.*)  HSSI calculated the Net Asset Value and prepared Optimal SUS's accounts. (*Id.* at 12, 15.)

## ARGUMENT

There is no Exchange Act jurisdiction over the foreign securities fraud alleged in the Complaint.[6]  "'It is well recognized that the Securities Exchange Act is silent as to its extraterritorial application.'"  *In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1313 (11th Cir. 2009) (quoting *Itoba Ltd. v. LEP Group PLC*, 54 F.3d 118, 121 (2d Cir. 1995)).  As the Eleventh

_____

[6] Some courts treat the extraterritorial application of the Exchange Act as an issue of the court's subject-matter jurisdiction over claims by foreign plaintiffs based on foreign conduct. *See, e.g., In re CP Ships Ltd. Sec. Litig.*, 578 F.3d 1306, 1312-13 (11th Cir. 2009); *Morrison v. Nat'l Aus. Bank, Ltd.*, 547 F.3d 167, 170-71 (2d Cir. 2008).  Others analyze the issue as one of Congress' "jurisdiction to prescribe" (also known as legislative jurisdiction), the lack of which is treated as a failure to state a claim.  *See Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975); *see also F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 164-65 (2004) (Sherman Act); *Liquidation Comm'n of Banco Intercontinental, S.A. v. Renta*, 530 F.3d 1339, 1351-52 (11th Cir. 2008) (RICO Act).  Accordingly, the Santander Defendants and PwC Ireland move to dismiss the Complaint under both Rule 12(b)(1) and 12(b)(6).  Under either analysis, Plaintiffs are not entitled to jurisdictional discovery as, to the extent the Court treats the issue as one of subject-matter jurisdiction, the Santander Defendants and PwC Ireland at this stage make a "facial attack" on the Complaint. *See CP Ships*, 578 F.3d at 1311-12.

5

Circuit recently noted, courts confronted with allegations of predominantly foreign conduct "'must seek to determine whether Congress would have wished the precious resources of United States courts and law enforcement agencies to be devoted to them rather than leave the problem to foreign countries'". *Id.* at 1313 (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 985 (2d Cir. 1975)). It "'would be no less than astonish[ing]'" if Congress had wished U.S. courts to adjudicate disputes where "all the essentials of the transactions between the parties occurred without the borders of the United States". *Williams v. Brandt*, 672 F. Supp. 507, 508-09 (S.D. Fla. 1987) (quoting *Fidenas AG v. Compagnie Internationale*, 606 F.2d 5, 10 (2d Cir. 1979)).

The courts of appeals have developed two tests to determine whether the Exchange Act applies to transnational securities fraud claims. The test for Exchange Act jurisdiction is whether (1) the "wrongful conduct occurred in the United States" or (2) "the wrongful conduct had a substantial effect in the United States or upon United States citizens". *SEC v. Berger*, 322 F.3d 187, 192 (2d Cir. 2003) (cited with approval in *CP Ships*, 578 F.3d at 1313). These tests are called the "conduct test" and the "effects test", respectively. *Id.* at 193. Courts apply an "admixture" of the two tests to evaluate whether the United States has a sufficient connection to the claims asserted for Plaintiffs to state a claim under the Exchange Act. *Itoba*, 54 F.3d at 122.

Here, the allegations of the Complaint fail to meet either the conduct test or the effects test.

## I.   THE ALLEGEDLY WRONGFUL CONDUCT DID NOT OCCUR IN THE UNITED STATES.

As the Eleventh Circuit has framed the conduct test, the defendant's activities in the United States must be "'more than merely preparatory to a securities fraud conducted elsewhere'", and the activities or omissions in the United States must "'directly cause[] the claimed losses'". *See CP Ships*, 578 F.3d at 1313 (quoting *Berger*, 322 F.3d at 193). This test, originally developed by the Second Circuit, has been adopted in at least six other circuits. *See SEC v. Kasser*, 548 F.2d 109, 113-15 (3d Cir. 1977); *Robinson v. TCI/US W. Commc'ns Inc.*,

6

117 F.3d 900, 905-06 (5th Cir. 1997); *Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 666-67 (7th Cir. 1998); *Cont'l. Grain (Aus..) Pty. Ltd. v. Pac. Oilseeds, Inc.*, 592 F.2d 409, 420 (8th Cir. 1979); *Grunenthal GmbH v. Hotz*, 712 F.2d 421, 424-25 (9th Cir. 1983); *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 30-31 (D.C. Cir. 1987). The Eleventh Circuit noted in *CP Ships* that the parties in that case "agreed that the Second Circuit's articulation of the conduct test is appropriate". 578 F.3d at 1313 n.8. While Plaintiffs reserve "the right to argue that the Court should apply a different standard" (Compl. at 112-13 n.15), there is no reason for the Court to depart from the test applied in the Second Circuit cases and by the Eleventh Circuit in *CP Ships*.[7]

### A.   For a Claim Under Section 10(b) and Rule 10b-5(b), the Conduct Test Focuses on the Conduct of Those Responsible for Making the Alleged Misrepresentations to Investors.

