**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 09-MD-02073-CIV-HUCK/O'SULLIVAN**
**09-CV-20215-CIV-HUCK/O'SULLIVAN**

IN RE BANCO SANTANDER
SECURITIES–OPTIMAL
LITIGATION
_____/

**ORDER GRANTING MOTIONS TO DISMISS FOR LACK OF PERSONAL**
**JURISDICTION AND DISMISSING CASE FOR *FORUM NON CONVENIENS***

      This case, arising out of foreign investors' purchases of securities in off-shore investment funds closed to American investors, is before the Court on ten motions to dismiss by various Defendants.  The Court has reviewed and considered the motions and associated briefing, the pertinent portions of the record, heard the argument of counsel on July 8, 2010, and is otherwise duly advised.  For the reasons set forth below, the Court grants six Defendants' motions to dismiss for lack of personal jurisdiction.  The Court also finds that this case should be dismissed under the doctrine of *forum non conveniens* because Ireland is a more convenient forum to try this case.

**I.**      **Introduction**

      This hydra-like litigation, in which the main actors are non-United States citizens litigating over non-United States securities, involves numerous interdependent issues of civil procedure, federal subject matter jurisdiction, personal jurisdiction, and conflicts of law.

      Six Plaintiffs (two British Virgin Islands corporations, a Chilean company, and individuals residing in Mexico, Argentina, and Spain) filed a consolidated class action complaint against various banks and financial services institutions.  The Plaintiffs invested in Bahamian investment funds, which in turn invested with a firm run by Bernard L. Madoff.  As is now well known, Madoff did not actually invest the Bahamian funds' money because he was running a Ponzi scheme.[1]  After the Bahamian funds lost their money in Madoff's scheme, these Plaintiffs and others filed lawsuits against various

_____

[1]      Madoff is currently serving a 150-year prison term after pleading guilty to numerous federal crimes in 2009.

defendants.[2]  None of the plaintiffs in the potential class are citizens or residents of the United States.  In fact, citizens and residents of the United States were not permitted to invest in the funds at issue.

The thrust of the complaint is that the Defendants, who are financial services institutions connected in some way with the Bahamian funds, failed to perform adequate due diligence on Madoff's transactions with the funds or otherwise breached their duties to the Plaintiffs by ignoring obvious red flags that should have raised alarm about Madoff's activities.  The Defendants, twelve in all from seven different countries (Spain, the Bahamas, Bermuda, Ireland, the United Kingdom, the United States, and Switzerland), are variously sued for securities fraud under federal securities law, breach of contract, breach of fiduciary duty, negligence, and other common law torts.  Only two of the twelve defendants are American citizens.  One of them is Banco Santander International (Banco Miami), located in Miami.  Banco Miami is an Edge Act corporation and a subsidiary of Defendant Banco Santander, S.A., a major Spanish bank.  The other is PricewaterhouseCoopers (PWC) LLP, a New York-based auditing firm with offices throughout the Untied States.  As reflected in the allegations in the complaint, these domestic Defendants had only a tangential connection to the relevant transactions in this lawsuit, which primarily concern the diligence (or lack thereof) conducted in connection with the Bahamian funds.

In addition to arguing that the Plaintiffs' allegations fail to state a cause of action, the Defendants argue that this case should be dismissed in whole or in part because of forum selection clauses, lack of subject matter jurisdiction, lack of personal jurisdiction, and *forum non conveniens*.  The Defendants contend that it would be far more convenient to try this case in Ireland because more parties and witnesses are located there than any other country, most of the other relevant parties and witnesses are located in Europe, only two (minor) parties are located in the United States, and it makes little sense for a United States court to try an action where choice of law rules dictate that foreign law will supply

---

[2]     Two lawsuits were filed in this federal judicial district and one was filed in the United States District Court for the Southern District of New York.  The three cases pending before the undersigned district judge were consolidated in the amended class action complaint.

the rules of decision for the Plaintiffs' common law claims.[3]   In addition, all the Defendants have consented to personal jurisdiction in Ireland while half of the Defendants challenge the personal jurisdiction of this Court.  The Plaintiffs claim that the United States is a more convenient forum for trying this case because Madoff, the center of the fraud, was located in New York, Madoff's documents and relevant witnesses are located in the United States, the United States has an interest in applying its securities laws to this transaction, and choice of law rules dictate that New York law governs the Plaintiffs' common law claims.

Because the jurisdictional and choice of law limitations incumbent upon this Court are designed to ensure that federal courts do not exercise jurisdiction or apply local law to defendants and controversies with little connection to this forum, the Plaintiffs have encountered a great deal of difficulty fitting their claims within established frameworks for applying federal securities law, exercising personal jurisdiction, and applying local law.  For example, despite the Supreme Court's recent holding that the Securities and Exchange Act lacks language sufficient to override the judicial presumption against extraterritorial application of a federal statute, the Plaintiffs rely on a strained reading of both that holding and other Supreme Court precedents in arguing that fraud in connection with foreign investors' purchases in a Bahamian fund is nonetheless actionable under federal securities law.

Similarly, the Plaintiffs' personal jurisdiction allegations against many of the Defendants are not based on the Defendants' own contacts but on those of other corporations or individuals.  Because the record indicates that half of the Defendants lack jurisdictionally sufficient contacts with the United States, Plaintiffs essentially ask the Court to ignore the corporate form and, without establishing a legal basis for doing so, impute to these Defendants the contacts of other entities and Defendants.  Plaintiffs further claim that the Defendants are attempting to play a "corporate shell game," which justifies the imputation of others' contacts to the various Defendants for personal jurisdiction purposes.  The Supreme Court, however, has described the legal distinction

---

[3]        Which, as the Court will explain below in Part III, are the only viable claims remaining in this action because the Supreme Court recently held that federal securities fraud claims do not reach the type of extraterritorial transactions that are the subject of this case.

between a corporation and its shareholders as "[a] basic tenet of American corporate law." *Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003); *see also First Nat'l City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 625 (1983) ("Separate legal personality has been described as 'an almost indispensable aspect of the public corporation.'").   The Plaintiffs fail to substantiate their jurisdictional claims with evidence of agency or alter ego relationships sufficient to impute the conduct of other persons or entities to the Defendants challenging personal jurisdiction.   The burden-shifting framework established by the Eleventh Circuit for evaluating motions to dismiss for personal jurisdiction requires the plaintiff to produce competent evidence in support of his jurisdictional claims once the defendant has rebutted the jurisdictional allegations in the complaint.   Plaintiffs have not produced such evidence.   Their failure to rebut, with some admissible evidence, the statements in the various Defendants' affidavits explaining how the Defendants acted as separate legal entities, fatally undermines the Plaintiffs' case for personal jurisdiction over half of the Defendants in this case.   Courts have found that the Defendants' remaining contacts, which consist mostly of telephonic, fax, and e-mail communications, or wire transfers through affiliate banks, do not, on their own, suffice to establish personal jurisdiction.

Since the Court lacks personal jurisdiction over half (and apparently some of the most important) of the Defendants in this action, including the Bahamian funds' auditor, custodian, administrator, and a director, it makes little sense to try an expensive and time-consuming case in Florida while another court, in a virtually duplicative proceeding over four thousand miles away, potentially adjudicates the same legal and factual issues.   The Plaintiffs do not agree that the inability to try this entire case in the United States weighs in favor of trying all claims together in another venue.   The Court, however, considers this a textbook example of a private convenience factor favoring *forum non conveniens* dismissal.

Choice of law considerations also favor trying this case in Ireland.   In their motions to dismiss, many of the Defendants argue that the Plaintiffs' claims are barred by Irish and Bahamian law, which, under applicable choice of law rules, appear to govern many of the Plaintiffs' claims.   The Court also notes the possibility that the laws of other nations, such as Switzerland or Spain, may also be applicable to some aspects of the

transactions at issue.  Even though the relevant transactions took place between foreign parties outside the United States, the Plaintiffs insist the New York common law—and not the law of any other jurisdiction—governs all of their common law claims.  Despite the fact that the Supreme Court has expressly declined to extend federal securities law to the claims at issue and the distinct possibility that other nations may have laws and regulations that govern the securities transactions here (not to mention the near certainty that foreign law governs most, if not all, of the Plaintiffs' common law claims), the Plaintiffs contend that a Florida court should apply federal securities law and New York common law in adjudicating claims between, for instance, a Spanish investor and a Spanish bank, a British Virgin Islands company and an Irish auditor, or a Mexican investor and a Swiss investment manager, none of whom contracted to perform any services for the Plaintiffs in the United States.

The Court finds that it is not appropriate to try to force a square peg (claims by foreign parties, governed by foreign law and concerning foreign securities) into a round hole (an American court).  Because Ireland offers an available and more convenient alternative for trying this case on the merits, it should be tried there.  As the Eleventh Circuit has explained, *forum non conveniens* is a favored and workable intellectual tool that, by "separating out for hearing only those cases where contacts with the American forum predominate," offers a reasonable solution to "vexing jurisdictional" and "complicated international choice of law questions increasingly presented to district courts."  *Sigalas v. Lido Maritime, Inc.*, 776 F.2d 1512, 1519 n.10 (11th Cir. 1985).

District courts have discretion to first address objections to personal and subject matter jurisdiction, or to first consider dismissal for *forum non conveniens*.  *See Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422 (2007).  Accordingly, the Court will adjudicate the motions to dismiss for personal jurisdiction because the Court's ability to exercise personal jurisdiction over all Defendants is an important private convenience factor in the *forum non conveniens* analysis.  Because the Court concludes that it lacks personal jurisdiction over six of the twelve Defendants, one or more lawsuits would have to be filed in other countries to adjudicate all the claims that the Plaintiffs assert.  Since Ireland can conduct a single trial with personal jurisdiction over all Defendants, it is a far more convenient forum to try the Plaintiffs' claims.  Additionally,

under applicable choice of law rules, United States common law will apply to few, if any, of the Plaintiffs' claims.  If this case were tried in Ireland, however, Irish courts would apply Irish law to many or most of the claims at issue.  An Irish court is also better equipped to apply the local laws of other European nations.  And the lack of a jury system in Ireland will avoid the unnecessary confusion and squandering of judicial resources that would ensue in instructing a jury on Bahamian, Irish, or other applicable law before it adjudicated claims of Latin American, Caribbean, and European investors against mostly European institutions and individuals.

To better understand the nature of this litigation and the complexity of the issues raised in the various motions, the Court will now introduce the key players and provide additional background.

## II.    Background

The six named Plaintiffs in this action are Inversiones Mar Octava Limitada, International Harvester Limited, San Javier International Limited, Juan Gonzalo Perez Valdez, Marcelo Guillermo Testa, and Antonio Atencia Puado.  They are, respectively, a Chilean company, two British Virgin Islands corporations, and individuals from Mexico, Argentina, and Spain.  Mar Octava, San Javier, and Valdez invested their money through Defendant Banco Miami in two Bahamian investment funds, Optimal SUS and Optimal Arbitrage,[4] which, through an Irish custodian, Defendant HSBC Trust Services, invested with Madoff's firm.  Harvester and Puado invested in the Optimal funds through Banco Santander Suisse, S.A. (Banco Switzerland), and Testa invested through Santander Bank & Trust, Ltd. (Bahamas).  Neither of these two Banco Santander entities are defendants in this action because of forum selection clauses requiring that claims against them be brought in Switzerland and the Bahamas respectively.  Defendant Banco Santander, S.A. (Banco Spain), is the parent company of Banco Switzerland and Defendant Banco Miami, as well as Defendant Optimal Investment Services, a Swiss investment management company and the Optimal funds' investment manager.

---

[4]    These two funds are sub-funds of Optimal Multiadvisors, Ltd., which was incorporated as an International Business Company under the laws of the Bahamas. Because distinguishing between these funds is not necessary to the outcome of this case, this Order refers to these funds, and to Irish funds available to European investors (all of which ultimately invested substantially with Madoff), as the "Optimal funds."

Other corporate Defendants include HSBC Securities Services, an Irish company that acted as the Optimal funds' administrator, and PWC Ireland, which audited one of the Optimal funds.  The Plaintiffs have also sued three individual directors of the Optimal funds: Manuel Echevarria Falla, a resident of Switzerland, who for a period was also the CEO and Chief Investment Officer of Optimal Investment Services; Brian Wilkinson, a citizen of the Bahamas who resides in Ireland; and Inder Rieden, a Dutch citizen who resides in the Bahamas.  Finally, the Plaintiffs sue PWC International, a U.K. auditing firm, PWC LLP, an auditing firm incorporated in New York with branch offices throughout the United States, and PWC Bermuda, a Bermudan auditing firm.  The complaint alleges that the various PWC entities operate as a unitary organization and that the member firms act as agents of PWC International.