Liability under Section 10(b) of the Exchange Act is based on making false and misleading statements. *See Stoneridge Invstmt. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 156-57 (2008); *Ledford v. Peeples*, 568 F.3d 1258, 1288-89 (11th Cir. 2009). In their Section 10(b) claims (Counts 32, 34, 36 and 37), Plaintiffs state that their claim is "based only upon Rule 10b-5(b)" (Compl. ¶¶ 639, 664, 676, 683), which prohibits a defendant from "mak[ing] any untrue statement of a material fact or … omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading". 17 C.F.R. § 240.10b-5(b). Section 10(b) does not prohibit "fraud" in the abstract. It does not encompass "all breaches of fiduciary duty in connection with

---

[7] The Fifth Circuit has characterized the conduct test of the Third, Eighth and Ninth Circuits as requiring "some lesser quantum of conduct". *Robinson*, 117 F.3d at 906, *quoted in CP Ships*, 578 F.3d at 1313 n.8. But any difference in formulation among the circuits is small, and does not affect the analysis here. Thus, the Eighth Circuit required conduct in the U.S. that "was in furtherance of a fraudulent scheme and was significant with respect to its accomplishment", *Continental Grain*, 592 F.2d at 421, but also adhered to the Second Circuit's two-part test that the conduct "cannot be 'merely preparatory', and must be material, that is, 'directly cause the losses'", *id.* at 420 (internal citations omitted). *See also Grunenthal*, 712 F.2d at 424-25 (adopting the *Continental Grain* test in the Ninth Circuit and characterizing the Third Circuit test as "similar"). The conduct alleged in the Complaint does not satisfy the test adopted in any circuit for extraterritorial application of the Exchange Act.

a securities transaction", or claims of "corporate mismanagement". *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 472, 477 (1977). Rather, Section 10(b) requires "a material misrepresentation or material failure to disclose" in connection with an investor's purchase or sale of the securities at issue. *Id.* at 474.

Accordingly, in applying the conduct test to Section 10(b) claims, courts focus on the conduct that constitutes the fraud—the allegedly misleading statements or omissions. Thus, in *Morrison*, the Second Circuit stressed that the plaintiffs' "claims arise under Rule 10b-5(b), which focuses on the accuracy of *statements* to the public and to potential investors". *Morrison v. Nat'l Aus. Bank Ltd.*, 547 F.3d 167, 176 (2d Cir. 2008) (footnote omitted) (emphasis in original); *see also Robinson*, 117 F.3d at 907; *Bersch*, 519 F.2d at 987.

In *Morrison*, defendant National Australia Bank Ltd. ("NAB") acquired a Florida mortgage service provider, HomeSide Lending Inc., which allegedly inflated its assets. 547 F.3d 167. These inflated numbers were then incorporated into NAB's financial statements in Australia, and NAB filed those financial statements with the Securities Exchange Commission ("SEC"). *Id.* at 169. Even though NAB's own subsidiary manipulated its numbers in the United States, the *Morrison* court concluded that NAB's acts or omissions in Australia were directly responsible for the harm alleged, *see id.* at 176, whereas the act in the United States underwent a "lengthy chain of causation" to reach the harm alleged by the shareholder-plaintiffs, *see id.* at 176-77. It was in Australia that NAB's accountants, lawyers and bankers prepared the company's public filings. *Id.* at 176. The actions of the foreign parent company, NAB, operating in Australia, were more directly responsible for the harm to the shareholder plaintiffs. *Id.* Thus, the "conduct compris[ing] the heart of" the Section 10(b) claim occurred in Australia, and was beyond the jurisdiction of the Exchange Act. *Id.* at 175.