The Plaintiffs have asserted securities fraud claims under Rule 10b-5, and control liability under Rule 20(a).  They have also asserted various common law claims, including breach of contract, negligence, and breach of fiduciary duty.  In summary, Plaintiffs allege that all Defendants ignored "obvious red flags" in the course of their diligence, such as Madoff's failure to identify counterparties; Madoff's failure to verify the existence of government securities (United States Treasury obligations); Madoff's use of a small, unknown auditing firm; Madoff's failure to provide sufficient information to allow others to conduct reasonable due diligence; and Madoff's consistent reporting of unattainable returns.  The complaint contains a more detailed account of specific instances of alleged malfeasance in connection with the Defendants' diligence activities, but it is not necessary to repeat these allegations here because the Court will not adjudicate the Plaintiffs' claims on the merits.

Six Defendants challenge the Court's personal jurisdiction: the two HSBC Defendants, PWC Ireland, PWC Bermuda, Rieden, and Wilkinson.

Many of the Defendants contest the Plaintiffs' standing to bring suit against them.  The Defendants argue that the Plaintiffs' claims are derivative of their status as shareholders in the Optimal funds and the claims properly belong to the funds themselves, not the Plaintiffs.  The Defendants also contest whether they owe a duty to the Plaintiffs under applicable common law tort standards.  Of course, the various Defendants' duty of care, and the consequent level of diligence each should be charged

7

with, are disputed issues in this case that the Court would address if it reached the merits of Defendants' motions to dismiss for failure to state a claim. But the Court will not address these issues, as they go to the merits of the Plaintiffs claims and, having concluded that Ireland is a more convenient forum to try this case, the Court will defer to the Irish court to adjudicate these dispositive legal questions. On the other hand, because the existence of federal securities claims is relevant to the *forum non conveniens* analysis, the Court will decide whether the Plaintiffs can assert federal securities fraud claims.

### III.  Foreign Securities Fraud Claims after *Morrison v. National Australia Bank*

On June 24, 2010, the Supreme Court decided *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010). *Morrison* meaningfully altered the face of this case by retiring the "effects" and "conduct" tests adopted by various circuits in determining the extraterritorial reach of federal securities fraud claims.[5] Prior to *Morrison*, there was a circuit split regarding the level of domestic conduct necessary to establish subject matter jurisdiction for federal securities fraud claims brought by foreign investors in foreign stock. The Second, Fifth, and Seventh Circuits adopted a restrictive approach, requiring that the domestic conduct be material to the fraud's success, while the Third, Eighth, and Ninth Circuits adopted a more lenient standard that required only some "significant" domestic conduct. *Compare, e.g., Kauthar SDN BHD v. Sternberg*, 149 F.3d 659, 667 (7th Cir. 1998) *with Continental Grain (Australia) Pty., Ltd. v. Pacific Oilseeds, Inc.*, 592 F.2d 409, 421 (8th Cir. 1979). The D.C. Circuit reluctantly adopted the Second Circuit's approach after expressing concern that the securities act was not intended to have any extraterritorial reach. *Zoelsch v. Arthur Andersen & Co.*, 824 F.2d 27, 32 (D.C. Cir. 1987).

*Morrison* found that the D.C. Circuit's concerns were justified and, applying the judicial presumption against the extraterritoriality of a federal statute, held that fraud in connection with the purchase of stock in an Australian bank by Australian investors was not actionable under Section 10(b) of the Securities Exchange Act of 1934. Adopting what it described as a "transactional test," *Morrison* held that "Section 10(b) [of the

---

[5]     The parties briefed the securities fraud claims under the "conduct" and "effects" tests, which both sides now agree are obsolete. At oral argument, the parties presented differing views of the impact of *Morrison* on the Plaintiffs' securities fraud claims.

Securities Act] reaches the use of a manipulative or deceptive device or contrivance only in connection with the purchase or sale of a security listed on an American stock exchange, and the purchase or sale of any other security in the United States." 130 S. Ct. at 2888. In this case, the Plaintiffs neither purchased shares on an American stock exchange, nor did they purchase shares in the United States. They made off-shore purchases in off-shore Bahamian investment funds closed to United States investors. The Plaintiffs' securities fraud claims therefore do not survive *Morrison*.

During oral argument, Plaintiffs argued that their claims satisfy *Morrison*'s transaction test because their purchase was made "in connection with" Madoff's investment fund. Plaintiffs reason that their purchase of the Optimal funds was for the purpose of ultimately investing with Madoff's firm, which purported to hold securities listed on American stock exchanges. Plaintiffs ask the Court to distinguish *Morrison* because the *Morrison* plaintiffs did not intend to ultimately own stocks listed on an American exchange. To justify their expansive view of the phrase "in connection with," Plaintiffs cite the Supreme Court's precedents in *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006), *SEC v. Zandford*, 535 U.S. 813 (2002), and *United States v. O'Hagan*, 521 U.S. 642 (1997).

A close reading of these cases, side by side with *Morrison*, indicates that the phrase "in connection with" refers generally to the fraud that is alleged, not the purchase or sale of securities. And to conclude otherwise, in our age of global finance, would undermine *Morrison*'s central holding by subjecting many foreign transactions to United States securities law. *Morrison* specifically cited *amicus* briefs filed by foreign nations and commercial associations and noted that the transactional test it adopted would prevent United States courts from interfering with foreign securities regulation. 130 S. Ct. at 2885-86. The funds at issue in this case are registered under the laws of the Bahamas, and the Plaintiffs purposefully went off-shore to invest. Adjudicating the Plaintiffs' securities fraud claims would therefore entail the type of interference with foreign securities regulation that *Morrison* sought to avoid.

Moreover, looking to the subjective intent of foreign investors to determine whether the securities act applies is clearly contrary to *Morrison*. The Supreme Court devoted substantial discussion to criticizing the unpredictability of the various approaches

previously employed by the courts of appeals.  130 S. Ct. at 2877-81.  Adopting the unpredictable and subjective criterion suggested by the Plaintiffs (i.e., a foreign investor's intent to ultimately own United States securities) would eliminate the doctrinal clarity that the Supreme Court provided in *Morrison*.  *Morrison* cannot be meaningfully distinguished from the facts of this case.

While the Court concludes that in light of *Morrison* United States securities law does not govern this case, it does not rule out the possibility that the securities laws and regulations of foreign countries may apply.  As the Court will explain below, international comity is an important public factor of the *forum non conveniens* analysis, and, in this case, deference to the securities laws of other nations weighs in favor of dismissal to Ireland.[6]

## IV.     Personal Jurisdiction

### A.      Overview of Personal Jurisdiction Analysis

Generally, a federal court "may properly exercise jurisdiction over a defendant only if two requirements are met: (1) the state long-arm statute, and (2) the Due Process Clause of the Fourteenth Amendment."  *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 (11th Cir. 1999).[7]  "A plaintiff seeking to obtain jurisdiction over a nonresident defendant

---

[6]      Significantly, *Morrison* also held that the issue of extraterritoriality is properly considered as a merits issue under Rule 12(b)(6), not a question of subject matter jurisdiction under Rule 12(b)(1).  This holding also impacts this case because, in the absence of federal securities claims, subject matter jurisdiction must now rest on minimal diversity under the Class Action Fairness Act, or the Edge Act.  *See* 28 U.S.C. § 1332(c)(1),(d)(2)(B), 12 U.S.C. § 632.  The Court's subject matter jurisdiction therefore depends on the presence of two defendants: (1) Banco Miami, an Edge Act Corporation headquartered in Miami, and (2) PWC LLP, headquartered in New York City.  If at a later stage in this litigation these defendants were dismissed from the case, subject matter jurisdiction would be lost over the remaining claims.  The possibility that, at a later stage of this litigation, the Court would be divested of subject matter jurisdiction is also a relevant convenience factor in the *forum non conveniens* calculus.

[7]      In certain narrowly defined circumstances a federal court can exercise personal jurisdiction under Federal Rule of Civil Procedure 4(k)(2).  Rule 4(k)(2) is an available basis for jurisdiction when (1) the plaintiff asserts causes of action arising under federal law, (2) no state court of general jurisdiction could exercise personal jurisdiction over the defendant, and (3) exercising personal jurisdiction based on the defendant's nationwide contacts is consistent with the Constitution's Due Process Clause.  Plaintiffs conceded during oral argument that if the Court concludes that their securities claims do

initially need only allege sufficient facts to make out a prima facie case of jurisdiction." *Posner*, 178 F.3d at 1214. Assuming that a plaintiff's jurisdictional allegations are sufficient, "the burden shifts to the defendant to make a prima facie showing of the inapplicability of the [long-arm] statute." *Polskie Linie Oceaniczne v. Seasafe Transport A/S*, 795 F.2d 968, 972 (11th Cir. 1986). "If the defendant sustains this burden, the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint." *Id.*; *see also Future Tech. Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000).

The Eleventh Circuit's burden-shifting framework is fatal to the Plaintiffs' claims. During oral argument, the Plaintiffs argued that their allegations are sufficient to establish personal jurisdiction. Because the agency relationships Plaintiffs allege for personal jurisdiction purposes have been rebutted by the Defendants' affidavits, the allegations are not sufficient to survive a motion to dismiss. Plaintiffs have not met their burden to produce competent evidence substantiating their agency allegations.

Plaintiffs contend that New York's long-arm statute confers personal jurisdiction over each of the six Defendants who challenge personal jurisdiction. The Court questions whether New York's, and not Florida's, long-arm statute is the relevant jurisdictional statute as the Plaintiffs contend. Nevertheless, because neither Florida's nor New York's long-arm statute confers personal jurisdiction over the Defendants who challenge it, the Court does not need to decide which long-arm statute properly applies to these Defendants.

**B.    Defendants Challenging Personal Jurisdiction**

### 1.    HSBC Defendants (HSBC Securities Services Ireland and HSBC Institutional Trust Services Ireland)

HSBC Securities served as the administrator, registrar, and transfer agent for the Optimal funds while HSBC Trust Services served as the funds' custodian. The custodian is charged with transferring funds between the clients' accounts and the broker-dealer (in this case Madoff) when clients subscribe or redeem their shares. The administrator's responsibilities include calculating the net asset value of the clients' shares and mailing

---

not survive *Morrison*, Rule 4(k)(2) cannot serve as an independent basis for personal jurisdiction.

periodic statements to the clients. Plaintiffs allege that the Ireland-based HSBC Defendants violated their administrative and custodial obligations in relation to the Optimal funds by failing to verify the pricing information supplied by Madoff when trade confirmation receipts reported prices that fell outside of the reported trading range during a given trading period.

Plaintiffs sue the HSBC Defendants for common law breach of fiduciary duty, negligence, gross negligence, unjust enrichment, and securities fraud under Rule 10b-5. Plaintiffs argue that personal jurisdiction exists over the HSBC Defendants based upon their contacts with Madoff's firm in New York, their physical presence in New York, and their use of an affiliate bank account in connection with their collection of fees in United States dollars.

### 2.     Brian Wilkinson & Inder Rieden

Brian Wilkinson and Inder Rieden were directors of Optimal Multiadvisors from 2002 and 1995 respectively. Wilkinson is a citizen of the Bahamas and a British subject but resides in Ireland. Reiden is a Dutch citizen who resides in the Bahamas. According to affidavits submitted by Rieden and Wilkinson, neither of them has ever resided, owned or leased real property, or maintained an office or place of business in the United States. Neither currently has a bank account in the United States.

Plaintiffs sue Wilkinson and Rieden for breach of contract, securities fraud, conversion, and breach of fiduciary duty. Plaintiffs alleged additional counts against Wilkinson for breach of fiduciary duty, negligence and gross negligence, unjust enrichment, imposition of a constructive trust, breach of contract, and a third party beneficiary breach of contract claim. Plaintiffs allege that Wilkinson and Rieden, as directors of the Optimal funds, had a fiduciary duty to the funds' shareholders, which they breached by failing to contact Madoff in New York. Plaintiffs contend that Wilkinson's and Rieden's failure to contact Madoff was wrongful because they knew of numerous facts concerning Madoff's operations that warranted further investigation. Plaintiffs claim that personal jurisdiction exists for Rieden and Wilkinson under New York law because Madoff's firm acted as the Optimal funds' agent in New York.