In *CP Ships*, the Eleventh Circuit applied the *Morrison* test and affirmed the district court's holding that the conduct alleged in plaintiffs' complaint was within the extraterritorial reach of the Exchange Act. *CP Ships*, 578 F.3d at 1313-17. The complaint alleged that CP Ships Ltd., a company incorporated in Canada and headquartered in England,

committed accounting fraud, which caused the company to issue false and misleading financial statements. *Id.* at 1310, 1314. The accounting malfeasance was alleged to have taken place at the Tampa, Florida offices of the company's accounting department, where the chief executive officer, Frank Halliwell, was based. *Id.* Plaintiffs alleged that Halliwell controlled the company from Florida. *Id.* at 1316. Critically, "Halliwell, operating out of Tampa, bore the primary responsibility not only for the alleged manipulation of the numbers, but also for ensuring the accuracy of financial information provided to investors". *Id.*

The distinction between *Morrison* and *CP Ships* was the location of the individuals responsible for the misstatements to investors. As the Eleventh Circuit explained, while in *Morrison* the financial irregularities occurred in the United States, "all of the executives bearing responsibility to present accurate information to the investing public" were in Australia. *Id.* at 1316. In *CP Ships*, by contrast, "the executives with responsibility for ensuring the accuracy of the accounting data operated from Florida". *Id.* Consequently, unlike in *Morrison*, there was "no lengthy chain of causation between the American contribution to the misstatements and the harm to investors". *Id.* "Rather, the causation [in *CP Ships*] was direct and immediate." *Id.*

By contrast, conduct that is merely preparatory to the alleged fraud does not satisfy the conduct test. In *Bersch*, the Second Circuit held that the Exchange Act did not apply extraterritorially even though (1) investment banks that underwrote the offering were headquartered in the United States; (2) the underwriters met numerous times in New York to structure the offering; (3) the underwriters retained auditors in New York and received a report from them in New York; (4) the proceeds of the offering were deposited in New York before being distributed to the Canadian mutual fund; and (5) parts of the prospectus were drafted in New York and then read over the telephone to personnel in Switzerland. 519 F.2d at 978-80, 985 n.24 (cited with approval in *CP Ships*, 578 F.3d at 1313). These activities were merely preparatory to the act to which liability attached—the dissemination of the prospectus—and therefore the Exchange Act did not reach the claim. *Bersch*, 519 F.2d at 985 n.24, 987-88. As

9

Judge Friendly explained, "[t]he fraud, if there was one, was committed by placing the allegedly false and misleading prospectus in the purchasers' hands", not in the activities preparatory thereto.  *Id.* at 987.

> **B.**     **Plaintiffs Do Not Allege That the Alleged Misstatements to the Funds' Investors Were Made in the United States.**

Plaintiffs do not allege that the Explanatory Memoranda, annual audited financial statements, periodic account statements, or any other materials provided to investors relating to the Funds, were prepared or issued in the United States.  Plaintiffs' Section 10(b) claim against OIS and the Director Defendants (Count 32) is based solely on alleged misrepresentations in the Explanatory Memoranda.  (*See* Compl. ¶¶ 642-656.)  The Section 10(b) claim against PwC Ireland (Count 34) is based solely on alleged misrepresentations in the 2003 to 2007 audit reports on Optimal SUS's financial statements.  (*See id.* ¶¶ 667-668.)  The Section 10(b) claim against HSSI (Count 36) is based solely on alleged misrepresentations in the monthly account statements and the Explanatory Memoranda (*see id.* ¶¶ 678-680), and the Section 10(b) claim against HTIE (Count 37) is based solely on alleged misrepresentations in the Explanatory Memoranda (*see id.* ¶¶ 685-686).  The Section 10(b) claims are based on public statements that, Plaintiffs allege, misstated the Funds' investment strategy, OIS's due diligence and the risks associated with Optimal SUS (*see id.* ¶¶ 642-656), PwC Ireland's audits and opinions on Optimal SUS's financial statements (*see id.* ¶¶ 667-668), Optimal SUS investors' account balances and the nature of the services provided by HSSI and HTIE (*see id.* ¶¶ 667-668, 678-680).

The Explanatory Memorandum and financial statements describe Bahamian and Irish investment companies with non-U.S. board members, a Swiss investment advisor, and an Irish administrator, custodian and auditor.  (*See, e.g.*, Compl. Exs. 12, 27.)  Just as in *Morrison*, the "heart" of the alleged fraudulent conduct was the preparation of those statements, not the underlying fraud by Bernard Madoff and Bernard L. Madoff Investment Securities LLC ("BMIS", and collectively with Bernard Madoff, "Madoff") in New York.  Unlike in *CP Ships*,

10

where the individual allegedly responsible for the misrepresentations was based in Florida, here those responsible for the statements were in The Bahamas, Switzerland and Ireland.  For purposes of Exchange Act jurisdiction, it is immaterial that the United States is where Madoff committed the underlying Ponzi scheme.  Madoff made no representations to investors in the Funds, and the chain of causation between information that Madoff supplied to Defendants and the representations to investors was indirect and attenuated.  *See CP Ships*, 578 F.3d at 1316.