### 3.    PricewaterhouseCoopers Ireland

PWC Ireland was retained by Optimal SUS, one of the Optimal funds, to audit the fund.  PWC Ireland issued unqualified, also known as "clean," audit opinions, which certified that Optimal SUS's financial statements conformed to requisite accounting standards.  Plaintiffs allege that PWC Ireland did not adhere to accounting standards because it failed to verify that the fund's assets actually existed.  In both the complaint and Plaintiffs' opposition memorandum, however, Plaintiffs oftentimes make generic references to "PwC" without indicating which PWC entity they are referring to.  Plaintiffs make additional allegations that this generic "PwC" never confirmed the trades that Madoff purportedly performed by obtaining trade confirmations from Madoff's purported counterparties.

Plaintiffs sue PWC Ireland for negligence and gross negligence, unjust enrichment, and securities fraud.  Plaintiffs argue that personal jurisdiction exists over PWC Ireland because of an agency relationship between PWC Ireland and the PWC entities who met with Madoff in the United States, PWC LLP, and PWC Bermuda.

### 4.    PricewaterhouseCoopers Bermuda

The complaint contains only scant substantive allegations against PWC Bermuda.  As mentioned above, the complaint often refers to "PwC" generically without identifying a particular entity.  The complaint also alleges that the various PWC entities operated as a unitary organization and that the member firms act as agents of PWC International.  Representatives of PWC Bermuda visited Madoff in New York where, according to the complaint, they blindly accepted all of Madoff's assertions and prepared a report on Madoff's activities, which report was later purchased by PWC Ireland.  PWC Bermuda was not hired to audit the Optimal funds and never issued any audit opinions on the Optimal funds.  Plaintiffs sue PWC Bermuda for negligence and gross negligence but do not assert any federal securities claims.  Plaintiffs claim that jurisdiction is proper under New York's long-arm statute even though PWC Bermuda was not sued in the original New York action and was added as a defendant in the consolidated amended complaint.

C.      **Personal Jurisdiction Analysis**

1.      **HSBC Defendants**

Plaintiffs do not attempt to establish personal jurisdiction under Florida's long-arm statute.  Nor do they identify any contacts between the HSBC Defendants and Florida.  Accordingly, the Court cannot exercise personal jurisdiction over the HSBC Defendants under Florida's long-arm statute.  Plaintiffs argue instead that personal jurisdiction exists over the HSBC Defendants under New York's long-arm statute.  *See* N.Y. C.P.L.R.  § 302(a)(1) (providing for personal jurisdiction over a non-domiciliary when a non-domiciliary "transacts any business within the state or contracts anywhere to supply goods or services in the state").

As Plaintiffs point out, § 302(a)(1) is a single-act statute that permits the exercise of personal jurisdiction over a non-domiciliary defendant on the basis of a single business transaction even if the defendant never enters the state.  *Kreutter v. McFadden Oil Corp.*, 522 N.E.2d 40, 43 (N.Y. 1988).  To satisfy the single-act requirement, however, (1) the relevant act must constitute "transacting business" in New York under the standard expounded by the New York Court of Appeals and (2) the plaintiff's claim must arise out of the underlying transaction.  *See id.* (exercising personal jurisdiction under New York's long-arm statute is proper if "the defendant's activities [in New York are] purposeful and there is a substantial relationship between the transaction and the claim asserted").

A non-domiciliary transacts business within the meaning of § 302(a)(1) when by "some act . . . the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *McKee Elec. Co. v. Rauland-Borg Corp.*, 229 N.E.2d 604, 607 (N.Y. 1967); *see also Hanson v. Denckla*, 357 U.S. 235, 253 (1958).  Purposeful availment occurs when the locus of contracting or performance is New York or the defendant projects itself into New York for the purpose of creating a business relationship.  *See Agency Rent A Car Sys. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir. 1996) (determining whether the defendant has transacted business in New York depends on (1) whether the defendant has an ongoing contractual relationship with a New York corporation, (2) whether the contract was negotiated or executed in New York, (3) whether, after executing a contract with a New York business, the defendant visited New York for the purpose of meeting

with parties to the contract regarding the relationship, (4) what the choice-of-law clause is in any such contract, and (5) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state); *see also Mayes v. Leipziger*, 674 F.2d 178 (2d Cir. 1982) (physical presence in New York is unnecessary if the defendant's acts are "purposeful and designed to permit it to conduct activities within New York").

A plaintiff's cause of action arises out of the defendant's business transaction when there is a nexus between the business transacted and the plaintiff's claim. *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1109 (2d Cir. 1997); *McGowan v. Smith*, 419 N.E.2d 321, 323 (N.Y. 1981). For a sufficient nexus to exist, "a 'substantial relationship' must be established between a defendant's transactions in New York and a plaintiff's cause of action." *Johnson v. Ward*, 829 N.E.2d 1201, 1202 (N.Y. 2005). Consequently, long-arm jurisdiction will exist over a non-domiciliary only "where the claim ha[s] the requisite nexus to an in-state transaction." *Id.* at 1203.

The HSBC Defendants' alleged contacts with New York can be divided into three categories: (1) Correspondence contacts between the HSBC Defendants and Madoff's firm in New York, (2) the HSBC Defendants' physical presence in New York, and (3) the HSBC Defendants' use of a bank account in New York though an affiliate, HSBC Bank USA.

### i.      Correspondence Contacts

Plaintiffs argue that the HSBC Defendants "interacted" with Madoff in New York in connection with their obligations as the funds' administrator and custodian. Plaintiffs argue that these interactions constituted "hundreds, if not thousands, of communications" with New York, but do not cite anything in their complaint or exhibits to substantiate this argument. Doc. 215, at 39 (09-20215). Plaintiffs do not allege that the HSBC Defendants entered into a contract in New York or projected themselves into New York in order to establish a business relationship.

Under the relevant case law, communications and correspondence are insufficient to establish personal jurisdiction. "[T]elephone calls and correspondence sent into New York, by a non-domiciliary defendant who is outside New York, generally are insufficient to establish personal jurisdiction." *Burrows Paper Corp. v. R.G. Eng'g, Inc.*,

363 F. Supp. 2d 379, 386 (N.D.N.Y 2005) (quoting *Int'l Customs Assocs. v. Ford Motor Co.*, 893 F. Supp. 1251, 1261 (S.D.N.Y. 1995)).   Such correspondence or telephonic contacts are only sufficient to confer personal jurisdiction when the "phone calls and mailings [] serve to 'project' a defendant into New York in such a manner that the defendant 'purposefully avails himself' of the protections and benefits of New York Law."  *Roper Starch Worldwide v. Reymer & Assocs.*, 2 F. Supp. 2d 470, 474 (S.D.N.Y. 1998).  For instance, in *Parke-Bernet Galleries, Inc. v. Franklyn*, 256 N.E.2d 506, 508 (N.Y. 1970), the New York Court of Appeals found a defendant's phone calls into New York for the purpose of participating in an auction (i.e., for the purpose of entering into a contractual or business relationship) sufficient to establish personal jurisdiction under § 302(a)(1).  When, however, the correspondence with New York is made for the purpose of carrying out duties pursuant to a contract formed elsewhere, and not to transact business in New York, such correspondence will not establish personal jurisdiction under New York's long-arm statute.  *See Roper Starch Worldwide*, 2 F. Supp. 2d at 474.

Plaintiffs' allegations do not indicate that the HSBC Defendants' telephonic and correspondence contacts with New York were purposefully designed to permit them to conduct business activities in New York.  Rather, the allegations indicate that the HSBC Defendants' correspondence with New York was incidental to another business relationship focused outside of the state.  The HSBC Defendants never projected themselves into New York for the purpose of conducting business there.  Therefore, the HSBC Defendants' telephonic and correspondence contacts with New York, incidental to a contractual relationship between an Irish custodian and administrator and the Bahamian funds which they serviced, do not meet the New York long-arm statute's transacting business requirement.[8]

---

[8]     *Picard v. Elbaum*, 707 F. Supp. 144, 147 (S.D.N.Y. 1989), which Plaintiffs rely on, is factually distinguishable from this case.  In *Picard*, the Court exercised jurisdiction over a non-domiciliary couple who invested money with an unscrupulous New York agent who, as a matter of course, diverted investors' funds for his personal use.  The defendants in *Picard* were fortunate enough to redeem their investment at a substantial profit before the scheme collapsed.  The district court exercised personal jurisdiction over the defendants in a suit brought by the estate's receiver to recoup the funds under New York's creditors' law and common law principles

### ii.        Physical Presence in New York

Plaintiffs also argue that personal jurisdiction exists over the HSBC Defendants based on Brian Pettitt's two visits to New York City to meet with Madoff.  Pettitt was the head of HSBC Securities Network Management, a subdivision of HSBC Holdings PLC (London), which is the parent corporation of both HSBC Defendants.  The HSBC Defendants submitted an affidavit explaining that Pettitt is an employee of HSBC Bank PLC, which has the same parent company, HSBC Holdings PLC (London), as the HSBC Defendants sued here.

As a logical matter, even assuming that an agency relationship exists between Pettiitt and HSBC Holdings PLC (London), and that Pettitt's visits to New York are attributable to HSBC Holdings, it would not follow that they can also be imputed to the HSBC Defendants.  Moreover, under New York law the actions of a parent company cannot automatically be imputed to a subsidiary.  *See Ins. Co. of N. Am. v. EMCOR Grp., Inc.*, 9 A.D.3d 319, 320 (N.Y. App. Div. 2004) ("[T]he existence of an agency upon which a finding of jurisdiction may be predicated may not be inferred from the mere existence of a parent-subsidiary relationship.") (citing *Frummer v Hilton Hotels Int'l*, 227 N.E.2d 851 (N.Y. 1967)).  A subsidiary's actions can be attributed to a parent corporation only with a strong showing that the parent company controlled the subsidiary.  *Delagi v. Volkswagenwerk AG of Wolfsburg*, 278 N.E.2d 895, 897 (N.Y. 1972) (in order to attribute the subsidiary's contacts to the parent corporation for personal jurisdiction purposes the parent's control over the subsidiary "must be so complete that the subsidiary is, in fact, merely a department of the parent").

---

of unjust enrichment.  There is no record evidence or allegation that either of the HSBC Defendants engaged in the type of business transaction described in *Picard*.

Plaintiffs rely on other cases similarly involving transactions in which the defendants projected themselves into New York for the purpose of transacting business. *See Newbro v. Freed*, 337 F. Supp. 2d 428, 433 (S.D.N.Y. 2004) (personal jurisdiction found where defendants chose New York broker and one defendant traveled to New York to meet with broker); *Bluestone Capital Partners, L.P. v. MGR Funds Ltd.*, No. 98 CIV. 3128 (WHP), 1999 WL 322658 (S.D.N.Y. May 20, 1999) (nonresident defendant opened an investment account and conducted securities transactions with New York plaintiff); *Triad Sec. Corp. v. Mfr. Indem. & Ins. Co. of Am.*, No. 93 Civ. 8019 (LMM), 1994 WL 330395 (S.D.N.Y. July 8, 1994) (nonresident defendant maintained a New York securities account).

Since the Court cannot automatically infer that a subsidiary is an agent of a parent, it certainly cannot infer that an agent of a parent corporation is an agent of a subsidiary corporation. Plaintiffs fail to offer any evidence that the HSBC Defendants themselves controlled Pettitt. As a result, Pettitt's contacts with New York cannot be imputed to the HSBC Defendants and cannot provide a basis for exercising personal jurisdiction under the New York long-arm statute.

### iii.       Use of a New York Bank Account

Plaintiffs also argue that the HSBC Defendants are subject to personal jurisdiction under New York's long-arm statute because of the designation of HSBC Bank USA Inc., located in New York, to receive fees from the Optimal funds. But according to the HSBC Defendants, and confirmed by the routing statement attached to the complaint, HSBC Bank PLC (London) opened the account with HSBC Bank USA and received fees from the Optimal funds. HSBC Bank PLC (London) in turn remunerated HSBC Services through a separate account.

Plaintiffs argue that the use of this bank account establishes personal jurisdiction under *Steinberg v. A Analyst Lmt.*, No. 04-60898, 2009 WL 806780, at *6 (S.D. Fla. Mar. 26, 2009), where the district court, applying New York law, found that the *defendant's* designation of a correspondent bank account in New York to receive funds subjected the defendant to personal jurisdiction. Plaintiffs appear to ignore that *Steinberg* specifically distinguished the present situation where an intermediary bank designates the correspondent bank to receive funds. *Steinberg* found that New York's long-arm statute would not confer personal jurisdiction in this situation since a third party's activities cannot be used to establish personal jurisdiction. *See id.* ("Rather, the bank that Wise Global used, Standard Bank Asia Limited, in turn had its own correspondent bank account at Citibank, N.A. in New York, which Standard Bank utilized in connection with the redemptions from the Funds. As a result, this Court held that fact to be insufficient to establish personal jurisdiction over Wise Global.").