Moreover, "making fraudulent statements about what is happening in the United States does not make those statements 'United States conduct' for purposes of the conduct test".  *Tri-Star Farms Ltd. v. Marconi, PLC*, 225 F. Supp. 2d 567, 578 (W.D. Pa. 2002); *accord In re Bayer AG Sec. Litig.*, 423 F. Supp. 2d 105, 113 (S.D.N.Y. 2005).  The conduct test depends on where the alleged misrepresentations were prepared and made, without regard to whether those misrepresentations were *about* U.S.-based conduct.  *See, e.g.*, *Morrison*, 547 F.3d at 176 (no jurisdiction where representations concerned results of U.S. subsidiary); *Butte Mining PLC v. Smith*, 76 F.3d 287, 291 (9th Cir. 1991) (no jurisdiction where representations concerned land transaction in Montana).  Thus, for example, alleged misrepresentations made and prepared by OIS outside the United States regarding OIS's due diligence of Madoff in the United States, and alleged misrepresentations made and prepared by PwC Ireland outside the United States based allegedly on PwC U.S. and PwC Bermuda's interviews with Madoff, do not satisfy the conduct test.

The allegations in the Complaint do not satisfy the conduct test with respect to the alleged misrepresentations by any of the Section 10(b) Defendants.  We examine each of Plaintiffs' allegations in turn.

OIS.  Plaintiffs allege that they satisfy the conduct test with respect to OIS because OIS had offices in New York (Compl. ¶ 309); four research analysts who conducted due diligence on Optimal SUS were based in the New York office (*id.* ¶¶ 310, 312); Madoff at times sent trade confirmations to the OIS office in New York (*id.* ¶ 311); OIS's "day-to-day supervision" of the Funds supposedly occurred in New York (*id.* ¶ 318); and OIS employees met

several times a year with Madoff in New York (*id.* ¶¶ 314-317, 319).  None of these alleged actions constitutes the making of the alleged misstatements in the Explanatory Memoranda that form the basis for the Section 10(b) and Rule 10b-5(b) claim against OIS.[8]  Again, what matters is not where the due diligence was performed, but where the representations to investors about due diligence were made.  The four individuals based in OIS's New York office (*see id.* ¶ 312) are not alleged to have had anything to do with preparing any of the Explanatory Memoranda. None of those individuals' names appear therein.  (*See* Compl. Exs. 7-13.)

        BSI.  Next, Plaintiffs allege conduct by BSI in the United States:  that BSI mailed account statements and explanatory memoranda from its Miami offices to certain of the Funds' investors (*see* Compl. ¶¶ 322-323, 329-331); and that BSI employees in Miami and New York sold shares in the Funds to certain investors in Latin America (*see id.* ¶¶ 332-334).  As an initial matter, these allegations regarding BSI's conduct are irrelevant because Plaintiffs do not bring a Section 10(b) claim against BSI, and do not allege any misrepresentation made by BSI. Moreover, as the Second Circuit explained in *Berger*, the conduct test does not turn on the location from which statements are mailed.  322 F.3d at 195.  Rather, courts look at where the substance of the statements is prepared, and who directs the mailing and dissemination of misleading statements.  *Id.*  Plaintiffs make no allegations about how these alleged BSI actions relate to alleged misrepresentations by *any* Defendant.

        Director Defendants.  With respect to the Director Defendants, Plaintiffs allege that Echeverría met several times a year with Madoff in New York (*id.* ¶¶ 314, 316-317) and that Madoff's conduct should be imputed to Echeverría, Inder Rieden and Wilkinson because Madoff supposedly acted as the agent and attorney-in-fact of the Fund (*id.* ¶ 368).  But Plaintiffs nowhere allege any false and misleading statement made by Madoff as the basis for their claims against these Defendants.  Thus, Madoff's conduct is irrelevant to the conduct test for Exchange

_____

        [8] Moreover, the Explanatory Memoranda were not even authored by OIS, but instead by Multiadvisors Bahamas and Multiadvisors Ireland, Bahamian and Irish companies that are not defendants in this action.  (*See* Compl. ¶¶ 56, 58.)

Act jurisdiction.  Moreover, Madoff was "agent and attorney-in-fact of Optimal SUS" for a limited purpose ("in connection with its sale of securities to Optimal SUS and the purchase of securities from Optimal SUS") (*see id.* ¶¶ 175, 183(g), 186(g), 187(e)), which has nothing to do with representations to Optimal SUS investors.[9]  Echeverría's meetings in New York with Madoff similarly fail to satisfy the conduct test, because the Section 10(b) claim against Echeverría is concerned with alleged misstatements, not with whether Echeverría conducted adequate due diligence of Madoff.