Moreover, even if the HSBC Defendants themselves directed or received wire transfers, the Second Circuit recently held that electronic funds transfers "in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law." *Shipping Corp. of India v. Jaldhi Overseas PTE*

*Ltd.*, 585 F.3d 58, 71 (2d Cir. 2009); *see also Casio Computer Co. v. Sayo*, No. 98 Civ. 3772 (WK) (RLE), 2000 WL 1877516, at *26 (S.D.N.Y. Sept. 20, 1999) (wire transfers reaching bank in New York State insufficient to confer personal jurisdiction over defendant).  Plaintiffs have not provided any authority that an affiliate bank's designation of a bank account in New York to receive fees is sufficient to establish personal jurisdiction.

Therefore, the Plaintiffs have failed to establish jurisdictionally relevant New York contacts for the HSBC Defendants and have failed to meet their burden that the HSBC Defendants transacted business in New York.  *See McKee Electric Co.*, 229 N.E.2d at 607 (refusing to adopt an interpretation of the New York long-arm statute under which "every corporation whose officers or sales personnel happen to pass the time of day with a New York customer in New York runs the risk of being subjected to the personal jurisdiction of our courts" and emphasizing that the "overriding criterion [for establishing specific jurisdiction is whether the defendant commits] 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws'").

#### iv.     Arising From Requirement

Finally, assuming that these actions do constitute transacting business in New York, the Plaintiffs would still be unable to establish personal jurisdiction in this case over the HSBC Defendants.  Even if the alleged contacts constituted transacting business, they do not satisfy the long-arm statute's "arising from" requirement.  The Plaintiffs' claims arise from the HSBC Defendants' alleged failure to perform adequate diligence *in Ireland*.  The Plaintiffs have not identified any tortious activity committed by the HSBC Defendants in New York and since the HSBC Defendants do not have a physical presence in New York, the actions giving rise to the Plaintiffs' claims necessarily occurred in Ireland.  While there may be cases where part performance of contractual duties in New York could subject a defendant to personal jurisdiction there, this is not such a case because the overwhelming majority of the HSBC Defendants' performance under their agreements with the Optimal funds took place in Ireland.  *See, e.g.*, *Beatie & Osborn LLP v. Patriot Sci. Corp.*, 431 F. Supp. 2d 367, 388 (S.D.N.Y. 2006) (finding no

personal jurisdiction when "the clear majority of the performance under the [contract] occurred" outside of New York).

### 2.   Brian Wilkinson & Inder Rieden

#### i.   Jurisdiction Based on Agency Theory

The complaint contains a conclusory allegation that all Defendants have sufficient minimum contacts with New York to warrant personal jurisdiction under New York's long-arm statute.   But Plaintiffs do not identify any individual contacts between Wilkinson, Rieden, and New York.   Instead, Plaintiffs argue that Wilkinson and Rieden are subject to personal jurisdiction in New York because the corporate contacts of Optimal SUS and Madoff's firm can be imputed to them.   This agency relationship is based on the following allegations:

> Pursuant to the EMs [explanatory memoranda] dated June 2004 and thereafter, [Madoff's firm] acted as the agent and attorney-in-fact of Optimal SUS. Echeverría, Inder Rieden, and Wilkinson served as directors of Optimal SUS during the time that [Madoff's firm] served as agent and attorney-in-fact of Optimal SUS. [Madoff's firm] thus acted in New York for the benefit of, on behalf of, and with the knowledge and consent of the Director Defendants. Accordingly, this Court has personal jurisdiction over the Director Defendants under New York's long arm statute (N.Y. C.P.L.R. § 302).

Compl. ¶ 368.   Even if an agency relationship existed between Optimal SUS and Madoff's investment firm, the firm's actions cannot also be imputed to Rieden and Wilkinson.

As a general matter, the acts of a corporation cannot automatically be imputed to shareholders or officers. *See Surorr v. First Inv. Corp.*, 700 So. 2d 139, 141 (Fla. 5th DCA 1997); *Newberry v. Rife*, 675 So. 2d 684, 685 (Fla. 2d DCA 1996).   However, New York courts have, under certain circumstances, attributed corporate acts to a corporate principals under agency theory, *see, e.g.*, *Kinetic Instruments, Inc. v. Lares*, 802 F. Supp. 976, 984 (S.D.N.Y. 1992), while Florida courts have required veil piercing. *Mother Doe I v. Maktoum*, 632 F. Supp. 2d 1130, 1141 (S.D. Fla. 2007).   Because the complaint lacks veil piercing allegations, the Court will only analyze the agency issue.

> [F]or a corporation to be considered an agent of an officer for personal jurisdiction purposes, a plaintiff must allege: (1) that the corporation engaged in purposeful activities in New York in relation to the transaction; (2) that the corporation's activities were performed for the benefit of the

individual defendant; (3) that the corporation's activities were performed
with the knowledge and consent of the individual defendant; and (4) that
the individual defendant exercised some control over the corporation.

*Beatie & Osborn*, 431 F. Supp. 2d at 389 (citing *Retail Software Svcs., Inc. v. Lashlee*,
854 F.2d 18, 22 (2d Cir. 1988) and *Kreutter*, 522 N.E.2d at 44).   In this respect, "a
plaintiff's allegations must sufficiently detail the defendant's conduct so as to persuade a
court" of the existence of a control relationship.  *Karabu Corp. v. Gitner*, 16 F. Supp. 2d
319, 324 (S.D.N.Y. 1998).    Courts will grant motions for lack of personal
jurisdiction where the plaintiff makes only broadly-worded or vague allegations about a
defendant's conduct.  *Id.* (citing *Kinetic Instruments*, 802 F. Supp. at 984-85 ("[T]he fact
that [the defendant] is the President and majority shareholder of [the corporation] does
not necessarily mean that the corporation will be considered his agent.")); *Ontel Prods.,
Inc. v. Project Strategies Corp.*, 899 F. Supp. 1144, 1148 (S.D.N.Y. 1995) ("[Plaintiff]
cannot obtain personal jurisdiction over [defendant] based solely on his position as
President of P.S.C.; instead, [plaintiff] must show that [defendant] personally took part in
the activities giving rise to the action at issue.").

The paltry allegations in the complaint are clearly insufficient to establish an
agency relationship for personal jurisdiction purposes.  The complaint contains only
threadbare assertions that lack any detail whatsoever, do not differentiate between the
various "director defendants," and do not specify any actions that the directors took that
would alter the standard legal presumption that directors and officers are agents of the
corporation, not the other way around.  *See Duravest, Inc. v. Viscardi, A.G.*, 581 F. Supp.
2d 628, 634 (S.D.N.Y. 2008) (noting that generally the corporation is not the agent of its
officers).  Nor have Plaintiffs cited any cases where a court exercised jurisdiction over a
principal based on the contacts of an agent's agent.

Furthermore, while the existence of an agency relationship is generally a jury
question, *Wood v. Holiday Inns, Inc.*, 508 F.2d 167, 173 (5th Cir. 1975), when, on a
motion to dismiss for lack of personal jurisdiction, the defendant makes a prima facie
showing that he is not subject to the court's jurisdiction, the plaintiff must substantiate
the agency allegations with competent evidence of the agency.  *See Future Tech. Today*,
218 F.3d at 1249; *Polskie Linie Oceaniczne*, 795 F.2d at 972.  Wilkinson and Rieden
have each submitted affidavits disclaiming any direct dealings with Madoff's firm or

21

having ever traveled to the United States in connection with their positions for the Optimal funds. Therefore the Plaintiffs bear the burden, which they have not met, to produce competent evidence of the agency relationship.

Plaintiffs do not allege personalized, individual contacts for Wilkinson or Rieden anywhere in New York. Rather, Plaintiffs rely solely on their flawed agency theory. But because Plaintiffs have not established the requisite agency relationships to impute Madoff firm's contacts to Wilkinson or Rieden, New York's long-arm statute cannot confer jurisdiction over either of them.[9]

### 3.     PricewaterhouseCoopers Ireland

As with the HSBC Defendants, the Plaintiffs do not identify any contacts between PWC Ireland and Florida, and do not argue that the exercise of personal jurisdiction is proper under the Florida long-arm statute. Instead, Plaintiffs argue that New York's long-arm statute or, alternatively, Rule 4(k)(2), establishes personal jurisdiction over PWC Ireland. In light of *Morrison*'s impact on the 4(k)(2) analysis, New York's long-arm statute provides the only possible avenue for establishing personal jurisdiction over PWC Ireland.

Plaintiffs argue that PWC Ireland is subject to personal jurisdiction under N.Y. C.P.L.R. § 302(a)(1), which provides for specific jurisdiction over non-domiciliaries when the non-domiciliary "transacts any business within the state or contracts anywhere to supply goods or services in the state" and when the claim "arises from" the transaction. As explained above, to establish personal jurisdiction under this section of New York's long-arm statute the Plaintiffs must show that PWC Ireland transacted business in New York and the Plaintiffs' claims arise from PWC Ireland's business transaction.

### i.     Correspondence Contacts

Similar to their argument regarding personal jurisdiction over the HSBC Defendants, Plaintiffs argue that personal jurisdiction can be based on PWC Ireland's

---

[9]     Although the complaint alleges general jurisdiction over Rieden in Florida, Plaintiffs concede that no general jurisdiction can exist over Rieden under Florida's long-arm statute because Florida has adopted the fiduciary shield doctrine. Plaintiffs also allege Rule 4(k)(2) jurisdiction over Rieden and Wilkinson but, as noted above, after *Morrison* there is no federal cause of action available to serve as a basis for personal jurisdiction under Rule 4(k)(2).

regular correspondence with New York in connection with their auditing responsibilities. Specifically, PWC Ireland corresponded with Optimal Investments Services' New York office, with other PWC entities in New York, and with Madoff himself.  In the course of this correspondence, PWC Ireland received brokerage statements and other information related to Madoff's activities.

Both Florida and New York cases have held that telephonic and electronic communications with individuals in the forum that are incidental to business conducted wholly outside of the forum are insufficient to trigger the transacting business requirement of the long-arm statute.  *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005) (California firm was not subject to personal jurisdiction in Florida when it performed auditing work in its California office on behalf of Florida client but made phone calls to Florida to obtain information); *Standard Enters., Inc. v. Bag-It, Inc.*, 673 F. Supp. 1216, 1220 (S.D.N.Y. 1987) ("Interstate telephone contacts do not generally have any great significance in" satisfying the business transaction requirement of the New York long-arm statute); *Current Textiles Corp. v. Ava Indus.*, 624 F. Supp. 819, 821 (S.D.N.Y. 1985) ("In general, telephone conversations between litigants inside and outside of the state about the contract at issue will not sustain personal jurisdiction under section 302(a)(1) absent additional evidence that the out of state litigant purposefully availed himself of the privilege of conducting activities in New York State.").   Thus, when a plaintiff seeks to predicate personal jurisdiction on communications with the forum, those communications must be for the purpose of initiating or participating in a business venture and cannot merely be incidental to ongoing business operations by a foreign company that does not generate business in the forum state.  *See Young v. FDIC*, 103 F.3d 1180, 1190-92 (4th Cir. 1997) (holding that when a foreign auditing firm's contacts with the forum consisted of receiving information for audit reports, no personal jurisdiction existed under the Due Process Clause); *Painewebber, Inc. v. Westgate Grp., Inc.*, 748 F. Supp. 115, 119 (S.D.N.Y. 1990) (frequent telephonic contact and communication by non-domiciliary who otherwise does not solicit any business from forum State does not constitute "transacting business"

unless contacts are designed to permit defendant to conduct business within the forum state).[10]

In this case, an Irish auditing firm obtained some information from New York in connection with its audits of a Bahamian fund whose investors all resided outside of the United States.  As such, PWC Ireland is not subject to personal jurisdiction in New York because it was not transacting business in New York; it was transacting business in Ireland on behalf of non-United States clients.  The Plaintiffs have not cited a single case in which a court exercised jurisdiction in comparable circumstances to those presented here.  And it is difficult to see how a contrary rule could be adopted in our age of global commerce without abandoning all traditional and fair notions of personal jurisdiction.  *Cf. McKee Electric Co.*, 229 N.E.2d at 607-08 ("[D]efendants, as a rule, should be subject to suit where they are normally found, that is, at their pre-eminent headquarters, or where they conduct substantial general business activities.  Only in a rare case should they be compelled to answer a suit in a jurisdiction with which they have the barest of contact.")