        PwC Ireland.  Plaintiffs allege that, in connection with its annual audits in Ireland of Optimal SUS's financial statements, PwC Ireland received each year a written confirmation from Madoff with the year-end brokerage account statements (*see id.* ¶ 343(d)) and received several other documents about Madoff, including reports from Madoff's auditor (Friehling & Horowitz) and reports from FINRA (the successor to the NASD) about Madoff (*see id.* ¶ 343(g)).  Plaintiffs allege further that over the years PwC Ireland had "a number of e-mail and telephonic communications" with individuals from OIS and PwC U.S. in New York.  (*See id.* ¶ 343(e)-(f).)  But conduct by PwC Ireland personnel in Ireland cannot possibly constitute jurisdictionally sufficient conduct in the United States.  Moreover, none of this alleged conduct constitutes the making of false and misleading statements that is the basis of Plaintiffs' Section 10(b) claim against PwC Ireland.  As is clear from the Complaint and its exhibits, the Explanatory Memoranda for the period when PwC Ireland was Optimal SUS's auditor identified PricewaterhouseCoopers in Dublin, Ireland (*id.* ¶ 178; Compl. Ex. 10, at 1), and PwC Ireland signed its audit reports, "PricewaterhouseCoopers, Dublin" (Compl. ¶ 202; Ex. 27, at 3).  Thus, the statements by PwC Ireland on which Plaintiffs base their Section 10(b) claim (*see* Compl. ¶ 667) were prepared in Ireland and issued from Ireland.

---

[9] Even if Madoff's conduct were relevant, no legally cognizable agency relationship existed between the Director Defendants and Madoff—as opposed to Optimal SUS and Madoff—which could serve to impute Madoff's conduct to the Director Defendants.  *Green v. McCall*, 710 F.2d 29, 33-34 (2d Cir. 1983).

      <u>PwC U.S. and PwC Bermuda.</u>  Plaintiffs also allege that PwC U.S. and PwC Bermuda met with Madoff in New York in December 2004 and December 2006, and that PwC Ireland supposedly "based its audit report" on those meetings.  (Compl. ¶¶ 342, 343(a)-(b), 344.) The conduct of these other PwC firms is irrelevant as Plaintiffs do not allege that either firm made any representations to Optimal SUS investors, and do not bring a Section 10(b) claim against either firm.  Indeed, even if (as Plaintiffs contend) this U.S.-based conduct by other PwC firms could be imputed to PwC Ireland,[10] such conduct was "merely preparatory" to the reports that PwC Ireland ultimately rendered, following the completion of its audit procedures, in Ireland.  *See CP Ships*, 578 F.3d at 1313.  This is also a classic instance of U.S.-based conduct that has only an indirect effect on alleged misrepresentations prepared outside the United States. *See Bersch*, 519 F.2d at 987; *cf. Morrison*, 547 F.3d at 174 ("The critical factor [in *Berger*] was that the conduct that directly caused loss to investors—the creation of the fraudulent statements—occurred in New York.").  The connection between the alleged conduct of PwC U.S. and PwC Bermuda and the later audit opinion made by PwC Ireland is too attenuated to confer jurisdiction for Exchange Act claims.

      <u>HSSI and HTIE.</u>  As for the two HSBC Defendants, Plaintiffs allege that HSSI received trade confirmations from Madoff in New York (Compl. ¶¶ 269-271, 371); that both HSSI and HTIE had unspecified interactions with Madoff in New York as part of their duties as Optimal SUS's administrator and custodian, respectively (*id.* ¶¶ 370-371); and that an affiliated HSBC company (HSBC Bank USA, Inc.) accepted certain U.S. dollar investments in Optimal SUS (*id.* ¶¶ 372-374).  There is no allegation, however, that either HSSI or HTIE engaged in any conduct in the United States, let alone that they prepared or issued any statements in the United States.  Nor do Plaintiffs show any connection between this alleged conduct by the HSBC

---

[10] In Part I.B.2 of its separate Memorandum of Law in Support of PwC Ireland's Motion To Dismiss, PwC Ireland demonstrates that Plaintiffs have not pleaded facts that would constitute an agency relationship between PwC Ireland as principal and PwC U.S. and PwC Bermuda as agents.