### ii.    Agency Theory

Plaintiffs also attempt to establish personal jurisdiction over PWC Ireland based on an alleged agency with PWC Bermuda and PWC LLP.  According to Plaintiffs, PWC Ireland is subject to personal jurisdiction because representatives from PWC Bermuda and PWC LLP met with Madoff in New York.  Later, for a fee, PWC Bermuda submitted a report to PWC Ireland on Madoff's firm's operations.  PWC Ireland submitted an affidavit by Ken Owens, a member of PWC Ireland, acknowledging that PWC Ireland paid for the report but asserting that PWC Bermuda created the report for another client who was connected to Madoff but not to the Optimal funds.  Owens only requested a copy of the report *after* learning that it was created.  Thus, Owens' unrefuted declaration confirms that PWC Ireland did not exercise any control over any other PWC entity, which, as Plaintiffs acknowledge, is the hallmark of an agency relationship.  According to

---

[10]    The Eleventh Circuit has held that an auditor's receipt of information from within a forum is not sufficient to establish personal jurisdiction under Florida law.  *See Horizon Aggressive Growth*, 421 F.3d at 1167.  PWC Ireland correctly points out that the facts in this case present an even weaker case for jurisdiction than those in *Horizon Aggressive Growth* since the defendants in *Horizon Aggressive Growth* provided services to a Florida citizen while PWC Ireland audited the Bahamian Optimal funds, not Madoff's firm itself.

Owens, at no time did PWC LLP or PWC Bermuda act as the agent of PWC Ireland when they met with Madoff in New York. PWC Ireland never instructed the other PWC entities on meeting with Madoff or preparing the report. Plaintiffs do not offer any evidence rebutting Owens' affidavit. Therefore, the Plaintiffs cannot carry their burden of establishing the agency relationship necessary to impute PWC LLP's and PWC Bermuda's conduct to PWC Ireland for personal jurisdiction purposes.

Plaintiffs argue, however, that the contacts of PWC Bermuda and PWC LLP can still be imputed to PWC Ireland because the three companies participated in a joint venture. Plaintiffs claim that the facts here are indistinguishable from those in *National Union Insurance Co. v. BP Amoco P.L.C.*, 319 F. Supp. 2d 352 (S.D.N.Y. 2004), where the district court exercised personal jurisdiction over foreign BP entities based on the existence of an agency relationship with an insurance broker who solicited and negotiated an insurance contract with a New York underwriter. In a critical passage, the court rejected the defendant's argument that it did not exercise the control necessary to establish an agency relationship because

> Each Foreign BP Defendant knew and voluntarily authorized BP to acquire insurance for it in relation to the project in which it holds some stake, whether as participant, partial owner, or both. A company cannot deputize another to take certain actions on its behalf and then disclaim knowledge or interest when those actions give rise to a legal dispute.

*Id.* at 360. In this case, however, PWC Ireland never authorized the other PWC entities to act on its behalf. As is clear from the Owens declaration, the other PWC entities would have conducted the same investigation and issued the same report on Madoff's activities without any intervention from or coordination with PWC Ireland. PWC Ireland's request for a copy of the report *after it had already been created* does not transform PWC LLP or PWC Bermuda into agents of, or joint venturers with, PWC Ireland.

Since Plaintiffs cannot establish the existence of an agency relationship and PWC Ireland's correspondence contacts are insufficient to establish personal jurisdiction, Plaintiffs cannot carry their burden in establishing personal jurisdiction over PWC Ireland under New York's long-arm statute.

### 4.    PricewaterhouseCoopers Bermuda

The complaint does not allege that PWC Bermuda has engaged in any activity in the state of Florida.  Plaintiffs' factual recitations against PWC Bermuda do not include any jurisdictional allegations relating to Florida, nor do they specify any act that PWC Bermuda committed in this jurisdiction.  As such, Florida's long-arm statute, Fla. Stat. § 48.193, cannot possibly support the exercise of personal jurisdiction over PWC Bermuda.

Instead, Plaintiffs argue that there is personal jurisdiction over PWC Bermuda because of PWC Bermuda's New York contacts.  Plaintiffs also argue that PWC Bermuda waived its right to challenge personal jurisdiction by failing to raise it in the New York action that was transferred to this Court, even though PWC Bermuda was not a party in the New York action.

PWC Bermuda was never sued in New York.  Plaintiffs have provided no authority that the law of the transferor forum would ever apply to a defendant who has been sued solely in the transferee forum.  Finally, PWC Bermuda satisfied its obligation under Rule 12(g) and (h) by challenging personal jurisdiction in their motion to dismiss.

Because Plaintiffs assert only common law claims against PWC Bermuda, and PWC Bermuda was never sued in New York, personal jurisdiction must be based on Florida's long-arm statute.  As Plaintiffs have failed to plead or identify any relevant contacts between PWC Bermuda and Florida, PWC Bermuda's motion to dismiss for lack of personal jurisdiction will also be granted.

Having concluded that it lacks personal jurisdiction over half of the Defendants sued in this action, the Court will now turn to the issue of *forum non conveniens*.

### V.    Forum Non Conveniens

A party who moves to dismiss for *forum non conveniens* "must demonstrate that (1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice."  *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001).  Although "the private factors are 'generally considered more important' than the public factors," the court should "consider both factors in all cases." *Id.* (quoting 17 Moore's Federal Practice § 111.74[3][b] at 111-221 (3d ed. 2000)); *see*

*also SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.*, 382 F.3d 1097, 1100 n.5 (11th Cir. 2004).  The "defendant has the burden of persuasion as to all elements" of a *forum non conveniens* motion.  *Leon*, 251 F.3d at 1311.

"An alternative forum is 'available' to the plaintiff when the foreign court can assert jurisdiction over the litigation sought to be transferred."  *Id*.  "Ordinarily, this requirement will be satisfied when the defendant is 'amenable to process' in the other jurisdiction."  *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 n.22 (1981).  A foreign forum can also be available because the defendant consents to personal jurisdiction, waives statute of limitations defenses, or agrees to other conditions designed to prevent prejudice to the plaintiff if the suit is reinstated in the foreign forum.  *See, e.g.*, *Perez-Lang v. Corporacion De Hoteles, S.A.*, 575 F. Supp. 2d 1345, 1353 (S.D. Fla. 2008).

"An alternative forum is adequate if it provides for litigation of the subject matter of the dispute and potentially offers redress for plaintiffs' injuries."  *King v. Cessna Aircraft Co.*, 562 F.3d 1374, 1382 (11th Cir. 2009).  In this respect, the prospect of "a change in substantive law should ordinarily not be given conclusive or even substantial weight in the *forum non conveniens* inquiry."  *Piper Aircraft*, 454 U.S. at 247.  The defendant must "demonstrate that the alternative forum offers at least some relief," *Leon*, 251 F.3d at 1311, but "[a]n adequate forum need not be a perfect forum."  *Satz v. McDonnell Douglas Corp.*, 244 F.3d 1279, 1283 (11th Cir. 2001).  The Supreme Court has stated that a foreign forum may fail to be adequate only when the remedy it provides "is so clearly inadequate or unsatisfactory that it is no remedy at all."  *Piper Aircraft*, 454 U.S. at 254.

If the district court finds that the defendant has met its burden of showing that an adequate alternative forum exists, the court must then weigh private and public convenience factors.  Private factors include access to proof, availability of compulsory process for the attendance of unwilling witnesses, the cost of obtaining witnesses, and any other practical issues that make the trial "easy, expeditious and inexpensive."  *King*, 562 F.3d at 1383-84 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  In this case, other practical issues bearing on private convenience include whether the case can be tried in a single proceeding, the expense of proving foreign law in the United States, and the desire to avoid inconsistent results.

Public factors include the forums' respective interests in hearing the case, the administrative burdens placed on the district court, the difficulty of resolving choice of law problems and the need to apply foreign law, and the possibility of imposing jury duty "upon the people of a community which has no relation to the litigation." *Gulf Oil*, 330 U.S. at 508-09; *see also La Seguridad v. Transytur Line*, 707 F.2d 1304, 1307 (11th Cir.1983); *King*, 562 F.3d at 1384. No one factor has controlling weight because a proper analysis of the relevant factors will necessarily vary from case to case. The district court must weigh the relevant factors as they relate to the specifics of the case before it and consider the relative advantages and disadvantages of the respective forums. *La Seguridad*, 707 F.2d at 1307-08.

### A.    Adequacy of Alternative Forum

In this case the Defendants contend that Ireland is a more convenient forum for trying this action. The Defendants claim that Ireland is an adequate and available forum to try this case because all of the Defendants are subject to personal jurisdiction there and the Plaintiffs can pursue comparable causes of action. The Plaintiffs argue that Ireland is not an adequate or available forum because the Irish courts cannot exercise personal jurisdiction over all Defendants, certain claims may be time-barred, and, according to one of Defendants' owns experts, the Plaintiffs would have no remedy under Irish law. Plaintiffs also contend that Ireland is inadequate because it lacks an opt-out class action mechanism.[11]

### 1.    Personal Jurisdiction of Irish Courts

All Defendants have consented to personal jurisdiction in Ireland in their memoranda or on the record in open court. According to the Defendants' Irish law expert, Irish law recognizes the validity of consent to jurisdiction.

---

[11]    The Plaintiffs also argue that an Irish court might not apply local law but would look to foreign law in adjudicating some their claims. This argument is more pertinent to the private and public factors analysis than the adequacy analysis, and the Court will address it there.

The Plaintiffs argue that because some of the Defendants contest personal jurisdiction before this Court, their consents to personal jurisdiction are not valid.[12]  The Plaintiffs attempt to distinguish the Supreme Court's holding in *Sinochem* that a district court needn't establish personal or subject matter jurisdiction before deciding a motion for *forum non conveniens* by noting the parties in *Sinochem* were already litigating in China.  *See* 549 U.S. at 435 ("Judicial economy is disserved by continuing litigation in [district court] given the proceedings long launched in China.").  *Sinochem*, which reaffirmed that district courts can dismiss a case under *forum non conveniens* without first establishing their own jurisdiction (personal or subject matter), placed no additional limits on a district court's discretion under the *forum non conveniens* doctrine, and did nothing to alter the case law, well-established in this circuit, that a district court can resolve personal jurisdiction questions on a motion to dismiss for *forum non conveniens* by conditioning dismissal on the foreign tribunal's exercise of personal jurisdiction over the defendants.  *See, e.g.*, *Magnin v. Teledyne Continental Motors*, 91 F.3d 1424, 1430-31 (11th Cir. 1996) (approving of conditional dismissals for *forum non conveniens*).

Accordingly, the Court finds that the Irish court would likely exercise personal jurisdiction over the Defendants.  The Court will honor the Defendants' consents to submit to personal jurisdiction in Ireland but will retain jurisdiction to try this case in the event that any of the Defendants do not submit to the jurisdiction of the Irish courts.  Additionally, because the Plaintiffs contend that certain statutes of limitations may have run since the onset of this litigation, the Court will condition dismissal on the Defendants' agreement to toll any statutes of limitations that had not expired at the time the first-filed consolidated case was brought.[13]

---

[12]    Naturally, the Defendants' consent to jurisdiction in Ireland is binding on those Defendants over whom the Court can exercise personal jurisdiction.  Concerning the Defendants for whom a basis for personal jurisdiction does not exist, those Defendants cannot in any event be subject to personal jurisdiction here, but their absence is a factor in the *forum non conveniens* inquiry.

[13]    The Plaintiffs also contend that the consents to personal jurisdiction in Ireland are only valid for the six named Plaintiffs and not for absent class members.  Given that no class certification order exists in this case, it would be premature to bind all Defendants to suits by absent class members.  The Court will, however, condition

## 2.    Ability to Obtain Relief in Ireland

The Defendants argue that Ireland provides the Plaintiffs with a remedy because Irish law recognizes causes of action for negligence and fraud against investment fund managers, promoters, directors, custodians, auditors, and administrators.  Irish courts also provide for discovery procedures through document production and depositions and award damages to prevailing plaintiffs.