Defendants and the alleged misrepresentations in the Explanatory Memoranda (*see id.* ¶¶ 679, 685).  Finally, any effect of U.S.-based conduct on the alleged misrepresentation in the NAV calculations and account balances prepared by HSSI in Ireland (*see id.* ¶ 678) is indirect and attenuated, as Plaintiffs themselves allege that HSSI had "responsibility for the administration of the Fund including the calculation of the Net Asset Value [and] preparation of the accounts" (*id.* ¶ 265; Compl. Ex. 13, at 12).

## II.  THE ALLEGED WRONGFUL CONDUCT HAD NO EFFECT IN THE UNITED STATES OR ON UNITED STATES RESIDENTS.

Plaintiffs' claim also fails the effects test, which looks to whether the alleged wrongful conduct "had a substantial effect on the United States or upon United States citizens". *Morrison*, 547 F.3d at 171.  The effect in the United States must also be foreseeable at the time of the transaction in question.  *See Tamari v. Bache & Co. (Leb.) S.A.L.*, 730 F.2d 1103, 1106 n.6, 1108 (7th Cir. 1984); *Cont'l. Grain*, 592 F.2d at 416.  Thus, where American investors owned less than 1% of shares in a foreign investment, "the shares of which apparently were not intended to be offered to American residents or citizens", the effect on the United States was too insubstantial to meet the effects test.  *IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975).

Here, Plaintiffs do not allege that any of the shareholders in the Funds were residents of the United States.  The named plaintiffs are all individuals or companies located outside the United States—in Chile, the British Virgin Islands, Mexico, Argentina and Spain. (Compl. ¶¶ 35-41.)[11]  It is also evident on the face of the Complaint that none of the shareholders were permitted to be U.S. citizens or residents at the time of investment.  The Explanatory Memorandum for Multiadvisors Bahamas declares, "The sale or transfer of Participating Shares directly or indirectly in the United States or to 'United States Persons' is prohibited."  (*See, e.g.*, Compl. Ex. 12, at 16; *see also id.* at 3; Ex. 7, at 5.)  The term "United States Person" is then defined in block letters to include "A CITIZEN OR RESIDENT OF THE UNITED STATES OR

---

[11] Only the residents of Chile, the British Virgin Islands and Mexico are plaintiffs on the Exchange Act claims.  (*See* Compl. ¶ 39.)

ITS TERRITORIES OR POSSESSIONS" and "ANY CORPORATION OR OTHER ENTITY ORGANIZED UNDER THE LAWS OF OR EXISTING IN THE UNITED STATES OR ITS TERRITORIES OR POSSESSIONS". (Compl. Ex. 12, at 16; *see also* Ex. 7, at 10.)  As the Fifth Circuit has held, where "no American individual or corporate entity can be said to have invested in the [securities] offering [at issue], the … 'effects' test is not applicable". *MCG, Inc. v. Great W. Energy Corp.*, 896 F.2d 170, 174 (5th Cir. 1990).

Nor did anyone purchase shares of the Funds on a U.S. exchange. *Cf. CP Ships*, 578 F.3d at 1313 & n.7 (holding that the "conduct" test was met with respect to purchasers on the Toronto Stock Exchange, and therefore not reaching the "effects" test with respect to purchasers on the New York Stock Exchange).  Shares of the Funds were purchased privately, and were not listed on any exchange anywhere in the world.  The Explanatory Memorandum for Multiadvisors Bahamas states, "[t]here is no public market for the Participating Shares." (*See, e.g.*, Compl. Ex. 12, at 2.)  Thus, there was no effect on securities markets in the United States.

Plaintiffs try to avoid the lack of any effect on the United States by pointing to indirect effects of Madoff's Ponzi scheme on U.S. citizens by virtue of tax revenue lost to the U.S. government, losses suffered by U.S. charities, insurance companies and banks, and losses by U.S. residents who placed their money with Madoff directly or through funds other than the Funds. (*See* Compl. ¶¶ 346-350.)  These sorts of indirect and general effects fail the effects test, which is met only when foreign acts "result in injury to purchasers or sellers of those securities in whom the United States has an interest, not where acts simply have an adverse [e]ffect on the American economy or American investors generally". *Bersch*, 519 F.2d at 989 (footnote omitted); *see also North South Fin. Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996) ("remote and indirect effects in the United States do not qualify as substantial").  Thus, Plaintiffs confuse Madoff's Ponzi scheme with the subject of the Section 10(b) claims in this case, namely Defendants' alleged misrepresentations to the Funds' investors.  The effects in the United States of Madoff's Ponzi scheme are well known, but irrelevant for jurisdiction over these Section

16

10(b) claims.  Plaintiffs identify no direct effects in the United States (because they cannot) from Defendants' alleged misrepresentations to the Funds' investors.