The Plaintiffs contend, based on the submissions of the HSBC Defendants' Irish law expert, that the HSBC Defendants have admitted that the Plaintiffs would have no remedy under Irish law.  The HSBC Defendants' expert stated that in his view the Plaintiffs' claims would fail as a matter of law because they are derivative claims which the Plaintiffs would not have standing to pursue, and that the Plaintiffs' claim for "gross negligence" is not a recognized tort under Irish law.  This is not the same as stating that the Plaintiffs have no remedy under Irish law.  It is merely an argument that the Plaintiffs cannot state a claim against the Defendants, just as the Defendants argue here in their motions to the dismiss under Rule 12(b)(6).  The law in the United States also recognizes the distinction between direct and derivative litigation in the corporate context and the Plaintiffs would similarly have to establish their standing to bring a direct suit were this case to remain here.

Irish courts must provide the Plaintiffs with a legal remedy to constitute an adequate alternative forum, which they do by recognizing causes of actions for fraud, negligence, breach of contract, and other causes similar to common law claims in the United States.  It is not necessary, as the Plaintiffs' argument seems to suggest, that the Court predetermine that the Plaintiffs state *meritorious* claims under Irish law before determining that Ireland is an adequate alternative forum.[14]

---

dismissal on the Defendants' agreement to be sued by the original Plaintiffs named in all three of the consolidated cases.

[14]    By illustration, United States courts as a general matter provide victims of securities fraud with a cause of action but, as discussed above, the federal securities claims alleged in this proceeding are not meritorious because they do not concern securities listed on American exchanges or transacted in the United States.

The fact that Irish causes of actions may not be identical to those recognized under the common law in this country also does not render Ireland inadequate. The Plaintiffs' Irish law expert admits that the "plaintiffs' claims against the Irish defendants would essentially be regarded in Irish law as claims in tort, for breach of duty." (Doc. 83-5 ¶ 11, (09-CV-2073). The Plaintiffs' expert also states that based on his review of the complaint, the Plaintiffs could assert claims that are similar or analogous to common law claims for breach of fiduciary duty, gross negligence, and unjust enrichment. Because Ireland provides causes of action for aggrieved parties and awards damages to plaintiffs who prove the various elements of the aforementioned causes, Ireland is an adequate forum.[15] The Defendants have carried their burden of establishing that the Irish courts could exercise jurisdiction over the Defendants and provide a remedy to the Plaintiffs. The Court therefore determines that Ireland is an adequate alternative forum.[16]

### 3. Availability of Class Action Procedure in Ireland

The Plaintiffs contend that the lack of a class action mechanism in Ireland renders that forum inadequate. According to the Defendants' Irish law expert, Ireland recognizes representative actions, which are essentially opt-in class actions, and a "test case"

---

[15] Now that *Morrison* has eliminated the Plaintiffs' securities law claims, it should also be noted that the Plaintiffs may be better off with Irish, Spanish, or Swiss securities law. Moreover, even if under Irish conflict of law rules Irish law does not apply to all of the Plaintiffs' claims and Bahamian, Swiss, or some other law applies, it is of no consequence to the *forum non conveniens* analysis because, as the Court will explain below, foreign law would also dictate the rules of decision if the case were tried here.

[16] Numerous district courts have found Ireland to be an adequate alternative forum for *forum non conveniens* purposes. *See Kroger, Inc. v. O'Donnell*, No. 07-3091, 2007 WL 3232586 (D.N.J. Oct. 31, 2007) (misappropriation, breach of contract, and tortious interference with economic advantage claims); *Doe v. Hyland Therapeutics Div.*, 807 F. Supp. 1117 (S.D.N.Y. 1992) (products liability action); *Oxley v. Wyeth Labs., Inc.*, No. 91-1285, 1992 WL 116308 (May 20, 1992) (claims for strict products liability, willful and wanton misconduct, and breach of implied warranty); *Dowling v. Hyland Therapeutics Div.*, 767 F. Supp. 57 (S.D.N.Y. 1991) (products liability action). The Plaintiffs note that none of these cases dealt with securities class actions. To the extent that this is relevant, the Court notes this case can no longer fairly be characterized as a *securities* class action because the Supreme Court's recent decision in *Morrison* eliminated the Plaintiffs' securities fraud claims.

mechanism where common issues of law and fact are resolved in a lead case and then imported into other cases. Although the parties disagree on how well these mechanisms are suited for this particular case, it is clear that, under applicable case law, they constitute an adequate substitute for the opt-out class action provided by the Federal Rules of Civil Procedure.[17]

The Supreme Court has explained that "the possibility of a change in law unfavorable to the plaintiff should not be given substantial weight" unless "the remedy provided by the alternative forum is so clearly inadequate or unsatisfactory that it is no remedy at all." *Piper Aircraft*, 454 U.S. at 252 n.19, 254. In *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 478 (2d Cir. 2002), the Second Circuit considered an Ecuadorian procedure, which as described is similar to the "representative action" available in Ireland, an adequate substitute for foreign plaintiffs:

> Plaintiffs' third objection is that Ecuadorian courts do not recognize class actions. On the other hand, Ecuador permits litigants with similar causes of action arising out of the same facts to join together in a single lawsuit. While the need for thousands of individual plaintiffs to authorize the action in their names is more burdensome than having them represented by a representative in a class action, it is not so burdensome as to deprive the plaintiffs of an effective alternative forum. *Cf. Blanco v. Banco Industrial de Venezuela, S.A.*, 997 F.2d 974, 982 (2d Cir. 1993) ("The unavailability of beneficial litigation procedures similar to those available in the federal district courts does not render an alternative forum inadequate.").

The availability of a class action procedure goes to the issue of convenience, not adequacy. *See Gilstrap v. Radianz Ltd.*, 443 F. Supp. 2d 474, 482 (S.D.N.Y. 2006) ("Plaintiffs do assert that this Court should retain jurisdiction because English courts do not permit class actions or contingent fees. It is well-established, and plaintiffs acknowledge, however, that the unavailability of such procedural mechanisms as class actions and contingent fees, while it may be relevant to the balancing of the public and private interest factors addressed below, does not render a foreign forum inadequate as a

---

[17]     Although the issue is facially premature, it should be noted that it is far from certain that the Plaintiffs would obtain class action status here, especially in any new common law fraud claims which they might assert, because different circumstances appear on the face of the pleading and no federal securities claim remains. Moreover, the Plaintiffs apparently have substantial damages claims—not minimal damages—justifying their interests in suing individually.

matter of law." (citation omitted)).  In balancing the public and private interest factors, however, the district court in *Gilstrap* went on to give the lack of a class action mechanism in England little weight, at least in part, because only one of the plaintiffs was a United States citizen:

> Though the lack of contingent fees and class actions in English courts may be considered relevant in weighing the private interests at stake, here, where the other private and public interest factors overwhelmingly favor dismissal, and where the only named plaintiff who is a U.S. citizen is not of modest means, and has represented to the Court, through counsel, that he intends to pursue litigation against defendants in England should this action be dismissed, such a factor carries little weight. Plaintiff Gilstrap holds approximately 20 percent of all outstanding options, and this circumstance gives him the incentive to bring suit on his own behalf in England. Moreover, though English courts might not offer the precise class action mechanism familiar to U.S. litigants, it has long been acknowledged that the English system "provides other procedural mechanisms to handle cases involving multiple plaintiffs—including representative actions, 'test' cases, and the consolidation of multiple actions." The individual claim of Mr. Gilstrap would appear to be ideally suited to be a test or "bellwether" suit which could form the basis for subsequent settlements or the application of the forum's claim preclusion principles.

*Id.* at 488-89 (citations omitted).

The Plaintiffs cite cases that found the lack of a class action mechanism made the foreign forums inadequate.  These cases do not appear to be entirely consistent with the Supreme Court's statement in *Piper Aircraft* that the possibility of a less favorable law not be given substantial weight.  Nonetheless, these cases are clearly distinguishable because the plaintiffs were United States citizens and their choice of forum was therefore entitled to greater deference than the plaintiffs here.  *Bonder v. Banque Paribas*, 114 F. Supp. 2d 117, 131-32 (E.D.N.Y. 2000), for example, refused *forum non conveniens* to France after finding that France was not an adequate alternative forum because defendants had not established the availability of a procedure comparable to the class action in France.  *Bonder* was brought by United States citizens and so, unlike the Plaintiffs here, their choice of forum was entitled to substantial deference.  It should also be noted that *Bonder* was decided before the Second Circuit's decision in *Aguinda* clarified that the lack of a class action mechanism does not deprive the plaintiff of an alternative forum.

*In re Lernout & Hauspie Securities Litigation*, 208 F. Supp. 2d. 74, 91-93 (D. Mass. 2002), which found the lack of a class action procedure in Belguim to weigh against *forum non conveniens* dismissal, is also distinguishable because "a substantial number of the class members [were] from the United States" and the district court emphasized that (unlike in this case) all class members purchased stock on American stock exchanges.   Additionally, *Lernout* does not appear to square fully with the First Circuit's own approach to class actions in assessing adequacy in *forum non conveniens* motions. *See Howe v. Goldcorp Invest., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) (in determining the adequacy of an alternative forum "small differences in standards and procedural differences (such as greater difficulty in meeting class action requirements or less generous rules for recovering attorney's fees) are beside the point").   Finally, a judge in this district rejected the argument that the lack of a class action mechanism in the Bahamas rendered the forum inadequate, in part, because of an expert's opinion that the Bahamas, like Ireland, permits representative actions.   *See Snee v. Sunrise Props. Ltd.*, No. 06-80614, 2009 WL 2163179, at *5 (S.D. Fla. July 17, 2009) (loss of procedural advantages for plaintiffs cannot defeat an otherwise well-supported *forum non conveniens* motion).

The Court agrees with *Snee*, and with the First and Second Circuits, that the lack of a class action mechanism does not weigh against finding that an alternative forum is adequate.   These positions are more faithful to the Supreme Court's teaching in *Piper Aircraft* than the district court cases that relied on the lack of a class action mechanism in declining to dismiss for *forum non conveniens*.   *See also Sigalas*, 776 F.2d at 1519 ("It is no longer sufficient to retain jurisdiction simply because the remedy available in an alternative forum is less substantively generous.").   Moreover, Plaintiffs' cited district court cases are distinguishable because they were brought by United States plaintiffs whose choice of forum was entitled to far greater deference.   According to PWC Ireland's memorandum, which the Plaintiffs do not dispute, only six other countries, none of which are the Plaintiffs' home countries, recognize an "opt-out" class action akin to that provided by Rule 23.[18]

---

[18]        They are Australia, Canada, Indonesia, Israel, Portugal, and Norway.

### B.    Private Factors

#### 1.    Deference Due to Plaintiffs' Choice of Forum

As an initial matter in analyzing the relevant convenience factors, the district court must take into account the amount of deference due to the plaintiff's choice of forum.  When plaintiffs are United States citizens suing in United States courts, their choice of forum is entitled to substantial deference.  This deference is accorded when the plaintiff chooses his home forum because "it is reasonable to assume that this choice is convenient."  *Piper Aircraft*, 454 U.S. at 256.  A foreign plaintiff who brings suit in the United States does not enjoy the strong presumption that his choice is based on convenience.  And "[b]ecause the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient, a foreign plaintiff's choice deserves less deference." *Id.*  When a plaintiff chooses to sue in a foreign forum he "substantially undercuts the presumption his choice is reasonable."  *La Seguridad*, 707 F.2d at 1307.  Thus, deference will be accorded to a foreign plaintiff's choice of forum to the extent that the plaintiff's choice is based on convenience because "the plaintiffs' choice of forum . . . is ultimately only a proxy for determining the convenience of litigating in one forum instead of another."  *Villeda Aldana v. Del Monte Fresh Produce N.A., Inc.*, 578 F.3d 1283, 1294 (11th Cir. 2009).

The Plaintiffs acknowledge that their decision to sue in the United States is, to a considerable extent, based on the availability of advantageous procedural mechanisms such as the class action and contingency fee arrangements.  But none of the Plaintiffs, and only two of the twelve Defendants, are citizens of the United States.  *See Piper Aircraft*, 454 U.S. at 456 ("citizenship and residence are proxies for convenience") (citing *Pain v. United Techs. Corp*, 637 F.2d 775, 797 (D.C. Cir. 1980)).   The relevant investment funds were incorporated in the Bahamas, and the largest share of the Defendants reside in Ireland.  It is therefore not apparent that the Plaintiffs' decision to sue in the United States was based on convenience.  Nor does the fact that one Defendant, Banco Miami, whose role in this dispute appears to be less than that of other foreign Defendants, is located in Miami, render this otherwise inconvenient forum convenient. The Plaintiffs' choice of forum is entitled to some, but little, deference.