Losses in other securities—such as shares in other so-called "feeder funds" that placed money with Madoff (*see* Compl. ¶ 348)—cannot confer jurisdiction over claims based on purchasers of the Funds.  The "substantial adverse effects on United States investors in or American markets [must be] for the *securities at issue*, relating to the foreign securities transactions challenged by the foreign claimants".  *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 346, 368 (S.D.N.Y. 2005) (emphasis added).  Indeed, foreign plaintiffs who purchased securities abroad may not establish jurisdiction by relying on "independent American losses" by other investors in the very same securities.  *Tri-Star Farms*, 225 F. Supp. at 573 n.7; *see also Bayer AG*, 423 F. Supp. 2d at 114-15; *McNamara v. Bre-X Minerals Ltd.*, 32 F. Supp. 2d 920, 924 (E.D. Tex. 1999); *Kaufman v. Campeau Corp.*, 744 F. Supp. 808, 810 (S.D. Ohio 1990).  Accordingly, Plaintiffs here cannot rely on independent American losses by investors in different securities also affected by Madoff's Ponzi scheme.

Because Plaintiffs' allegations fail both the conduct and effects tests, the Exchange Act does not apply extraterritorially to their claim.

17

## CONCLUSION

For the foregoing reasons and those reasons set forth in their separate Memoranda of Law in support of their other Motions To Dismiss, Defendants OIS, Echeverría, Inder Rieden, Wilkinson, Banco Santander, S.A. and PwC Ireland respectfully request that the Court dismiss Plaintiffs' claims against them under Section 10(b) of the Exchange Act (Counts 32 and and 34) and Section 20(a) of the Exchange Act (Count 33) with prejudice.

November 18, 2009                                  Respectfully submitted,


                                                   By:  /s/   Harry R. Schafer ____

Richard H. Critchlow (Bar No. 155227)      Samuel A. Danon (Bar No. 892671)
Harry R. Schafer (Bar No. 508667)          Gustavo J. Membiela (Bar No. 0513555)
**KENNY NACHWALTER, P.A.**                 **HUNTON & WILLIAMS LLP**
Miami Center – Suite 1100                  Mellon Financial Center
201 South Biscayne Boulevard               1111 Brickell Avenue, Suite 2500
Miami, Florida 33131                       Miami, Florida 33131
Telephone: (305) 373-1000                  Telephone: (305) 810-2500
Facsimile:  (305) 372-1861                 Facsimile:  (305) 810-2460
rhc@kennynachwalter.com                    sdanon@hunton.com
hrs@kennynachwalter.com                    gmembiela@hunton.com

                                           *Attorneys for Banco Santander, S.A., Banco*
                                           *Santander International, Optimal Investment*
Thomas G. Rafferty (*Admitted Pro Hac Vice*)   *Services S.A., Manuel Echeverría Falla,*
Antony L. Ryan (*Admitted Pro Hac Vice*)   *Anthony L.M. Inder Rieden, and Brian*
**CRAVATH, SWAINE & MOORE LLP**            *Wilkinson*
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Telephone: (212) 474-1000
Facsimile:  (212) 474-3700
trafferty@cravath.com
aryan@cravath.com

*Attorneys for Defendant*
*PricewaterhouseCoopers Ireland*

18

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2009, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing

document is being served this day on counsel of record via transmission of Notices of

Electronic Filing generated by CM/ECF.

By: /s/ Harry R. Schafer _____

<u>Service List</u>

*IN RE BANCO SANTANDER SECURITIES-OPTIMAL LITIGATION*
*CASE NO.: 09-20215-CIV-HUCK/O'SULLIVAN*

<u>Counsel for Plaintiffs</u>

Michael Hanzman
ACKERMAN, LINK & SARTORY, P.A.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
(305) 529-9100 (telephone)
(305) 529-1612 (facsimile)
mhanzman@alslaw.com

Joel H. Bernstein
Javier Bleichmar
Donald P. Delaney
Alan I. Ellman
Christopher J. Keller
LABATON SUCHAROW LLP
140 Broadway
New York, NY 10005
(212) 907-0700 (telephone)
(212) 818-0477 (facsimile)
jbernstein@labaton.com
jbleichmar@labaton.com
ddelaney@labaton.com
aellman@labaton.com
ckeller@labaton.com