### 2.      Location of Parties and Party Witnesses

Assessing the location of parties and witnesses within their control is the next step in the private factors analysis.  The parties' residences are as follows: four parties reside in Ireland (the HSBC Defendants, PWC Ireland, and Wilkinson); two parties reside in each of Spain (Banco Spain and Paudo), Switzerland (Optimal Investment Services and Echevarria), the British Virgin Islands (San Javier and Int'l Harvestor), and the United States (Banco Miami and PWC LLP); and one party resides in each of the United Kingdom (PWC Int'l), Bermuda (PWC Bermuda), the Bahamas (Rieden), Mexico (Valdez), Argentina (Testa), and Chile (Mar Octava).  The Bahamas are also the place of incorporation of the Optimal funds.  Thus, four parties (and one-third of the Defendants) are located in Ireland, nine parties (and the majority of the Defendants) are located in Europe, three Plaintiffs are located in Latin America, four parties (two Plaintiffs and two Defendants) are located in island nations (the British Virgin Islands, Bermuda, and the Bahamas), and two Defendants (three if one includes PWC Int'l, which maintains a large office in New York City) are located in the United States.  And it should be noted that the two (or three) Defendants located in the United States did not play a central role in the due diligence functions central to this case.

This factor is not as significant as the Court's ability to compel testimony from non-party witnesses.  Still, it weighs in favor of Ireland as the more convenient forum. Ireland is home to more parties than any other country and for many of the European parties is a more convenient forum to try this case than the United States.  Because international travel is required in any event for the parties from Latin American and island nations, Miami's closer proximity is only a slight convenience factor for these parties and a negligible factor in the greater scheme of this litigation.  The location of the majority of parties and witnesses clearly points to trial in Ireland as a more convenient and less expensive forum than the United States.  It will be more convenient for willing witnesses to attend trial in Ireland than in the United States because many of those witnesses are either located in Ireland or other European countries, while the non-European witnesses will be required to travel in any event and the few United States Defendants, who do not appear to have a significant role in the conduct underlying this litigation, have agreed to litigate in Ireland.

### 3.       Ability to Compel Testimony and Evidence from Non-Parties

The forums' respective abilities to compel testimony and evidence from non-parties, especially the unwilling, is another important private factor.  The Plaintiffs argue that this case should be tried here because an Irish court cannot compel testimony from Madoff, Madoff's assistant Frank Dispascali, and Jonathan Clark, a former employee of Optimal Investment Services who lives in New Jersey.  Plaintiffs also seek production of documents in the custody of Madoff's estate's trustee.  The Defendants meanwhile point to many former employees who are beyond their control who live in Ireland and are subject to the subpoena power of Irish courts but not American courts.  The Plaintiffs counter by arguing that the Defendants have enough current employees who could testify about the relevant conduct in question.

A review of the witness list submitted by the Defendants reveals that the largest share of witnesses in this case whose testimony may have to be compelled are those who worked on the audits and diligence of the Optimal funds.  These witnesses include numerous former employees of the Defendants.  With few exceptions, these witnesses are located in Europe, with most residing in Ireland.

The Court finds that this factor also weighs in favor of Ireland as a more convenient forum.  First, Federal Rule of Civil Procedure 45(b) limits the district courts' subpoena power to 100 miles from the place of trial if the witness is located outside the district.  Another district court could subpoena the depositions of Madoff, Dipascali, and Clark, but live testimony would be unavailable.  By contrast, Irish courts can compel live testimony from anyone residing in Ireland.  An Irish court, therefore, would be similarly disadvantaged for non-party witnesses in the United States but would have significantly greater ability to compel the testimony of non-parties within Ireland.  Several courts have considered the inability to subpoena live testimony from non-party witnesses as a factor that weighs heavily towards dismissal because "a witness's live in-court testimony is the preferred method of presenting his or her testimony."  *Strategic Value Master Fund, Ltd. v. Cargill Fin. Servs., Corp.*, 421 F. Supp. 2d 741, 769 (S.D.N.Y. 2006); *see also Howe v. Goldcorp Invest., Ltd.*, 946 F.2d 944, 952 (1st Cir. 1991) ("Compulsory process would seem especially important where, as here, fraud and subjective intent are elements of the claim, making the live testimony of witnesses for the purposes of presenting demeanor

evidence essential to a fair trial."); *Morse v. Sun Int'l Hotels Ltd.*, No. 98-7451, 2001 WL 34874967, at *3 (S.D. Fla. Feb. 26, 2001).

Second, the Court questions whether, as a practical matter, it possesses sufficient coercive power to compel any testimony from Madoff, who is serving an effective life sentence, including deposition testimony.  Nor is the Court persuaded that Madoff and DiPascali possess information that is necessarily relevant to the pertinent issues in this case, namely any Defendant's state of mind, the nature of the Defendants' due diligence, and any Plaintiff's reliance on the Defendants' actions and representations.  *See Ford v. Brown*, 319 F.3d 1302, 1308 (11th Cir. 2003) ("A correct 'private interest' analysis begins with the elements of the plaintiff's causes of action.  The court must then consider the necessary evidence required to prove and disprove each element.  Lastly, the court should make a reasoned assessment as to the likely location of such proof."); *see also Piper Aircraft*, 454 U.S. at 258-59 (indicating that a district court must obtain sufficient information to balance the parties' interests but needn't require a full preview of the evidence to be presented at trial).  Jonathan Clark's testimony seems more relevant, but his assistance, if not voluntarily provided in Ireland or by deposition in New Jersey, could be obtained in Ireland through letters rogatory, which are freely granted by district courts in the United States.  The parties' access to one witness in the United States who may have relevant information does not outweigh the parties' ability to compel the testimony of numerous former employees of the Defendants who are located in Ireland and throughout Europe (or the Defendants' need to produce these witnesses in their defense).

### 4.    Other Relevant Private Convenience Factors

#### i.    Ability to Try the Entire Case in a Single Forum

The Court considers the ability to try this case in a single location to be an extremely important factor in the private factors analysis.  Wherever this case is tried it will necessarily inconvenience many parties and non-parties because the relevant parties, witnesses, and evidence are scattered across three continents.  The prospect of conducting more than one trial is therefore an important consideration.  Because the Court lacks personal jurisdiction over half the Defendants, and all Defendants have agreed to waive personal jurisdiction defenses in Ireland, Ireland is the only forum that can try all the claims against all the Defendants.  This factor renders Ireland a significantly more

convenient forum than the United States and weighs heavily in favor of *forum non conveniens* dismissal to Ireland.  Surely one trial is more convenient and less expensive than two, and would also avoid potentially inconsistent results.

The Plaintiffs discount the convenience of avoiding multiple trials because, they argue, they may lack standing to pursue their claims under Irish law.  This, however, is a merits question, and it would defeat the purpose of *forum non conveniens* if district courts were required to predetermine whether a plaintiff's claims are meritorious under foreign law before sending the case abroad.  It may well be that the plaintiffs would lack standing under United States law as well.  What is important is that in Ireland a single court will be able to make this uniform legal determination for all parties.[19]

### ii.    Litigation Costs of Proving Foreign Law

Another important private factor is the costly exercise of proving foreign law in a United States court.  The Court's own experience applying foreign law is that, given the cost and time of obtaining expert testimony and proving foreign law, this is a substantial convenience factor that weighs in favor of *forum non conveniens* dismissal.  Here, the substantial disagreements between the parties' respective experts on several basic legal matters as seemingly straightforward as, for example, whether this case could be tried under the "test case" procedure in Ireland, have given the Court a preview of even thornier problems to come if the Court must apply foreign law in trying the merits of this case.  Since, as the Court will explain below, United States law will not govern the merits of the Plaintiffs' claims, but Irish law will for a significant number of claims, this factor weighs strongly in favor of Ireland as a more convenient forum because the litigation costs will be substantially less in Ireland.

### iii.   Enforceability of Class Judgments

A final private factor the Court considers is the reality that many European courts do not recognize the class action mechanism and may, if a class judgment is rendered, decline to enforce a judgment in favor of absent class members.  *See, e.g.*, *In re Air*

---

[19]     Moreover, as the Court explains in the public factors discussion below, neither Florida nor New York law will apply to the question of standing.  It is likely that Ireland will apply its local law to a substantial number of the claims in this case, and an important public factor consideration is that the forum whose law governs should ordinarily be the one that tries the case.

*Cargo Shipping Servs. Antitrust Litig.*, No. 06-MD-1775, 2008 WL 5958061, at *28 (E.D.N.Y. Sept. 26, 2008). This consideration also weighs in favor of trying the case in Ireland because the Plaintiffs, if successful here, might obtain a judgment that could not be enforced and in the process squander the parties' time and money on a trial whose outcome would be largely irrelevant for the vast majority of the class Plaintiffs.

      **C.    Public Factors**

          **1.      Choice of Law & Application of Foreign Law**

      Choice of law considerations, particularly the application of foreign rules of decision, are an important public factor in considering a motion to dismiss for *forum non conveniens*. *Magnin v. Teledyne Cont'l Motors*, 91 F.3d 1424, 1430 (11th Cir. 2002) (stating that it is "[f]ar better that the case be tried . . . by one or more jurists as familiar with [the foreign] law as we are unfamiliar with it"). The Court does not, and need not, decide which nations' laws would apply to which claims. Such claim-by-claim analysis would defeat one of the purposes of *forum non conveniens*, which is to avoid knotty conflicts of law issues. It is clear, however, that Irish law will apply to many, if not most, of the claims at issue in this case, and that United States law is unlikely to apply at all. In such a case, the "Supreme Court has suggested firmly that, unless there is some idiosyncracy in the facts of a case to be resolved under foreign law, it should ordinarily be dismissed in favor of a foreign tribunal." *Sigalas*, 776 F.2d at 1520 (citing *Piper Aircraft*, 454 U.S. at 251, 260); *see also King*, 562 F.3d at 1384 (affirming *forum non conveniens* dismissal to Italy after district court concluded that Italian law would control numerous issues in the case).

      If this case proceeded on its present trajectory valuable judicial resources would be consumed deciding choice of law questions. The parties do not agree on which state's choice of law rules should apply, much less what the substantive rules of decision should be for the individual claims in this case. The Plaintiffs contend that New York's choice of law rules apply because of the one action that was transferred from New York and consolidated with the two Florida cases. The Defendants argue that Florida's choice of law rules govern. Meanwhile, on the issue of whether the Plaintiffs' claims are derivative of the corporation's rights (and therefore cannot be brought directly by the Plaintiffs), the Defendants claim that Bahamian law governs because under the "internal affairs

doctrine" the law of the state of incorporation governs the threshold question of whether the Plaintiffs' claims are derivative.  *See Int'l Ins. Co. v. Johns*, 874 F.2d 1447, 1458 n.19 (11th Cir. 1989) (applying § 309 of the Second Restatement of Conflicts, "which provides that the law of the state of incorporation governs the liabilities of the officers or directors to the corporation").  And on the issue of whether the Defendants owed the Plaintiffs a duty of care under tort law, several Defendants claim that Irish law applies. The HSBC Defendants claim that Irish law also applies to the Plaintiffs' unjust enrichment claim.

The Plaintiffs argue that New York law supplies the rules of decision for all their common law claims but under modern choice of law principles it is difficult to see how this could be.  *See, e.g.*, *Schultz v. Boy Scouts of Am.*, 480 N.E.2d 679, 684 (N.Y. 1985) (applying an "interest analysis" to determine choice of law in tort actions); *Bishop v. Fla. Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980) (adopting the "significant relationships test" set forth the Second Restatement of Conflicts §§ 145-46).  At oral argument, the Plaintiffs agreed that the choice of law analysis is essentially the same under either Florida or New York law and is properly analyzed by weighing factors set forth in the Second Restatement of Conflicts to determine which forum has the most significant relationship to the parties and occurrences that are the subject of the tort. These factors include "(a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil[e], residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered."  *Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007).  According to the comments to the Restatement, the state whose interests are most deeply affected by the dispute should apply its law.  Second Restatement of Conflicts § 6, cmt. f.; *see also Judge v. Am. Motors Corp.*, 908 F.2d 1565, 1569-70 (11th Cir. 1990) (court should apply the law of the forum with the greatest interest in applying its own law).

Plaintiffs argue that all of these factors point to the application of New York common law.  The Court disagrees.  Although the factors may not necessarily dictate that a single nation's laws govern every claim, choice of law principles clearly favor the application of Irish or Bahamian law (over New York law) to this dispute.