Stephen R. Astley
Paul Jeffrey Geller
Michael L. Greenwald
Jack Reise
Douglas S. Wilens
COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000 (telephone)
(561) 750-3364 (facsimile)
sastley@csgrr.com
pgeller@csgrr.com
mgreenwald@csgrr.com
jreise@csgrr.com
dwilens@csgrr.com

Michael F. Ghozland
James I. Jaconette
Julie A. Kearns
COUGHLIN STOIA GELLER RUDMAN
& ROBBINS LLP
655 W. Broadway, Suite 1900
San Diego, CA 92101
(619) 231-1058 (telephone)
(619) 231-7423 (facsimile)
mghozland@csgrr.com
jamesj@csgrr.com
jkearns@csgrr.com

Stephen L. Brodsky
Ana Maria Cabassa
David R. Kromm
Robert S. Schachter
Hillary Sobel
Jeffrey C. Zwerling
ZWERLING, SCHACHTER & ZWERLING, LLP
41 Madison Avenue
New York, NY 10010
(212) 223-3900 (telephone)
(212) 371-5969 (facsimile)
sbrodsky@zsz.com
acabassa@zsz.com
dkromm@zsz.com
rschachter@zsz.com
hsobel@zsz.com
jzwerling@zsz.com

Michael Elliot Criden
Kevin Bruce Love
CRIDEN & LOVE, P.A.
7301 S.W. 57th Court, Suite 515
South Miami, FL 33143
(305) 357-9010 (telephone)
(305) 357-9050 (facsimile)
mcriden@cridenlove.com
klove@cridenlove.com

Daniel P. Chiplock
Steven E. Fineman

David S. Stellings
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
250 Hudson Street, 8th Floor
New York, NY 10013
(212) 355-9500 (telephone)
(212) 355-9592 (facsimile)
dchiplock@lchb.com
sfineman@lchb.com
dstellings@lchb.com

Richard M. Heimann
LIEFF CABRASER HEIMANN & BERNSTEIN,
LLP
25 Battery Street, 30th Floor
San Francisco, CA 94111
(415) 956-1000 (telephone)
(415) 956-1008 (facsimile)
rheimann@lchb.com

**Counsel for Defendants HSBC Securities
Services (Ireland) Limited and HSBC
Institutional Trust Services (Ireland)
Limited**

Jason D. Joffe
Traci H. Rollins
SQUIRE, SANDERS & DEMPSEY LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, FL 33401
(561) 650-7200 (telephone)
(561) 655-1509 (facsimile)
jjoffe@ssd.com
trollins@ssd.com

Evan A. Davis
Joaquin P. Terceno
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000 (telephone)
(212) 225-3999 (facsimile)
edavis@cgsh.com
jterceno@cgsh.com

**Counsel for Defendant
PricewaterhouseCoopers International,
Ltd.**

Benjamine Reid
CARLTON FIELDS, P.A.
100 Southeast Second Street, Suite 4000
Miami, FL 33131
(305) 530-0050 (telephone)
(305) 530-0055 (facsimile)
breid@carltonfields.com

Samuel J. Salario
CARLTON FIELDS, P.A.
Corporate Center Three at International
Plaza
4221 West Boy Scout Blvd., Suite 1000
Tampa, FL 33607
(813) 223-7000 (telephone)
(813) 229-4133 (facsimile)
ssalario@carltonfields.com

**Counsel for Defendant
PricewaterhouseCoopers,
a Bermuda Partnership**

Laura Besvinick
HOGAN & HARTSON LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1900
Miami, FL 33131
(305) 459-6500 (telephone)
(305) 459-6550 (facsimile)
lbesvinick@hhlaw.com

Sanford M. Litvack
Dennis H. Tracey, III
HOGAN & HARTSON LLP
875 Third Ave.
New York, NY 10022
(212) 918-3000 (telephone)
(212) 918-3100 (facsimile)
slitvack@hhlaw.com
dhtracey@hhlaw.com

**Counsel for Defendant
PricewaterhouseCoopers LLP**

Melissa Fernandez-Stiers
Manuel A. Garcia-Linares
Alan G. Greer
RICHMAN GREER, P.A.
Miami Center, Suite 1000
201 South Biscayne Boulevard
Miami, FL 33131
(305) 373-4000 (telephone)
(305) 373-4099 (facsimile)
mfernandez@richmangreer.com
mlinares@richmangreer.com
agreer@richmangreer.com

Michael P. Carroll
Michael S. Flynn
James W. Haldin
James H. R. Windels
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
(212) 450-4000 (telephone)
(212) 701-5800 (facsimile)
michael.carroll@davispolk.com
michael.flynn@davispolk.com
james.haldin@davispolk.com
james.windels@davispolk.com