First, the injury most likely occurred in the Bahamas where the Optimal funds were incorporated and where their value plummeted following the revelation that Madoff was operating a Ponzi scheme.  Alternatively, the injury may have occurred in the Plaintiffs' respective domiciles, none of which are the United States.  The Court does not agree with the Plaintiffs that the injury occurred in New York simply because Madoff was located there.

Second, the place where the conduct giving rise to the injuries occurred is not New York.  For Plaintiffs to succeed on their various claims they must prove that the Defendants' conduct—not Madoff's—caused their injury.  In other words, because the Plaintiffs' claims are predicated on the Defendants' failure to conduct proper due diligence, the relevant acts or omissions must have occurred where the Defendants are located.  The relevant relationships in this litigation, as in all litigation, are the relationships between the Plaintiffs and the Defendants, not the Plaintiffs and Madoff, who is not a party to this lawsuit.  Madoff's actions are simply not the crux of this litigation.  If Madoff's actions alone caused the Plaintiffs' injury then the Plaintiffs have no viable claims against the Defendants.  In other words, the theory on which the Plaintiffs' case rests is that the Defendants' actions caused their substantial injury.  Therefore, the Court must look to the conduct of the Defendants, not to Madoff, in determining the place where the conduct causing the injury is centered.

Third, the Court considers the location of the parties.  This again favors Ireland because it is home to the largest share of parties to this action.  The only Defendant that is a citizen of New York is PWC LLP, which appears to be, at best, a minor player in this litigation.[20]  The most significant contact with New York appears to be that of Optimal Investment Services, which maintained a satellite office and conducted diligence on Madoff in New York.  But this contact with New York is far outweighed by the fact that all of the Plaintiffs and most of the Defendants are domiciled and located elsewhere, mostly in Europe, and that these parties' relevant conduct occurred in their home countries.

---

[20]     As previously noted, the Court must reject the allegation that the PWC entities act as a unitary organization because of the Defendants' uncontroverted affidavit to the contrary.

Finally, the Court considers the place where the relationship of the parties is centered. This again points to Ireland (where the Optimal funds' auditor, custodian, administrator, and a key director were located) or the Bahamas (where the funds were incorporated). This factor does not point to New York or anywhere else in the United States. Only half of the Plaintiffs (Mar Octava, San Javier, and Valdez) maintained a relationship with Banco Miami, which is located in Florida not New York, and even then they did so for the purpose of investing in an off-shore fund.[21] The Court will not speculate as to the precise reasons why the Plaintiffs decided to invest in an off-shore fund closed to American citizens and residents. But when the Plaintiffs purposefully choose to invest outside of the United States, it cannot simultaneously be maintained that their relationship is centered here. Moreover, the other three Plaintiffs (Testa, Puado, and Int'l Harvestor) invested through foreign banks and had no relationship with the United States whatsoever. As further evidence that the parties' relationship is not centered in the United States, these Plaintiffs' account agreements contained forum selection clauses requiring them to bring suit in Switzerland or the Bahamas. Thus, there may be multiple centers in the parties' relationship. Ireland may be the best candidate for the center of the parties' relationship, but the Bahamas, Switzerland, and Spain are also distinct possibilities. The United States, however, is not. The Court cannot imagine any scenario in which applicable choice of law principles would point to the application of United States law. The more likely scenario is that the Court would be required to apply foreign law (and very likely the foreign law of multiple nations) in determining class certification issues and in instructing a jury.

Plaintiffs cite *Cromer Finance v. Berger*, 137 F. Supp. 2d 452, 479-80 (S.D.N.Y. 2001), for their proposition that New York law should apply. *Cromer*, a pre-*Morrison* decision, exercised subject matter jurisdiction over securities fraud claims under the recently retired conduct and effects tests. As discussed above, Plaintiffs' securities fraud claims do not survive the transactional test that *Morrison* adopted. The district court in *Cromer* applied New York law to claims by plaintiffs from the British Virgin Islands and

---

[21]     At most, therefore, United States law would apply to the claims brought by three Plaintiffs against a single Defendant and, even then, the law to be applied would be Florida law, not New York law as the Plaintiffs claim.

Netherlands Antilles against a Bermudan auditor.  The district court based its choice of law analysis on the fact that New York was the locus of the alleged fraud, the defendant auditor allegedly acted in furtherance of that fraud, and New York had a strong interest in regulating a company that performed audit work connected with New York.  *Cromer Fin.*, 137 F. Supp. 2d at 492-93.

To the extent that *Cromer* may survive *Morrison*, the Court respectfully declines to adopt the reasoning of *Cromer*.  Perhaps because of the presence of federal securities fraud claims, which no longer exist in this action (and likely would not on the facts presented in *Cromer*), *Cromer* may have overweighed New York's interest in the choice of law analysis.  In any event, the United States' interest in preventing fraud has already been validated by Madoff's effective life sentence, and the Court finds that the Defendants' own domiciles, particularly Ireland, which is home to the largest share of Defendants in this action, have a far greater interest in regulating the foreign transactions at issue in this case.  As previously explained, the relevant relationships in this case are the relationships between each plaintiff and each defendant, not the relationship between the parties and Madoff.  Viewed in this light, it is difficult to see how the relevant relationships can be described as centered in New York, or anywhere in the United States.  Moreover, the reasoning in *Cromer* logically undermines the comity interests articled by *Morrison* which, unlike *Cromer*, is binding authority on this Court.

In sum, this action involves entirely foreign Plaintiffs suing mostly foreign Defendants over foreign securities, and the probability is that foreign law will apply to the Plaintiffs' claims.  The difficulty and resource-intensive analysis inherent in complex choice of law determinations is itself a factor that favors *forum non conveniens* dismissal. *La Seguridad*, 707 F.2d at 1307 (public factors bearing on the forum's interest include, in addition to the application of foreign law, the "difficulties attendant resolving conflict-of-laws problems"); *see also Gulf Oil*, 330 U.S. at 509 ("There is an appropriateness, too, in having the trial of a diversity case in a forum that is at home with the state law that must govern the case, rather than having a court in some other forum untangle problems in conflict of laws, and in law foreign to itself.")

The Court, of course, has no special knowledge of Irish or Bahamian law.  The Court does, however, have experience in cases that hinge on foreign law.  Invariably the

parties produce experts who disagree on what the law of the foreign jurisdiction is, and proving foreign law becomes a difficult, costly and time-intensive process.  In addition, if this case proceeded to trial the Court would have to instruct a jury on a law that is both foreign to the Court and to the jurors.  But that is not all.  In all likelihood the Court would have to instruct the jury on different substantive laws for different Defendants, and the jurors would potentially have to keep track of different standards of care and different requirements for providing negligence and fraud.  These conflicts and choice of law concerns strongly favor dismissal.

### 2.    Interests of Respective Forums in Resolving this Dispute

Of course, the Court is fully capable of determining and applying foreign law, and in an appropriate case the Court would do so and would instruct a jury accordingly.  But this is not such a case.  Just as principles of comity dictate that the United States should not apply its laws to this foreign dispute, they also counsel that the United States should not referee a contest between foreign plaintiffs and major banks and financial services institutions of foreign nations.

One of the Plaintiffs' main public factor arguments for trying this case in the United States, that is, applying federal securities law and preventing fraud, was mooted by *Morrison*.  130 S. Ct. at 2886 ("While there is no reason to believe that the United States has become the Barbary Coast for those perpetrating frauds on foreign securities markets, some fear that it has become the Shangri-La of class-action litigation for lawyers representing those allegedly cheated in foreign securities markets.").

The United States' interest in policing conduct within its borders has been affirmed already with the prosecution of Madoff, who will spend the remainder of his life in a federal prison.  Furthermore, the Securities and Exchange Commission is fully capable of validating the United States' interest in policing the securities market by bringing suit on its own, which it has already done.  *See e.g.*, *SEC v. Cohmad Sec. Corp.*, No. 09 Civ. 5680(LLS), 2010 WL 363844 (S.D.N.Y. Feb. 1, 2010) (bringing suit against defendants for alleged participation in Madoff's Ponzi scheme).  As is common knowledge, numerous lawsuits have also been filed by domestic plaintiffs asserting domestic causes of action arising out of the unfortunate Madoff affair.  The United States has ample mechanisms in place to punish fraudulent conduct; it is not necessary for

foreign plaintiffs to bring lawsuits in our courts in order to validate those interests. In fact, it is apparent from the briefing that the Plaintiffs' choice of forum rests largely on the procedural mechanisms available to Plaintiffs in the United States, such as the opt-out class action and contingency fee arrangements. The want of these processes does not render Ireland an unavailable or less convenient forum.

Furthermore, the Plaintiffs did not have a reasonable expectation of a United States venue for claims arising out of their investment in the Optimal funds. All of them purchased shares in a foreign fund with foreign directors, a foreign investments manager, a foreign custodian, a foreign administrator, and a foreign auditor. And, of course, the Plaintiffs themselves are all foreign. In addition, half of the Plaintiffs, in account agreements with their Banco Santander affiliate banks, explicitly agreed to forum selection provisions requiring them to sue in forums other than the United States.

Ireland's interest in adjudicating this dispute is much greater than that of the United States. Ireland is home to PWC Ireland, the HSBC Defendants, and director Wilkinson. The allegations against these Defendants are much more substantial than those against the United States Defendants. Of all the PWC entities, only PWC Ireland was actually engaged to audit one of the Optimal funds. Ireland has a significantly greater interest in adjudicating claims against these Defendants. "When the action is based on facts occurring in [another] jurisdiction, the interest of that sovereign favors dismissal of the action." *Chazen v. Deloitte & Touche, LLP*, 247 F. Supp. 2d 1259, 1268 (N.D. Ala. 2003) (citing *Satz*, 244 F.3d at 1284). Ireland's sovereign interest in regulating major financial services institutions within its borders clearly outweighs the United States' nominal interests in what is essentially a foreign dispute, albeit with a minimal and not particularly significant connection to the United States.

### 3. Judicial Resources, Jury Services & Other Administrative Problems

Finally the Court considers the administrative burdens that would accompany trying this case in Miami. The Court does not consider this to be a critical factor in the analysis. If there were a clear basis for personal jurisdiction over all defendants and subject matter jurisdiction, the forum had an interest in regulating the relevant transactions, and United States law would apply, the Court would try the case no matter the administrative burdens. To the extent that this factor is relevant, it merely

reemphasizes the Court's prior conclusion that because this forum has only a minor connection to the controversies underlying this litigation it would be a waste of judicial resources to try the case here.

As such, the Court finds that holding a trial here in Miami would unduly burden this Court and jurors with adjudicating claims that have, at best, only a tangential connection to this forum. The Court does not believe that this forum has a sufficient interest in the litigation to require a jury to sit through a protracted trial and instruct the jury on the laws of foreign countries for claims between overwhelmingly foreign parties. "Jury duty is a burden that ought not to be imposed upon the people of a community which has no relation to the litigation." *Gulf Oil*, 330 U.S. at 508-09.

Therefore, the Court finds that the Defendants have met their burden of demonstrating that Ireland is an adequate alternative forum and that the relevant private and public factors weigh strongly in favor of *forum non conveniens* dismissal in favor of Ireland.

## VI.    Conclusion

For the reasons set forth above, the Court finds that it lacks personal jurisdiction over PWC Ireland, the HSBC Defendants, PWC Bermuda, Anthony Inder Rieden, and Brian Wilkinson, and that the case should be dismissed for *forum non conveniens* in favor of Ireland as a more convenient forum. It is therefore

ORDERED AND ADJUDGED that the motions to dismiss for lack of personal jurisdiction by PWC Ireland, the HSBC Defendants, PWC Bermuda, Anthony Inder Rieden, and Brian Wilkinson are GRANTED; it is further

ORDERED that this case is dismissed for *forum non conveniens* with the following conditions:

1.    The Defendants shall submit to personal jurisdiction in Ireland;

2.    The Defendants shall waive all statute of limitations defenses that had not expired at the time the complaint in the first-filed consolidated case (09-20215) was filed;

3.    The Defendants' consents to personal jurisdiction in Ireland and waiver of statute of limitations defenses shall be valid for all named Plaintiffs in any of the three original complaints; and

4.      The Court retains jurisdiction in the event that any of the Defendants fail to comply with the foregoing conditions.

DONE AND ORDERED in Chambers, at Miami, Florida, July 30, 2010.

Paul C. Huck
United States District Judge

Copies furnished to:
Counsel of Record